1   Brian A. Vogel (No. 167413)
    E-Mail: brian@bvogel.com
2   Heather A. Quest (No. 186740)
    E-Mail: heather@bvogel.com
3   THE LAW OFFICES OF BRIAN A. VOGEL, PC
    770 County Square Drive, Suite 104
4   Ventura, California 93003
    Telephone: (805) 654-0400
5   Facsimile: (805) 654-0326

6

7   Barrett S. Litt (No. 45527)
    E-Mail: blitt@kmbllaw.com
8   David S. McLane (No. 124952)
    E-Mail: dmclane@kmbllaw.com
9   KAYE, McLANE, BEDNARSKI & LITT, LLP
    234 East Colorado Boulevard, Suite 230
10  Pasadena, California 91101
    Telephone: (626) 844-7660
11  Facsimile: (626) 844-7670

12  Attorneys for Plaintiffs

13
14                      **UNITED STATES DISTRICT COURT**
                        **CENTRAL DISTRICT OF CALIFORNIA**
15

16  M.S., an Individual by and through      Case No. 16-03084-BRO-RAO
    his Guardian Ad Litem, MARY
17  RODGERS-VEY,  *et al.*,                 [Hon. Beverly R. O'Connell]

18
                    Plaintiffs,             **PLAINTIFFS' REQUEST FOR**
19                                          **JUDICAL NOTICE IN SUPPORT OF**
20                  vs.                     **THEIR OPPOSITION TO**
                                            **DEFENDANTS' MOTIONS TO**
21  COUNTY OF VENTURA, *et al.*,            **DISMISS; MEMORANDUM OF**
                                            **POINTS AND AUTHORITIES;**
22                                          **DECLARATION OF DAVID S.**
                    Defendants.             **McLANE**
23

24
                                           DATE:        February 27, 2017
25                                         TIME:        1:30 p.m.
26                                         CRTRM:       350 W. 1st St., Rm. 7C

27
28

TO THE COURT, TO ALL PARTIES AND TO THEIR ATTORNEYS OF

RECORD:

Pursuant to Federal Rule of Evidence 201, Plaintiffs, by and through their

attorneys of record, hereby request the Court to take judicial notice of the

following facts:

PLEASE TAKE NOTICE that on February 27, 2017, at 1:30 p.m., or as

soon thereafter as the matter may be heard in Courtroom 7C of the above-entitled

Court, located at 350 West 1st Street, Los Angeles, California, 90012, Plaintiffs

Mary Rodgers-Vey as Guardian Ad Litem for M.S., and Adrian Mojica, Guardian

Ad Litem for O.M., will, and hereby do, request that the Court consider the

following documents filed of record in ruling on Defendants' Motions to Dismiss

Plaintiffs' First Amended Complaint:

1. Senate Bill 863, Adult Local Criminal Justice Facilities Construction

Financing Program Proposal Form. For security reasons, site plans,

diagrams and maps of the layout of the current and proposed facilities on

Bates page numbers 65, 102, 111, 114, 120, 221, 245 and 246 have been

redacted. In addition, the document has been Bates numbered in its

entirety, pages 1 through 281 for ease of reference. Exh. 1.

2. Ventura County Grand Jury 2015-2016, Final Report: Annual Detention

Facilities and Law Enforcement Issues. Dated May 24, 2016. The

document is numbered 1 through 17. Exh. 2.

The Court previously granted Plaintiffs' request for judicial notice in support

of Plaintiffs' opposition to Defendants' motions to dismiss. (Dkt. 62, pp. 10, 11).

Plaintiffs request judicial notice again of these two documents in support of its

oppositions to the Motions to Dismiss.

Additionally, Plaintiffs request judicial notice of the following two exhibits:

1

3. California Legislative Analyst Report, "An Alternative Approach: Treating the Incompetent to Stand Trial", dated January 3, 2012. Exh. 3.

4. City News Group article detailing expansion of restoration of competency program, San Bernardino County, dated August 31, 2015, quoting Defendant Ahlin about the San Bernardino County ROC program). Exh. 4.

The grounds for the request are that the foregoing may be judicially noticed are that the documents are part of the official records of the Ventura County Board of Supervisors, the State of California Legislative Analyst office, and a news article where Defendant Ahlin is quoted, they are not reasonably subject to dispute, and their authenticity of both the facts set therein and the statements set forth therein are easily verifiable, and are relevant to Plaintiffs' oppositions to all Defendants' motions to dismiss the First Amended Complaint.

Dated: January 20, 2017          LAW OFFICES OF BRIAN A. VOGEL, PC

                                 By:  /s/  Brian A. Vogel
                                        Brian A. Vogel

Dated: January 20, 2017          KAYE, McLANE, BEDNARSKI & LITT, LLP

                                 By:  /s/  Barrett S. Litt
                                        Barrett S. Litt
                                     Attorneys for Plaintiffs

2

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## MEMORANDUM OF POINTS AND AUTHORITIES

Rule 12(b)(1) of the Federal Rules of Civil Procedure allows for dismissal of a complaint when there is a "lack of jurisdiction over the subject matter" of the suit. Fed. R. Civ. P. 12(b)(1).  A Rule 12(b)(1) jurisdictional attack may be facial or factual.  *White v. Lee,* 227 F.3d 1214, 1242 (9th Cir. 2000) In a "facial attack," the court's inquiry generally is confined to the allegations in the complaint.  *Id.*  By contrast, in a "factual attack," the court may consider extrinsic evidence such as affidavits or other evidence necessary to decide a jurisdictional issue.  *Maya v. Centex Corp,* 658 F.3d 1060, 1067 (9th Cir 2011).

In ruling on a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, the court may take judicial notice "of 'matters of public record' without converting a motion to dismiss into a motion for summary judgment."  *United States v. 14.02 Acres of Land,* 547 F.3d 943, 955 (9th Cir. 2008) *(citing Lee v. City of Los Angeles,* 250 F.3d 668, 688 (9th Cir. 2001).  *Accord, Green v. Uribe,* 2010 U.S. Dist. LEXIS 81444, *1, n. 1(C.D. Cal August 6, 2010) ("[t]he Court takes judicial notice of such 'matters of public record,'" citing *Lee*).

The Court has already taken judicial notice of Exhibits 1 and 2. (Dkt. 62, pp. 10-11).  With respect to Exhibits 3 and 4, the Legislative Analyst report is a matter of public record and, as such, may be judicially noticed.  The news article detailing Pam Ahlin's direct role in dealing with the delays in admissions of IST's into state hospitals is easily verifiable, and is an admission by her, and thus reliable.  These records are relevant to Plaintiffs' oppositions to Defendants' motions to dismiss the Second Amended Complaint.  The document confirms that there are inadequate facilities and staff available to provide adequate care and treatment to pre-trial detainees in the Ventura County Sheriff's Office Jail who have been found to be incompetent to stand trial.

3

CONCLUSION

Plaintiffs therefore respectfully request that the Court take judicial notice of Senate Bill 863, Adult Local Criminal Justice Facilities Construction Financing Program Proposal Form and the Ventura County Grand Jury 2015-2016, Final Report: Annual Detention Facilities and Law Enforcement Issues in consideration of Plaintiffs' opposition to Defendants' motion to dismiss the First Amended Complaint.

Dated: January 20, 2017          LAW OFFICES OF BRIAN A. VOGEL, PC

                                 By:  /s/   Brian A. Vogel_____
                                          Brian A. Vogel


Dated: January 20, 2017          KAYE, McLANE, BEDNARSKI & LITT, LLP

                                 By:  /s/  Barrett S. Litt_____
                                          Barrett S. Litt
                                       Attorneys for Plaintiffs

4

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## DECLARATION OF DAVID S. McLANE

I, DAVID S. McLANE, declare as follows:

1.     I am an attorney duly licensed and admitted to practice law in all courts of the State of California, including the United States District Court for the Central District of California.

2.     I make this declaration based upon information personally known to me.  If called to do so, I could and would testify competently to the facts set forth below.

3.     Attached hereto and made a part hereof as Exhibit 1 is a true and correct copy of Senate Bill 863, Adult Local Criminal Justice Facilities Construction Financing Program Proposal Form, Bates numbered pages 1 through 281.

4.     Attached hereto and made a part hereof as Exhibit 2 is a true and correct copy of Ventura County Grand Jury 2015-2016, Final Report: Annual Detention Facilities and Law Enforcement Issues, numbered 1 through 17.

5.     Attached hereto and made part hereof as Exhibit 3 is a true and correct copy of the California Legislative Analyst Report, "An Alternative Approach: Treating the Incompetent to Stand Trial," dated January 3, 2012.

6.     Attached hereto and made part hereof as Exhibit 4 is a true and correct copy of the City News Group article detailing expansion of restoration of competency program, at the San Bernardino County Jail, dated August 31, 2015, quoting defendant Ahlin about the San Bernardino ROC program).

I declare under penalty of perjury under the laws of the United States and the State of California, that the foregoing is true and correct.

Dated: January 20, 2017          By:  /s/  David S. McLane

David S. Mclane

5

**EXHIBIT 1**



**SENATE BILL 863, ADULT LOCAL CRIMINAL JUSTICE FACILITIES CONSTRUCTION FINANCING PROGRAM PROPOSAL FORM**

*This document is not to be reformatted.*

## SECTION 1: PROJECT INFORMATION

| A.  APPLICANT INFORMATION AND PROPOSAL TYPE | |
|---|---|
| COUNTY NAME<br>Ventura | <u>STATE</u> FINANCING REQUESTED<br>$ 55,137,000 |

| SMALL COUNTY<br>(200,000 and UNDER GENERAL COUNTY POPULATION) ☐ | MEDIUM COUNTY<br>(200,001 - 700,000 GENERAL COUNTY POPULATION) ☐ | LARGE COUNTY<br>(700,001 + GENERAL COUNTY POPULATION) ☒ |
|---|---|---|

| TYPE OF PROPOSAL –  INDIVIDUAL COUNTY FACILITY /REGIONAL FACILITY<br>PLEASE CHECK ONE (ONLY): | |
|---|---|
| INDIVIDUAL COUNTY FACILITY ☒ | REGIONAL FACILITY ☐ |

| B:  BRIEF PROJECT DESCRIPTION |
|---|
| FACILITY NAME<br>Todd Road Jail Health and Programming Unit |
| PROJECT DESCRIPTION<br>New Construction of a 64 Bed Housing, Clinic, and Programming Unit for Inmates with Medical and Mental Health Needs |
| STREET ADDRESS<br>600 S. Todd Road |

| CITY<br>Santa Paula | STATE<br>CA | ZIP CODE<br>93060 |
|---|---|---|

| C.  SCOPE OF WORK – INDICATE FACILITY TYPE <u>AND</u> CHECK ALL BOXES THAT APPLY. | | | |
|---|---|---|---|
| FACILITY TYPE (II, III or IV)<br>II | ☒ NEW STAND-ALONE FACILITY | ☐ RENOVATION/ REMODELING | ☐ CONSTRUCTING BEDS OR OTHER SPACE AT EXISTING FACILITY |

| D.  BEDS CONSTRUCTED – Provide the number of BSCC-rated beds and non-rated special use beds that will be subject to construction as a result of the project, <u>whether remodel/renovation or new construction.</u> | | | | |
|---|---|---|---|---|
|  | A.   MINIMUM SECURITY BEDS | B.   MEDIUM SECURITY BEDS | C.   MAXIMUM SECURITY BEDS | D.   SPECIAL USE BEDS |
| Number of beds constructed |  |  |  | 64 |
| TOTAL BEDS (A+B+C+D) | 64 (Represents a rated capacity increase of 0 beds). | | | |

P000001

## E. APPLICANT'S AGREEMENT

By signing this application, the authorized person assures that: a) the County will abide by the laws, regulations, policies, and procedures governing this financing program; and, b) certifies that the information contained in this proposal form, budget, narrative, and attachments is true and correct to the best of his/her knowledge.

PERSON AUTHORIZED TO SIGN AGREEMENT

NAME Geoff Dean                          TITLE Sheriff

AUTHORIZED PERSON'S SIGNATURE                          DATE 8/12/15

## F. DESIGNATED COUNTY CONSTRUCTION ADMINISTRATOR

This person shall be responsible to oversee construction and administer the state/county agreements. (Must be county staff, not a consultant or contractor, and must be identified in the Board of Supervisors' resolution.)

COUNTY CONSTRUCTION ADMINISTRATOR

NAME Jeff Pratt                          TITLE Public Works Director

| DEPARTMENT | | TELEPHONE NUMBER | |
| --- | --- | --- | --- |
| Ventura County Public Works | | 805-654-2073 | |

STREET ADDRESS
800 S. Victoria Avenue

| CITY | STATE | ZIP CODE | E-MAIL ADDRESS |
| --- | --- | --- | --- |
| Ventura | CA | 93009 | Jeff.Pratt@ventura.org |

## G. DESIGNATED PROJECT FINANCIAL OFFICER

This person is responsible for all financial and accounting project related activities. (Must be county staff, not a consultant or contractor, and must be identified in the Board of Supervisors' resolution.)

PROJECT FINANCIAL OFFICER

NAME Paul Derse                          TITLE Chief Financial Officer

| DEPARTMENT | | TELEPHONE NUMBER | |
| --- | --- | --- | --- |
| Chief Executive Office | | 805-662-6792 | |

STREET ADDRESS
800 S. Victoria Avenue

| CITY | STATE | ZIP CODE | E-MAIL ADDRESS |
| --- | --- | --- | --- |
| Ventura | CA | 93009 | Paul.Derse@ventura.org |

## H. DESIGNATED PROJECT CONTACT PERSON

This person is responsible for project coordination and day-to-day liaison work with the BSCC. (Must be county staff, not a consultant or contractor, and must be identified in the Board of Supervisors' resolution.)

PROJECT CONTACT PERSON

NAME Ronald Nelson                          TITLE Sheriff's Commander

| DEPARTMENT | | TELEPHONE NUMBER | |
| --- | --- | --- | --- |
| Ventura County Sheriff's Office | | 805-933-8505 | |

STREET ADDRESS
800 S. Victoria Avenue

| CITY | STATE | ZIP CODE | E-MAIL ADDRESS |
| --- | --- | --- | --- |
| Ventura | CA | 93009 | Ronald.Nelson@ventura.org |

## SECTION 2: BUDGET SUMMARY

### Budget Summary Instructions

Definitions of total project costs for purposes of this program (state reimbursed, county cash contribution, and county in-kind contribution) can be found in the "Budget Considerations" page 22 of the Senate Bill (SB) 863, Construction of Adult Local Criminal Justice Facilities (ALCJF's) Request for Proposals (RFP). The county cash and in-kind contributions are collectively the county contribution. Those defined costs in the RFP shall be the guide for accurately completing this budget summary section.

In the Budget Summary Table that follows in part D of this section, indicate the amount of state financing requested and the amount of cash and/or in-kind contributions allotted to each budget line-item, in total defining the total project costs. It is necessary to fully include each eligible project cost for state-reimbursed, county cash, and county in-kind contribution amounts.

The in-kind contribution line items represent only county staff salaries and benefits, needs assessment costs, transition planning costs and/or current fair market value of land. An appraisal of land value will only be required after conditional award and only if land value is included as part of the county's contribution.

The total amount of state financing requested cannot exceed 90 percent of the total project costs. The county contribution must be a minimum of 10 percent of the total project costs (unless the applicant is a small county petitioning for a reduction in the county contribution amount). County contributions can be any combination of cash or in-kind project costs. Small counties requesting a reduction in county contribution must state so in part A of this section. The County contribution must include all costs directly related to the project necessary to complete the design and construction of the proposed project, except for those eligible costs for which state reimbursement is being requested.

State financing limits (maximums) for all county proposals are as follows. For proposed regional ALCJF's, the size of the lead county determines the maximum amount of funds to be requested for the entire project:

- **$80,000,000** for large counties;
- **$40,000,000** for medium counties; and,
- **$20,000,000** for small counties.

**A.**     <u>**Under 200,000 Population County Petition for Reduction in Contribution**</u>

Counties with a population below 200,000 may petition the Board of State and Community Corrections (BSCC) for a reduction in its county contribution. This proposal document will serve as the petition and the BSCC Board's acceptance of the county's contribution reduction, provided the county abides by all terms and conditions of this SB 863 RFP and Proposal process and receives a conditional award. The county (below 200,000 population) may request to reduce the required match to an amount not less than the total non-state reimbursable projects cost as defined in Title 15, Division 1, Chapter 1, Subchapter 6, Construction Financing Program section 1712.3. If requesting a reduction in match contribution, check the box below to indicate the county's petition.

☐   **By checking this box the county hereby petitions for a contribution reduction request as reflected in the proposal budget.**

**B.**     <u>**Readiness to Proceed Preference**</u>

In order to attest that the county is seeking the readiness to proceed with the proposed project, the county included a Board of Supervisors' resolution doing the following: 1) identifying and authorizing an adequate amount of available matching funds to satisfy the counties' contribution, 2) approving the forms of the project documents deemed necessary, as identified by the board to the BSCC, to effectuate the financing authorized in SB 863 3) and authorizing the appropriate signatory or signatories to execute those documents at the appropriate times. The identified matching funds in the resolution shall be compatible with the state's lease revenue bond financing. Additionally see Section 6 "Board of Supervisors' Resolution" for further instructions.

☒   **This proposal includes a Board of Supervisors' Resolution that is attached and includes language that assures funding is available and compatible with state's lease revenue bond financing. <u>See below for the description of compatible funds.</u>**

*County Cash Contribution Funds Are Legal and Authorized*.  The payment of the county cash contribution funds for the proposed adult local criminal justice facility project (i) is within the power, legal right, and authority of the County; (ii) is legal and will not conflict with or constitute on the part of the County a material violation of, a material breach of, a material default under, or result in the creation or imposition of any lien, charge, restriction, or encumbrance upon any property of the County under the provisions of any charter instrument, bylaw, indenture, mortgage, deed of trust, pledge, note, lease, loan, installment sale agreement, contract, or other material agreement or instrument to which the County is a party or by which the County or its properties or funds are otherwise subject or bound, decree, or demand of any court or governmental agency or body having jurisdiction over the County or any of its activities, properties or funds; and (iii) have been duly authorized by all necessary and appropriate action on the part of the governing body of the County.

*No Prior Pledge*.  The county cash contribution funds and the Project are not and will not be mortgaged, pledged, or hypothecated by the County in any manner or for any purpose and have not been and will not be the subject of a grant of a security interest by the County.  In addition, the county cash contribution funds and the

Project are not and will not be mortgaged, pledged, or hypothecated for the benefit of the County or its creditors in any manner or for any purpose and have not been and will not be the subject of a grant of a security interest in favor of the County or its creditors.  The County shall not in any manner impair, impede or challenge the security, rights and benefits of the owners of any lease-revenue bonds sold by the State Public Works Board for the Project (the "Bonds") or the trustee for the Bonds.

*Authorization to Proceed with the Project*.  The Project proposed in the County's SB 863 Financing Program proposal is authorized to proceed in its entirety when and if state financing is awarded for the Project within the SB 863 Financing Program.

## C.   California Environmental Quality Act (CEQA) compliance

Has the county completed the CEQA compliance for the project site?

☒ **Yes. If so, include documentation evidencing the completion (preference points).**

☐ **No. If no, describe the status of the CEQA certification.**

**D.     Budget Summary Table (Report to Nearest $1,000)**

| LINE ITEM | STATE REIMBURSED | CASH CONTRIBUTION | IN-KIND CONTRIBUTION | TOTAL |
|---|---|---|---|---|
| 1.  **Construction** | $ 44,523,000.00 | $ 3,493,000.00 | | $ 48,016,000.00 |
| 2.  **Additional Eligible Costs\*** | $ 1,109,000.00 | $ 94,000.00 | | $ 1,203,000.00 |
| 3.  **Architectural** | $ 4,427,000.00 | $ 362,000.00 | | $ 4,789,000.00 |
| 4.  **Project/Construction Management** | $ 5,078,000.00 | $ 320,000.00 | | $ 5,398,000.00 |
| 5.  **CEQA** | $ 0.00 | $ 18,000.00 | | $ 18,000.00 |
| 6.  **State Agency Fees\*\*** | $ 0.00 | $ 141,000.00 | | $ 141,000.00 |
| 7.  **Audit** | | $ 0.00 | $ 15,000.00 | $ 15,000.00 |
| 8.  **Needs Assessment** | | $ 95,000.00 | $ 0.00 | $ 95,000.00 |
| 9.  **Transition Planning** | | $ 0.00 | $ 353,000.00 | $ 353,000.00 |
| 10. **County Administration** | | | $ 137,000.00 | $ 137,000.00 |
| 11. **Land Value** | | | $ 1,100,000.00 | $ 1,100,000.00 |
| **TOTAL PROJECT COSTS** | $ 55,137,000.00 | $ 4,523,000.00 | $ 1,605,000.00 | $ 61,265,000.00 |
| **PERCENT OF TOTAL** | 90.00% | 7.40% | 2.60% | 100.00% |

  \* Additional Eligible Costs: This line item is limited to specified fees and moveable equipment and moveable furnishings (eligible for state reimbursement or cash contribution), and public art (eligible for cash contribution only)

\*\* For State Agency Fees: State reimbursable costs include Real Estate Due Diligence only. State Fire Marshal fees may only be claimed as cash match.

Provide an explanation below of how the dollar figures were determined for <u>each</u> of the budget categories above that contain dollar amounts. Every cash contribution (match) line item shall be included with a reporting of the full amount budgeted unless a line item is not an actual cash contribution project cost for the county. (In that case, indicate so below.) For each budget category explanation below, include how state financing and the county contribution dollar amounts have been determined and calculated (be specific).

1.     **Construction (includes fixed equipment and furnishings) (state reimbursement/cash match):** Construction includes all materials and labor, bonds and insurance, contractors' fee, escalation to mid-point of construction, and construction contingency. Cost estimation was developed by HDR Architecture, Inc. and Cummings, LLC for this project.

2.     **Additional Eligible Costs (specified allowable fees, moveable equipment and furnishings, and public art)**

        a) **Define each allowable fee types and the cost of each:** Cost included are for

Building Permits, Surveys, and Geotechnical Reports, Plan Check and Building permit fees: $624,706.00 Taxes: $208,235.00

  b) **Moveable equipment and moveable furnishings total amount:** Furniture, Fixture, and Equipment (FFE) costs are included within the eligible costs. FFE total cost is $370,000.00

  c) **Public art total amount:** $0.00

3.  **Architectural(state reimbursement/cash match):**

  a) **Describe the county's current stage in the architectural process:** Ventura County has a site plan and a functional diagram in place to launch the design, along with CEQA completed. Ventura is using the Design-Bid-Build methodology and is ready to issue an RFP for design services.

  b) **Given the approval requirements of the State Public Works Board (SPWB) and associated state reimbursement parameters (see "State Lease Revenue Bond Financing" section in the RFP), define which portions/phases of the architectural services the county intends to seek state dollar reimbursement:** Design Professional Fees, and Architectural Construction Support and Administration, to be spent beginning in the Schematic Design through Construction phases.

  c) **Define the budgeted amount for what is described in b) above:** Ventura is requesting $4,427,122.00 as reimbursed by the state with costs that includes the full scope of services from the Architect of Record for developing and completing construction documents, bidding related services, and providing construction administration services through construction and project close-out.

  d) **Define which portion/phases of the architectural services the county intends to cover with county contribution dollars:** The County's contribution will be spent on design professional fees and Architectural Construction Support and Administration beginning in the Schematic Design through Construction phases.

  e) **Define the budgeted amount for what is described in d) above:** Cost includes design and engineering fees of $362,294.00 that will be part of the County Cash Contribution.

4.  **Project/Construction Management - Describe which portions/phases of the construction management services the county intends to claim as:**

  a) **Cash:** Specialty Inspection and testing: $1,041,177.00; Management and Inspection: $4,356,474.00

  b) **In-Kind:** $0.00

5.  **CEQA – may be state reimbursement (consultant or contractor) or cash match:** Planning and Permitting Fees: $18,000.00

6.  **State Agency Fees – Counties should consider approximate costs for the SFM review which may be county cash contribution (match). $16,000 for the due diligence costs which may be county cash contribution (match) or state reimbursement.** County Cash Contribution for State Fire Marshall Review: $125,000.00; and, Real Estate Due Diligence Fee: $16,000.00

7.  **Audit of Grant - Define whether the county is intending to use independent**

**county auditor (in-kind) or services of contracted auditor (cash) and amount budgeted:** County Auditor/Controller (in-kind): $15,000.00

8.   **Needs Assessment - Define work performed by county staff (in-kind), define hired contracted staff services specifically for the development of the needs assessment (cash match):** Ventura County contracted a consultant (HDR) to assist in writing the Needs Assessment; HDR cost to complete this was $94,580.00.

9.   **Transition Planning – Define work performed by county staff (in-kind), define the staff hired specifically for the proposed project (cash match):** County staff from Sheriff's Office (in-kind), is estimated to be approximately $353,000.00 over the life of the project.

10.   **County Administration – Define the county staff salaries/benefits directly associated with the proposed project.** Public Works Real Estate Division (Appraisal) $7,000, Public Works Building Officials: $28,000.00. County CEO: $102,000

11.   **Site Acquisition - Describe the cost or current fair market value (in-kind):** Appraised Land Value: $1,100,000.00

## SECTION 3: PROJECT TIMETABLE

Prior to completing this timetable, the county must consult with all appropriate county staff (e.g., county counsel, general services, public works, county administrator) to ensure that dates are achievable. Please consult the "State Public Works Board (State Capital Outlay Process)/Board of State and Community Corrections Processes and Requirements" section, page 30 of the RFP for further information. Complete the table below indicating start and completion dates for each key event, including comments if desired. Note the <u>required time frames</u> for specific milestone activities in this process. The BSCC Board intends to make conditional awards at its November 2015 board meeting.

| KEY EVENTS | START DATES | COMPLETION DATES | COMMENTS |
|---|---|---|---|
| Site assurance/comparable long-term possession <u>within 90 days of award</u> | 11/12/15 | 02/10/16 | Ready to proceed upon award |
| Real estate due diligence package submitted <u>within 120 days of award</u> | 11/12/15 | 03/11/16 | |
| SPWB meeting – Project established <u>within 18 months of award</u> | 11/12/15 | 05/12/17 | |
| Schematic Design with Operational Program Statement <u>within 24 months of award</u> (design-bid-build projects) | 11/12/15 | 08/1/16 | SOQ/RFP/Interview Selection/Award Contract/Plans/Section/ Elevations/Reviews |
| Performance criteria with Operational Program Statement <u>within 30 months of award</u> (design-build projects) | 11/12/15 | 05/12/18 | |
| Design Development (preliminary drawings) with Staffing Plan | 08/4/16 | 01/14/17 | Plans/Sections/Engineer/ Spec |
| Staffing/Operating Cost Analysis approved by the Board of Supervisors | 07/21/15 | 07/22/15 | Board Resolution 7/21/15 |
| Construction Documents (working drawings) | 01/15/17 | 07/29/17 | |
| Construction Bids or Design-Build Solicitation | 7/30/17 | 9/28/17 | |
| Notice to Proceed <u>within 42 months of award</u> | 9/29/17 | 10/29/17 | |
| Construction (maximum three years to complete) | 10/30/17 | 3/14/19 | |
| Staffing/Occupancy <u>within 90 days of completion</u> | 3/15/19 | 6/13/19 | |

## SECTION 4: FACT SHEET

To capture key information from Section 5: Narrative, applicants must complete this Fact Sheet.  Minimal information is requested. Narrative information or explanations are not to be included on this Fact Sheet nor as part of the tables in this section.  Explanations of what is provided in these tables may be included in the Narrative section of the Proposal Form. Proposal narratives may include reference back to one or more of these specific tables (e.g., refer to Table 4 in Section 4 Fact Sheet).

### Table 1: Provide the following information

| | | |
|---|---|---|
| 1. | County general population | 846,178 |
| 2. | Number of detention facilities | 3 |
| 3. | BSCC-rated capacity of jail system (multiple facilities) | 1,854 |
| 4. | ADP (Secure Detention) of system | 1,680 |
| 5. | ADP (Alternatives to Detention) of system | 111 |
| 6. | Percentage felony inmates of system | 73% |
| 7. | Percentage non-sentenced inmates of system | 60% |
| 8. | Arrests per month | 2,541 |
| 9. | Bookings per month of system | 2,288 |
| 10. | "Lack of Space" releases per month | 427 |

### Table 2: Provide the name, BSCC-rated capacity (RC) and ADP of the adult detention facilities (type II, III, and IV) in your jurisdiction (county)

| | Facility Name | RC | ADP |
|---|---|---|---|
| 1. | Ventura County Main Jail (Pre-Trial Detention Facility – PTDF) | 823 | 794 |
| 2. | Ventura Co Work Furlough | 235 | 67 |
| 3. | Todd Road Jail | 796 | 760 |
| 4. | | | |
| 5. | | | |
| 6. | | | |
| 7. | | | |
| 8. | | | |

| Table 3: List the current offender programming in place and the ADP in each program | |
| --- | --- |
| **Pre-Trial Program** | **ADP** |
| **1.** GED Classes | 68 |
| **2.** Life Skills | 12 |
| **3.** Alcoholics Anonymous & Narcotics Anonymous | 95 |
| **4.** Pre-Release Counseling (Inmates with Mental Health Disorders) | 76 |
| **5.** Computer Basics | 22 |
| **6.** Sheriff's Electronic Monitoring Program | 20 |
| **Sentences Offender Program** | **ADP** |
| **1.** Vocational: Print Shop | 6 |
| **2.** Re-Entry: Re-Entry Action Planning (RAP) | 67 |
| **3.** Treatment: 1170 Substance Abuse (Sentenced Inmates) | 5 |
| **4.** Changing Course journal | 2 |
| **5.** Food Safety and Food Handler Certificate | 20 |
| **6.** MRT (Sentenced Inmates) | 17 |

| Table 4: List of the offender assessments used for determining programming | |
| --- | --- |
| **Assessment tools** | **Assessments per Month** |
| **1.** Ohio Pretrial Risk Assessment Tool (ORAS) | 41 |
| **2.** Offender Reintegration Scale (ORS) | 20 |
| **3.** | |
| **4.** | |
| **5.** | |
| **6.** | |

## SECTION 5: NARRATIVE

**1. Statement of Need: What are the safety, efficiency, and offender programming and/or treatment needs addressed by this construction proposal? Please cite findings from the needs assessment (through 2019) submitted with this proposal.**

**PROJECT NEED**

The Ventura County (County) Sheriff's Office jail facilities have continued to experience operational challenges as a result of an inmate population with increasing chronic medical/mental health needs. The current medical/mental health housing for these inmates was built at the Pre-Trial Detention Facility (PTDF) in 1981. The PTDF was designed with 12 medical/mental health beds to serve a total inmate capacity of 400 in single-bunk cells. Shortly after opening, the PTDF was double-bunked, increasing the capacity, which currently has 823 Board of State and Community Corrections (BSCC) rated beds. The original medical/mental health housing was inadequate to support the facility's larger population. In response, double-bunking of the existing medical/mental health area and conversion of some office and dayroom space increased total facility medical/mental health housing to 32 beds. Even with this increase, the Sheriff's Office was forced to utilize a housing area designed for general population inmates to house the overflow of inmate-patients with mental health issues. This housing area has inadequate resources with which to provide necessary services to this population.

The County jail system also includes the East Valley Jail and the Todd Road Jail (TRJ). The East Valley Jail (Type I) was built in 1989 and has a total of 31 BSCC rated

P000012

beds. The TRJ was built in 1995 and currently has 796 BSCC rated beds. Neither of these facilities has any medical/mental health housing capacity.

All three County facilities have a combined BSCC rated capacity of 1,650. In 2014, the average daily population was 1,680 inmates. On a system-wide basis, only 2 percent of available beds are presently designed for inmates in need of medical or mental health treatment. The number of beds allocated for inmate-patients requiring treatment services falls short of meeting even minimal jail system needs.

In addition to the Sheriff-run jail facilities, County Probation (Probation) operates a Work Furlough facility for sentenced inmates. The facility has a rated capacity of 235 beds.  Work Furlough has an average daily population of 67 inmates; however, the facility is scheduled for closure in October 2015, and the majority of those inmates will be transitioned to the Sheriff's jail facilities.

Despite the recent passage of Proposition 47, jail system population levels in the County have not gone down and are, in fact, within 5 percent of historical highs. Accordingly, system crowding and its associated impact on limiting opportunities for dedicated housing strategies for special management populations remains an issue for the County.

Moreover, the population of inmates with chronic medical issues and severe and persistent mental illness housed in the County jail system continues to increase. A recent snapshot indicated there are currently 47 inmates-patients with serious medical conditions that require ongoing care. The number of inmates-patients with severe and persistent mental illness in custody has grown by 65 percent since the first quarter of calendar year 2011. Now, over 6 percent of the inmates in the County jail system have

P000013

been diagnosed and classified as having a severe and persistent mental illness. These 93 inmates have acute mental health conditions that require specialized housing and program services.

Additionally, during 2014, 18.9 percent of inmates in custody had a diagnosed mental illness, while the number of inmates prescribed psychotropic drugs for treatment of underlying mental health conditions and behavioral issues approached 25 percent of the population. Unfortunately, nearly one out of every five inmates diagnosed as requiring psychotropic medication does not comply with treatment requirements.

The jail system's 32 dedicated treatment beds do not provide adequate resources to manage and effectively treat these inmate-patients. This shortage of medical/mental health housing beds has resulted in the release of inmate-patients from medical beds back to general population housing prior to the completion of their medical treatment plans.

The population of inmates with severe and persistent mental illness that are housed in overflow housing often require separation from other inmates for their own protection. While the Sheriff's Office attempts to provide support and programming within the housing unit, the facility is not designed for treatment or for evidence-based programming, diminishing the effectiveness of the treatment provided.

Moreover, the housing unit is designed with an upper housing tier above the main floor. Over the course of the past several years, inmates have used the upper tier as a tool for suicide or self-harm.

In order to address this critical lack of medical/mental health beds in the jail system, the County proposes adding 64 non-rated medical/mental health beds through the

P000014

Senate Bill 863 (SB 863) RFP process. The proposed project will allow for more efficient use of the existing housing at the PTDF, as well as improve access to medical and behavioral health programs. In addition, the expansion of medical/mental health beds will allow for more effective use of overflow housing beds currently used for inmates with mental illness. The proposed project will also create an opportunity to develop dedicated veterans', senior, and positive-behavior housing units.

The proposed project will add 64 dedicated medical/mental health treatment beds to the County jail system. Although needs exceed this level, the proposed project is designed to meet program needs within an operational model that can be fiscally sustained by the County. Building more beds than the County can afford is not an option.

Utilizing data from the 2007 Ventura County Todd Road Jail Needs Assessment (2007 Needs Assessment), the 2011 Ventura County Todd Road Jail Feasibility Study for Medical and Mental Health Housing Unit (updated Needs Assessment), and a 2015 analysis of the County's jail population by CGL, the Sheriff's Office has identified a number of safety, efficiency, and inmate-patient programming/treatment needs for the County jail system that will be addressed by this proposal.

For example, the PTDF has safety cells that are located at the end of a hallway in an area that does not permit direct visual and audio observation. Officer's and nurse's stations are located at opposite ends of the housing unit, creating concerns for staff security, as visual supervision from the officer's work station to the nurse's work station does not provide a direct line of sight. Showers are located throughout the linear housing unit and not within individual housing units. This requires security escorts to

and from showers, creating inefficiencies in supervision and excessive movement of inmates within the facility. The linear housing design does not provide the level of visual supervision featured in modern, efficient medical/mental health housing. The lack of adequate programming space within the medical/mental health housing units requires treatment to take place in hallways.

In addition, the medical/mental health housing unit is located near an area with heavy traffic from within the main circulation area of the PTDF, creating undo stress on the mental health inmate-patient population. These security concerns and inefficiencies indicate a clear need for a new standalone medical/mental health facility at the TRJ.

The 2007 Needs Assessment examined the expansion of the TRJ and the needs of the medical/mental health inmate-patient population. The updated Needs Assessment determined that the construction of a new 64-bed medical/mental health facility, the TRJ Health and Programming Unit, would best meet the County jail system's need for increased treatment and programming space to manage the medical/mental health inmate-patient population.

The County is seeking, through SB 863, funding for a total project cost of $61,263,964 to build the TRJ Health and Programming Unit. ***The County has not received any AB 900 or SB 1022 construction funding in previous grant cycles. There are no other projects being planned or under construction.***

The County has spent much time and resources in preparation for an award of SB 863 funding and is ready to proceed with this project as outlined in this proposal. The County seeks funding preference for California Environmental Quality Act (CEQA) compliance, has provided the Board of Supervisors' resolution of approval, and has

P000016

submitted a budget that satisfies the County's financial contribution requirements. In addition, the County owns the land where the construction is proposed, has completed the conceptual facility design, and has submitted an updated Needs Assessment.

In evaluating current safety, efficiency, and offender programming and/or treatment needs, the Sheriff's Office has established the following goals for the County jail system:

*Safety*

- A safe, secure learning environment to allow the best opportunity for inmates to succeed, both while in custody and upon re-entry into the community

- Physical plant design features that create a safer environment for inmates focused on self-harm

*Efficiency*

- Efficiencies in the delivery of medical/mental health care, including additional space for easier access, observation, and evaluation by health care professionals

*Offender Programming/Treatment Needs*

- Expanded program space to allow for and assess, address, and transition appropriate medical/mental health inmate-patients into community settings that set them on a path to successful integration with our social services partners

- Expanded program space for new and additional evidence-based programs and practices and cognitive behavioral therapy for inmate-patients with various medical/mental health needs

- Sufficient modern beds for the medical/mental health inmate-patient population

P000017

- Appropriate housing to meet the current housing and classification requirements of the inmate population

***Updated Needs Assessment Findings***: The 2011 Medical Services Feasibility Study documents current conditions in the County's jail system specific to the medical/mental health needs of the County's inmate-patient population. Overall, the updated Needs Assessment used the following data sources to analyze jail system medical and mental health program issues:

- Jail statistics

- Medical and mental health caseloads

- Contracted medical provider staffing projections

- National trend data

The updated Needs Assessment includes a projection of future jail system population growth, which was then used as the basis for the development of three medical/mental health unit expansion concepts at the TRJ.

The 2015 County jail inmate population analysis performed by CGL shows that while the crime rate, adult arrests, and bookings have shown signs of stabilizing over the last five years, the jail population had been steadily increasing until Proposition 47 passed. Once passed, Proposition 47 produced an immediate decline in the inmate population within Ventura County. Since then, the jail population has steadily increased, and currently remains within 5 percent of historical highs.  Although there is less than one year of data since Proposition 47, it appears that the initial effects of Proposition 47 on the overall jail population numbers are diminishing over time.

P000018

The fact that the jail bookings have been relatively stable while there has been steady growth in the jail population indicates that the length of stay (LOS) has been growing within the County jail system. The majority of inmates are being charged or convicted with a felony level crime. While felons continue to be a substantial percentage of our inmate population, Proposition 47 is increasing the number of sentenced misdemeanants in custody. In addition, Probation appears to be flash incarcerating (a tool for managing realignment inmates by returning them to custody for short periods of time for probation violations) at a higher rate this year over last. "Flashed" inmates are also staying in custody longer. All of these factors are having a direct correlation to the LOS, causing it to steadily increase.



Approximately 2 percent of the inmate population is assigned to a specialized medical/mental health care bed, while the current need for the population that has been diagnosed with acute medical/mental health needs is around 5 percent. This current gap in need will only continue to widen, as those diagnosed with specialized medical/mental health needs has been on the increase for the last five years. Ventura

P000019

County has developed a schematic plan for a new medical/mental health housing unit to help provide the appropriate care, housing, and treatment for these inmate-patients, and through funding provided by SB 863 to build this new medical/mental health unit, the County can start the process of intensive treatment and care that is so desperately needed for the inmate-patients.

In developing the 10-year (2015-2025) forecast for specialized medical/mental health housing, the differential effects of the demographics, crime, juvenile and adult arrests, and booking data were applied to produce the projections. Among these factors, the most influential are the combination of adult arrests and bookings combined with the specialized medical/mental health care population growth at local County level, as well as growth trends on the national level, to produce the projected bed needs for the medical/mental health care population.

The overall County jail population growth over the next 10 years, absent significant changes in criminal justice policies, shows no real, substantial need for bed gains in the general population. There will, however, be long-term demographic pressures that will serve to increase the jail population as the at-risk medical/mental health population increases throughout jails in California counties and nationwide. Ventura County is not exempt from the growth anticipated in the specialized medical/mental health housing population and can continue to expect to see increases in bed needs centered around medical/mental health housing and treatment.

An analysis of the acute and sub-acute medical and mental health populations shows the total special needs population for the jail similarly stabilizing at around 135 inmates. Due to the specialized housing requirements of this population, a 15 percent

P000020

peaking and classification factor was applied to estimate the capacity required to ensure this population is properly housed, managed, and treated. The County is projecting a need for 155 beds in total by the year 2019 to house this specialized medical/mental health population.

**Projected Ventura County Jail Population**

**2015-2019**

| Year | Jail Population | Medical Population | Mental Health Population | Special Needs Population | Special Needs Population Capacity |
|------|------|------|------|------|------|
| 2015 | 1,673 | 33 | 100 | 133 | 153 |
| 2016 | 1,676 | 34 | 101 | 135 | 155 |
| 2017 | 1,671 | 33 | 100 | 133 | 153 |
| 2018 | 1,674 | 33 | 100 | 133 | 153 |
| 2019 | 1,675 | 34 | 101 | 135 | 155 |

With an understanding of future demands for special needs capacity, the updated Needs Assessment then moved to a comprehensive examination of existing facilities that assessed operations and the medical/mental health needs system wide. The updated Needs Assessment determined that the TRJ was the most fiscally and operationally appropriate location for construction and program development for a solution to the County's need for medical/mental health treatment housing. The updated Needs Assessment also developed how the proposed TRJ Health and Programming Unit can be integrated into overall facility operations efficiently and effectively, and how

P000021

the new construction can be implemented without disrupting ongoing operations. Finally, the updated Needs Assessment also identified (1) the custody and medical staffing requirements for the new TRJ Health and Programming Unit, (2) master planning options as to how the new medical/mental health services will fit into the approved master plan for the TRJ campus, (3) preliminary site investigations of the TRJ campus with regard to existing infrastructure and security systems that could be impacted by the addition of the new TRJ Health and Programming Unit, and (4) conceptual cost estimates.

The updated Needs Assessment supports the need for the expansion of the TRJ to increase capacity for medical/mental health services within the County jail system.

The proposed program specifically addresses the additional responsibilities placed on counties to house inmates for longer sentences. Currently, inmate-patients housed in the PTDF's medical/mental health housing do not have access to the higher level of programming that is available at TRJ, due to the PTDF facility's limitations. The TRJ was designed as a sentenced facility with the goal of providing inmate education and vocational opportunities, but lacks an appropriate housing unit for those with mental illness and the medical population. The expansion of medical/mental health capacity at the TRJ affords a more holistic approach to programming opportunities for those inmate-patients with medical/mental health needs by meeting the following goals:

- Provide a physical lay-out coupled with well-trained, professional, and competent staff that can handle specific needs of all medical/mental health inmate-patients.

- Allow adequate space for inmate-patients and staff to implement a medical/mental health re-entry program to be expanded.

P000022

- Provide a continuum of care not only while incarcerated, but through the time of release and beyond.

The Sheriff's Office has also identified the lack of housing as impacting the successful transition from jail to the community for the medical/mental health population. To assist in this transition, the Sheriff's Office is currently partnering with County Behavioral Health (Behavioral Health) to coordinate housing placement and continued treatment upon successful re-entry. Expanding the jail system's medical/mental health treatment and programming capacity will allow greater participation for this at-risk population, as well as allow the County to treat and serve more inmate-patients.

The Sheriff's Office has proven success in developing programs that reduce recidivism. Using a collaborative team approach, Sheriff's Office Inmate Services (Inmate Services) and staff from Behavioral Health partnered to develop an effective re-entry pilot program in 2010. The pilot group involved 57 inmates with substance abuse or mental health histories. The intensive programming, transitional planning, and community-based resources produced a significant drop in the rate of recidivism, from 89 percent to 55 percent.

The Sheriff's Office staff will continue to partner with members of Behavioral Health, County Human Services Agency, and the courts to identify community-based options for offenders with special mental health or medical needs who are close to re-entry into the community. The Sheriff's Office has found the most effective means of assuring the continued participation in the re-entry planning process is to combine in-custody incentives and strong support from the re-entry team, which also includes the public defender's sentencing specialist staff.

P000023

The new TRJ Health and Programming Unit will allow more program participation amongst medical/mental health inmate-patients, as the County currently does not have adequate programming/treatment space for this population.

**2. Scope of Work: Describe the areas, if any, of the current facility to be replaced or renovated, and the nature of the renovation, including the number of cells, offices, classrooms or other programming/treatment spaces to be replaced or added and the basic design of the new or renovated units.**

The proposed project addresses the lack of beds and programming space for the medical/mental health inmate-patient population through the construction of a 64-bed standalone facility specifically designated to serve and treat the medical/mental health inmate-patient population. The expansion of programming space will allow the County to provide more evidence-based programs and cognitive behavioral therapy to the medical/mental health population. While the number of those with mental illness and medical issues remains high, challenges in complexity due to longer-term commitments have increased under the Public Safety Realignment Act – Assembly Bill 109 (AB 109), which was signed into law in 2011. The housing of long-term offenders in the County jail system has created a substantially increased demand for preventative medical/mental health treatment and long-term care in a system originally intended to manage a short-term population that primarily required emergent health care needs.

The Sheriff's Office has determined the most cost-effective option to address the deficiency of medical/mental health beds and increase program capacity is to move inmate-patients with medical/mental health challenges from the inadequate facilities at the PTDF and relocate them to TRJ, where the proposed new facility would be built

P000024

adjacent to the existing facility. The new TRJ Health and Programming Unit will be a standalone building attached to the existing TRJ facility by expanding the northern pedestrian sallyport. The newly constructed building will have more than a 15-foot buffer from all other buildings and have a clear title for finance leasing.

This new facility will be able to take advantage of the existing solar energy field already located at the site, thus reducing the electricity required. In addition, the County's intention is to utilize LEED silver facility requirements to reduce the usage of energy even further.

The design concept is for the facility to be laid out as a health care facility with a custody overlay: custody staff will be present to ensure safety of staff and inmate-patients, while health care staff provide needed treatment and services.

The issues to be remedied by the project include addressing the current lack of appropriate medical/mental health housing and program space, inefficiencies in the delivery of medical/mental health care, and the double-tier housing design that creates an unsafe environment for mentally ill inmate-patients focused on self-harm.

The new TRJ Health and Programming Unit will consist of three distinct functional elements:

1. Housing: The proposed construction option of 64 non-rated medical/mental health beds dedicated to this population will allow more program participation among medical/mental health inmate-patients, as the County currently does not have adequate programming/treatment space for this population.

2. Program: The program component will provide ample program space for education and individualized health treatment plans with the goal of reducing recidivism and

P000025

ensuring that individualized needs are met both in custody and upon release into the community.

3. Clinic: The clinic component will support the corresponding inmate-patient population with basic outpatient medical services.

The housing component is a single-level, secure housing unit designed to be operated with the same "interactive management" approach deployed in the general population units at TRJ. Special attention will be paid to the medical/mental health rooms with respect to type, size, and configuration, as they are the basic building blocks of the housing component. The medical/mental health rooms will be arranged to provide clear visibility and close access from a central nursing and custody station. The nursing and custody station will have a physical and sound barrier to assure a secured and private environment.

The configuration of the new housing unit as a whole will address the medical, safety, classification, and programming needs of the inmate-patients housed there. The housing design of double-occupancy rooms will afford the flexibility of housing medical/mental health inmate-patients in single or double-occupancy rooms, depending on capacity and treatment needs. The double-occupancy design is a more efficient use of square footage than a comparable all-single-occupancy design, and also requires fewer interior walls and plumbing fixtures than an all-single-occupancy unit.

Program space will be an integral piece of the project design. The new design concept includes three multipurpose rooms designed for group socialization, group discussions, and life skills development. Individualized program space will be incorporated into the clinic design. The clinic programming area will provide

P000026

individualized medical/mental health assessment, treatment planning, and community re-entry facilitation. Currently, the program space for medical/mental health is almost non-existent. When programming does occur, inmate-patients need to be handcuffed to individual tables within the dayroom to allow for safe programming. Handcuffing these individuals to tables in the dayroom is not conducive to the successful treatment of the medical/mental health inmate-patients.

Additionally, the new TRJ Health and Programming Unit will have four safety cells and two medical isolation rooms. The medical isolation rooms will be designed for a reversible, negatively or positively, pressurized room paired with an ante room.

A pantry will be provided for food cart staging and storage of special meals. All room types will be designed to have two-sided bed access and will provide full accessibility. All rooms will have glazing across the front/doors to allow visual supervision and to "borrow light" from the dayroom, maximizing daylight into the interior space.

The clinic component is designed on two levels. The first level contains all the clinical spaces for treating medical/mental health inmate-patients, as well as clinical support spaces. All exam rooms and procedure rooms will have half-lite doors. The second floor will contain the dental clinic and visitation area. All medical/mental health inmate-patients will access the second floor areas by stairs or elevator within the unit. The second floor interior corridor will be accessible by staff; the exterior corridor will facilitate visiting from the public. The second floor will also contain necessary administrative functions of the clinic, as well as staff support spaces such as break rooms, medical records, and work/copy area.

P000027

The clinic will perform basic outpatient medical services, such as emergency/triage care, advanced first aid, and general radiographic diagnostics. Highly acute cases requiring invasive procedures, medical sedation, or inpatient care will be sent to the County hospital under existing agreements and protocols.

Treatment and procedure rooms will be equipped with electronic medical records, and may also serve as mental health and program counseling rooms. Telemedicine and telepsychiatry may be utilized, as well as video visitation.

The new TRJ Health and Programming Unit is a specialized housing unit with security and medical staffing 24 hours a day, seven days a week. Medical staff assigned to the new TRJ Health and Programming Unit will provide care, medication, delivery, and treatment. Inmate-patients who are housed in general housing locations will be escorted by sheriff's deputies to the new TRJ Health and Programming Unit should they require a higher level of medical care. Food services will be delivered by food cart from the existing kitchen location. A separate sallyport will provide direct access for ambulances.

All inmate-patient treatment rooms, including exam rooms, procedure rooms, and dental rooms will have a duress alarm. The duress alarm will activate an open microphone heard at the nearest officer's station, with an alarm indication at the local officer's station and central control.

It is important to understand that the end goal for the Sheriff's Office is to reduce recidivism by providing the best possible evidence-based programs and treatment that will allow inmate-patients to flourish once they re-enter the community. This success will be made possible through the construction of the planned program space in the new

P000028

TRJ Health and Programming Unit, which will facilitate the use of evidence-based programs.

The updated Needs Assessment was the driving force of the planning process for this project. The PTDF facility was never intended to house medical or mental health inmate-patients for the length of time they are holding offenders today. The current design does not allow a reasonable way to provide the type of space or programs this population so desperately needs. The Needs Assessment identified the TRJ as the facility that would best suit the needs to serve the medical/mentally ill inmate-patient population and improve outcomes to reduce recidivism.

The PTDF was originally built in 1981 and currently houses medical/mental health inmate-patients, but the current design is no longer adequate to provide treatment for this type of population. The medical/mental health average daily population is increasing and has resulted in a strain in the health care system. The goal of the Sheriff's Office is to provide a state-of-the-art facility that provides an individualized level of care for each inmate-patient in a learning environment.

With this proposal, the Sheriff's Office plans on housing 64 medical/mental health inmate-patients at the new TRJ Health and Programming Unit. The existing overflow housing used for medical/mental health inmates at PTDF will be re-purposed for housing unique populations (veterans, senior, and inmates with good behavior). The design of the new TRJ Health and Programming Unit will provide the space required to deliver more evidence-based programming/treatment that will have a significant impact on providing critical services to this challenging medical/mental health inmate-patient population.

P000029

The anticipated outcome of the new construction is a living and learning environment that will provide this population the best opportunity for re-entry into the community by providing evidence-based programs individualized for each inmate-patient. Currently, mental health care professionals meet with inmates at the PTDF to teach basic care and life skills development and socialization through the Transitions Program. This training is carried out in the dayroom, which impacts the ability of other inmate-patients to use the dayroom as it was intended. The new facility will include program areas separate from the dayroom, allowing other inmate-patients access to showers, phones, and other services and privileges available in the dayroom.

The project includes general dayroom space and a number of interview rooms and classrooms. This space will allow for greater flexibility and efficient program delivery for a larger group of inmate-patients. Additionally, the design of the space allows for increased observation of inmate-patients by medical staff. Early detection of medical complications or mental decompensation is the key in providing humane care and for ensuring a safe custody environment.

Once the construction project is completed, the ability to deploy both educational opportunities and treatment programs will be a reality. The current design of the PTDF does not afford these opportunities. Currently, the County and Community Corrections Partnership (CCP) have developed an expanded group of community-based organizations who work with Behavioral Health, Probation, and Inmate Services to build program capacity and access to services for all inmates, including a case manager providing the information and services upon release. A cornerstone of this effort is the ability to reach, assess, and treat inmate-patients with medical/mental health needs who

P000030

are heavy users of services both in and out of custody. The availability of the Affordable Care Act will increase options, as funding now exists for more substance abuse and mental health treatment programs in the community.

The new TRJ Health and Programming Unit will provide an individualized level of care that will facilitate re-entry into the community. A re-entry planning specialist that is currently assigned in the jail facilities, employed by Behavioral Health, will work to connect inmate-patients with various community-based resources upon release. These resources include alcohol and drug treatment, mental health care, housing assistance, and life skills support.

The design of the new single-story housing facility eliminates the use of an upper level as a tool for suicide or self-harm as the existing facility is currently designed. The use of a holistic treatment/programming model adds value and effectiveness to the security and safety goals while also providing access to a variety of programs/treatment for successful re-entry into the community.

**3**. **Programming and Services. Describe the programming and/or treatment services currently provided in your facility. Provide the requested data on pretrial inmates and risk-based pretrial release services. Describe the facilities or services to be added as a result of the proposed construction; the objectives of the facilities and services; and the staffing and changes in staffing required to provide the services.**

Probation and Sheriff's Office staff, both sworn and professional, work side-by-side to conduct interviews and perform assessments on each individual who enters the jail system to ensure successful re-entry into the community through the evidence-based

P000031

programs and treatment the County offers the incarcerated. The jail system has strong partnerships with organizations that deliver educational opportunities to adult inmates, including GED, computer basics, English as a Second Language, job readiness, and word processing. Probation has embedded a probation officer into the Sheriff's Office re-entry team. The probation officer liaisons with Inmate Services and the courts, providing risk assessment using the Ohio Risk Assessment System (ORAS) instrument, an evidence-based instrument that assesses risk to re-offend based on scores in the criminogenic domain factors such as substance abuse, education, vocation/employment skills, attitude and beliefs, and family and social supports. The risk to recidivate can be reduced when these risk factors are addressed through education and vocational training, substance abuse treatment, and cognitive-behavioral treatment.

Inmate Services has integrated the offender reintegration scale (ORS), a self-report assessment designed to measure the concerns and potential barriers faced by offenders and ex-offenders with regards to re-entry. The ORS helps individuals to identify gaps in the areas of basic needs, life skills, and family concerns that, when addressed, facilitate successful re-entry into the community. An inmate's readiness and commitment to change can be assessed by their level of participation in the re-entry planning process. While the process is a self-reporting document, Inmate Services staff members meet with the inmate to assist in the interpretation and recommend educational and vocational opportunities available while incarcerated.

**Inmate Programs**

Inmate Services facilitates a wide variety of academic and vocational opportunities to the inmate population housed in our detention facilities. However, the majority of

P000032

these programs are not available to the medical/mental health inmate-patient population due to facility limitations at PTDF. These programs also include evidence-based treatment for substance abuse, treatment basics, GED preparation (classroom and independent study), basic computer skills, English as a Second Language, Malachi Men class and Women of the Word (both are faith-based leadership programs), ServeSafe food handler certificate, Alcoholics Anonymous/Narcotics Anonymous (AA/NA) meetings, and re-entry planning. Inmate Services also manages our print shop, providing inmates with an opportunity to develop skills in both offset and digital printing applications. In 2014, the jail system expanded the use of evidence-based programs to include moral reconation therapy (MRT) and cognitive behavior therapy. Other programs of particular interest include:

- **Transitions Program:** A life skills educational program for inmates with mental health issues and developmental disabilities.

- **S.T.E.P.S. Program**: The Striving 4 Transformation through Education & Personal Success (S.T.E.P.S.) Program is based upon promoting and developing positive change using a group setting.

- **R.A.P. Program:** The Re-Entry Action Planning (R.A.P.) Program is a 12-week-long program. The curriculum has an emphasis on developing and changing cognitive skills, addressing job readiness, and re-entry planning. To date, our initial results show that 23 percent of released participants have not returned to custody.

- **Bridges to Work:** The Bridges to Work Program, funded by a County Human Services Agency grant, places a case worker in the jail to assist in the vocational

P000033

training of inmates, as well as in coordinating and collaborating with potential employers in the community who can provide employment to inmates upon their release from custody. A component of this program works with other community-based organizations to provide housing and continued substance abuse treatment.

- **1170(h) Substance Abuse:** A certified, clinical-based substance abuse treatment program available to inmates sentenced under the 1170(h) PC Realignment Initiative. Inmates attend small group sessions with a licensed counselor as they work through the courses. The courses are also offered through community-based organizations to afford inmates the opportunity to continue or complete the program after release.

- **1170(h) Moral Reconation Therapy (MRT):** MRT is a cognitive-behavioral approach therapy aimed at decreasing recidivism by increasing moral reasoning. The program is available to inmates sentenced under the 1170(h) PC Realignment Initiative. The courses are also offered through community-based organizations to afford inmates the opportunity to continue or complete the program after release.

- **Transitional-Aged Youth (TAY):** In 2012, the Sheriff's Office partnered with Pacific Clinics to provide peer counseling for offenders known as "transitional-aged youth" who are an age range of 18-25 and who have mental illnesses.

**Alternative Programs to Incarceration**

- **Work Release Program:** Under the direction of the court, inmates can be released before their sentences have been completed in order to re-establish ties

P000034

with their families. Inmates can return to their former employment and serve the community on their non-scheduled workdays. The program helps to reduce recidivism because it allows inmates to remain connected to family and employment, both stabilizing factors that to some degree keep people from re-offending.

- **Electronic Monitoring Program for Sentenced and Un-Sentenced Inmates**: The Electronic Monitoring Program allows inmates to complete their court-ordered jail commitment at home while being monitored electronically. The Sheriff's Office Electronic Monitoring Program began in November 2011. The program targets sentenced inmates; however, it has also been used for pre-trial inmates who have medical conditions that are not compatible for jail placement.

- **Early Releases**: Court-authorized program for early release granted once the maximum jail capacity has met the overcrowding threshold.

- **County Parole:** A method for local inmates to apply for County parole after serving a portion of their sentences.

Ventura County courts have taken the lead in developing specialty courts to address a defined population of defendants whose behaviors are better served outside of the mainstream court process. The specialty courts include ***mental health court, veterans' court, community (homeless) court, and re-entry court.*** Each of these courts holds defendants accountable for their conduct while providing treatment, supervision, and community-based housing options. By offering alternatives throughout the justice system, the County is able to reduce recidivism and assist former offenders to a more

P000035

productive future outside of the jail. As the population continues to increase, the availability of programs is constantly evaluated and expanded whenever possible.

**Pre-Trial Services**

From January 1, 2013 through December 31, 2013, County jails housed the following percentages of pre-trial and sentenced inmates:

| Percentage of Pre-Trial and Sentenced Inmates for 2013 | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec |
| Sentenced | 36 | 36 | 37 | 38 | 39 | 38 | 40 | 41 | 43 | 42 | 42 | 42 |
| Pre-Trial | 64 | 64 | 63 | 62 | 61 | 62 | 60 | 59 | 57 | 58 | 58 | 58 |

All arrestees that are booked into the County jail are screened for possible release. All misdemeanor pre-trial detainees are screened for eligibility for release on their own recognizance prior to arraignment. Eligibility factors include the nature and seriousness of the crime, defendants' history of court attendance, and any probation or parole wants or warrants. Those not eligible for an "own-recognizance release" may still be eligible to post bail. All felony arrestees are also screened for similar eligibilities prior to the court deciding on own-recognizance releases.

Our Probation partners manage another pre-trial jail alternative in partnership with the courts, district attorney's office, and the public defender's office. During 2014, this pre-trial release program screened 491 pre-trial inmates, resulting in 221 being released from custody on electronic monitoring.

**Facilities to Be Added**

The proposed project is a 64-bed standalone facility specifically meant to treat the medical/mental health inmate-patient population. New programming space will allow access for those with medical/mental health issues to the already-present programming

P000036

culture at TRJ. The Sheriff's Office has placed an emphasis on providing evidence-based programs that are currently in place in its existing facilities. These programs would naturally flow into the new TRJ Health and Programming Unit and will not only create the necessary safe and humane housing, but will provide access to programs and treatment not currently available for this vulnerable population.

The new TRJ Health and Programming Unit is designed without an upper housing level to provide a safe environment for the mentally ill population. All rooms and areas to which inmate-patients will have access are on one level, thereby eliminating all opportunities for this type of self-harm. The design also includes dedicated rooms for education and treatment programming to take place. The Sheriff's Office currently contracts with a private medical provider for medical/mental health service delivery for the inmate-patient population. Behavioral Health provides an on-site liaison to the jail for program delivery, provides the mental health court with inmate mental-health status, and coordinates the transition of inmates from custody into the community as a partner in the re-entry team. This service will be greatly enhanced to serve the medical/mental health population through the construction of the new 64-bed facility.

The Sheriff's Office is committed to offering programs that will increase the success of those we incarcerate with their re-entry into the community. The medical/mental health inmate-patient population will begin to benefit from the time they enter the facility to the time re-entry into the community takes place. The Sheriff's Office goal is to provide the right tools to each individual, which will in turn reduce recidivism and help manage the inmate population.

P000037

The new TRJ Health and Programming Unit will be the primary unit available in the County jail system for the care of inmate-patients with long-term medical/mental health needs. The proposed construction will provide the adequate space required for implementing evidence-based programs that will increase inmate-patient participation while in-custody and positively affect re-entry.

**Staffing**

The following increases to existing jail, medical, and mental health services staffing will be required to provide proper services and security at the new TRJ Health and Programming Unit: four charge RNs, two medical assistants, four LVNs, and two deputy sheriffs. This is in addition to re-purposing two deputy sheriffs currently staffing the existing medical/mental health housing unit at the PTDF and assigning additional oversight duties to an existing sergeant and senior deputy. The additional staffing demonstrates the County's commitment to providing medical/mental health care, since there are 10 health care staff and 4 deputies. The Sheriff's Office has spent a considerable amount of resources to analyze the appropriate staffing levels, and the County is committed to funding the future costs of needed staffing. All security staff assigned to work with mentally ill inmates currently receives 40 hours of crisis intervention training, which will continue for those who staff the new facility. The 30-year cost for operating the new medical/mental health facility was approved through the County Board of Supervisors Resolution as required in Section 5, Question 6 of the SB 863 RFP response.

P000038

**4. Administrative Work Plan: Describe the steps required to accomplish this project. Include a project schedule, and list the division/offices including personnel that will be responsible for each phase of the project, and how it will be coordinated among responsible officials both internally and externally.**

The project has gone through a substantial planning and pre-design phase, and schematic design is anticipated to begin immediately after the funding award is made. The project schedule for the County starts at the conditional award date of November 12, 2015 and runs until occupancy takes place in June of 2019. The project design is anticipated to be completed in 16 months, and bidding is expected to occur in summer of 2017. Construction duration is expected to be approximately 15 months, with project occupancy expected in June of 2019.

The following is the County organization chart to complete this project.

TRJ Health and Programming Unit

P000039

**Board of Supervisors:** The Board of Supervisors is made up of elected officials representing the interests of the citizens. The Board of Supervisors grants final approval for many steps of the planning process and ensures that services are provided in the most cost-effective way.

**Sheriff:** The Sheriff is an elected official representing the interests of the citizens and the Sheriff's Office. The Sheriff provides project oversight during all phases of the project and ensures the design meets the requirements of the Sheriff's Office.

**Project Management Team:** The project management team is the hub of all planning, design, and construction. They must monitor the project throughout all phases and produce the official project of record.

**Planning Team:** The planning team meets regularly and performs all the necessary tasks associated with the planning process. The planning team is involved in, but is not limited to, conceptual design, application for state funding, analyzing data and determining future needs, reviewing final plans and specifications, reviewing bids, and developing the activation plan.

Upon funding for the project, the following will be added to the organization chart:

**Facility Manager:** Facility managers include Sheriff's personnel who will take an active role in decision making during the entire facility development and construction process. They oversee the transition team and ensure policy development and coordinate the move to the new facility.

**Technical Advisors:** This group is tasked with developing the facility and providing the required documents and specifications needed to build the new facility. This group is made up of, but not limited to, architects, specialty design, and energy consultants.

P000040

**Contractor:** The contractor is in charge of construction of the building using the specifications and drawings prepared by the design team. The contractor must work closely with the project manager and onsite team members to ensure the project is completed as planned.

| Division | Personnel | Office |
|---|---|---|
| Sheriff | Geoff Dean | Sheriff's Office |
| Project Management Team | Herb Schwind | Director of Engineering |
| Project Management Team | Christopher Cooper | Deputy Director Engineer |
| Project Management Team | Project Manager | TBA |
| Planning Team | Guy Stewart | Assistant Sheriff |
| Planning Team | Ron Nelson | Jail Commander |
| Planning Team | Donald Aguilar | Captain |
| Planning Team | Richard Barber | Sheriff's Office |
| Planning Team | Frank Chow | CEO |
| Planning Team | Nicoleta Weeks | Medical/Mental Health |
| Facility Manager | Guy Stewart | Assistant Sheriff |
| Facility Manager | Ron Nelson | Jail Commander |

P000041

| Division | Personnel | Office |
|---|---|---|
| Facility Manager | Donald Aguilar | Captain |
| Facility Manager | Richard Barber | Sheriff's Office |
| Facility Manager | Nicoleta Weeks | Medical/Mental Health |
| Facility Manager | Commissioning (TBA) | TBA |
| Facility Manager | GSA (TBA) | GSA |

**5. Budget Narrative. Describe the amounts and types of funding proposed and why each element is required to carry out the proposed project. Describe how the county will meet its funding contribution (match) requirements for all project costs in excess of the amount of state financing requested and how operational costs (including programming costs) for the facility will be sustained.**

During the pre-design phase of the project, the County reviewed multiple design options in which project cost was a major factor in the decision-making process. Several cost estimates were completed of each option to ensure that cost-effectiveness was a design and decision-making factor. Additionally, site selection took a high priority, as it has a major impact on cost-effectiveness of the project. A major factor in selecting the current site was reduced costs due to the proximity of the existing TRJ and the ability to make a physical connection not only to the building, but also to the utilities needed to support the new facility.

P000042

The seismically separated physical connection allowed the ability to keep operational costs to a minimum, as the services needed to operate the new facility can all be provided from TRJ. Services such as food, laundry, and inmate janitorial services can all be provided by inmates housed at TRJ. Being co-located to TRJ allows the Sheriff's Office to maintain a number of jail management and operational spaces within the existing TRJ administration office suite and not duplicate them within the new building design, greatly reducing the overall needed square footage. Additionally, this drastically reduced the staffing demand of the new facility.

**Describe Funding**

Ventura County is a large county and is eligible to apply for $80 million dollars of funding through the SB 863 RFP. The cost to build a jail facility is very minimal when compared to the yearly costs to operate a jail facility. Upon review of the updated Needs Assessment and careful fiscal evaluation of what size a jail facility the County could maintain and operate on a yearly basis, the County decided on the proposed TRJ Health and Programming Unit. The 64-bed project does not fully meet the needs identified in the updated Needs Assessment and 2015 CGL analysis of the need for medical/mental health housing, but will allow the County to make major headway in treatment and programming of its medical/mental health inmate-patient population. The cost to build the facility is estimated to be $61,263,964. **The County is seeking $55,137,567 in state funding through SB 863.** The County Board of Supervisors has authorized and set aside $6.1 million as a 10 percent match under an Assigned Fund Balance Account in the FY 2015/2016 Budget to be used to satisfy the County's contribution. The identified matching funds are compatible with the state's lease-

P000043

revenue bond financing. Additionally, the County plans on using the identified land for the project as a portion of the County's match. The property was appraised in August 2015 with a value of $1,100,000.

The County Board of Supervisors provided a resolution, committing to funding and staffing the new facility. It is estimated that over the next 30 years, the cost to staff and operate the new TRJ Health and Programming Unit, assuming a 3 percent annual increase, will be $134,065,000. The County has committed to providing the necessary funding.

**6. Readiness to Proceed.**

The County Board of Supervisors provided a resolution matching all the requirements of SB 863, which authorized an adequate amount of available matching funds to satisfy the County's contribution, and a commitment to staff and operate the new facility once construction is completed. Furthermore, the resolution approved the project documents deemed necessary, as identified by the State Public Works Board to the BSCC to effectuate the financing authorized by the legislation, and authorized the appropriate signatory to execute those documents at the appropriate times.

Ventura County has provided within this proposal a Notice of Determination as evidence that CEQA compliance is complete, along with a letter from County Counsel certifying the associated statute of limitations has expired and no challenging legal action was filed, allowing the project to proceed as proposed.

P000044

# Ventura County
# Todd Road Jail Needs Assessment
# And Engineering Analysis

The following professionals participated in meetings and discussions, and the preparation of the raw data, which was provided to the consultants, for the preparation of this report.

**County of Ventura**
Kathryn E. Kemp, Chief Deputy, VCSD, Detention Services Division
Brent Morris, Commander, VCSD, Todd Road Jail Facility
Rick Barber, Sergeant, VCSD, Todd Road Jail Facility
Frank Chow, Program Management Analyst, Executive Office
Allyn Cahoon, Facilities Operation Specialist II, GSA
Henk VanDerkraan, Director of Food Services, Todd Road Jail Facility
Daniel Hustedt, California Forensic Medical Group
Paul Young, GSA
Rob Harris, GSA
Karl Novak, Project Manager, Public Works Agency

The following consultants participated in the preparation of the report, and wish to express our appreciation for the diligent efforts of the Ventura County staff and departments in working with us, to make this a complete and comprehensive report.

**HDR Architecture, Inc.**
Al Korth
Jeff Goodale
Mike Brenchley
Jay Madden

**Carter Goble Lee**
Bob Goble
Bob Greene
Sofia Tata

**Cumming, LLC**
Phil Mathur

**Laschober + Sovich**
Rick McHenry

**Rasmussen and Associates**
Jay Lomagno

P000046

Ventura County Todd Road Jail Needs Assessment and Engineering Analysis

Participant Acknowledgement

**TABLE OF CONTENTS**                                                              i-iii

Section                                                                            Page

Glossary of Terms and Abbreviations                                                v

Executive Summary                                                                  ix

1.0 Introduction                                                                    1

2.0 Background                                                                      3
   2.1 Recent Overcrowded Conditions                                               4
   2.2 History of Compliance with Standards                                        4

3.0 Todd Road Jail                                                                 5
   3.1 Facilities                                                                  5
   3.2 Operational and Design Approach                                             6

4.0 Local Factors Affecting Inmate Population                                      9
   4.1 County Population Growth                                                     9
   4.2 Changing Demographics                                                        9
   4.3 Crime Trends                                                                11
   4.4 Criminal Process                                                            12
   4.5 Impacts from Staffing Cutbacks                                              13
   4.6 Jail Population Factors                                                     13
   4.7 Crowding and Early Releases                                                 14
   4.8 Conclusions                                                                 14

5.0 Jail System Inmate Population Analysis                                         17
   5.1 Continued Growth                                                            17
   5.2 Statistical Reliability                                                     18
   5.3 Jail Population Profile                                                     20
   5.4 Special Management Inmates                                                  22
   5.5 Inmate Classification System                                               22
   5.6 Conclusions                                                                 23

6.0 Future Inmate Population and Bed Needs Projections                             25
   6.1 ADP Projection Analysis                                                     25
   6.2 Description of Alternative Models                                           25
   6.3 Operational Bed Capacity Need                                              29
   6.4 Conclusions                                                                 30

7.0 Inmate Programs and Specialized Service Needs                                 33
   7.1 Inmate Programs                                                             33
   7.2 Mental Health Needs                                                         33
   7.3 Medical Disability Needs                                                    34

P000047

8.0 Local Detention System Diversion Alternatives Status and Capacities          35
    8.1 State Proposition 36 Drug Program (Substance Abuse Act of 2000)          35
    8.2 Work Furlough Program          36
    8.3 Work Release Program          37
    8.4 Direct Work          37
    8.5 Educational Furlough          38
    8.6 Stages          38
    8.7 Employment Resources Development          39
    8.8 Look for Work Job Search          39
    8.9 Conclusions          39

9.0 Proposed Expansion Options, Programs and Staffing Analysis          41
    9.1 Expansion Options          41
    9.2 Expansion Programs          41
    9.3 Expansion Staffing Analysis          41
    9.4 Expansion Option 1          42
    9.5 Program Spaces Option 1          43
    9.6 Staffing Analysis Option 1          49
    9.7 Expansion Option 2          51
    9.8 Program Spaces Option 2          51
    9.9 Staffing Analysis Option 2          52
    9.10 Expansion Option 3          54
    9.11 Program Spaces Option 3          54
    9.12 Staffing Analysis Option 3          55
    9.13 Summary of Costs per Bed          56

10.0 Expansion Option 4 – Full Build-Out          59
    10.1 Potential Impact of State Programs on Inmate Population          59
    10.2 Expansion Option 4 – Full Build-Out          59
    10.3 Program Spaces Option 4          60
    10.4 Staffing Analysis Option 4          61
    10.5 Summary of Costs per Bed          63

11.0 Wastewater Treatment Plant          65
    11.1 Concept A          65
    11.2 Concept B          66
    11.3 Conclusions          67

12.0 Expansion Cost Analysis          69
    12.1 Conclusions          69
    12.2 Financing          70

13.0 Engineering Analysis of the Existing TRJ Facility          73
    13.1 Priority A Items – Detail Analysis          73
        Vacuum Waste System          73
        Observation of Supervisory Staff          78
        HVAC Controls          80
        Circuit Breaker Maintenance          83
        Fire Alarms          84
    13.2 Priority B Items – Detail Analysis          85
        Door Systems and Controllers          85

P000048

| | |
|---|---|
| Security Cameras | 86 |
| Roof Leaks | 87 |
| Duress Alarm | 88 |
| Steam System | 89 |
| Blue Cards | 92 |
| Swamp Coolers | 93 |
| Absorption Chiller | 95 |
| On-Site Power Generation | 96 |
| Housing Section Heating | 98 |
| 13.3 Priority C Items – Detail Analysis | 99 |
| Water Intrusion and Sealing of Block Walls | 99 |
| Noisy Pneumatic Tube-Transfer System in Cluster Observation Center | 100 |
| Separate Controls for Cluster Showers | 101 |
| Housing Section Entry | 102 |

| | |
|---|---|
| APPENDICES | 105 |
| A. Projections Database | 107 |
| B. Inmate Classification System | 139 |
| C. December 12, 2005 TRJ Inspection Report by CSA | 141 |
| D. Expansion Options 1, 2, 3 and 4 Construction Cost Forecast | 155 |
| E. July 20, 2006, Ventura County Sheriff's Department Letter to CSA (Notification Letter) | 161 |
| F. August 14, 2006, CSA Letter to Ventura County Sheriff's Department (Plan Review  #111.6000.04) | 165 |
| G. CUP and EIR Compliance Review | 167 |
| H. Engineering Analysis – Summary Breakdown | 169 |

REFERENCE MATERIAL

1. 1994 Todd Road Jail Comprehensive Planning Manual
2. Todd Road Jail Construction Documents approved by the Board of Corrections
3. Todd Road Jail, Conditional Use Permit approved May 7, 1992, permit # 4735
4. Ventura County Jail, Todd Road Site; Final Subsequent EIR approval April 1992
5. Ventura County Jail; Environmental Impact Report (EIR) approved July 3, 1990, by the Ventura County BOS
6. 1988 Needs Assessment

P000049

Ventura County Todd Road Jail Needs Assessment and Engineering Analysis

P000050

Ventura County Todd Road Jail Needs Assessment and Engineering Analysis

**GLOSSARY OF TERMS AND ABBREVIATIONS**

"Administrative segregation" means the physical separation of different types of inmates from each other as specified in Penal Code Sections 4001 and 4002, and Section 1053 of these regulations.  Administrative segregation is accomplished to provide that level of control and security necessary for good management and the protection of staff and inmates.

"Admissions" (ADM)

"Average daily population" (ADP) means the average number of inmates housed daily during the last fiscal year.

"Average Length of Stay" (ALOS)

"Closed Circuit Television" (CCTV)

"Contact" means communications, whether verbal or visual, or immediate physical presence.

Correctional Standards Authority (CSA) – Previously known as the Board of Corrections, which board acts by and through its executive director, deputy directors, and field representatives.

"Custodial personnel" means those officers with the rank of deputy, correctional officer, patrol persons, sheriff's service technicians (SST) or other equivalent sworn or civilian rank whose primary duties are the supervision of inmates.

"Delivering medication," as it relates to managing legally obtained drugs, means the act of providing one or more doses of a prescribed and dispensed medication to a patient.

"Direct visual observation" means direct personal view of the inmate in the context of his/her surroundings without the aid of audio/video equipment.  Audio/video monitoring may supplement but not substitute for direct visual observation.

"Disciplinary isolation" means that punishment status assigned an inmate as the result of violating facility rules and which consists of confinement in a cell or housing unit separate from regular jail inmates.

"Dispensing," as it relates to managing legally obtained drugs, means the interpretation of the prescription order, the preparation, repackaging, and labeling of the drug based upon a prescription from a physician, dentist, or other prescriber authorized by law.

"Emergency" means any significant disruption of normal facility procedure, policies, or activities caused by a riot, fire, earthquake, attack, strike, or other emergent condition.

"Emergency medical situations" means those situations where immediate services are required for the alleviation of severe pain, or immediate diagnosis and treatment of unforeseeable medical conditions are required, if such conditions would lead to serious disability or death if not immediately diagnosed and treated.

"Facility/system administrator" means the sheriff, chief of police, chief probation officer, or other official charged by law with the administration of a local detention facility/system.

P000051

"Facility manager" means the jail commander, camp superintendent, or other comparable employee who has been delegated the responsibility for operating a local detention facility by a facility administrator.

"Full Time Equivalent" (FTE)

"Health authority" means that individual or agency that is designated with responsibility for health care policy pursuant to a written agreement, contract or job description.  The health authority may be a physician, an individual or a health agency.  In those instances where medical and mental health services are provided by separate entities, decisions regarding mental health services shall be made in cooperation with the mental health director.  When this authority is other than a physician, final clinical decisions rest with a single designated responsible physician.

"Health care" means medical, mental health and dental services.

"Jail," as used in Article 8, means a Type II or III facility as defined in the "Minimum Standards for Local Detention Facilities."

"Law enforcement facility" means a building that contains a Type I Jail or Temporary Holding Facility.  It does not include a Type II or III jail, which has the purpose of detaining adults, charged with criminal law violations while awaiting trial or sentenced adult criminal offenders.

"Licensed health personnel" includes but is not limited to the following classifications of personnel:  physician/psychiatrist, dentist, pharmacist, physician's assistant, registered nurse/nurse practitioner/public health nurse, licensed vocational nurse, and psychiatric technician.

"Local detention facility" means any city, county, city and county, or regional jail, camp, court holding facility, or other correctional facility, whether publicly or privately operated, used for confinement of adults or of both adults and minors, but does not include that portion of a facility for confinement of both adults and minors which is devoted only to the confinement of minors.

"Local detention system" means all of the local detention facilities that are under the jurisdiction of a city, county or combination thereof whether publicly or privately operated.  Nothing in the standards are to be construed as creating enabling language to broaden or restrict privatization of local detention facilities beyond that which is contained in statute.

"Local Health Officer" means that licensed physician who is appointed pursuant to Health and Safety Code Section 101000 to carry out duly authorized orders and statutes related to public health within their jurisdiction.

"Managerial custodial personnel" means the jail commander, camp superintendent, or other comparable employee who has been delegated the responsibility for operating a local detention facility by a facility administrator.

"Mental Health Director," means that individual who is designated by contract, written agreement or job description, to have administrative responsibility for the facility or system mental health program.

"Needs Assessment and Engineering Analysis" (NA/EA)

P000052

Ventura County Todd Road Jail Needs Assessment and Engineering Analysis

"Non-secure custody" means that a minor's freedom of movement in a law enforcement facility is controlled by the staff of the facility; and
>     (1) the minor is under constant direct visual observation by the staff;
>     (2) the minor is not locked in a room or enclosure; and,
>     (3) the minor is not physically secured to a cuffing rail or other stationary object.

"Non-sentenced inmate," means an inmate with any pending local charges or one who is being held solely for charges pending in another jurisdiction.

"People with disabilities" includes, but is not limited to, persons with a physical or mental impairment that substantially limits one or more of their major life activities or those persons with a record of such impairment or perceived impairment that does not include substance use disorders resulting from current illegal use of a controlled substance.

"Pre-Trial Detention Facility" (PTDF)

"Psychotropic medication" means any medication prescribed for the treatment of symptoms of psychoses and other mental and emotional disorders.

"Rated capacity" means the number of inmate occupants for which a facility's single and double occupancy cells or dormitories, except those dedicated for health care or disciplinary isolation housing, were planned and designed in conformity to the standards and requirements contained in Title 15 and Title 24.

"Remodel" means to alter the facility structure by adding, deleting, or moving any of the buildings' components thereby affecting any of the spaces specified in Title 24, Section 2-470A.

"Repair" means to restore to original condition or replace with like-in-kind.

"Safety checks" means regular, intermittent and prescribed direct, visual observation to provide for the health and welfare of inmates.

"Secure detention" means that a minor being held in temporary custody in a law enforcement facility is locked in a room or enclosure and/or is physically secured to a cuffing rail or other stationary object.

"Security glazing" means a glass/polycarbonate composite glazing material designed for use in detention facility doors and windows and intended to withstand measurable, complex loads from deliberate and sustained attacks in a detention environment.

"Sentenced inmate," means an inmate that is sentenced on all local charges.

"Storage," as it relates to legally obtained drugs, means the controlled physical environment used for the safekeeping and accounting of medications.

"Supervisory custodial personnel" means those staff members whose duties include direct supervision of custodial personnel.

"Todd Road Jail" (TRJ)

P000053

Ventura County Todd Road Jail Needs Assessment and Engineering Analysis

"Type I Facility" means a local detention facility used for the detention of persons for not more than 96 hours excluding holidays after booking.  Such a Type I facility may also detain persons on court order either for their own safekeeping or sentenced to a city jail as an inmate worker, and may house inmate workers sentenced to the county jail provided such placement in the facility is made on a voluntary basis on the part of the inmate.  As used in this section, an inmate worker is defined as a person assigned to perform designated tasks outside of his/her cell or dormitory, pursuant to the written policy of the facility, for a minimum of four hours each day on a five day scheduled work week.

"Type II Facility" means a local detention facility used for the detention of persons pending arraignment, during trial, and upon a sentence of commitment.

"Type III Facility" means a local detention facility used only for the detention of convicted and sentenced persons.

"Type IV Facility" means a local detention facility or portion thereof designated for the housing of inmates eligible under Penal Code Section 1208 for work/education furlough and/or other programs involving inmate access into the community.

P000054

Ventura County Todd Road Jail Needs Assessment and Engineering Analysis

## Executive Summary

This Needs Assessment and Engineering Analysis (NA/EA) was prepared for Ventura County as an update of the Needs Assessment that was approved by the Ventura County Board of Supervisors in March 1988. This NA/EA presents a discussion of the background and current operating conditions of the Ventura County local detention system and forecasts the revised requirements for the planned and approved expansion of Todd Road Jail (TRJ).

**TRJ Background**
In 1990, Ventura County selected a large 157-acre rural site near Santa Paula for construction of the Todd Road Jail. The 1990 EIR and Subsequent EIR (SEIR) for TRJ approved construction of TRJ with a capacity of 2307 rated beds. On May 7, 1992, the Ventura County Board of Supervisors (BOS) approved a Conditional Use Permit (CUP) that only allowed construction and operation of TRJ Phases IA and IB. Construction of TRJ Phase 1A was completed in 1995, as a sentenced-inmate facility with a rated capacity of 782 beds.

Since the 2002 closing of the Honor farm and due to the growing volume of jail admissions and the increasing average length of stay of jail inmates, overcrowded conditions for the Ventura County Jail system are common. In 2006, the system experienced an average daily population (ADP) of 1,692 inmates in the first eight months of the year compared to the system's rated capacity of 1,575.  As a result of the overcrowding, detention staff have found that the jail population generally presents higher risks.

The County uses a number of jail diversion alternatives and criminal process procedures to reduce jail population. The County Probation Department operates several criminal offender diversion and treatment programs and the Detention Services Division implemented the Accelerated Release Provision of Section 4024.1 of the California Penal Code, all of which have been used to reduce jail population.

TRJ now houses a majority of unsentenced inmates. TRJ was designed to operate using "Interactive Inmate Management," which is a hybrid combination of direct and indirect supervision techniques supported by a facility design.

**Factors Affecting Inmate Population**
This NA/EA reviewed the trends in a variety of demographic, crime, justice and jail system databases that are related to growth in the need for adult detention capacity.  Major conclusions in the analysis of these local factors found:

- The California Department of Finance projects a 19.8% population growth in Ventura County between 2010 and 2025. This will result in increased demand for Jail system capacity.
- The general "aging of the population" and the increasing rate of mental disorders among criminal offenders will result in a need for expanded medical and mental health care services in the Jail system.
- Continuing increases in levels of violence among the 12 to 24-year old "at risk" population group continue to increase inmate management and security demands on staff.
- The Superior Court's criminal case filings average annual disposition rate exceeded a 98% average from 2002 through 2005. This indicates that court case processing time did not contribute to Jail system overcrowding.

P000055

Ventura County Todd Road Jail Needs Assessment and Engineering Analysis

- The Jail system population continued to grow while staffing cutbacks occurred in the Sheriff's, Prosecutor's, and Public Defender's offices in 2004 and 2005.
- From 2001 to 2006 when the County population grew by 4%, the Jail system average daily population grew by 28% and reported Part 1 crimes of violence grew by 11%.
- Between 2004 and mid 2006 a total of 7,154 criminal offenders were released early from the County Jail system due to overcrowding.

Historic jail population data was also analyzed in order to develop a statistically reliable projection of future inmate population and the resulting total bed capacity needs. Key data variables include: admissions (ADM), average daily population (ADP), and average length of stay (ALOS). Analysis of the periodic population "peaks" experienced in the jail system is one of the critical factors in computing the total number of beds needed over and above the ADP.

Key historical population trends by gender, pretrial versus sentenced status, felon versus misdemeanant charges and mental disorders were also considered. The inmate classification system used by the Sheriff's Department is also factored into the projection since it defines the general types of housing unit conditions and separations needed for different custody groups.

Major conclusions of the analysis of the historic jail population data found:

- While Jail system admissions (ADM) remained relatively stable from 1997 through 2006 with a 4% 10-year growth rate, the average length of stay (ALOS) for this period increased by almost 26% (from 16.7 days to 21 days), which had a far greater growth impact on ADP than increased ADM.
- Even though Section 4024.1 "Early Releases" have lowered the ADP, inmate populations still regularly exceed the Jail system's capacity and the use of "overflow" bunk beds in the common rooms is required.
- For the first eight months of 2006 the Jail system ADP was 1,692 inmates, which exceeded the total rated bed capacity by 60 inmates.
- Female inmates increased from 12% of the system population in 1997 to 15% by 2006.
- The prevalence of inmates that were sentenced versus non-sentenced fully reversed from a sentenced/non-sentenced ratio of 53/47% in 1996, to 47/53% by 2006.
- The percentage of felons in the jail population increased from 58% to 79% between 1996 and 2006. This increased the level of custody supervision and caused additional security concerns for staff.
- Recent monthly Jail system health care data shows that 10% of the inmate population receive psychotropic medications and 15% "require significant mental health attention by staff and specialists."

The County has non-jail based alternative supervision diversion programs which have had a beneficial impact on reducing the severity of an already overcrowded jail system.. The lower cost per offender per day to operate such programs compared to the cost per day of a jail bed is economically advantageous for the County. For the active four county programs (Proposition 36 Drug Diversion, Work Furlough, Work Release, and Direct Work), the total estimated ADP reduction is 198.

The Sheriff's Department's has vocational and inmate service programs designed to educate, rehabilitate, and vocationally train the inmates so that they can be more successful when released from jail and reduce the likelihood of them re-offending.

x

Ventura County Todd Road Jail Needs Assessment and Engineering Analysis

---

**Inmate Projections**

The historical population and jail database was used to provide the statistical variables for seven different inmate population projection models. Projections were developed through the year 2022. Statistical tests for the reliability or strength of correlation of the independent variables were used for model comparison. An ADP-based Box Jenkins ARIMA model was found to be the most suitable for the Ventura County study.

The projected bed needs were also allocated by gender and security levels of minimum, medium and maximum custody for each of the three optional target years. These projections also include an additional 4.4% for peaking and 5% for classification separations. Table E.1 shows the results of the ARIMA model and bed space projections for Ventura County. The bed space projections greatly exceed the current Jail system capacity of 1575.

**Table E.1**
**Recommended Bed Space Projection**

| Bedspace Projections | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Projected ADP (Model 1 ARIMA) | 1,884 | 1,920 | 1,955 | 1,991 | 2,027 | 2,063 | 2,098 | 2,134 | 2,170 | 2,206 | 2,242 |
| Peaking = 4.4% | 83 | 84 | 86 | 88 | 89 | 91 | 92 | 94 | 95 | 97 | 99 |
| Classification = 5% | 94 | 96 | 98 | 100 | 101 | 103 | 105 | 107 | 109 | 110 | 112 |
| Total Projected Beds | 2,061 | 2,100 | 2,139 | 2,178 | 2,217 | 2,257 | 2,296 | 2,335 | 2,374 | 2,413 | 2,452 |

Source: Carter Goble Lee:  October 2006.

**TRJ Expansion Options**

Three site expansion options were developed based upon reaching the projected bed space capacity in the years 2012, 2017, and 2022. A fourth option illustrates a complete "Build-out" of TRJ beyond that contemplated in the original 1988 Needs Assessment and TRJ SEIR. This option is in response to the Governor's proposal being debated in the 2007 legislative session that could substantially increase the number of convicted felons confined to county jails rather than in state prisons. It is estimated that an expansion of TRJ could be opened in 2011. The expansion options are as follows:

Option 1 is projected to reach capacity in the year 2012 (only 1 year after opening), and includes the addition of one building cluster with 528 rated beds for maximum and medium security inmates.  This will provide a total system capacity of 2103 rated beds. One housing unit in the new cluster will be dedicated to 24 new medical and 24 mental health beds and include medical administration space and all required clinic functions. The Muster building, laundry, and kitchen facilities will also be expanded. A video visitation system will be implemented. Option 1 can be constructed under the existing CUP and complies with the current TRJ SEIR.

Option 2 is projected to reach capacity in the year 2017 (6 years after opening) and includes the expansion of the support facilities described in Option 1. This will provide a total system capacity of 2231 rated beds. In Option 2, the medical and mental health cells would be placed in a new separate medical building, reserving the new second housing cluster for general population housing. This increases the number of rated beds by 656. Option 2 can be constructed under the existing TRJ SEIR but will require a new CUP.

Option 3 is projected to reach capacity in the year 2022 (11 years after opening) and includes the expansion of the support facilities described in Option 1. Option 3 adds 877

P000057

Ventura County Todd Road Jail Needs Assessment and Engineering Analysis

rated beds and will provide a total system capacity of 2452 rated beds. Option 3 places the medical and mental health cells in two new building clusters. Option 3 can be constructed under the existing TRJ SEIR but will require a new CUP.

Option 4 will provide 2,304 additional rated beds, which in itself, is the maximum expansion allowed at TRJ under the 1990 Master Plan. It is unknown when this option will reach capacity since it is designed to accept the return of state inmates to Ventura County. The number of inmates to be returned is not known at this time. Option 4 includes the expansion of the support facilities described in Option 1 and three new building clusters. Construction of Option 4 will require a new CUP and modifications to the existing TRJ SEIR.

Table E.2 summarizes the TRJ expansion option bed capacity.

**Table E.2**
**Todd Road Jail Expansion Options – Rated Beds**

| Option | New TRJ Rated Beds | Total TRJ Rated Beds | Total VC Jail System Beds | System Reaches Capacity | TRJ CUP (1191 Beds) | TRJ SEIR (2307 Beds) |
|---|---|---|---|---|---|---|
| 1 | 528 | 1310 | 2103 | Year 2012 | Complies | Complies |
| 2 | 656 | 1438 | 2231 | Year 2017 | New CUP | Complies |
| 3 | 877 | 1659 | 2452 | Year 2022 | New CUP | Complies |
| 4 | 2304 | 3086 | 3879 | | New CUP | Modify SEIR |

Expansion of the on-site wastewater treatment plant (WWTP) would be required for Options 1, 2, 3, or 4 and consist of the construction of a new package type treatment facility to handle the increased waste stream. This unit would replace the currently constructed on-site facility. This option is recommended over construction of a pipeline to the Santa Clara Waste Water Treatment facility due to lower construction and annual cost. The estimated construction cost of the on-site system for a full build out (Option 4) is $2.5 M. The estimated annual operating cost is $350 K.

The construction and annual cost per bed is proportionally lower as the magnitude of the expansion increases. Table E.3 summarizes the TRJ expansion option cost estimates.

P000058

Ventura County Todd Road Jail Needs Assessment and Engineering Analysis

**Table E.3**
**Todd Road Jail Expansion Options – Cost Estimates**

| Option | System Reaches Capacity | Design & Construct* | Design & Construct Cost/Bed | Additional Annual (Staff & Operating Cost)* | Annual (Cost/Bed) |
|---|---|---|---|---|---|
| 1 | Year 2012 | $75.1 M | $142 K | $21.7 M | $41.5 K |
| 2 | Year 2017 | $89.5 M | $136 K | $21.9 M | $34.0 K |
| 3 | Year 2022 | $97.0 M | $111 K | $27.2 M | $31.1 K |
| 4 | | $139.7 M | $61 K | $50.9 M | $22.1 K |

*Does not include WWTP costs.

**Engineering Analysis**

This report also evaluated the design and operation of building and security systems at the existing TRJ facility for retrofit of and/or inclusion into the design of any expansion. The analysis for these items considered existing conditions, current issues, discussion, and recommendations. A probable construction cost forecast was prepared.

An extensive evaluation of the existing vacuum waste system at TRJ was completed. The system has been prone to frequent clogging and maintenance problems. Several measures are recommended for repair of the existing system. The vacuum system is not recommended for use in any expanded facilities.

Recommendations were also presented for housing control room observation issues, HVAC system and control problems, circuit breaker maintenance, alarm and security system issues, steam plant maintenance, generator usage, and roof and wall leak problems.

P000059

Ventura County Todd Road Jail Needs Assessment and Engineering Analysis

P000060

Ventura County Todd Road Jail Needs Assessment and Engineering Analysis

## 1.0 INTRODUCTION

This Needs Assessment and Engineering Analysis (NA/EA) was prepared for Ventura County as an update of the Needs Assessment that was approved by the Ventura County Board of Supervisors in March 1988. This NA/EA presents a discussion of the background and current operating conditions of the Ventura County local detention system and determines the revised requirements for the planned and approved expansion of Todd Road Jail (TRJ).

HDR Architecture, Inc. was hired by the Ventura County Public Works Agency to prepare the NA/EA.  Funding was provided for their effort by the Ventura County Sheriff's Department.

The NA/EA presents a discussion of the background and current operating conditions of the Ventura County local detention system. A projection of future inmate growth was then used as the basis for the development of four TRJ expansion concepts that include facility layouts, specific building expansion needs, staffing requirements, and cost estimates. The engineering analysis of the current TRJ facilities was prepared to consider items that may need to be retrofitted and/or included in the design of the TRJ expansion.

The California Code of Regulations, Title 24, Minimum Standards for Local Detention Facilities, requires any local government intending to add 25 or more beds to an existing facility complete a "Needs Assessment Study." This document provides a "Needs Assessment Study" as required by Title 24 for the proposed expansion of TRJ.  The statute specifies 11 items that must be addressed and also provides guidelines for what should be documented in each item. All of these items are addressed throughout this report.  Once approved by the County, this study must be submitted to the Corrections Standards Authority (CSA) prior to contracting for plans and specifications.[1]

The Ventura County Sheriff's Department submitted a notification letter to the Corrections Standards Authority (CSA) dated July 20, 2006 (Appendix E), indicating the County's desire to move forward with an expansion of TRJ.  In response to the County's letter, CSA provided a Plan Review Number, 111.6000.04, which will allow the County to move forward with the expansion as defined in the letter (Appendix F).

---

[1] Section 6030, California Penal Code, Title 24 California Code of Regulations, Section 13-102 (c) 2. Effective May 22, 2006.

P000061

Ventura County Todd Road Jail Needs Assessment and Engineering Analysis

P000062

Ventura County Todd Road Jail Needs Assessment and Engineering Analysis

---

## 2.0 BACKGROUND

In March 1988, the County completed a Needs Assessment that identified the need for additional jail beds in Ventura County. At that time, Ventura County had two primary detention facilities for confinement of non-sentenced inmates and sentenced inmates, the Pre-Trial Detention Facility (PTDF) located in Ventura, and the Honor Farm located in Ojai.

The 1988 Needs Assessment predicted that Ventura County would need to add 2307 new "rated beds" by the year 2010. A "rated bed", as defined by CSA, is a general inmate population bed and is not a medical, mental health, or disciplinary isolation bed. The 1988 Needs Assessment recommended that construction of jail facilities should occur over three phases as shown in Table 2.1. The Master Plan also indicated that all beds were intended for sentenced inmates with the exception of Phase II which would allow 400 beds "which are required for pre-trial population" (un-sentenced inmates).

Table 2.1
**1988 Needs Assessment Results**

| Phase | Year | Beds Required |
|-------|------|---------------|
| Phase I | 1990 | 1,191 |
| Phase II | 2000 | 705 |
| Phase III | 2010 | 411 |
| Total | | 2,307 |

Source: 1988 Needs Assessment.

In 1990, Ventura County selected a large 157-acre rural site on Todd Road, near Santa Paula, for construction of a new jail. This site was selected over five other possible sites, including expansion of the PTDF. The Todd Road site was confirmed in the July 3, 1990 Environmental Impact Report (EIR) and Subsequent EIR to be acceptable for the three phases of construction identified in the 1988 Needs Assessment.

In 1990, a Master Plan was prepared to guide the design and operation of the new Todd Road Jail. In this document conceptual designs and cost estimates were prepared. To accommodate the construction budget, Phase I was divided into two phases (1A and 1B).

On May 7, 1992, the Ventura County Board of Supervisors (BOS) approved a Conditional Use Permit (CUP) that allowed construction and operation of TRJ Phases IA and IB. Construction of Phases 2 and 3 were not approved.  The CUP placed conditions for TRJ as follows:

- 752 beds in Phase IA.
- 439 additional beds in Phase IB (1191 total beds).
- Total beds may temporarily increase by 38% under overcrowded conditions.
- 328,628 SF for Phase 1A and 1B building area footprint - (4.8% site coverage).
- 423,630 SF for Phase 1A and 1B total building area.

Construction of TRJ Phase 1A was completed in 1995, as a "Sentenced Facility" with rated capacity of 782 beds.

### 2.1 Recent Overcrowded Conditions

P000063

Ventura County Todd Road Jail Needs Assessment and Engineering Analysis

Ventura County closed the Ojai Honor Farm facility in 2002 due to County-wide budget cutbacks. This reduced the rated bed capacity in Ventura County to 1,575 beds (793 beds at PTDF and 782 beds at TRJ). The subsequent transfer of over 200 female inmates from the Honor Farm to PTDF and transfer of an equivalent number of male inmates from PTDF to TRJ resulted in overcrowded conditions at both PTDF and TRJ.

Since 2003, the growing volume of jail admissions and the increasing average length of stay by jail inmates have also contributed to overcrowded conditions for the Ventura County local detention system. In 2006, the system experienced an average daily population (ADP) of 1,692 inmates in the first eight months of the year compared to the system's rated capacity of 1,575.

PTDF has an overflow capacity of 108 beds above its rated capacity and TRJ has an overflow capacity of 98 beds above its rated capacity. Overflow beds are bunk beds placed in dayrooms of housing sections during overcrowded conditions. The majority of these beds are normally occupied and one cell remains open to give inmates housed in the dayrooms access to a toilet.

As a result of the overcrowding, detention staff has found that the jail population generally presents higher risks. For example, inmate-on-inmate battery has increased by 35% between 2003 and 2004 and inmate assaults on deputies increased by 15%. Deputies injured by assaults lost 256 work days in 2003 and 318 work days in 2004. In 2005, assaults by inmates on deputies increased by 73%, and inmate-on-inmate assaults increased by 25%. Fortunately, deputies injured by assaults lost less than 100 workdays.

The County has begun to use a number of jail diversion alternatives and criminal process procedures to reduce jail population. The County Probation Department operates several criminal offender diversion and treatment programs and the Detention Services Division implemented the Accelerated Release Provision of Section 4024.1 of the California Penal Code, all of which have been used to reduce jail population.

## 2.2 History of Compliance with Standards

The Ventura County Sheriff's Department has routinely maintained compliance with CSA standards and all code requirements, except when forced overcrowding and staffing cutbacks occur beyond the control of the Department. The December 12, 2005, CSA Inspection Report (Appendix C) reflects non-compliance findings in regard to "staff shortages" and "temporary overcrowding".

Staff shortages started during a "major reduction" in the County's budget in 2004 (see Section 4.5, Impacts from Staffing Cutbacks).

The Ventura County Board of Supervisors restored funding for the staffing needed in 2006 and the Department undertook special efforts including public relations promotions and a recruiting program to restore adequate staffing. These public relations promotions and recruiting efforts are continuing in 2007.

P000064

Ventura County Todd Road Jail Needs Assessment and Engineering Analysis

## 3.0 TODD ROAD JAIL

This section summarizes the detention and support facilities at TRJ along with a discussion of the TRJ operation and design approach.  TRJ is classified as a "Type II Facility" by Title 24 definition, for both sentenced and unsentenced inmates. When it was originally planned, constructed and opened in 1994, the intent by local policy was that it would primarily house sentenced offenders, since that was the predominant need at that time.  In recent years however, the percentage of non-sentenced inmates has been increasing.  The original planning and design of TRJ as an all-cell (no dormitories) facility gave the County the secure spatial conditions and capabilities to manage non-sentenced inmates, as well as sentenced inmates of various security and custody levels.

### 3.1 Facilities

The Phase 1A construction implemented the first part of the 1990 Master Plan with an expandable support core of multiple buildings and a single Cluster of four Housing Units (Cluster 1) with a 782-bed rated operating capacity. Figure 3.1 shows the existing TRJ site and the facilities that were constructed for Phase 1A.  The concept developed was to have administrative, staff and public functions located in the center of the site with access on the west (front) side of the facility.  All of these components are located on the free side of the facility, outside the secure perimeter of the facility.  Intake-Release, the Housing Cluster, and Central Services are located within the secure perimeter.

**Figure 3.1**
**Todd Road Jail Existing Site Plan**

The Counties success with its inmate management approach in TRJ's Phase 1A Housing Cluster 1 will allow the 1B expansion to continue with a proven familiar housing design concept that is also in keeping with the site master plan.  Phase 1B will also include space additions and upgrades for a number of other support services elements, improvements to existing buildings, building systems, equipment, infrastructure, and security systems.

P000065

Ventura County Todd Road Jail Needs Assessment and Engineering Analysis

Cluster 1 is designed with three 96-cell units and one 110-cell unit, with fourteen cells in the latter unit being used for administrative segregation and/or disciplinary isolation, and two special use cells.

All housing units are comprised of 96 cells, configured to optimize observation of inmates by custody staff and provide convenient access to inmate services. Dining, library, pill call, and commissary are provided in the dayroom of each housing unit. The housing units are sized to accommodate 192 inmates in double occupancy cells.

A secure corridor is used to move inmates into the four housing units from the Intake/Release building. Inmates are brought by vehicle from PTDF to TRJ and enter through a secure vehicle sally port. They are escorted into the Intake/Release holding rooms from which they are escorted into one of the four housing units.  Additionally, the Intake/Release building has facilities to provide inmates with basic healthcare needs including dental, medication, screening for infectious disease, medical exams and inmate program services.

The Central Services building contains food service, laundry, commissary, print shop, vocational, and educational classroom.  Inmate labor is used to supplement staff in the preparation of meals, in the washing, drying and folding of laundry and in the breakdown, sorting and distribution of commissary products for the inmates.

The Central Plant is a "high bay" building design and the equipment configuration allows for linear expansion.  The building contains central chillers, pumps, central emergency generators, a main telephone switch room, and maintenance offices.

The Administration building contains facility administration, security administration, staff dining, and provides access to the public through the lobby.  Public parking is adjacent to the building.

The Muster building provides all staff access to a training room, locker and shower rooms, and a fitness room.  Staff parking is providing adjacent to this building.


## 3.2 Operational and Design Approach

**Operational and Design Approach, Inmate Management**
TRJ is operated using "Interactive Inmate Management," which is a hybrid combination of direct and indirect supervision techniques supported by a facility design that also permits the use of both supervision methods. All staff who supervises or directly interacts with inmates is sworn deputies. Civilian staff is used for support functions, such as monitoring audiovisual systems, and do not require in-person control of or direct interaction with inmates. This labor mix provides a cost efficient staff-to-inmate ratio with a proper balance of functions requiring sworn deputies and civilian staff.

**Housing Concepts and Staffing**
From this operational approach, a design concept was developed that organized the inmate housing in six or seven housing "Sections" (depending on classification, custody and physical security needs) and each group of Sections makes up one housing "Unit." The Unit provides the basic housing operational platform for determining the particular staff deployment in relation to custody and security needs for each Section in the Unit.  General population cells are double-bunked whereas those cells used for administrative segregation and special use cells are single-bunked, which complies with CSA and American Correctional Association standards.

P000066

Ventura County Todd Road Jail Needs Assessment and Engineering Analysis

For general population Sections and Units the staffing deployment can be virtually the same pattern with the most cost efficient staff-to-inmate ratios. For special management populations and inmates needing temporary or long-term segregation, deployment can be flexible depending on the particular risk and needs of that population, i.e. violent, mentally disordered, protective custody, and disciplinary.

TRJ's standardized cell size provides operational flexibility since it is large enough to hold one or two inmates.  By CSA and ACA standards, the cell size is sufficient for general population double-bunking or single bunking for disciplinary or administrative segregation that could include a 23-hour per day lockdown.

TRJ currently has a total of five ADA accessible cells all on the ground level in Unit C with one in each of five Sections in that Unit.

**Visual and Remote Supervision**
As an indirect supervision facility, maintaining safe and sound operating conditions for both staff and inmates requires a design and layout that supports both direct and remote visual supervision of inmate activity and movement areas. TRJ facility design provides a combination of design conditions, layout and monitoring systems that support visual supervision by direct line of sight, remote monitoring and casual observation in all areas where inmates are present.  The design makes substantial use of security glazing, windows and vision panels inside the buildings' security perimeter in all inmate housing, dayrooms, recreation yards, activity areas, service areas and inmate program areas.  Large windows or vision panels give staff in the area the opportunity to see into all group activity rooms and areas in addition to the remote monitoring via Closed Circuit Television (CCTV) in the control rooms. There is widespread use of CCTV systems in each of TRJ's three types of control rooms (Central, Cluster and Housing) that are monitored.

**Inmate and System Data Access**
Ventura County has an Inmate Management System (IMS), which is a component of the Ventura County Integrated Justice Information System (VCIJIS) that received major software upgrading in 2001. The County's criminal justice officials and agencies all use this comprehensive system as a means of managing and tracking criminal cases. For the Sheriff's Detention Services Division, the system plays a key role in managing and using data on all inmates in the PTDF and the TRJ. In addition to being the data entry and analysis system for all regular detention system statistics it provides staff with ready access to the current status of any inmate.

P000067

Ventura County Todd Road Jail Needs Assessment and Engineering Analysis

P000068

# 4.0 LOCAL FACTORS AFFECTING INMATE POPULATION

This section reviews the trends in a variety of demographic, crime, justice and jail system data that tends to be related to growth in the need for adult detention capacity.  Potential impacts that may affect the makeup as well as the size of the jail population are highlighted.

## 4.1 County Population Growth

Ventura County's population projections were used in two alternative projection models.  The models, which are discussed in the following section, show that exclusive of other factors, the County's continued population growth will result in an increased jail population. The County's population, including all incorporated and unincorporated areas in the year 2001, was estimated as 756,673.  The official projection by the State Department of Finance for 2007 is 821,929. Future total population projections for Ventura County are summarized in Table 4.1.

Table 4.1
**Ventura County Future Population Projections**

| Year | Total | # Change | % Change |
|------|-------|----------|----------|
| 2010 | 860,664 | 64,558 | 8.1% |
| 2015 | 892,537 | 31,873 | 3.7% |
| 2020 | 924,410 | 31,873 | 3.6% |
| 2025 | 953,602 | 29,192 | 3.2% |
| 2005-25 Total | | 157,496 | 19.8% |
| Annual Growth Rate | | 7,875 | 1.0% |

Source: California Department of Finance.

## 4.2 Changing Demographics

Ventura County's population growth has been accompanied by a shift in the aging of the population and changes in the ethnic make-up of the County. By the year 2010, the Hispanic population is projected to be the County's primary ethnic group.

These trends are also reflected in the makeup of County jail population.  The aging of the population has a relatively small impact on jail population growth; however, within the jail itself, the increasing number of older inmates results in an increased need for health care services and in some cases additional separation for older, more vulnerable inmates.  The need for special housing clusters and increased health care resources for older inmates increases the demands on the jail system compared to previous decades. More bi-lingual staff will be needed to be able to effectively supervise and manage growing Hispanic and Asian populations.  As with the geriatric inmate situation, but in far larger numbers, increases in the incidence of mental disorders and clinically diagnosed mental illnesses have also impacted the jail.  Also, the growing number of inmates with dual diagnoses for substance abuse and mental illness requires more special need housing units and treatment resources.   Between January 2005 and June 2006 an average of 235 new mental health cases were "opened" monthly by jail mental health staff[2].

---

[2] As reported to the State of California Corrections Standards Authority by the Ventura County Sheriff's Department.

P000069

Ventura County Todd Road Jail Needs Assessment and Engineering Analysis

Collectively, these demographic, behavioral, medical and mental health trends have created and will continue to create more demanding and complex inmate management conditions for detention staff in the future.  While the aging of the population may suggest a drop in the need for jail beds, this has not been the case in the last two decades.  A major underlying factor is the disproportionate counteracting impact of the 12 to 24 "at-risk" population group.  While a slight reduction in the size of this group is projected, it is a group that has steadily become more violent, with more gang activity, drug and substance abuse involvement, and higher rates of mental disorders.  These trends have resulted in a jail population that presents much greater security risks and more complex needs than in the past.  The impact is more acute in California than in other states, primarily due to the uniquely high level of gang activity. The more serious nature of the crimes committed by this group directly correlates with longer sentences and the increasing average-length-of-stay observed in Ventura County over the last five years.

In summary, the impact of these growth trends in the general population is reflected in the inmate population.   Collectively, they make jail operation more demanding with the need to provide more medical, mental health and substance abuse diagnostic and treatment services. In addition, the impact from an increased need for more security separations for gang members requires more space for separations with longer average stays resulting in a need for more jail beds.

Figure 4.1 shows trend changes in the County's historic and projected age groups and Figure 4.2 shows the projected shifts in the size of different ethnic groups.



Figure 4.1
**Aging of the Population**

Source: State Department of Finance.

P000070

Ventura County Todd Road Jail Needs Assessment and Engineering Analysis

Figure 4.2
**Ethnic Group Population Forecast**



Source: State Department of Finance.

## 4.3 Crime Trends

Ventura's Part 1 Crime Rate (murder and non-negligent manslaughter, forcible rape, robbery, aggravated assault, burglary, larceny-theft, motor vehicle theft and arson) increased from 22.2 per 1,000 in 2001 to 23.2 per 1,000 in 2005 with reported crime numbers increasing from 17,008 incidents to 18,848.  Increasing crime rate and crime numbers do not directly impact jail population numbers; however, they indirectly impact the jail's average daily population (ADP) by providing impetus for enhancing law enforcement resources which often leads to more arrests and subsequently higher admissions.

In 2001 there were 2,108 full time law enforcement staff employed by the various Ventura County jurisdictions. The following year the number increased to 2,157; however, there was a major decline in law enforcement staff (patrol peace officers and prosecutors) in recent years. From 2003 to the end of 2005, the county-wide number of patrol peace officers decreased by 12%, from 2,157 to 1,903.  This has been a major factor in the leveling off of admissions to the Ventura detention system.  However, the concurrent increase in Average Length of Stay (ALOS) correlates to a 20% decline in prosecutorial staff since 2003 (from 294 to 234) and a 6.5% decline in public defender staff (from 81 to 76).

Were it not for the fact that jail admissions in Ventura started leveling off in 2003, the system's ADP would be far greater than presently recorded.  If increases in any law enforcement staff lead to a significant increase in admissions, the jail's ADP will rise unless they are accompanied by enhancements to increase the flow of jail case processing by the court.

P000071

**4.4 Criminal Process**

A possible contributing factor to jail overcrowding occurs if the jurisdiction's criminal court process concludes cases more slowly than normal and generates a significant case backlog, primarily of pretrial detainees.  Growth in criminal court filings and the annual rate of criminal case dispositions are indicators of court operating efficiency and whether a backlog of cases may be building that contributes to jail overcrowding by increasing the average length of stay. For the Superior Court in Ventura County, Table 4.2 gives a summary of the criminal case filings, case dispositions and a computation of the case disposition rate for the past three fiscal years (only three years were used due to the recent unification of the courts and changes in data reporting).

Table 4.2
**Superior Court Criminal Case Trends**

| Court Data | FY 2002-2003 | FY 2003-2004 | FY 2004-2005 | % Change |
|---|---|---|---|---|
| Felony Filings | 3,420.0 | 3,031.0 | 3,720.0 | 9% |
| Felony Dispositions | 2,925.0 | 2,941.0 | 3,330.0 | 14% |
| % dispositions to filings | 85.5% | 97.0% | 89.5% | 5% |
| Non Traffic Misdemeanor Filings | 12,988.0 | 10,760.0 | 8,830.0 | -32% |
| Non Traffic Misdemeanor Dispositions | 11,285.0 | 11,123.0 | 9,385.0 | -17% |
| % dispositions to filings | 86.9% | 103.4% | 106.3% | 22% |
| Traffic Misdemeanor Filings | 8,043.0 | 10,171.0 | 8,270.0 | 3% |
| Traffic Misdemeanor Dispositions | 8,366.0 | 8,420.0 | 7,628.0 | -9% |
| % dispositions to filings | 104.0% | 82.8% | 92.2% | -11% |

Source: California Court Information Annual Reports 2003, 2004, 2005 : Compiled by Carter Goble Lee.

Generally, a court that disposes of 90% or more of its criminal caseload each year is performing efficiently and not contributing to jail overcrowding. The sooner a court disposes of a jail case, the lesser the time needed to hold the accused.  In the case of Ventura County the criminal filings have increased 9% for felony cases, 3% for traffic misdemeanor cases, and decreased by 32% for non-traffic misdemeanor cases from 2002 to 2005.  The disposition rate of the court's caseload has averaged 91% for felony, 99% for non-traffic misdemeanors, and 93% for traffic misdemeanor cases over the 3-year period.  Thus, in comparison to the 90% benchmark it appears that the Superior Court's criminal case processing is probably not contributing to jail crowding.

In California the Supreme Court has established guidelines for criminal case disposition rates that are to be followed by all trial courts.  Those standards are:

- 100% of all felony cases should be disposed of in 1 year from first court appearance.
- 90% of all misdemeanant cases should be disposed of in 30 days from first court appearance; 98% within 90 days; and 100% within 120 days.

When these guidelines are followed, the Court is most likely to be moving jail cases in an efficient manner.  Given the Court's relatively high disposition rate performance in recent years it does not appear that any meaningful reduction in the Jail system's average length of stay for pretrial detainees could be expected via changes in the Court's criminal process.

P000072

## 4.5 Impacts from Staffing Cutbacks

In fiscal year 2004/05 the Detention Budget was under funded, requiring staffing cutbacks at TRJ. During the shortage, a total of four (4) critical staff positions were vacant. This caused a "rolling lockdown" of inmates by Section and Unit starting in October 2004 since a sufficient number of staff were not available for inmate supervision 24 hours a day 7 days a week. Since recruiting, training and retention impact the speed of deploying new staff under such circumstances, it has taken the extra efforts of senior staff and a recruitment committee with support from a public relations firm to begin in 2006 to build back the staffing levels needed. In 2006 the County CEO indicated support for providing the staffing needed to expand TRJ.

In addition to detention staffing cutbacks the County also experienced reductions in the County Prosecutor's Office and the Public Defender's staff between 2002 and 2005. In total, the combined staffing of County law enforcement, Prosecutor, and Public Defender was reduced from 2,532 FTE in 2002 to 2,213 by 2005. *During this period of staff cutbacks, the average daily population of TRJ and PTDF continued to grow.*

With these staffing reductions, frequent crowding, continued growth in detention admissions, and a major rise in length of stay at TRJ and PTDF, the need for additional capacity at TRJ is clear. The amount of expansion needed by year for the next 15 years will be calculated from a projections analysis in the following sections.

## 4.6 Jail Population Factors

A jail's average daily population (ADP) is a factor of the number of people admitted into the jail (ADM) and their ALOS. In the year 2001, the system's ADP was 1,319, and for 2006 the ADP was 1,692 (through the month of August). There were 26,775 jail admissions in the year 2001 and 29,916 admissions in 2006. The ALOS for 2001 was 18 days and for 2006, ALOS is projected to be 21 days.

As already discussed the number of jail admissions can be substantially impacted to grow or decline by the number of law enforcement staff that work within the jurisdiction. More law enforcement officers will produce more jail admissions whereas cutbacks in staff tend to slow up criminal process, thereby increasing the length of stay in jail, as happened in Ventura County between 2002 through 2005. ALOS is primarily impacted by case processing times (i.e. how long it takes for a pretrial jail case to move from ADM to conclusion and release) and secondarily, lengths of sentence for local incarceration in the county jail. As evidence collected by law enforcement staff must by properly processed and examined prior to its review by prosecutors and/or defense attorneys, law enforcement staff availability also impacts case processing times. Increases in either ADM or ALOS without a corresponding decrease in the other will cause jail populations to rise, and significant increases in ADP will occur if there is a rise in both jail admissions and average length of stay.

Table 4.3 summarizes some of the recent years' trends for the factors discussed above from 2001 to 2005 or 2006 as noted.

P000073

Ventura County Todd Road Jail Needs Assessment and Engineering Analysis

Table 4.3
**Recent Detention Demand Variables**

| Item | 2001 | 2002 | 2003 | 2004 | 2005 | 2006* | % Change 2001-06 |
|------|------|------|------|------|------|-------|------------------|
| 1. County Population | 768,429 | 780,562 | 790,237 | 796,165 | 796,106 | 796,165 | 4% |
| 2. Average Daily Population | 1,319 | 1,414 | 1,572 | 1,602 | 1,551 | 1,692 | 28% |
| 3. Admissions | 26,775 | 27,256 | 29,921 | 30,609 | 28,487 | 29,916 | 12% |
| 4. Average Length of Stay | 18.0 | 18.9 | 19.2 | 19.0 | 20.0 | 21.0 | 17% |
| 5. Total Criminal Justice Staff* | 2,190 | 2,532 | 2,503 | 2,274 | 2,213 | n.a. | 1%* |
| 6. Reported Part 1 Crime* | 17,008 | 17,699 | 18,469 | 19,440 | 18,848 | n.a. | 11% |
| 7. Part 1 Crime Rate/1,000* | 22.2 | 22.7 | 23.3 | 24.3 | 23.2 | n.a. | 4% |

*Item 5 totals are for Prosecutor, Law Enforcement, Public Defender, excluding Prosecutor in 2001.  Data for 2006 is annualized from 9 months and items 5, 6 and 7 are for percentage change from 2001 to 2005.  County population is as reported by the U.S. Census.

## 4.7 Crowding and Early Releases

Between 1996 and June 2006, the total ADP of the County's jail facilities grew from 1,338 to 1,635.  This overcrowding situation has resulted in beds being placed in the housing pod dayrooms and implementation of the "Accelerated Release" provision of California Penal Code Section 4024.1.  Records show that the release provision has been used frequently since 2004.  Between 2004 and September 2006, a total of 7,154 persons were released early under this provision with approval of the Chief Judge.  The impact of these releases was a decrease in the annual ADP of 34 inmates (10 females and 24 males) for calendar year 2004, 16 (4 females and 12 males) for 2005 and 53 (9 females and 44 males) for 2006.

A subsequent section of this assessment report entitled "Local Detention System Diversion Alternatives Status and Capacities" shows that the County has developed a substantial array of diversion programs that place a sizeable offender population under community supervision instead of being remanded to jail. Despite this or any other trends or factors that may reduce jail population, the overall situation in Ventura County is one that continues to require more jail beds than the system's rated capacity will hold.

## 4.8 Conclusions

The preceding assessment of certain local trends and factors affecting adult detention in Ventura County collectively point to continued inmate population growth and the need for Jail system capacity:

- The official projection for total population growth in Ventura County is for a 19.8% increase between 2010 and 2025, which will result in increased demand for Jail system capacity.
- The general "aging of the population" and the increasing rate of mental disorders among criminal offenders will result in a need for expanded medical and mental health care services in the Jail system.
- Continuing increases in levels of violence among the 12 to 24-year old "at risk" population group continues to increase inmate management and security demands on staff.

P000074

Ventura County Todd Road Jail Needs Assessment and Engineering Analysis

- The gender distribution of the local detention system shifted from approximately 12% female to 15% female from 1997 through 2006. Detailed data on this shift is contained in Section 5.0.
- The Superior Court's criminal case filings average annual disposition rate exceeded a 98% annual average from 2002 through 2005, which indicates that court case processing time did not contribute to Jail system overcrowding.
- Even with staffing cutbacks in 2004/05 for the Sheriff, Prosecutor and Public Defender, Jail system population continued to grow.
- From 2001 to 2006 when the County population grew by 4%, the Jail system average daily population grew by 28%, and reported Part 1 crimes of violence grew by 11%.
- Between 2004 and 2006 a total of 7,154 criminal offenders were released early from the County Jail system due to overcrowding.

P000075

Ventura County Todd Road Jail Needs Assessment and Engineering Analysis

P000076

Ventura County Todd Road Jail Needs Assessment and Engineering Analysis

# 5.0 JAIL SYSTEM INMATE POPULATION ANALYSIS

This section examines the various historic jail population data needed to develop a statistically reliable projection of future inmate population and the resulting total bed capacity needs.  Key data variables include: admissions (ADM), average daily population (ADP), and average length of stay (ALOS).  Analysis of the periodic population "peaks" experienced in the jail system is included as one of the critical factors in computing the total number of beds needed over and above the ADP. Prevalent historical population trends by gender, pretrial versus sentenced status, felon versus misdemeanant charges and mental disorders are also included.  The inmate classification system used by the Department is also reviewed since it defines the general types of housing unit conditions and separations needed for different custody groups.

## 5.1 Continued Growth

Jail admissions have held steady since 2003 which is most likely due to the decline in criminal justice staff as described in Section 4.5. At the same time, ALOS has increased by approximately 10% since 2003.  Increases in ALOS are generally due to case processing factors, and secondarily to increases in the length of local jail sentences or transfer time to state custody.  Were it not for the fact that admissions have essentially held steady since 2003, the ADP - assuming no Section 4024.1 early releases - would have been even greater requiring more frequent use of un-rated overflow beds.  However, the County anticipates future increases in law enforcement staffing which will result in increased arrests and jail admissions.

The 2003 through 2005 staffing reductions were made in Patrol Peace Officers, Prosecuting Attorney and Public Defense due to County budget cutbacks.  Such cutbacks obviously could have reduced the use of Detention, however, as shown in Table 5.1 the opposite happened with detention ADM and ADP remaining at consistently high levels in recent years.  Although the detention system ADP dropped from 2004 to 2006, it has grown to an all-time high in 2006 year-to-date.  For the first six months of 2006 Ventura County's total adult detention system ADP was 1,635 inmates, which exceeds the system's total rated bed capacity of 1,575 by 60 inmates.  During this time an average of 2,473 persons were admitted monthly (ADM), and the ALOS grew to 21 days.

Table 5.1 presents 10 years of historic detention data for the County from 1996 through 2005 and year-to-date for 2006 ADP, ADM and ALOS.

Table 5.1
**County Population and Jail System Data Growth Trends**
(TRJ and PTDF Totals)

|  | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 |
|---|---|---|---|---|---|---|---|---|---|---|
| Co. Population | 721,107 | 730,779 | 743,357 | 756,673 | 768,429 | 780,562 | 790,237 | 796,165 | 796,106 | 796,165 |
| ADP | 1,313 | 1,412 | 1,381 | 1,383 | 1,319 | 1,414 | 1,572 | 1,602 | 1,551 | 1,692 |
| ADM | 28,727 | 28,998 | 28,834 | 28,605 | 26,775 | 27,256 | 29,921 | 30,609 | 28,487 | 29,916 |
| ALOS | 16.7 | 17.8 | 17.5 | 17.6 | 18.0 | 18.9 | 19.2 | 19.0 | 20.0 | 21.0 |

ADP – Average Daily Population, ADM – Average Daily Admissions, ALOS – Average Length of Stay
Source: Compilations from local jail data and U.S. Census by Carter Goble Lee, August 2006.

P000077

Ventura County Todd Road Jail Needs Assessment and Engineering Analysis

---

**5.2 Statistical Reliability**

Statistical correlation coefficients measure the degree to which certain variables are related toward the same or opposite trend direction over time or duration of an event.  For example, do increases in arrests accompany increases in Jail ADP during the same time period, or does one increase while the other decreases, or are the results random and not highly correlated?

Correlation coefficients were computed between variables including staff, arrests, admissions, and average daily population.  The strongest correlation, using data from 2002 to 2005, was found: (1) between law enforcement, prosecution and defense staff; (2) between arrests and admissions; and (3) between admissions and ADP.  A strong positive correlation coefficient was considered to be above 0.87 (1.0 being perfect) indicating that the variables tended to move in the same direction.  Strong linear correlations were found between adult arrests and jail admissions, and between jail admissions and average daily population.   Weak negative correlation coefficients were found when testing the trend relation between law enforcement, prosecution and defense staff and the ADP, reflecting that in recent years as the staffing counts decreased the Jail ADP increased.  However, the coefficients for this relationship were relatively low between 0.57 and 0.69.

In summary, the statistical tests results having the strongest positive correlations (+0.87 and above) were for three different sets of variables as follows:

- Law enforcement, prosecution and defense staff tended to move in the same direction;
- Arrests and jail admissions tended to move in the same direction and
- Jail admissions and ADP tended to move in the same direction

Figures 5.1, 5.2 and 5.3 show the historic trends for each of the three jail system growth variables graphically including ADP, ADM, and ALOS for 1997 through 2006.  The ADP counts reflect the Section 4024.1 Early Releases that the Sheriff's Department has been forced to make due to overcrowding.

Figure 5.1
**Jail System Data Growth Trends**
**Average Daily Population (ADP)**



P000078

Ventura County Todd Road Jail Needs Assessment and Engineering Analysis



Figure 5.2
**Jail System Data Growth Trends
Admissions (ADM)**



Figure 5.3
**Jail System Data Growth Trends
Average Length Of Stay (ALOS)**

P000079

Ventura County Todd Road Jail Needs Assessment and Engineering Analysis

**5.3 Jail Population Profile**

Ventura County's inmate population in terms of gender, non-sentenced/sentenced status and felons/misdemeanants reveals the following general characteristics.

In 1996, females accounted for approximately 12% of the system's inmate population. However, the trend has been upward and currently (2006) females are between 14% and 15% of the population.  This is consistent with national trends where females have been the fastest growing segment of jail and prison populations for the past 10 to 15 years.  From a jail operations resource perspective, the increase in female inmates is significant as female inmates generally require more health care and more mental health services than male inmates. The U.S. Justice Department's Bureau of Justice Statistics, in an article published in September 2006, noted that "nationally, 75% of incarcerated women, as opposed to 63% of incarcerated men, had 'mental health' problems."

In 1996, approximately 53% of the system's inmate population was sentenced and 47% was non-sentenced.  These percentages have since reversed and for 2006 the population is recorded as 53% non-sentenced and 47% sentenced.  As a result, a significant number of non-sentenced inmates are currently housed at TRJ compared to its early years when all TRJ inmates were sentenced.  TRJ was originally planned and designed to house sentenced inmates. This has resulted in significantly higher inmate traffic through the intake area at TRJ than what had been planned for.

In 1996, felons accounted for approximately 58% of the system's inmate population.  In response to issues of crowding, misdemeanants are diverted from jail to a community-based supervision program as soon as possible.  In 2006, the population was approximately 79% felon and 21% misdemeanant.  With this 10-year rise in the number of felony cases, the percentage of inmates who can potentially be diverted from incarceration to community supervision has declined significantly, thus increasing the need for jail beds.

The following graphs in Figures 5.4, 5.5 and 5.6 illustrate the trends in ADP by gender, non-sentenced/sentenced, and crime status for 1997 through 2006.

P000080

Ventura County Todd Road Jail Needs Assessment and Engineering Analysis

Figure 5.4
**Historical Average Daily Population by Gender**



Figure 5.5
**Historical Average Daily Population by Un-sentenced/Sentenced**



P000081

Figure 5.6
**Historical Average Daily Population by Crime Status**



## 5.4 Special Management Inmates

The jail system's inmate population consists primarily of felony offenders and many of them have gang affiliations documented by jail staff.  In addition, the County has a significant transient (homeless) population, many of whom have histories of mental illness and substance abuse.  Monthly mental health data reveals that upwards of 10% of the jail system population receive psychotropic medication and 15% of the population "require significant mental health attention."  The high numbers of gang members and persons in need of mental health attention impacts classification categorization and the degree of restrictiveness and separations needed.  Ventura County's objective based behavioral classification system is not categorized by the three customary security levels of maximum, medium and minimum security; however, subjectively applying these terms to its population suggests the following security breakdown: 42% maximum, 38% medium and 20% minimum.

## 5.5 Inmate Classification System

TRJ uses an objective classification system based on a combination of charges, potential length of sentence, and previous in-custody behavior.  Classification staff make 10-year history queries in developing the database for each sentenced inmate.  A committee process is used for reviews in conjunction with the application of the 13-category classification system shown in Appendix B.

The current classification system categories are summarized as follows:

> **Standard Classifications:**
> <u>ADSEG</u> – Administrative Segregation – single cell maximum security.

P000082

<u>PSYCH</u> – Psychiatric – Inmates who have or are suspected of having a clinical mental disorder and exhibit a continued pattern of behavior that requires separation from general populations.

<u>P.C.</u> – Protective Custody – Inmates who are vulnerable and unable to protect themselves.

<u>V.C.</u> – Violent Crime – Inmates charged with Penal Code Sections that include a violent act.

<u>V.A.</u> – Violent Assaultive – Inmates who have assaulted staff or show a pattern of violence toward others.

<u>S.T.</u> – Security Threat – Inmates charged with certain Penal Code Sections that could relate to compromising the security of TRJ.

<u>LEVEL 3</u> – Non-sentenced general population inmates charged with certain Penal Code Sections considered to require medium security.

<u>LEVEL 2</u> – Non-sentenced Level 1 inmates or Sentenced Level 1 inmates with a hold.

<u>LEVEL 1</u> – Sentenced general population inmates, except those with holds.

**Cross Classifications applied to any of the 9 standard classifications:**

<u>TODD NO</u> – Inmates charged with certain Penal Code Sections, any "third strike" inmate and inmates with serious/acute medical condition.

<u>TS</u> – Inmates charged with a "third strike" allegation.

<u>SUICIDAL</u> – Overriding classification for any classified inmate and not removed until cleared by medical staff.

<u>HOLDS</u> – Holds from agencies of other jurisdictions.

In addition to expanding the capacity for general population non-sentenced and sentenced inmates, the TRJ expansion will enhance the classification system by expanding the housing for special needs populations. More inmates will be appropriately separated and provided the level of supervision and diagnostic/treatment-related services needed. This will be especially important for: 1) inmates with mental disorders who cannot safely remain in general population; 2) those inmates with a suspected suicide potential; 3) inmates with medical conditions that require temporary separation for examination; and 4) recuperation or long-term separation due to certain chronic conditions. Such a dedicated housing unit does not now exist at TRJ, which requires a number of inmates to remain or be transferred to the PTDF who could otherwise be maintained at TRJ.

**5.6 Conclusions**

- In spite of reductions in law enforcement, prosecutor's and public defender's staff during 2003 through 2005, the Ventura County Jail system average daily population (ADP) grew by 29% from 1997 through 2006.

- While Jail system admissions (ADM) remained relatively stable from 1997 through 2006 with a 4% 10-year growth rate, the average length of stay (ALOS) for this period increased by almost 26% (from 16.7 days to 21 days), which had a far greater growth impact on ADP than increased ADM.

- One intervening factor that caused the ADP to be even lower than it would have been for the period was the use of Section 4024.1 "Early Releases" to avoid severe and unsafe

P000083

Ventura County Todd Road Jail Needs Assessment and Engineering Analysis

overcrowding.  In spite of this, the system still needed to periodically use "overflow beds," which exceed the Jail system's capacity.

- For the first six months of 2006 the Jail system ADP was 1,635 inmates, which exceeded the total rated bed capacity by 60 inmates.

- Female inmates increased from 12% of the system population in 1997 to 15% by 2006.

- The prevalence of inmates that were sentenced versus non-sentenced fully reversed from a sentenced/non-sentenced ratio of 53% / 47% in 1996, to 47% / 53% sentenced/non-sentenced by 2006.

- In 1996 felons accounted for 58% of Jail system population, but grew to 79% by 2006 indicating increased levels of custody supervision and security concerns for staff.  This also means that the number of inmates likely to be found eligible for diversion to community supervision has diminished substantially.

- Recent monthly Jail system health care data shows that 10% of the inmate population receives psychotropic medications and 15% "require significant mental health attention by staff and specialists."

P000084

Ventura County Todd Road Jail Needs Assessment and Engineering Analysis

---

## 6.0 FUTURE INMATE POPULATION AND BED NEEDS PROJECTIONS

The historical database summarized in the previous sections provides the various statistical variables used to develop and assess the results of several different projection models. The process involves first projecting the number of inmates likely to be incarcerated in each future year from 2006 to 2022 expressed as average daily population (ADP). From the 16-year projections three optional design and construction target years were highlighted including 2012, 2017 and 2022. Seven different models were analyzed and, where statistically possible, standard statistical tests for the reliability or strength of correlation of the independent variables were tested. An ARIMA model was found to be the most suitable. The projected bed needs were also allocated by gender and security levels of minimum, medium and maximum custody for each of the three optional target years.

### 6.1 ADP Projections Analysis

Seven projection models using different independent variables were compared. The key variables in Models 1, 2, and 3 are ADP based. These ADP-based models include a Box-Jenkins ARIMA model, Exponential Smoothing, and a linear trend projection based on the ADP's annual percent rate of growth (1.8% annually) respectively. The key variables in Models 4 and 5 are County population based. The population based models link projected County population growth to the ADP. The key variables in Model 6 are based on projected ADM (admissions) and ALOS (average length of stay). The Model utilizes projected ADM and ALOS to estimate the ADP. The key variables in Model 7 are ADP based and it applies a Box-Jenkins ARIMA formula as used in Model 1.

### 6.2 Description of Alternative Models

Following is an explanation of the different independent variables, number of data points and statistical performance/reliability test results for each of the seven models as summarized in Table 6.1. Statistical tests were not applicable for three of the seven models because of their limited database size. For those models applicable to standard statistical tests, three computations were made: (1) $R^2$ to measure the strength of the relationships in the database used where a score of 1.0 indicates the strongest relationship possible; (2) a MAPE computation of potential standard error where the lower the percentage score the better; and (3) a BIC score measuring the projecting performance related to error potential where the lower the number score the better.[3]

- Model 1 – ADP Based ARIMA Projection (Autoregressive Integrated Moving Averages) is a non-linear 3-component model that computes three different outputs from the same database by different formulas and then, integrates the results over all data points in the time series database. This model's database contained a total of 128 monthly data points from January 1996 through August 2006. Its statistical tests resulted in an $R^2$

---

[3] The Bayesian Information Criterion (BIC) is an approximate measure of the projecting performance to expect from the model. It rewards goodness of fit, as measured by the mean square errors. The model that minimizes the BIC is likely to provide the best projecting performance. Mean absolute percent error (MAPE) is a measure of goodness-of-fit for a sample. Out-of-sample, it is a measure of actual projecting accuracy. MAPE examines the magnitude of mean absolute error in percentage of the actual series.

P000085

value of 0.91; a mean absolute percent error (MAPE) of 2.09%; and a Bayesian Information Criterion (BIC) score of 42.2.

- Model 2 – ADP Exponential Smoothing generates levels and trends by smoothing the last few of the monthly data points of ADP to decrease irregularity and also computes a seasonality factor to adjust the results accordingly. The seasonal indexes are obtained by smoothing seasonal patterns in the historical data. The model's database series contained the same 128 data points of monthly data as Model 1 from January 1996 through August 2006. This model's $R^2$ value was 0.88, the MAPE computation was 2.43% and the BIC score was 46.47.

- Model 3 – ADP Historical Percentage Increase is derived by calculating the total percentage change from the beginning point (1996) to the end point of the historical data series (2005), and dividing the total by the number of years in the period. The result is then multiplied by the desired number of years to be projected into the future. One year's change point is added to that figure and the result is multiplied by the 2005 base year ADP of 1,551. The resulting annual percentage increase rate from 1996 to 2005 used in the model was 1.8%. Since Model 3 used 10 years of annual data rather than monthly data its database is not large enough for the use of statistical tests.

- Model 4 – IR Ratio to Population Growth uses the two variables of the County's 2005 "Incarceration Rate," (1.95 jail inmates per 1,000 population) with its historic average annual rate of growth of 0.4% applied to the projected future County population. The resulting increased IR rate is then multiplied by future population projections to estimate future ADP. As with Model 3 this model's database is not large enough for the use of statistical tests.

- Model 5 – Multiple Linear Regression (ADP/Population) projects future ADP population based on a regression analysis of ADP and County population, and applies projected County population to the model's coefficients. Model 4 $R^2$ value was 0.6168, which is relatively weak compared to the test results for Models 1 and 2.

- Model 6 – Projected ADM and ALOS is based on the two key independent variables of the Jail system's ADP, ADM, and ALOS. Admissions were projected using an ARIMA model with 128 data points that yielded an $R^2$ value of 0.6610; and a MAPE value of 5.3%. The ALOS was projected using 10 annual data points from the 2005 base (19.9 days) plus the historic average annual growth rate of 0.4 days. Thus, a total of 138 data points were used in Model 6, but not in a manner to be able to apply the standard statistical tests to the final result, although the $R^2$ value for the ADM projection was relatively weak at 0.6610.

- Model 7 – ADP Based ARIMA Projection (Autoregressive Integrated Moving Averages) is another non-linear 3-component model that computes three different outputs from the same database by different formulas and then, integrates the results over all data points in the time series database. This model's database was much shorter than the one used by ARIMA Model 1 and contained a total of only 61 monthly data points from August 2001 through August 2006. Its statistical tests resulted in an $R^2$ value of 0.92; a mean absolute percent error (MAPE) of 1.73%; and a Bayesian Information Criterion (BIC) score of 37.31. However, even with these positive test results the limited term database

P000086

Ventura County Todd Road Jail Needs Assessment and Engineering Analysis

spans an atypical period (2002 to 2005) when significant reductions were made in the County's criminal justice personnel.

While the consultants recommend projection Model 1 which utilized 10 years and eight months of monthly data for 128 data points and had a relatively high score on its statistical reliability, County staff suggested testing an alternate projection (Model 7) that emphasized trends during the years 2001 through 2006.  The reason for doing so was to determine if there would be a significantly different projection outcome since significant staffing reductions occurred in that time period due to County budget cutbacks which reduced the number of County Prosecutors, Public Defenders and law enforcement as previously stated.   Model 7 resulted in an R-square value of 0.92, and statistical indicators such as BIC of 37.31 and MAPE of 1.73%. These indicate that the alternative model fit the historical data similar to Model 1.  *However, the bias reflected in using only the most recent five or six years of data is that it assumes that the short term conditions will continue, which reflects in the projection results.*  Staff indicated that such reductions in criminal justice personnel are not likely to continue.

According to Model 7, the increase in ALOS that has occurred since 2002 and is due in part to a reduction in prosecutors and public defenders appeared to have a greater impact than the leveling off of ADM due to fewer law enforcement staff.  Thus, the jail ADP rose during this period rather than remaining level or even reducing.  This alternate projection results in the highest projected ADP of all the Models tested.  The alternate model projects an ADP of 2,007 in the year 2012, 2,275 for 2017 and 2,545 for 2022.  Thus, for planning purposes this could be considered a high end projection with all other conditions being equal, and potentially provide the County with more bed space much sooner that needed.

Table 6.1 provides a summary of the models' results in five year increments from 2012 through 2022.

P000087

Ventura County Todd Road Jail Needs Assessment and Engineering Analysis

Table 6.1
**Ventura County Inmate ADP Projections**

| Projected ADP | 2012 | 2017 | 2022 |
|---|---|---|---|
| ADP Based Models | | | |
| Model 1 - ARIMA | 1,884 | 2,063 | 2,242 |
| R-square = 0.91 | | | |
| Model 2 - Exponential Smoothing (Winters) | 1,813 | 1,891 | 1,969 |
| R-square = 0.88 | | | |
| Model 3 - Historical Percent Increase | 1,743 | 1,881 | 2,018 |
| Base ADP 2005: 1551  Growth: 1.8% per yr | | | |
| POPULATION Based Models | | | |
| Model 4 - Ratio to Population Growth | 1,747 | 1,844 | 1,942 |
| Projected IR | 2.00 | 2.04 | 2.07 |
| Model 5 - Multiple Regression (ADP/Population) | 1,731 | 1,815 | 1,897 |
| R-square = 0.6168 | | | |
| BOOKINGS Based Models | | | |
| Model 6 - Projected ADM and ALOS | 1,931 | 2,107 | 2,276 |
| Projected Annual Bookings | 31,084 | 31,173 | 31,143 |
| Projected ALOS | 22.7 | 24.7 | 26.7 |
| Alternate ADP Based Model | | | |
| Model 7 - ARIMA (2001-06) | 2,007 | 2,275 | 2,545 |
| R-square = 0.92 | | | |

Source: Carter Goble Lee:  November 2006.

The ADP based Box Jenkins ARIMA Model 1 was found to be the most appropriate for Ventura County.  Since Model 1 was based on the historic ADP, it incorporates the effects from various factors that impact admissions and average length of stay including: County population growth; arrest/citation/case prosecution actions by law enforcement, Prosecutor and Public Defender staff; the period of staff cutbacks from 2002 to 2005; case processing times; and use of incarceration alternatives.

The extrapolation method for forecasting by ARIMA models uses a combination of auto-regressive, integration, and moving average computations.  ARIMA models may also have a seasonal component depending on the size of the database used.  Model 1 utilized 128 data points (January 1996 to August 2006 ADP) and 4 parameters (two seasonal autoregressive coefficients and two moving average coefficients) had the highest R-square factor for strength of correlation between the independent and dependent variables of the models examined.  While reviewing and comparing statistical indicators, Model 1 resulted in one of the best Bayesian information criterion (BIC = 42.2) variables and mean absolute percent error (MAPE = 2.09%) which indicates a good fit of the model and suitable forecasting results.

Table 6.2 presents the selected projection model's annual results from 2012 through 2022.  Also, the resulting statistical tests for the model's parameters and coefficients are shown under the table for A [12] and A [24] as seasonal autoregressive coefficients, and b [1] and B [12] as low order and seasonal moving average coefficients.

P000088

Table 6.2
**Ventura County Inmate Annual ADP Projections for Model 1-ARIMA**

| Projected ADP | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Selected Model - ARIMA R-square = 0.91 | 1,884 | 1,920 | 1,955 | 1,991 | 2,027 | 2,063 | 2,098 | 2,134 | 2,170 | 2,206 | 2,242 |

Source: Carter Goble Lee: October 2006.

Coefficient computations for each ARIMA projection parameter were: b [1] = +0.2452; A [12] = -0.4152; A [24] = -0.1903, and B [12] = +0.8695.

The Table 6.2 projection gives the annual average daily population (ADP) starting in the year 2012 (assumed earliest probable occupancy year for completing and activating the expansion), and ends with 2022, which would be 15 years from 2007.  As shown in the table, the County could expect to have a need to house 1,884 inmates by 2012; 2,063 inmates by 2017 at 10 years from 2007; and 2,242 inmates 2022 at 15 years from 2007.

## 6.3 Operational Bed Capacity Need

In order to determine the County's jail bed operating capacity expansion need, "peaking" and "classification" factors are added to the ADP projection to calculate a bed projection.  The peaking factor accounts for those instances when a jail's population exceeds the monthly average.  Ventura's peaking factor is calculated at 4.4% from several years of monthly data analyzed.  The classification factor helps to ensure that enough beds are available for required custody and security separations, excluding unrated medical, mental health and disciplinary isolation beds.  A standard industry planning practice classification factor of 5% is added to provide this margin.

Table 6.3 presents the Bed space Projection.  This projection is followed by Table 6.4 that allocates the bed capacity projection into gender and basic security level categories that will be useful in developing the architectural space program for the proposed expansion.  Section 5.0, Jail System Inmate Population Analysis, contained a breakdown of the jail system's population that was used as the basis for allocating the bed needs projections.  Over the most recent five years the average gender breakdown has equaled approximately 86% male and 14% female. The security levels applied to the projected bed needs were computed from the average security level distribution of the most recent five years, which was: 42% maximum, 38% medium, and 20% minimum security.

Table 6.3 highlights the recommended projection model results for 5-, 10- and 15-year outlooks from 2007 showing the County to need 2,061 beds by 2012; 2,257 beds by 2017; and 2,452 beds by 2022.  Table 6.4 provides a breakdown of the total projections by gender and the three general security levels.

Table 6.3
**Recommended Bed Space Projection**

| Bedspace Projections | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Projected ADP (Model 1 ARIMA) | 1,884 | 1,920 | 1,955 | 1,991 | 2,027 | 2,063 | 2,098 | 2,134 | 2,170 | 2,206 | 2,242 |
| Peaking = 4.4% | 83 | 84 | 86 | 88 | 89 | 91 | 92 | 94 | 95 | 97 | 99 |
| Classification = 5% | 94 | 96 | 98 | 100 | 101 | 103 | 105 | 107 | 109 | 110 | 112 |
| **Total Projected Beds** | **2,061** | **2,100** | **2,139** | **2,178** | **2,217** | **2,257** | **2,296** | **2,335** | **2,374** | **2,413** | **2,452** |

Source: Carter Goble Lee; October 2006.

P000089

Ventura County Todd Road Jail Needs Assessment and Engineering Analysis

The gender breakdowns in Table 6.4 are based on the most recent gender ratios in the jail system.  The security levels are the same categories as used in the data reports provided to the CSA by the Sheriff's Department and also reflect current ratios by category.

Table 6.4
**Projection Allocation by Gender and Security Level**

| Bed Classification | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Projected Bed Need | 2,061 | 2,100 | 2,139 | 2,178 | 2,217 | 2,257 | 2,296 | 2,335 | 2,374 | 2,413 | 2,452 |
| Males = 86% | 1,773 | 1,806 | 1,840 | 1,873 | 1,907 | 1,941 | 1,974 | 2,008 | 2,042 | 2,075 | 2,109 |
| Maximum (41%) | 727 | 740 | 754 | 768 | 782 | 796 | 809 | 823 | 837 | 851 | 865 |
| Medium (37%) | 656 | 668 | 681 | 693 | 706 | 718 | 730 | 743 | 755 | 768 | 780 |
| Minimum (22%) | 390 | 397 | 405 | 412 | 420 | 427 | 434 | 442 | 449 | 457 | 464 |
| Females = 14% | 289 | 294 | 299 | 305 | 310 | 316 | 321 | 327 | 332 | 338 | 343 |
| Maximum (41%) | 118 | 121 | 123 | 125 | 127 | 130 | 132 | 134 | 136 | 139 | 141 |
| Medium (37%) | 107 | 109 | 111 | 113 | 115 | 117 | 119 | 121 | 123 | 125 | 127 |
| Minimum (22%) | 63 | 65 | 66 | 67 | 68 | 70 | 71 | 72 | 73 | 74 | 76 |

Source: Carter Goble Lee:  October 2006.

Since TRJ is an all-cell (no dormitories to house inmates) facility it provides County detention staff with a great deal of flexibility to assign any custody group to virtually any of the six or seven housing sections in any of the four units of Cluster 1.  The same will be true for the Phase 1B expansion assuming that the same design is retained for Cluster 2.  Thus, while the number of inmates within each security level can be expected to fluctuate somewhat over time and the number of female inmates continues to grow at a faster rate than males, TRJ housing design will allow the County to readily accommodate such fluctuations as needed.

## 6.4 Conclusions

- Seven different projection models were developed that computed the future inmate ADP for the Jail system for the years 2012, 2017 and 2022.  Year 2022 outcomes ranged from a low ADP of 1,969 to a high of 2,545.  An ADP-based Box Jenkins ARIMA model that projected an ADP of 2,242 by 2022 was found to be the most appropriate fit for Ventura County that also had very positive test scores for statistical reliability.

- The ADP projections provided the basis to estimate the number of rated beds needed in future years by adding both a "peaking factor" and a "classification factor."  These additions help assure having enough beds to accommodate periodic average peaks in jail admissions and to separate inmates into discrete housing units by gender, custody needs and security levels.  These computations added 4.4% for peaking and 5% for classification separations resulting in a need for:

  o 2,061 rated beds by 2012
  o 2,257 rated beds by 2017
  o 2,452 rated beds by 2022

- An allocation of the 2022 projected bed need by gender and security level using the most recently available ratios in the Jail system resulted in:

P000090

Ventura County Todd Road Jail Needs Assessment and Engineering Analysis

Table 6.5
**Projected Bed Need by Gender and Security Level**

| Security Level | Male | Female |
|---|---|---|
| Maximum | 865 | 141 |
| Medium | 780 | 127 |
| Minimum | 464 | 75 |
| **TOTAL** | **2,109** | **343** |

P000091

Ventura County Todd Road Jail Needs Assessment and Engineering Analysis

P000092

# 7.0 INMATE PROGRAMS AND SPECIALIZED SERVICE NEEDS

This section documents the Department's inmate programs and non-jail based alternative supervision diversion programs.  For the alternative supervision and diversion programs the impact in terms of reduced jail ADP is estimated to show one of the primary benefits of having such a program.  The caseloads for five of the jail diversion programs are summarized for four to six years as available.

## 7.1 Inmate Programs

Ventura County provides a focus for providing education, training and programs to help inmates meet local job opportunity needs in that sector.  The programs currently provided at TRJ that will be extended to support the expansion include:

1. **Vocational Training** with emphasis on local agricultural and landscape employment opportunities.
2. **Print Shop** where inmates learn the trade in printing of County government and Sheriff's Department forms and reports.
3. **GED** classes.
4. **Life Skills** training classes by the Santa Barbara Adult Education Program, which also provides all classroom education programs at TRJ.
5. **Computer Applications** are taught focused on basic MS Windows Office programs.
6. **English As a Second Language.**
7. **Alcoholics Anonymous and Narcotics Anonymous** in evening classes for addicts.
8. **Bible Study** classes by two employed chaplains with one stationed at TRJ and one at PTDF, plus volunteer religious leaders.
9. **Religious Services** by the two employed chaplains and volunteer religious leaders.
10. **County Behavioral Health Agency** provides discharge/pre-release counseling and planning for inmates with mental disorders that includes making sure that a prescribed medication supply is available for those in need.
11. **County Public Health Agency** AIDS awareness sessions and individual counseling.

With the expansion of TRJ, additional multi-purpose group rooms dedicated for small group activities, education, training, counseling and treatment programs will be needed.  These rooms will be centralized, for access by inmates in the existing and new Clusters.

## 7.2 Mental Health Needs

Approximately 15% of Ventura's jail population requires mental health attention.  The majority do not need a "mental health" bed; they need a housing section that supports their individual program and treatment needs.  For those who are not able to function in general population, a dedicated housing section should be planned to also include a nursing station, counseling rooms and custody staff with mental health treatment staff also assigned.  Mental health staff would need to provide diagnostics, develop treatment plans, work directly with the facility's health care staff, and assist in coordinating post release treatment plans with appropriate County agencies.  It is currently anticipated that approximately 24 beds would be utilized for meeting this need.  Some inmates will remain in the section long-term, but others will transition back to general population housing once they are deemed stable and ready.

P000093

Ventura County Todd Road Jail Needs Assessment and Engineering Analysis

---

**7.3 Medical Disability Needs**

The Ventura system, like all jail systems, includes a significant number of persons with physical disabilities who do not require a "medical bed", but should be housed separately from the general inmate population.  These individuals may include those who are geriatric, infirm, amputees, diabetics, those with serious vision impairments, etc.  These individuals will be assigned to a medical infirmary.  This could be accomplished by modifying the design of a housing section to support the physically disabled to include a nursing station, physical therapy room and custody staff who oversee the infirmary with medical care support staff.  Alternately, depending on operational programming and design decisions a separate dedicated medical/mental health unit could be built centrally. It is currently anticipated that the medical infirmary would need approximately 24 beds.

P000094

Ventura County Todd Road Jail Needs Assessment and Engineering Analysis

# 8.0 LOCAL DETENTION SYSTEM DIVERSION ALTERNATIVES STATUS AND CAPACITIES

The County has implemented a number of community-based jail diversion programs through its Probation Department, which diverts a sizeable number of criminal offenders away from the jail system. The Probation Department provides all diversion programs available in Ventura County. Aside from probation supervision, the major alternative focus of the Probation Department is on the Proposition 36 Substance Abuse Program and its residential Work Furlough Program, which is supported by several treatment and counseling programs. Additionally, the County's jail diversion alternatives also include three adult work programs, four employment support/preparedness programs and one drug treatment program for Work Furlough participants:[4] There are no plans to expand these programs at this time as their full capacity has not yet been used although they have a track record for several years in diverting a substantial number of criminal offenders.

## 8.1 State Proposition 36 Drug Program (Substance Abuse Act of 2000)

This State-mandated program provides for the post conviction placement of "non-violent primarily misdemeanant substance abuse offenders" (users not traffickers) to probation with treatment. It is also required for all "non-violent drug offenders" who are or would otherwise be sentenced to the local detention system. The County's Behavioral Health Agency provides both residential and non-residential treatment for some program participants. The majority of the caseload is served by nine for-profit outpatient private providers and seven for-profit residential providers throughout the County.

The treatment design is organized in a 3-level program that is generally followed by each provider agency. Each program level provides different degrees of treatment intensity and regimen depending on the offender's acuity and needs related to substance abuse. Level 1 is for first time and casual/recreational users; Level 2 is for those with a more substantial history of usage; and Level 3 is for those who are addicted with a history of deep involvement in substance abuse.

Table 8.1
**Proposition 36 Drug Program Caseloads**

| Program Action | 2001/02 | 2002/03 | 2003/04 | 2004/05 | 2005/06 |
|---|---|---|---|---|---|
| Assessments | 1,275 | 1,235 | 815 | 828 | 726 |
| Program Transfers | NA | NA | 99 | 116 | 97 |
| Re-assessments | 205 | 833 | 884 | 1,047 | 703 |
| Program Completions | 29 | 245 | 435 | 451 | 364 |

Source: County Probation Department, October 2006.

---

[4] Program descriptions are summarized from phone interviews, narratives and data provided by staff of the Ventura County Probation Department, October 2007.

P000095

Findings – Table 8.1 indicated the program completions have exceeded 360 for the last three years compared to 245 for 2002/03. Also, the completion rate was only 20% for 2002/03 but improved to 53% in its third year and has remained at approximately 50% since then. Program Transfers are persons transferred to another geographical jurisdiction where the Probation Department arranges with a local agency to provide similar types of supervision and treatment. Re-assessments are made for program participants who either dropped out of the program or committed another offense. For 2005/06 the 703 re-assessments were a substantial drop of 33% from 1,047 re-assessments in 2004/05.

If the 364 offenders who completed the program in 2005/06, instead had been inmates at TRJ, these inmates *would have increased the jail ADP by approximately 21, at the current 21 day ALOS.*

## 8.2 Work Furlough Program

The Work Furlough facility is located at the Camarillo Airport Complex, which is a 2-story, former military barrack building that was remodeled for a 250-bed capacity. However, only 180 beds are available due to repair needs. The facility's average daily population has recently been 120 offenders.

Work Furlough provides criminal offenders with the opportunity to maintain jobs while completing their local sentence instead of being confined to jail. To participate in the program inmates are required to work a minimum of 24 hours weekly with a maximum allowable time away from the Work Furlough Facility of 6 days per week and 12 hours per day including travel time. Participation may also require attendance in treatment programs such as Domestic Violence, AA or NA meetings at the Facility or off-site. An inmate must have at least a 20-day sentence; not be denied work furlough by the sentencing court; attain a score of not more than 18.5 points on the program screening instrument; and/or qualify as a participant who would benefit from various specialized treatment programs developed to meet the needs of defined populations.

As noted, this Program requires residential confinement at the Probation Department's Work Furlough facility during the night or non-work hours for all participants. The facility has a number of offices for use by resident supervisors and provider agency staff, a large dining hall that doubles as a large group activity room, and one large conference room.

Table 8.2
**Work Furlough Program Placements and Caseloads**

| Year | 2001/02 | 2002/03 | 2003/04 | 2004/05 | 2005/06 | 2006/07 3 Mos. |
|---|---|---|---|---|---|---|
| **WF Placements** | 727 | 712 | 755 | 770 | 771 | 165 |
| **WF ADP** | 97 | 89 | 103 | 118 | 116 | 115 |

Source: County Probation Department, October 2006.

P000096

Findings – Table 8.2 indicated the program experienced some growth in placements from 727 in 2001/02 to 771 for 2005/06 and a slight growth in the ADP for the same period as summarized below.  If the 3-month partial year data continues at the same level for 2006/07 there will be a drop in the number of placements and the ADP.

Since this program has averaged over 110 participants for the past four years it clearly has the capacity to continue diverting eligible offenders, which is very important since the average ADP of 110 offenders would otherwise take up 110 jail beds.

If an average of just 700 annual Work Furlough placements were instead inmates at TRJ, *they would account for an ADP of 40, at the current 21 day ALOS.*

## 8.3 Work Release Program

Work release is used as an alternative for criminal, traffic and domestic cases in Ventura County and by State Penal Code placement can be made by the judge if they conclude that the "person is a fit subject thereof."  Different from many counties it is a non-residential program with all offenders living independently, but required to check in at the Work Furlough Facility between 7:30 AM and 3:30 PM each day.  The Work Release program is permitted to reject or remove a defendant despite the court's referral.  It is intended for those offenders who represent a low risk to public safety and are sentenced to 30 days or less in the County jail.  Participants are normally required to pay a fee from their earnings to help cover the cost of the program.  The court may remand the participant to jail if they do not appear at their work program at the time and place agreed to and may be required to serve the balance of their sentence time in jail.

Table 8.3
**Work Release Program Participants**

| Year | 2000/01 | 2001/02 | 2002/03 | 2003/04 | 2004/05 | 2005/06 |
|---|---|---|---|---|---|---|
| **WR Clients Paid** | 1,923 | 1,958 | 1,603 | 2,475 | 1,790 | 1,389 |

Source: County Probation Department, October 2006.

Findings – As Table 8.3 indicates, similar to the Work Furlough Program, Work Release does have an impact on jail overcrowding for convicted offenders who would otherwise spend a local jail sentence of 30 days or less.  For example, taking a 6-year average of participants from Table 8.3, if approximately 1,860 offenders had instead spent an average of 21 days in the County jail system, *they would account for an ADP of approximately 107, which would have a major impact on jail overcrowding.*

## 8.4 Direct Work

This is an option for the court to require an offender to perform a certain amount of public service, usually in multiples of days, weeks or hours, but can be whatever the judge decides.  Offenders with medical limitations can be referred to a community-based organization to complete their requirement.  Direct Work requires the participant to work in a community service that benefits the general public.  This program is used for violations of probation as well as an original sentence.  Participants are normally required to pay a fee from their earnings to help cover the cost of the program.  Like Work Release, the court may remand the participant in

P000097

Ventura County Todd Road Jail Needs Assessment and Engineering Analysis

jail if they do not appear at their work program at the time and place agreed to and may be required to serve the balance of their sentence time in jail.

Table 8.4
Direct Work Program Participants

| Year | 2000/01 | 2001/02 | 2002/03 | 2003/04 | 2004/05 | 2005/06 |
|---|---|---|---|---|---|---|
| DW Clients Paid | 760 | 440 | 536 | 549 | 427 | 413 |

Source: County Probation Department, October 2006.

Findings – Table 8.4 indicates Direct Work has had a somewhat similar pattern of fluctuation as Work Release since 2000/01 including a decline to its lowest count in 2005/06.  However, like Work Release it also has a beneficial impact on reducing the demand for jail beds.  For example, taking a 6-year average of participants from Table 8.4, if approximately 520 Direct Work offenders, had instead, spent an average of 21 days in *jail, they would account for an ADP of approximately 30.*

## 8.5 Educational Furlough

This program is supplemental to the Work Furlough Program intended for those Work Furlough participants who need or have a desire for educational advancement.  Jail inmates who are students may apply for admission to the Program and thereby continue their education while completing a local sentence.  Part-time students are required to have or seek part-time employment, while full-time students are not required to do so.

Findings – The Program is reportedly used to a very limited degree and typically has less than 10 participants at any time. Since it is not a comprehensive treatment / diversion program on its own, it cannot be attributed to reducing jail population.   However, as a supplemental educational opportunity for offenders it should have some beneficial impact in reducing recidivism by a small number of offenders.

## 8.6 Stages

The Stages Program is supplemental to the Work Furlough Program and only those offenders who are in Work Furlough may apply to or be referred to Stages. The Stages Program is a substance abuse program managed by Miracle Recovery Centers, Inc. under contract with Probation.  It is designed to provide a complement to the Work Furlough program and interested applicants can request consideration at the time of their Work Furlough initial screening.  The Stages Program Coordinator reviews and approves all applicants.

The Stages program budget provides two instructors/counselors who are permitted to have no more than 30 in a group.  Participants meet twice a week in 2-hour sessions.   They are also required to attend AA or NA classes as appropriate twice a week.  Depending on their condition and needs some participants are also involved in individual counseling with the same instructor who teaches their class.

Finding – Since this program, like Education Furlough, is supplemental to the Work Furlough Program involving some of that same population, it does not provide an added direct impact on reducing jail population.  However, to the extent that this program deters substance abuse

P000098

offenders away from drug involvement, it would be considered useful and effective as a treatment program to the extent that the same offenders do not re-offend and go to jail.

## 8.7 Employment Resources Development

Since 1998, job counselors from the County's Employment Resources Development agency have worked with Work Furlough and Stages inmates under a funding grant.  While the program was originally targeted at victims of domestic violence to increase their employability, it is now open to all inmates.   Usage data shows that the program is primarily used by Stages participants who are unemployed and lack job-seeking skills.  In addition to job preparedness training, counselors also work with offenders on improving their general life skills.

Finding – Since this also is a supplemental program for Work Furlough offenders it does not provide an added direct impact on reducing jail population.  However, to the extent that it helps offenders to obtain employment it would be considered useful and effective, especially to the extent that the same offenders do not re-offend and go to jail.

## 8.8 Look for Work Job Search

New Work Furlough inmates are counseled for seeking employment, education, or vocational training and are generally given three weeks to secure a position.  Some may be assigned to a Work Release crew for up to two weeks and then given two more weeks to find employment.  Those who are not employed at the end of their initial term limit are remanded to PTDF.  Typically less than ten Work Furlough inmates are involved in this job seeking assistance program.

Finding – While this program benefits a relatively small number of offenders, it can have a benefit similar to the Employment Resources Development Program described above to the extent that offenders are successful in finding and keeping employment.

## 8.9 Conclusions

In total, the County's jail diversion programs have a beneficial impact on reducing the severity of crowding in the already overcrowded jail system.  The lower cost per offender per day to operate such programs (especially with participants paying for part of the program cost) compared to the cost per day of a jail bed is economically advantageous for the County.   As long as these programs can continue to supervise enough offenders whose risk level is appropriate for community-based supervision, their operation should be cost efficient and helpful in reducing the demand for jail beds.

Four of the probation Department's treatment / diversion programs are directly attributable to jail system population reduction.   The other four provide specialized support for enrollees in each of the four primary treatment / diversion programs that reported caseload results in Tables 8.1, 8.2, 8.3 and 8.4.

The combined estimated impact of the Probation Department's four primary programs on reducing jail system population computed in ADP Is as follows:

P000099

Ventura County Todd Road Jail Needs Assessment and Engineering Analysis

| | |
|---|---|
| Proposition 36 Drug Diversion | 21 |
| Work Furlough | 40 |
| Work Release | 107 |
| Direct Work | 30 |
| **Total Estimated ADP Reduction** | **198** |

From this assessment it does not appear that the County could expect to make a substantial increase in jail diversion at this time by changing or expanding its community-based offender supervision programs. Moreover, at some future date, the criteria for program eligibility may need to be changed in order to keep pace with the continued growth in higher risk and more serious offenders. Otherwise the volume of offenders found eligible for diversion will diminish and so reduce the impact of the programs. To do so, the Justice system and public would need to approve of opening the programs to more high risk non-violent offenders.

From discussions with Probation Department staff, it appears that the County's programs are reaching most of the offenders found to be safe and suitable for community supervision under current eligibility criteria. The programs would be reviewed in more depth with the Court, Prosecuting Attorney and Public Defender in order to determine if any substantial adjustments in eligibility criteria are warranted that would increase the diversion of a significant number of criminal offenders.

P000100

# 9.0 PROPOSED EXPANSION OPTIONS, PROGRAMS AND STAFFING ANALYSIS

The following section provides a description of the space needs that should be accommodated in the expansion, both by the individual components needed in the expansion and how those components could be organized in three optional site expansion plans.

## 9.1 Expansion Options

Each site expansion option is geared to a different rated bed capacity based on three different target years for reaching capacity from the future bed needs projections for Ventura County. A fourth option (Section 10) illustrates a complete "Build-out" of TRJ on its existing site. This option is in response to the Governor's proposal being debated in the 2007 legislative session that could substantially increase the number of convicted felons confined to the County jail rather than State prison.

Figures 9.1, 9.2 and 9.3 graphically represent Expansion Options that relate to different rated bed capacities. Each Option is sized to correspond to different future bed needs projections for 2012, 2017 and 2022 respectively.

## 9.2 Expansion Programs

Narratives describing the programs recommended to be included in each expansion option are presented hereunder in the general order given by the CSA Title 24 Physical Plant Regulations for Local Detention Facilities. Title 24, Section 13-102 (c) 3 specifies and requires that at a minimum these functional components be addressed in an expansion project. Refer to sub-sections 9.5, 9.8, and 9.11.

## 9.3 Expansion Staffing Analysis

One of the County's major responsibilities for an expanded TRJ will be the provision of additional staffing required to operate the new housing units and expanded support components. Accordingly the staffing pattern currently used at TRJ was examined for application to the proposed expansion options assuming that the same general housing component design as was constructed for Phase 1A would be used again. Four optional expansion concept plans were developed and four staffing tables for each option ranging from a 528 rated bed capacity to 2,304 rated beds (refer to Section 10, Full Build Out for Expansion Option 4). The Department's 2006 current staff classifications and ranks appropriate for each type of housing and non-housing post were used.

A preliminary staffing needs analysis has been completed for each of the four different optional expansion concepts under consideration. Tables 9.1, 9.3 and 9.5 indicate the detailed staffing allocations by position, business shift (8 AM – 5 PM); 12-hour day and night shifts for each of the teams; relief staff; and totals. All positions are organized in the tables by their respective spatial or operational component of TRJ.

Companion Tables 9.2, 9.4, and 9.6 provide summaries of each staffing plan by position classification and compensation categories. The analysis was done in close cooperation with TRJ staff in order to assure that the allocations would provide for efficient and sound staffing

P000101

Ventura County Todd Road Jail Needs Assessment and Engineering Analysis

practices and procedures consistent with TRJ's organization, operational philosophy and methods.

## 9.4 Expansion Option 1

**Option 1** will reach capacity in the year 2012, and includes the addition of Cluster 2, 528 rated beds, comprised of maximum and medium security beds.  One Unit will be dedicated to 24 new medical and 24 mental health beds with administration space and all required clinic functions. This Unit will be at the far southwest edge of the facility with easy access to emergency vehicles on the extended perimeter road. This expansion would include a pantry and inmate program building, expanded commissary, warehouse and central plant, modifications to the existing intake/release building including new holding cells, a dedicated video visitation center at the administration building and expansion of the locker rooms at the Muster Building.

Option 1 will provide Ventura County with a total jail system capacity of 2,103 rated beds. Option 1 is the largest expansion that can be constructed under the existing CUP and also complies with the SEIR.

Figure 9.1
**Expansion Option 1**
**528 New Rated Beds and 48 Bed Medical/Mental Unit**

P000102

Ventura County Todd Road Jail Needs Assessment and Engineering Analysis

---

**9.5 Program Spaces Option 1**

Housing Types

The expansion as provided for in the 1991 Site Master Plan as 1B and designated in this report as Option 1, will utilize the same basic design concept used in Phase 1A (existing facility).  All cells will meet or exceed 77 square feet; therefore, the cells are adequate for either single or double occupancy and include dayrooms.  The design concept consists of 18, 16-cell general and special needs population units and one, 14-cell administrative segregation unit.  The special needs populations (persons with physical and mental health disabilities) require separation from the general inmate population.  These populations are distinct from those individuals who require ongoing medical or psychiatric attention and therefore need to be housed in a medical and/or mental health unit.

The current facility lacks a disciplinary isolation capacity. Inmates who require short term segregation due to disciplinary violations cannot be effectively separated from the rest of the population.  The facility's current administrative segregation unit has 14 cells and is not large enough to handle TRJ's current administrative segregation population.  As a result, the expansion will include an additional 48-cell housing unit that will be dedicated to short term disciplinary isolation housing. These are non-rated beds by CSA standards. There will also be a 24-bed medical infirmary and an adjacent 24-bed mental health section, both of which are also non-rated beds by CSA standards.

Dayrooms

The proposed expansion will provide the same overall floor plan design as included in the Phase 1A housing Cluster 1.  This means that the standard layout for each of the six 16-cell "sections" that normally make up a housing "Unit" will have the same dayroom conditions as constructed in Phase 1A, except that one restroom will be added to each dayroom to comply with current standards.  All dayrooms will comply with the 35 net square feet per inmate standard for the maximum number of inmates that may occupy the dayroom at one time.

Visiting

A video visitation system is proposed to provide all regular visits for inmates in the Facility.  This will require the design of inmate visiting stations with a CRT type audiovisual station to be located inside each housing section (pod) so that inmates are not required to leave their assigned housing section for a video visitation.  This will also require the design of video visitation stations for the visitors in new space to be added to the public lobby at the Administration Building.  This system will save costs that would otherwise be incurred to construct the same public visitor corridor and secure visiting booths inside the housing cluster's central core as was needed in Phase 1A.  The public visitor's video visitation stations can be constructed at a much lower cost since they will be located at the public lobby and thus outside the building's secure perimeter construction zone.

Programs Space

The design of the housing cluster to be added in Option 1 includes one multipurpose room in each housing Unit (three in the entire new Cluster 2) that will be available for inmate programs, classes and small group functions at housing.  The medical infirmary will not have program spaces.  The Central Inmate Services will be moved and expanded to provide additional space

P000103

Ventura County Todd Road Jail Needs Assessment and Engineering Analysis

for program staff offices.  For Options 2 or 3, or in the event inmate programs were to be expanded substantially, rooms built along the secure corridor linking Cluster 2 to the Central Services Building could provide an alternate location for centralized program spaces.

<u>Medical and Mental Health Services</u>

As part of the expansion TRJ will require an expansion of the medical and mental health resources to give the facility the capability to maintain inmates with medical or mental health conditions requiring medical housing.  This need is separate and distinct from the special needs inmates with disabilities including geriatric, infirmed, mentally handicapped, or mentally ill. Currently, the system's medical beds are located at the downtown facility and are consistently at full capacity and do not have space for expansion.  TRJ expansion will include space for all medical records and certain administrative spaces in order to vacate the same space at the PTDF, thus allowing needed infirmary beds to be added at the PTDF.

TRJ's current and future bed count is large enough that TRJ needs its own clinic and infirmary operation with medical beds.  The only alternative would be the costly transfer of inmates who require low level infirmary care to area hospitals.  Video monitoring will be required in the medical and mental health areas.  Option 1 provides for 24 general medical beds, 24 mental health beds, 6 negative pressure isolation beds, and 4 safety cells.

<u>Outdoor Exercise</u>

The three general population housing Units (96 cells each) in Option 1 will each have two adjacent dedicated outdoor recreation yards in the same secure design as in Phase 1A.  Two recreation yards will be included in the medical and mental health services unit.

<u>Attorney Interview Rooms</u>

In addition to private/confidential interview rooms located in the central core of Housing Cluster 2, attorneys will also have the option to use the video visitation system.  Each of the four Units in the Housing Cluster Building will have 3 private/attorney visiting/interview rooms in its central core in the same manner as in Phase 1A.  Video visitation systems in other jails are being used frequently by attorneys although some still prefer a face to face visit, when papers need to be signed or documents reviewed.

<u>Confidential Interview Rooms</u>

The same private/confidential interview rooms in each Unit core used for attorneys as noted above will also be available for other professional private interviews as needed.

<u>Intake/Release/Processing</u>

As part of any expansion the County will need to make certain modifications to TRJ's intake/transfer processing area for three reasons.  First, as described above the original 1991 facility mission to hold only convicted and sentenced inmates has been reversed by trends yielding a majority of pretrial detainees and a minority of convicted and sentenced inmates at TRJ.  Secondly, the overall growth in the system's need for bed space and the lack of additional capacity or expansion potential at PTDF places a greater volume of demand on TRJ for which expansion was planned.  Thirdly, in the event that a catastrophe or emergency condition

P000104

disrupted the centralized booking/intake operation at PTDF, TRJ would need to be able to provide that critical function 24 hours a day, seven days a week.

Unlike sentenced inmates, pretrial inmates require regular transportation to court and greater holding cell capacity. While court transportation accounts for the majority of movement through the intake area, at least twice weekly inmates are transported to PTDF for x-rays and other medical practices. Currently, the intake area can properly hold 76 persons with a configuration that includes four 16-person holding cells and four 3-person holding cells. The area also has one "safety" cell.

The need to increase the number of holding cells is not due solely to the area's total capacity but also the inability to properly separate prisoners (i.e. by custody and security needs). For example, Administrative Segregation inmates need to be isolated from other inmates, protective custody inmates going to court need to be separated from general population inmates, and new incoming detainees need to be kept separate from those inmates going to court.

To meet current requirements, the following actions are recommended. The facility needs to add 1 large capacity cell (16 persons), 2 small capacity cells and convert the existing Photo/Search cell to Safety Cell. However, to also meet the capacity needs that will result from the Option 1 expansion, an additional large capacity cell and two additional small capacity cells must be developed. The end result of this expansion will be an intake area capable of properly holding approximately 120 inmates, as compared to the area's current 76-seat capacity.

<u>Central, Cluster and Housing Control Rooms</u>

The TRJ design and master plan has a 3-level control room system including Central Control, Cluster Control and Housing Unit Control. These three provide a common hierarchy of facility control from outer property and building entry/exit centrally controlled; to interior secure zone movement at the Cluster level; and thirdly, internal housing unit control. Since Option 1 will construct a Housing Cluster of almost the identical design as Phase 1A it will include a new Cluster Control Room. Each of the four housing units will have their own Housing Unit Control Booth for managing up to 7 Sections of 16 cells each per Unit.

Central Control will be upgraded to accommodate: 1) movement between Clusters 1 and 2; 2) all primary and backup monitoring and control functions associated with the construction of the Option 1 Housing Cluster expansion; and 3) all related facility improvements. Where related expansions or modifications are made to Phase 1A buildings any monitoring and control function that should be centrally managed will be included in the modifications for either head-end equipment and/or for linking new remote equipment to the central systems.

The Option 1 Cluster Control Room to be located in the central core of the new Housing Cluster Building will have generally the same control functions as in 1A. Those functions will include:

- All Cluster alarm "annunciators"
- Secure door control for entry/exit from each housing unit corridor into the central circulation hallway at Cluster Control
- Each Unit's inside emergency fire door exit from one section
- All CCTV monitoring cameras
- Radio system linkage to dispatch
- Backup monitoring of all cell intercoms

Ventura County Todd Road Jail Needs Assessment and Engineering Analysis

___

- Keys for manual unlocking.

Depending on programming and design this Cluster Control, like Cluster 1A, may need to also have certain interior zone remote door controls that are separated from the Cluster 2 Building. If, for example, a new separate secure circulation corridor is added as a direct linkage from Cluster 2 to the Central Services Building, the Cluster Control would at least need to control the access doors at its end.

If Housing Cluster 3 should become a part of the expansion, the Cluster 3 Control Room will need to be included and activated to manage Cluster level control functions in that building and its linkages to the rest of the facility.

The new Housing Unit Control Booth located in each of the four new Housing Units will have controls for:

- Door status and fire alarm system monitoring
- Remote locking control of doors for all cells, recreation yards, multipurpose room, exam room, interview rooms and interior emergency evacuation doors in dayroom partition walls
- CCTV monitoring of section entry door areas, dayrooms and recreation yards
- Cell intercoms
- Shutoffs for TVs, showers, water, inmate phones and electrical outlets in the dayrooms
- A PA/broadcast system for each Section within the Unit.  The system would have the ability to broadcast into all Sections and individual Sections via the PA/video (dayroom TV).

Administration

No direct administrative space additions or changes are proposed for Option 1.  TRJ public entry lobby at the front of the Administration Building will be modified to accommodate the video visitation room noted above.

Staff Stations

Each of the four Housing Units in Cluster 2 will have one "Housing Control Booth" with adequate floor area for one desk with two chairs for a Deputy while working in the Booth.  The Booth will be the same design as in the 1A Housing Units with a direct line of sight into each housing section in the Unit and will provide those security and life safety monitoring systems as described above in the Control Rooms section.

Public Areas

There will only be two changes in the public area at TRJ.  One will be at the public entry where a video visitation room will be constructed adjacent to the Public Lobby as described above to accommodate the inmate visitors' end of the video system.  The other will be to expand the staff and visitor parking commensurate with the projected staffing need and added inmate capacity related to a typical visitor ratio.

P000106

Ventura County Todd Road Jail Needs Assessment and Engineering Analysis

---

Kitchen/Food Service

Some kitchen equipment will need to be upgraded to larger capacities. Some limited remodeling/expansion of the kitchen area will be needed to accommodate the additional food carts that will be stored in the cart staging area adjacent to the production and tray preparation area. The dishwasher area will need to be either relocated or remodeled to accommodate higher volumes, and additional freezers and coolers will be needed that could be accommodated on an existing exterior wall by the bake shop.

Laundry

New larger capacity washers and dryers will be needed for the additional inmate capacity, but can be accommodated in the existing space.

Receiving Space

No change is proposed for the existing loading dock/receiving area.

Maintenance Space

The existing small maintenance closet in the Central Services Building is at capacity and sufficient work space is not available in the Central Plant Building. The expansion will need to include the addition of workshop space sized for several workbenches for use by multiple trades. It appears that the Central Plant Building may be a logical place to add this space, which would require an expansion of its floor area.

Storage

Additional storage space will be added to the warehouse to accommodate additional food freezers and coolers as noted above. New higher density racking systems will also be considered for use in the warehouse.

Inmate private property storage capacity at PTDF will also be increased through the addition of high density storage bins.

Central Plant

Engineering studies will be used to confirm whether any new chillers and an additional emergency generator and related switch controls will be needed for Option 1.

Commissary

The existing commissary may need to be reconfigured or moved to allow needed food service and food storage space to be added in the kitchen area. The existing commissary floor area is sufficient to accommodate the needs of the Option 1 expansion provided that the existing racking and shelving is replaced with a higher density storage system. It will also continue to serve the PTDF commissary delivery needs.

P000107

Ventura County Todd Road Jail Needs Assessment and Engineering Analysis

---

Perimeter Road

TRJ perimeter road will be altered as needed to accommodate a secure ambulance sally port at the proposed Medical/Mental Health Infirmary unit.

Secure Hallways

The addition of an additional Housing Cluster is likely to require the addition of a secure interior hallway to link it directly to the Central Services Building and avoid unnecessary added inmate movement through the existing Housing Cluster's central core.  This secure hallway will also provide an alternative location for adding future Central Services and Inmate Programs spaces as may be needed for expansion.  It would also provide an alternative means of emergency evacuation and temporary refuge.

Staff Services/Muster Building

The existing Muster Building will be expanded to accommodate additional lockers, showers, toilets, staff assembly and storage needed to support the projected staff increase from the expansion.

P000108

Ventura County Todd Road Jail Needs Assessment and Engineering Analysis

## 9.6 Staffing Analysis Option 1

### Table 9.1
Option 1 Medical/Mental Unit in Housing Cluster – EXPANSION STAFFING ESTIMATE

(528 rated bed capacity with 624 Total Beds - Non rated beds are 24 medical infirmary, 24 mental health infirmary, 48 disciplinary segregation)

| Ref. No. | Position | Business Shift* | Days A | Days B | Nights A | Nights B | Shift Staff Total | Relief Factor (.18) | Relief Staff FTE | Total Staff FTE |
|---|---|---|---|---|---|---|---|---|---|---|
| | **Administration, Visitation, Food Service** | | | | | | | | | |
| 1 | Custody Records Tech | 2.0 | 0.0 | 0.0 | 0.0 | 0.0 | 2.0 | 0.0 | 0.0 | 2.0 |
| 2 | Adminstrative Aide | 1.0 | 0.0 | 0.0 | 0.0 | 0.0 | 1.0 | 0.0 | 0.0 | 1.0 |
| 3 | Senior Deputy Administration | 1.0 | 0.0 | 0.0 | 0.0 | 0.0 | 1.0 | 0.0 | 0.0 | 1.0 |
| 4 | Video Visitation System Svc Tech II | 0.0 | 1.0 | 1.0 | 0.0 | 0.0 | 2.0 | 0.18 | 0.4 | 2.4 |
| 5 | Jail Cook (main and prep kitchen) | 8.0 | 0.0 | 0.0 | 0.0 | 0.0 | 8.0 | 0.0 | 0.0 | 8.0 |
| | Sub Total | 12.0 | 1.0 | 1.0 | 0.0 | 0.0 | 14.0 | NA | 0.4 | **14.4** |
| | | | | | | | | | | |
| | **Facility Security** | | | | | | | | | |
| 6 | Intake Sergeant | 0.0 | 1.0 | 1.0 | 0.0 | 0.0 | 2.0 | 0.0 | 0.0 | 2.0 |
| 7 | Intake Deputy (Classification) | 0.0 | 2.0 | 2.0 | 0.0 | 0.0 | 4.0 | 0.0 | 0.0 | 4.0 |
| 8 | Housing Sergeant | 0.0 | 1.0 | 1.0 | 1.0 | 1.0 | 4.0 | 0.0 | 0.0 | 4.0 |
| 9 | Cluster Control Svc Tech II | 0.0 | 1.0 | 1.0 | 1.0 | 1.0 | 4.0 | 0.18 | 0.7 | 4.7 |
| 10 | Central Control Svc Tech II | 0.0 | 1.0 | 1.0 | 1.0 | 1.0 | 4.0 | 0.18 | 0.7 | 4.7 |
| 11 | Intake Deputy | 0.0 | 1.0 | 1.0 | 0.0 | 0.0 | 2.0 | 0.18 | 0.4 | 2.4 |
| 12 | Prep Kitchen Deputy | 0.0 | 1.0 | 1.0 | 1.0 | 1.0 | 4.0 | 0.18 | 0.7 | 4.7 |
| 13 | Inmate Transport and Movement Deputy | 0.0 | 3.0 | 3.0 | 2.0 | 2.0 | 10.0 | 0.18 | 1.8 | 11.8 |
| | Sub Total | 0.0 | 11.0 | 11.0 | 6.0 | 6.0 | 34.0 | NA | 4.3 | **38.3** |
| | | | | | | | | | | |
| | **Unit E General Population - 192 beds** | | 6, 32-bed sections (192 rated beds) | | | | | | | |
| 14 | Housing Senior Deputy | 0.0 | 0.5 | 0.5 | 0.5 | 0.5 | 2.0 | 0.18 | 0.4 | 2.4 |
| 15 | Housing Control Room Svc Tech II | 0.0 | 2.0 | 2.0 | 0.0 | 0.0 | 4.0 | 0.18 | 0.7 | 4.7 |
| 16 | Housing Deputy | 0.0 | 2.0 | 2.0 | 2.0 | 2.0 | 8.0 | 0.18 | 1.4 | 9.4 |
| | Sub Total | 0.0 | 4.5 | 4.5 | 2.5 | 2.5 | 14.0 | NA | 2.5 | **16.5** |
| | | | | | | | | | | |
| | **Unit F General Population - 192 beds** | | 6, 32-bed sections (192 rated beds) | | | | | | | |
| 17 | Housing Senior Deputy | 0.0 | 0.5 | 0.5 | 0.5 | 0.5 | 2.0 | 0.18 | 0.4 | 2.4 |
| 18 | Housing Control Room Svc Tech II | 0.0 | 2.0 | 2.0 | 0.0 | 0.0 | 4.0 | 0.18 | 0.7 | 4.7 |
| 19 | Housing Deputy | 0.0 | 2.0 | 2.0 | 2.0 | 2.0 | 8.0 | 0.18 | 1.4 | 9.4 |
| | Sub Total | 0.0 | 4.5 | 4.5 | 2.5 | 2.5 | 14.0 | NA | 2.5 | **16.5** |
| | | | | | | | | | | |
| | **Unit G General Population - 128 beds** | | 4, 24-bed sections and 2, 16-bed sections (128 rated beds) | | | | | | | |
| 20 | Housing Senior Deputy | 0.0 | 0.5 | 0.5 | 0.5 | 0.5 | 2.0 | 0.18 | 0.4 | 2.4 |
| 21 | Housing Control Room Svc Tech II | 0.0 | 2.0 | 2.0 | 0.0 | 0.0 | 4.0 | 0.18 | 0.7 | 4.7 |
| 22 | Housing Deputy | 0.0 | 2.0 | 2.0 | 2.0 | 2.0 | 8.0 | 0.18 | 1.4 | 9.4 |
| | Sub Total | 0.0 | 4.5 | 4.5 | 2.5 | 2.5 | 14.0 | NA | 2.5 | **16.5** |
| | | | | | | | | | | |
| | **Unit H - 112 Beds and Medical/Mental Clinic** | | Special Housing and medical clinic (16 rated beds, 96 non-rated beds) | | | | | | | |
| 23 | Unit Senior Deputy | 0.0 | 0.5 | 0.5 | 0.5 | 0.5 | 2.0 | 0.18 | 0.4 | 2.4 |
| 24 | Housing Control Room Svc Tech II | 0.0 | 2.0 | 2.0 | 0.0 | 0.0 | 4.0 | 0.18 | 0.7 | 4.7 |
| 25 | Administrative Segregation Deputy - 16 beds | 0.0 | 1.0 | 1.0 | 1.0 | 1.0 | 4.0 | 0.18 | 0.7 | 4.7 |
| 26 | Disciplinary Isolation Deputy - 48 beds | 0.0 | 1.0 | 1.0 | 1.0 | 1.0 | 4.0 | 0.18 | 0.7 | 4.7 |
| 27 | Mental Health Unit Deputy - 24 beds | 0.0 | 1.0 | 1.0 | 1.0 | 1.0 | 4.0 | 0.18 | 0.7 | 4.7 |
| 28 | Medical Infirmary Deputy - 24 beds | 0.0 | 1.0 | 1.0 | 1.0 | 1.0 | 4.0 | 0.18 | 0.7 | 4.7 |
| 29 | Medical Clinic Deputy | 0.0 | 1.0 | 1.0 | 0.0 | 0.0 | 2.0 | 0.18 | 0.4 | 2.4 |
| | Sub Total | 0.0 | 7.5 | 7.5 | 4.5 | 4.5 | 24.0 | NA | 4.3 | **28.3** |
| | | | | | | | | | | |
| | **Total Staff** | 12.0 | 33.0 | 33.0 | 18.0 | 18.0 | 114.0 | NA | 16.6 | **130.6** |

* Business Shift hours vary as required for maximum efficiency.

Source: Carter Goble Lee with assistance from TRJ staff, November 21, 2006.

P000109

Ventura County Todd Road Jail Needs Assessment and Engineering Analysis

Table 9.2
**Option 1- 528 Rated Capacity Beds with 624 Total Beds**
**TRJ Staffing Estimate Summary**

| Class Code | Class Title | Current | Expansion | Total |
|---|---|---|---|---|
| 0020 | Adm Aide | 1 | 1.0 | 2.0 |
| 0030 | Adm Asst I | 1 | 0.0 | 1.0 |
| 0043 | Commander | 1 | 0.0 | 1.0 |
| 0494 | Manager Food Service | 1 | 0.0 | 1.0 |
| 0504 | Custody Records Tech | 5 | 2.0 | 7.0 |
| 0550 | Deputy Sheriff | 64 | 72.4 | 136.4 |
| 0786 | Sr Shf Food Svc | 1 | 0.0 | 1.0 |
| 0914 | Jail Cook | 16 | 8.0 | 24.0 |
| 1001 | Spvr Sheriff Food Service | 1 | 0.0 | 1.0 |
| 1057 | Sr Deputy Sheriff | 16 | 10.4 | 26.4 |
| 1285 | Courier II | 1 | 0.0 | 1.0 |
| 1331 | Management Asst I | 1 | 0.0 | 1.0 |
| 1332 | Management Asst II | 1 | 0.0 | 1.0 |
| 1365 | Sheriff Cadet II | 1 | 0.0 | 1.0 |
| 1539 | Sheriff's Service Tech II | 30 | 30.7 | 60.7 |
| 1698 | Sheriff's Captain | 1 | 0.0 | 1.0 |
| 1780 | Sheriff's Sergeant | 8 | 6.0 | 14.0 |
|  | **TOTALS** | **150** | **130.6** | **280.6** |

Source: Carter Goble Lee with assistance from TRJ staff, November 21, 2006.

P000110

Ventura County Todd Road Jail Needs Assessment and Engineering Analysis

---

**9.7 Expansion Option 2**

**Option 2** will reach capacity in the year 2017, and includes expansion of the support facilities described in Option 1, and a fourth Housing Unit in Cluster 2. Option 2 increases the number of rated beds to 656.  24 new medical and 24 mental health cells would be placed in a new building near the intake/release building at the northwest end of the facility.  This location of medical and mental health next to the current intake/release area would require a supplemental vehicle sally port access for that unit.

Option 2 will provide Ventura County with a total jail system capacity of 2,231 rated beds. Option 2 can be constructed under the existing SEIR but will require a new CUP.

Figure 9.2
**Expansion Option 2**
**656 New Rated Beds and 48 Bed Medical/Mental Unit Separated from Housing**

**9.8 Program Spaces Option 2**

Option 2 adds 656 rated beds and includes all of the same expansions described in Option 1, with the exception of moving the new medical and mental health wing over to the administration building.  The location of that facility allows the fourth unit of Cluster 2 to be used as additional housing for medium security beds.

P000111

Ventura County Todd Road Jail Needs Assessment and Engineering Analysis

Option 2 centralizes medical and mental health services near the current medical and mental health location, maintaining centralized access to the vehicle sally port and is in fact closer to kitchen and laundry service.

## 9.9 Staffing Analysis Option 2

Table 9.3

Option 2 Medical/Mental Unit Separated from Housing Cluster – EXPANSION STAFFING RECOMMENDATION

(656 rated bed capacity with 752 Total Beds - Non rated beds are 24 medical infirmary, 24 mental health infirmary, 48 disciplinary isolation)

| Ref. No. | Position | Business Shift* | Days A | Days B | Nights A | Nights B | Shift Staff Total | Relief Factor (.18) | Relief Staff FTE | Total Staff FTE |
|---|---|---|---|---|---|---|---|---|---|---|
| | Administration, Visitation, Food Service | | | | | | | | | |
| 1 | Custody Records Tech | 2.0 | 0.0 | 0.0 | 0.0 | 0.0 | 2.0 | 0.0 | 0.0 | 2.0 |
| 2 | Administrative Aide | 1.0 | 0.0 | 0.0 | 0.0 | 0.0 | 1.0 | 0.0 | 0.0 | 1.0 |
| 3 | Senior Deputy Administration | 1.0 | 0.0 | 0.0 | 0.0 | 0.0 | 1.0 | 0.0 | 0.0 | 1.0 |
| 4 | Video Visitation System Svc Tech II | 0.0 | 1.0 | 1.0 | 0.0 | 0.0 | 2.0 | 0.18 | 0.4 | 2.4 |
| 5 | Jail Cook (main and prep kitchen) | 8.0 | 0.0 | 0.0 | 0.0 | 0.0 | 8.0 | 0.0 | 0.0 | 8.0 |
| | Sub Total | 12.0 | 1.0 | 1.0 | 0.0 | 0.0 | 14.0 | NA | 0.4 | 14.4 |
| | Facility Security | | | | | | | | | |
| 6 | Intake Sergeant | 0.0 | 1.0 | 1.0 | 0.0 | 0.0 | 2.0 | 0.0 | 0.0 | 2.0 |
| 7 | Intake Deputy (Classification) | 0.0 | 2.0 | 2.0 | 0.0 | 0.0 | 4.0 | 0.0 | 0.0 | 4.0 |
| 8 | Housing Sergeant | 0.0 | 1.0 | 1.0 | 1.0 | 1.0 | 4.0 | 0.0 | 0.0 | 4.0 |
| 9 | Cluster Control Svc Tech II | 0.0 | 1.0 | 1.0 | 1.0 | 1.0 | 4.0 | 0.18 | 0.7 | 4.7 |
| 10 | Central Control Svc Tech II | 0.0 | 1.0 | 1.0 | 1.0 | 1.0 | 4.0 | 0.18 | 0.7 | 4.7 |
| 11 | Intake Deputy | 0.0 | 1.0 | 1.0 | 0.0 | 0.0 | 2.0 | 0.18 | 0.4 | 2.4 |
| 12 | Prep Kitchen Deputy | 0.0 | 1.0 | 1.0 | 1.0 | 1.0 | 4.0 | 0.18 | 0.7 | 4.7 |
| 13 | Inmate Transport and Movement Deputy | 0.0 | 3.0 | 3.0 | 2.0 | 2.0 | 10.0 | 0.18 | 1.8 | 11.8 |
| | Sub Total | 0.0 | 11.0 | 11.0 | 6.0 | 6.0 | 34.0 | NA | 4.3 | 38.3 |
| | Unit E General Population - 192 beds | | 6, 32-bed sections (192 rated beds) | | | | | | | |
| 14 | Housing Senior Deputy | 0.0 | 0.5 | 0.5 | 0.5 | 0.5 | 2.0 | 0.18 | 0.4 | 2.4 |
| 15 | Housing Control Room Svc Tech II | 0.0 | 2.0 | 2.0 | 0.0 | 0.0 | 4.0 | 0.18 | 0.7 | 4.7 |
| 16 | Housing Deputy | 0.0 | 2.0 | 2.0 | 2.0 | 2.0 | 8.0 | 0.18 | 1.4 | 9.4 |
| | Sub Total | 0.0 | 4.5 | 4.5 | 2.5 | 2.5 | 14.0 | NA | 2.5 | 16.5 |
| | Unit F General Population - 192 beds | | 6, 32-bed sections (192 rated beds) | | | | | | | |
| 17 | Housing Senior Deputy | 0.0 | 0.5 | 0.5 | 0.5 | 0.5 | 2.0 | 0.18 | 0.4 | 2.4 |
| 18 | Housing Control Room Svc Tech II | 0.0 | 2.0 | 2.0 | 0.0 | 0.0 | 4.0 | 0.18 | 0.7 | 4.7 |
| 19 | Housing Deputy | 0.0 | 2.0 | 2.0 | 2.0 | 2.0 | 8.0 | 0.18 | 1.4 | 9.4 |
| | Sub Total | 0.0 | 4.5 | 4.5 | 2.5 | 2.5 | 14.0 | NA | 2.5 | 16.5 |
| | Unit G General Population - 192 beds | | 6, 32-bed sections (192 rated beds) | | | | | | | |
| 20 | Housing Senior Deputy | 0.0 | 0.5 | 0.5 | 0.5 | 0.5 | 2.0 | 0.18 | 0.4 | 2.4 |
| 21 | Housing Control Room Svc Tech II | 0.0 | 2.0 | 2.0 | 0.0 | 0.0 | 4.0 | 0.18 | 0.7 | 4.7 |
| 22 | Housing Deputy | 0.0 | 2.0 | 2.0 | 2.0 | 2.0 | 8.0 | 0.18 | 1.4 | 9.4 |
| | Sub Total | 0.0 | 4.5 | 4.5 | 2.5 | 2.5 | 14.0 | NA | 2.5 | 16.5 |
| | Unit H High Custody - 128 beds | | 4, 16-bed sections and 2, 32-bed sections (80 rated beds, 48 non-rated Discp. Isolation) | | | | | | | |
| 23 | Housing Senior Deputy | 0.0 | 0.5 | 0.5 | 0.5 | 0.5 | 2.0 | 0.18 | 0.4 | 2.4 |
| 24 | Housing Control Room Svc Tech II | 0.0 | 2.0 | 2.0 | 0.0 | 0.0 | 4.0 | 0.18 | 0.7 | 4.7 |
| 25 | Housing Deputy | 0.0 | 2.0 | 2.0 | 2.0 | 2.0 | 8.0 | 0.18 | 1.4 | 9.4 |
| | Sub Total | 0.0 | 4.5 | 4.5 | 2.5 | 2.5 | 14.0 | NA | 2.5 | 16.5 |
| | Medical and Mental Health Unit | | 1, 24-bed medical unit and 1, 24-bed mental health unt, all non rated beds | | | | | | | |
| 26 | Medical/Mental Senior Deputy | 0.0 | 1.0 | 1.0 | 1.0 | 1.0 | 4.0 | 0.18 | 0.7 | 4.7 |
| 27 | Medical/Mental Deputy (1 in Clinic day shifts) | 0.0 | 2.0 | 2.0 | 1.0 | 1.0 | 6.0 | 0.18 | 1.1 | 7.1 |
| | Sub Total | 0.0 | 3.0 | 3.0 | 2.0 | 2.0 | 10.0 | NA | 1.8 | 11.8 |
| | Total Staff | 12.0 | 33.0 | 33.0 | 18.0 | 18.0 | 114.0 | 0.0 | 16.6 | 130.6 |

* Business Shift hours vary as required for maximum efficiency.

Source: Carter Goble Lee with assistance from TRJ staff, November 21, 2006.

P000112

Ventura County Todd Road Jail Needs Assessment and Engineering Analysis

Table 9.4
**Option 2 – 656 Rated Capacity Beds with 752 Total Beds**
**TRJ Expansion Staffing Estimate Summary**

| Class Code | Class Title | Current | Expansion | Total |
|---|---|---|---|---|
| 0020 | Adm Aide | 1 | 1.0 | 2.0 |
| 0030 | Adm Asst I | 1 | 0.0 | 1.0 |
| 0043 | Commander | 1 | 0.0 | 1.0 |
| 0494 | Manager Food Service | 1 | 0.0 | 1.0 |
| 0504 | Custody Records Tech | 5 | 2.0 | 7.0 |
| 0550 | Deputy Sheriff | 64 | 67.7 | 131.7 |
| 0786 | Sr Shf Food Svc | 1 | 0.0 | 1.0 |
| 0914 | Jail Cook | 16 | 8.0 | 24.0 |
| 1001 | Spvr Sheriff Food Service | 1 | 0.0 | 1.0 |
| 1057 | Sr Deputy Sheriff | 16 | 15.2 | 31.2 |
| 1285 | Courier II | 1 | 0.0 | 1.0 |
| 1331 | Management Asst I | 1 | 0.0 | 1.0 |
| 1332 | Management Asst II | 1 | 0.0 | 1.0 |
| 1365 | Sheriff Cadet II | 1 | 0.0 | 1.0 |
| 1539 | Sheriff's Service Tech II | 30 | 30.7 | 60.7 |
| 1698 | Sheriff's Captain | 1 | 0.0 | 1.0 |
| 1780 | Sheriff's Sergeant | 8 | 6.0 | 14.0 |
| | **TOTALS** | **150** | **130.6** | **280.6** |

Source: Carter Goble Lee with assistance from TRJ staff, November 21, 2006.

P000113

**9.10 Expansion Option 3**

**Option 3** will reach capacity in the year 2022, and adds 877 beds to the current facility, adding one additional housing unit at  Cluster 3 and providing  24 mental health and 24 medical beds with vehicle access on the extended perimeter road.  The other significant difference in this expansion is moving the pantry and programs building back to the service core and shortening the link between Cluster 1 and Cluster 2.

Option 3 will provide Ventura County with a total jail system capacity of 2,452 rated beds. Option 3 can be constructed under the existing SEIR but will require a new CUP. Option 3 would require a variance to the Ventura County General Plan because lot coverage will exceed 5%.

Figure 9.3
**Expansion Option 3**
**877 New Rated Beds and 48 Bed Medical/Mental Unit in Housing Cluster 3**

**9.11 Program Spaces Option 3**

Option 3 adds 877 rated beds to the current facility, by adding one additional Unit in a partial build-out of the third cluster.  The rest of the build-out of the third cluster would be the mental health and medical unit, with vehicle access on the extended perimeter road.

P000114

Ventura County Todd Road Jail Needs Assessment and Engineering Analysis

The other significant difference in this expansion is moving the pantry and programs building back to the service core and shortening the link between Cluster 1 and Cluster 2.  Option 3 centralizes services near the core service area.

## 9.12 Staffing Analysis Option 3

Table 9.5

**Option 3 -  EXPANSION STAFFING RECOMMENDATION**

(877 rated bed capacity with 973 Total Beds - Non rated beds are 24 medical infirmary, 24 mental health infirmary, 48 disciplinary isolation)

| Ref. No. | Position | Business Shift* | Days A | Days B | Nights A | Nights B | Shift Staff Total | Relief Factor (.18) | Relief Staff FTE | Total Staff FTE |
|---|---|---|---|---|---|---|---|---|---|---|
| | **Administration, Visitation, Food Service** | | | | | | | | | |
| 1 | Custody Records Tech | 2.0 | 0.0 | 0.0 | 0.0 | 0.0 | 2.0 | 0.0 | 0.0 | 2.0 |
| 2 | Adminstrative Aide | 1.0 | 0.0 | 0.0 | 0.0 | 0.0 | 1.0 | 0.0 | 0.0 | 1.0 |
| 3 | Senior Deputy Administration | 1.0 | 0.0 | 0.0 | 0.0 | 0.0 | 1.0 | 0.0 | 0.0 | 1.0 |
| 4 | Video Visitation System Svc Tech II | 0.0 | 1.0 | 1.0 | 0.0 | 0.0 | 2.0 | 0.18 | 0.4 | 2.4 |
| 5 | Jail Cook (main and prep kitchen) | 8.0 | 0.0 | 0.0 | 0.0 | 0.0 | 8.0 | 0.0 | 0.0 | 8.0 |
| | Sub Total | 12.0 | 1.0 | 1.0 | 0.0 | 0.0 | 14.0 | NA | 0.4 | 14.4 |
| | | | | | | | | | | |
| | **Facility Security** | | | | | | | | | |
| 6 | Intake Sergeant | 0.0 | 1.0 | 1.0 | 0.0 | 0.0 | 2.0 | 0.0 | 0.0 | 2.0 |
| 7 | Intake Deputy (Classification) | 0.0 | 2.0 | 2.0 | 0.0 | 0.0 | 4.0 | 0.0 | 0.0 | 4.0 |
| 8 | Housing Sergeant (Clusters 2 and 3) | 0.0 | 2.0 | 2.0 | 2.0 | 2.0 | 8.0 | 0.0 | 0.0 | 8.0 |
| 9 | Cluster Control Svc Tech II (Clusters 2 and 3) | 0.0 | 2.0 | 2.0 | 2.0 | 2.0 | 8.0 | 0.18 | 1.4 | 9.4 |
| 10 | Central Control Svc Tech II | 0.0 | 1.0 | 1.0 | 1.0 | 1.0 | 4.0 | 0.18 | 0.7 | 4.7 |
| 11 | Intake Deputy | 0.0 | 1.0 | 1.0 | 0.0 | 0.0 | 2.0 | 0.18 | 0.4 | 2.4 |
| 12 | Prep Kitchen Deputy | 0.0 | 1.0 | 1.0 | 1.0 | 1.0 | 4.0 | 0.18 | 0.7 | 4.7 |
| 13 | Inmate Transport and Movement Deputy | 0.0 | 4.0 | 4.0 | 3.0 | 3.0 | 14.0 | 0.18 | 2.5 | 16.5 |
| | Sub Total | 0.0 | 14.0 | 14.0 | 9.0 | 9.0 | 46.0 | NA | 5.8 | 51.8 |
| | | | | | | | | | | |
| | **Unit E General Population - 192 beds** | 6, 32-bed sections (192 rated beds) | | | | | | | | |
| 14 | Housing Senior Deputy | 0.0 | 0.5 | 0.5 | 0.5 | 0.5 | 2.0 | 0.18 | 0.4 | 2.4 |
| 15 | Housing Control Room Svc Tech II | 0.0 | 2.0 | 2.0 | 0.0 | 0.0 | 4.0 | 0.18 | 0.7 | 4.7 |
| 16 | Housing Deputy | 0.0 | 2.0 | 2.0 | 2.0 | 2.0 | 8.0 | 0.18 | 1.4 | 9.4 |
| | Sub Total | 0.0 | 4.5 | 4.5 | 2.5 | 2.5 | 14.0 | NA | 2.5 | 16.5 |
| | | | | | | | | | | |
| | **Unit F General Population - 192 beds** | 6, 32-bed sections (192 rated beds) | | | | | | | | |
| 17 | Housing Senior Deputy | 0.0 | 0.5 | 0.5 | 0.5 | 0.5 | 2.0 | 0.18 | 0.4 | 2.4 |
| 18 | Housing Control Room Svc Tech II | 0.0 | 2.0 | 2.0 | 0.0 | 0.0 | 4.0 | 0.18 | 0.7 | 4.7 |
| 19 | Housing Deputy | 0.0 | 2.0 | 2.0 | 2.0 | 2.0 | 8.0 | 0.18 | 1.4 | 9.4 |
| | Sub Total | 0.0 | 4.5 | 4.5 | 2.5 | 2.5 | 14.0 | NA | 2.5 | 16.5 |
| | **Unit G General Population - 192 beds** | 6, 32-bed sections (192 rated beds) | | | | | | | | |
| 20 | Housing Senior Deputy | 0.0 | 0.5 | 0.5 | 0.5 | 0.5 | 2.0 | 0.18 | 0.4 | 2.4 |
| 21 | Housing Control Room Svc Tech II | 0.0 | 2.0 | 2.0 | 0.0 | 0.0 | 4.0 | 0.18 | 0.7 | 4.7 |
| 22 | Housing Deputy | 0.0 | 2.0 | 2.0 | 2.0 | 2.0 | 8.0 | 0.18 | 1.4 | 9.4 |
| | Sub Total | 0.0 | 4.5 | 4.5 | 2.5 | 2.5 | 14.0 | NA | 2.5 | 16.5 |
| | **Unit H High Custody/Flex - 157 beds** | 3, 16-bed sections; 1, 13-bed section; 3, 32-bed sections (109 rated beds, 48 non-rated Discp. Isolation) | | | | | | | | |
| 23 | Housing Senior Deputy | 0.0 | 0.5 | 0.5 | 0.5 | 0.5 | 2.0 | 0.18 | 0.4 | 2.4 |
| 24 | Housing Control Room Svc Tech II | 0.0 | 2.0 | 2.0 | 0.0 | 0.0 | 4.0 | 0.18 | 0.7 | 4.7 |
| 25 | Housing Deputy | 0.0 | 2.0 | 2.0 | 2.0 | 2.0 | 8.0 | 0.18 | 1.4 | 9.4 |
| | Sub Total | 0.0 | 4.5 | 4.5 | 2.5 | 2.5 | 14.0 | NA | 2.5 | 16.5 |
| | **Unit I General Population - 192 beds (Cluster 3)** | 6, 32-bed sections (192 rated beds) | | | | | | | | |
| 26 | Housing Senior Deputy | 0.0 | 0.5 | 0.5 | 0.5 | 0.5 | 2.0 | 0.18 | 0.4 | 2.4 |
| 27 | Housing Control Room Svc Tech II | 0.0 | 2.0 | 2.0 | 0.0 | 0.0 | 4.0 | 0.18 | 0.7 | 4.7 |
| 28 | Housing Deputy | 0.0 | 2.0 | 2.0 | 2.0 | 2.0 | 8.0 | 0.18 | 1.4 | 9.4 |
| | Sub Total | 0.0 | 4.5 | 4.5 | 2.5 | 2.5 | 14.0 | NA | 2.5 | 16.5 |
| | **Medical and Mental Health Unit** | 1, 24-bed medical unit and 1, 24-bed mental health unit, all non rated beds | | | | | | | | |
| 26 | Medical/Mental Senior Deputy | 0.0 | 1.0 | 1.0 | 1.0 | 1.0 | 4.0 | 0.18 | 0.7 | 4.7 |
| 27 | Medical/Mental Deputy (1 in Clinic day shifts) | 0.0 | 2.0 | 2.0 | 1.0 | 1.0 | 6.0 | 0.18 | 1.1 | 7.1 |
| | Sub Total | 0.0 | 3.0 | 3.0 | 2.0 | 2.0 | 10.0 | NA | 1.8 | 11.8 |
| | | | | | | | | | | |
| | **Total Staff** | 12.0 | 40.5 | 40.5 | 23.5 | 23.5 | 140.0 | 0.0 | 20.5 | 160.5 |

* Business Shift hours vary as required for maximum efficiency.

P000115

Ventura County Todd Road Jail Needs Assessment and Engineering Analysis

Table 9.6
**Option 3 – 877 Rated Capacity Beds with 973 Total Beds**
**TRJ Expansion Staffing Estimate Summary**

| Class Code | Class Title | Current | Expansion | Total |
|---|---|---|---|---|
| 0020 | Adm Aide | 1 | 1.0 | 2.0 |
| 0030 | Adm Asst I | 1 | 0.0 | 1.0 |
| 0043 | Commander | 1 | 0.0 | 1.0 |
| 0494 | Manager Food Service | 1 | 0.0 | 1.0 |
| 0504 | Custody Records Tech | 5 | 2.0 | 7.0 |
| 0550 | Deputy Sheriff | 64 | 81.9 | 145.9 |
| 0786 | Sr Shf Food Svc | 1 | 0.0 | 1.0 |
| 0914 | Jail Cook | 16 | 8.0 | 24.0 |
| 1001 | Spvr Sheriff Food Service | 1 | 0.0 | 1.0 |
| 1057 | Sr Deputy Sheriff | 16 | 17.5 | 33.5 |
| 1285 | Courier II | 1 | 0.0 | 1.0 |
| 1331 | Management Asst I | 1 | 0.0 | 1.0 |
| 1332 | Management Asst II | 1 | 0.0 | 1.0 |
| 1365 | Sheriff Cadet II | 1 | 0.0 | 1.0 |
| 1539 | Sheriff's Service Tech II | 30 | 40.1 | 70.1 |
| 1698 | Sheriff's Captain | 1 | 0.0 | 1.0 |
| 1780 | Sheriff's Sergeant | 8 | 10.0 | 18.0 |
| | **TOTALS** | **150** | **160.5** | **310.5** |

Source: Carter Goble Lee with assistance from TRJ staff, November 30, 2006.

**9.13 Summary of Costs per Bed**

TRJ staff provided the salary and fringe benefits computations applicable by the County's 2006 classification and compensation schedules for the total positions in each option.  The results were as follows:

Annual Staffing Cost
- Option 1 at 528 Rated Beds = 130.6 added FTE @ $15.2 million ($28,800/bed).
- Option 2 at 656 Rated Beds = 130.6 added FTE @ $15.4 million ($23,500/bed).
- Option 3 at 877 Rated Beds = 160.5 added FTE @ $18.7 million ($22,000/bed).

Operational costs include maintenance and utility cost required to operate the facility.

Annual Operational Cost
- Option 1 at 528 Rated Beds = $6.5 million ($12,300/bed).
- Option 2 at 656 Rated Beds = $6.5 million ($9,900/bed).
- Option 3 at 877 Rated Beds = $8.1 million ($9,236/bed).

P000116

Ventura County Todd Road Jail Needs Assessment and Engineering Analysis

---

The probable construction cost is based upon a detailed measurement of quantities where possible, reasonable allowances, and on industry costs established in 2006 for each of the Options. Refer to Appendix D for a summary breakdown of costs for each Option.

Construction Costs
- Option 1 at 528 Rated Beds = $69.3 million ($131,300/bed).
- Option 2 656 Rated Beds = $82.5 million ($125,800/bed).
- Option 3 at 877 Rated Beds = $88.7 million ($101,100/bed).

The design fee includes professional fees. It does not include inspection and testing, plan check, or building permit fees.

Design Costs
- Option 1 at 528 Rated Beds = $5.8 million ($11,000/bed).
- Option 2 at 656 Rated Beds = $7.0 million ($10,700/bed).
- Option 3 at 877 Rated Beds = $8.3 million ($9,500/bed).

The staff, operational, construction and design cost for the Waste Water Treatment Plant (WWTP) expansion will be presented in Section 12 of this report.

P000117

Ventura County Todd Road Jail Needs Assessment and Engineering Analysis

P000118

Ventura County Todd Road Jail Needs Assessment and Engineering Analysis

# 10.0 EXPANSION OPTION 4 – FULL BUILD-OUT

This section presents an expansion option designed to maximize the capacity at TRJ. This option will be needed in the event that a large number of state inmates are transferred to the county jail system.

## 10.1 Potential Impact of State Programs on Inmate Population

The California Governor's office is currently negotiating with the State legislature, County Sheriffs and other stakeholders to develop a plan to relocate approximately 40,000 state prison inmates to local jail facilities. The final recommendation has not been completed and there are several variations of the plan under consideration. Initially, the plan called for revising state sentencing laws to direct certain "non-violent" offenders sentenced to three years or less to serve their time in the County Jail. The Ventura County Sheriff's Department estimates that approximately 600 inmates per year would be housed locally instead of being transferred to State Prison. The majority of the sentences were in the two-three year range. Considering a stay of three years plus peaking and classification factors, the expected increase in the County's jail population is estimated to be approximately 1,969 inmates or a 119% increase.

A more recent proposal offered by a committee from the State Sheriff's Office is described below. This proposal reduces the length of stay from a maximum of three years to a maximum of eighteen months. This scenario results in an expected jail population increase of 985 inmates or 58%. Total jail population including both state and local inmates would increase to approximately 3,619 under the first proposal and 2,635 under the more recent proposal. Expansion Options 1, 2, and 3 as discussed in this report are based upon the projected increase for local inmates.  Those expansion options would not be sufficient to handle the increased number of expected state prison inmates. A Full Build-Out option for the Todd Road Jail is included for consideration to accommodate the expected increase of state prisoners housed in the County Jail system.

## 10.2 Expansion Option 4 – Full Build-Out

The maximum number of beds that could be constructed at TRJ, following the 1990 Master Plan, is 3,086. This includes 782 existing rated beds and 2,304 additional rated beds (in double occupancy cells).  However, to build 2,304 additional beds, modifications to the TRJ SEIR would be required since the SEIR limits the total number of rated beds at TRJ to 2,307. A variance to the General Plan is also required since lot coverage will exceed 5%.

Option 4 would raise the total rated bed capacity for the Ventura County Jail System as follows:

| | |
|---|---|
| PTDF current capacity | 793 |
| TRJ current capacity | 782 |
| Full Build-Out new beds | 2,304 |
| Total rated capacity | 3,879 |

P000119

Ventura County Todd Road Jail Needs Assessment and Engineering Analysis

Figure 10.1
**Expansion Option 4 - Full Build-Out**
**2,304 New Rated Beds and 48 Medical/Mental Beds**

**10.3 Program Spaces Option 4**

Option 4 is considerably different in its approach than Options 2 or 3.  Option 4 includes the addition of 768 new beds in a new Cluster 2, one unit being dedicated to new medical and mental health beds, a new pantry and program building, expanded commissary, warehouse and central plant, modification to intake, a dedicated video visitation center at the administration building, and a pre-engineered vehicle building.  Expansions of the warehouse and commissary would be considerably larger in Option 4.  The kitchen would be considered for conversion to a cook-chill unit.  Intake, medical and mental health would experience major expansions in the current core administration building.  Most significant would be the west build expansion of Clusters 3 and 4 with a pantry and programs wing for those clusters.  The perimeter road would be lengthened to enclose this significantly larger footprint.

P000120

Ventura County Todd Road Jail Needs Assessment and Engineering Analysis

---

**10.4 Staffing Analysis Option 4**

One of the County's major responsibilities for an expanded TRJ will be the provision of additional staffing required to operate the new housing units and expanded support components.   Accordingly the staffing pattern currently used at TRJ was examined for application to the proposed expansion options assuming that the same general housing component design as was constructed for Phase 1A would be used again.   This option of expansion was developed and a staffing table for 2,304 additional rated beds.   The Department's 2006 current staff classifications and ranks appropriate for each type of housing and non-housing post were used.

A preliminary staffing needs analysis has been completed for the expansion concepts under consideration.  Table 10.1 indicates the detailed staffing allocations by position, business shift (8 AM – 5 PM); 12-hour day and night shifts for each of the teams; relief staff; and totals.   All positions are organized in the tables by their respective spatial or operational component of TRJ.

Companion Table 10.2 indicates summaries of each staffing plan by position classification and compensation categories.

P000121

Ventura County Todd Road Jail Needs Assessment and Engineering Analysis

Table 10.1

EXPANSION STAFFING RECOMMENDATION TO FULL BUILD OUT (OPTION 4)

(2,304 rated bed capacity with 2,352 Total Beds - Non rated beds are 24 medical infirmary, 24 mental health infirmary)

| Ref. No. | Position | Business Shift* | Days A | Days B | Nights A | Nights B | Shift Staff Total | Relief Factor (.18) | Relief Staff FTE | Total Staff FTE |
|---|---|---|---|---|---|---|---|---|---|---|
| | **Administration, Visitation, Food Service** | | | | | | | | | |
| 1 | Custody Records Tech | 2.0 | 0.0 | 0.0 | 0.0 | 0.0 | 2.0 | 0.0 | 0.0 | 2.0 |
| 2 | Administrative Aide | 1.0 | 0.0 | 0.0 | 0.0 | 0.0 | 1.0 | 0.0 | 0.0 | 1.0 |
| 3 | Senior Deputy Administration | 1.0 | 0.0 | 0.0 | 0.0 | 0.0 | 1.0 | 0.0 | 0.0 | 1.0 |
| 4 | Video Visitation System Svc Tech II | 0.0 | 1.0 | 1.0 | 0.0 | 0.0 | 2.0 | 0.18 | 0.4 | 2.4 |
| 5 | Jail Cook (main and prep kitchen) | 8.0 | 0.0 | 0.0 | 0.0 | 0.0 | 8.0 | 0.0 | 0.0 | 8.0 |
| | Sub Total | 12.0 | 1.0 | 1.0 | 0.0 | 0.0 | 14.0 | NA | 0.4 | 14.4 |
| | | | | | | | | | | |
| | **Facility Security** | | | | | | | | | |
| 6 | Intake Sergeant | 0.0 | 1.0 | 1.0 | 0.0 | 0.0 | 2.0 | 0.0 | 0.0 | 2.0 |
| 7 | Intake Deputy (Classification) | 0.0 | 2.0 | 2.0 | 2.0 | 2.0 | 8.0 | 0.0 | 0.0 | 8.0 |
| 8 | Housing Sergeant (Clusters 2, 3, 4) | 0.0 | 3.0 | 3.0 | 3.0 | 3.0 | 12.0 | 0.0 | 0.0 | 12.0 |
| 9 | Cluster Control Svc Tech II (Clusters 2, 3,4) | 0.0 | 6.0 | 6.0 | 3.0 | 3.0 | 18.0 | 0.18 | 3.2 | 21.2 |
| 10 | Central Control Svc Tech II | 0.0 | 2.0 | 2.0 | 2.0 | 2.0 | 8.0 | 0.18 | 1.4 | 9.4 |
| 11 | Public Deputy | 0.0 | 1.0 | 1.0 | 0.0 | 0.0 | 2.0 | 0.18 | 0.4 | 2.4 |
| 12 | Prep Kitchen Deputy | 0.0 | 2.0 | 2.0 | 2.0 | 2.0 | 8.0 | 0.18 | 1.4 | 9.4 |
| 13 | Inmate Transport and Movement Deputy | 0.0 | 3.0 | 3.0 | 2.0 | 2.0 | 10.0 | 0.18 | 1.8 | 11.8 |
| | Sub Total | 0.0 | 20.0 | 20.0 | 14.0 | 14.0 | 68.0 | NA | 8.3 | 76.3 |
| 14 | **Medical and Mental Health Center** | | 1, 24-bed medical infirmary and 1, 24-bed mental health infirmary, all non rated beds | | | | | | | |
| 15 | Medical/Mental Senior Deputy | 0.0 | 1.0 | 1.0 | 1.0 | 1.0 | 4.0 | 0.18 | 0.7 | 4.7 |
| 16 | Medical/Mental Deputy (1 in Clinic day shifts) | 0.0 | 2.0 | 2.0 | 1.0 | 1.0 | 6.0 | 0.18 | 1.1 | 7.1 |
| | | 0.0 | 3.0 | 3.0 | 2.0 | 2.0 | 10.0 | NA | 1.8 | 11.8 |
| | **CLUSTER 2 - 768 RATED BEDS** | | | | | | | | | |
| | **Unit E General Population - 192 beds** | | 6, 32-bed sections (192 rated beds) | | | | | | | |
| 17 | Housing Senior Deputy | 0.0 | 0.5 | 0.5 | 0.5 | 0.5 | 2.0 | 0.18 | 0.4 | 2.4 |
| 18 | Housing Control Room Svc Tech II | 0.0 | 2.0 | 2.0 | 0.0 | 0.0 | 4.0 | 0.18 | 0.7 | 4.7 |
| 19 | Housing Deputy | 0.0 | 2.0 | 2.0 | 2.0 | 2.0 | 8.0 | 0.18 | 1.4 | 9.4 |
| | Sub Total | 0.0 | 4.5 | 4.5 | 2.5 | 2.5 | 14.0 | NA | 2.5 | 16.5 |
| | **Unit F General Population - 192 beds** | | 6, 32-bed sections (192 rated beds) | | | | | | | |
| 20 | Housing Senior Deputy | 0.0 | 0.5 | 0.5 | 0.5 | 0.5 | 2.0 | 0.18 | 0.4 | 2.4 |
| 21 | Housing Control Room Svc Tech II | 0.0 | 2.0 | 2.0 | 0.0 | 0.0 | 4.0 | 0.18 | 0.7 | 4.7 |
| 22 | Housing Deputy | 0.0 | 2.0 | 2.0 | 2.0 | 2.0 | 8.0 | 0.18 | 1.4 | 9.4 |
| | Sub Total | 0.0 | 4.5 | 4.5 | 2.5 | 2.5 | 14.0 | NA | 2.5 | 16.5 |
| | **Unit G General Population - 192 beds** | | 6, 32-bed sections (192 rated beds) | | | | | | | |
| 23 | Housing Senior Deputy | 0.0 | 0.5 | 0.5 | 0.5 | 0.5 | 2.0 | 0.18 | 0.4 | 2.4 |
| 24 | Housing Control Room Svc Tech II | 0.0 | 2.0 | 2.0 | 0.0 | 0.0 | 4.0 | 0.18 | 0.7 | 4.7 |
| 25 | Housing Deputy | 0.0 | 2.0 | 2.0 | 2.0 | 2.0 | 8.0 | 0.18 | 1.4 | 9.4 |
| | Sub Total | 0.0 | 4.5 | 4.5 | 2.5 | 2.5 | 14.0 | NA | 2.5 | 16.5 |
| | **Unit H High Custody - 192 beds** | | 6, 32-bed sections (192 rated beds) | | | | | | | |
| 26 | Housing Senior Deputy | 0.0 | 0.5 | 0.5 | 0.5 | 0.5 | 2.0 | 0.18 | 0.4 | 2.4 |
| 27 | Housing Control Room Svc Tech II | 0.0 | 2.0 | 2.0 | 0.0 | 0.0 | 4.0 | 0.18 | 0.7 | 4.7 |
| 28 | Housing Deputy | 0.0 | 2.0 | 2.0 | 2.0 | 2.0 | 8.0 | 0.18 | 1.4 | 9.4 |
| | Sub Total | 0.0 | 4.5 | 4.5 | 2.5 | 2.5 | 14.0 | NA | 2.5 | 16.5 |
| | **CLUSTER 3 - 768 RATED BEDS** | | | | | | | | | |
| | **Unit I General Population - 192 beds** | | 6, 32-bed sections (192 rated beds) | | | | | | | |
| 29 | Housing Senior Deputy | 0.0 | 0.5 | 0.5 | 0.5 | 0.5 | 2.0 | 0.18 | 0.4 | 2.4 |
| 30 | Housing Control Room Svc Tech II | 0.0 | 2.0 | 2.0 | 0.0 | 0.0 | 4.0 | 0.18 | 0.7 | 4.7 |
| 31 | Housing Deputy | 0.0 | 2.0 | 2.0 | 2.0 | 2.0 | 8.0 | 0.18 | 1.4 | 9.4 |
| | Sub Total | 0.0 | 4.5 | 4.5 | 2.5 | 2.5 | 14.0 | NA | 2.5 | 16.5 |

Page 62 of 174

P000122

Ventura County Todd Road Jail Needs Assessment and Engineering Analysis

Table 10.2
**Option 4 – 2,304 Rated Capacity of 2,352 Total Beds**
**TRJ Expansion Staffing Estimate Summary**

| Class Code | Class Title | Current | Expansion | Total |
|---|---|---|---|---|
| 0020 | Adm Aide | 1 | 1.0 | 2.0 |
| 0030 | Adm Asst I | 1 | 0.0 | 1.0 |
| 0043 | Commander | 1 | 0.0 | 1.0 |
| 0494 | Manager Food Service | 1 | 0.0 | 1.0 |
| 0504 | Custody Records Tech | 5 | 2.0 | 7.0 |
| 0550 | Deputy Sheriff | 64 | 152.0 | 216.0 |
| 0786 | Sr Shf Food Svc | 1 | 0.0 | 1.0 |
| 0914 | Jail Cook | 16 | 8.0 | 24.0 |
| 1001 | Spvr Sheriff Food Service | 1 | 0.0 | 1.0 |
| 1057 | Sr Deputy Sheriff | 16 | 34.0 | 50.0 |
| 1285 | Courier II | 1 | 0.0 | 1.0 |
| 1331 | Management Asst I | 1 | 0.0 | 1.0 |
| 1332 | Management Asst II | 1 | 0.0 | 1.0 |
| 1365 | Sheriff Cadet II | 1 | 0.0 | 1.0 |
| 1539 | Sheriff's Service Tech II | 30 | 89.7 | 119.7 |
| 1698 | Sheriff's Captain | 1 | 0.0 | 1.0 |
| 1780 | Sheriff's Sergeant | 8 | 14.0 | 22.0 |
| | **TOTALS** | **150** | **300.7** | **450.7** |

Source: Carter Goble Lee with assistance from TRJ staff, February 9, 2007.

**10.5 Summary of Costs per Bed**

TRJ staff provided the salary and fringe benefits computations applicable by the County's 2006 classification and compensation schedules for the total positions in each option.  The results were as follows:

Annual Staffing Cost
- Option 4 at 2,304 Rated Beds = 300.7 added FTE @ $35.7 million ($15,190/bed).

Operational costs include maintenance and utility cost required to operate the facility.

Annual Operational Cost
- Option 4 at 2,304 Rated Beds = $15.2 million ($6,600/bed).

The probable construction cost is based upon a detailed measurement of quantities where possible, reasonable allowances, and on industry costs established in 2006 for each of the Options. Refer to Appendix D for a summary breakdown of costs for each Option.

P000123

Ventura County Todd Road Jail Needs Assessment and Engineering Analysis

---

Construction Costs
- Option 4 at 2,304 Rated Beds = $128.5 million ($55,777/bed).

The design fee includes professional fees. It does not include inspection and testing, plan check, or building permit fees.

Design Costs
- Option 4 at 2,304 Rated Beds = $11.2 million ($4,900/bed).

The staff, operational, construction and design cost for the Waste Water Treatment Plant (WWTP) expansion will be presented in Section 11 of this report.

P000124

# 11.0 WASTEWATER TREATMENT PLANT

TRJ utilizes vacuum plumbing and gravity plumbing systems which produce 50,000 gallons per day (GPD). The low volume, high concentration waste is treated on-site via a "package type" waste water treatment plant (WWTP). The existing settling/evaporation ponds are designed to store approximately 50,000 GPD of waste water. The WWTP has the capacity to treat 80,000 GPD of waste. Any expansion to TRJ will require the WWTP to be upgraded or the waste disposed of by another manner. The expansion concepts presented will only utilize conventional gravity flow systems, which will increase the flow rate (Section 13.1, "Vacuum Waste System").

We have estimated the current and future waste stream from the facility as follows:
- Current TRJ                      50,000 GPD
- Expansion Option 1              150,000 GPD
- Expansion Option 2              160,000 GPD
- Expansion Option 3              200,000 GPD
- Expansion Full Build Out        350,000 GPD

Two Concepts were considered and reviewed to accommodate the increased waste stream as follows:

A. On-site WWTP, improve the capacity of the existing treatment facility.
B. Pipe the waste to Santa Clara Wastewater (SCWW) for treatment and processing.

## 11.1 Concept A

On-site WWTP would consist of the construction of a new package type treatment facility on-site to handle the increased waste stream. This unit would replace the currently constructed on-site facility and ultimately handle the capacity of Expansion Options 1, 2, 3 and 4. A typical system configuration is shown in Figure 11.1 (General Electric ZENON Z-MOD-L176 waste water treatment system).

Figure 11.1
**Waste Water Treatment System**



This system utilizes membrane bioreactor technology to treat the waste stream. It would be designed to treat an initial Maximum Daily Flow of 0.288 million gallons/day (MGD) (TRJ Expansion Option 3). This capacity would serve the needs of up to 2,500 persons (staff, public

P000125

and inmates).  The system as proposed can support a flow of up to 0.576 MGD for intermittent periods not exceeding twenty-four hours.  The system would be easily expandable to treat a 0.46 MGD (TRJ Expansion Option 4) which would handle up to 4,000 persons (staff, public and inmates).

The system would require an operator (1 FTE), use 727,764 (kW/hr/year) of electricity, would consume 600 gallons of Sodium Hypochlorite per year and 50 gallons of Citric Acid per year.

Expanded capacity of the existing percolation ponds would be required since the existing rate coincides with the current capacity of the ponds.  Construction of seven additional percolation ponds would be required to handle the difference between 0.05 MGD and 0.35 MGD.

TRJ currently has a permit from the Regional Board to operate at a capacity of 0.09 MGD. Therefore, any significant expansion to the facility would require obtaining either a new or modified permit from the Regional Board.  This would require additional groundwater hydrology and water quality studies.

The cost to purchase and install the treatment plant to handle 0.34 MGD is approximately $750,000.  This cost is for the treatment equipment only.  In addition to this, costs will be incurred for building additional percolation ponds and construction of the infrastructure to support the plant.  An estimate for the ponds and infrastructure would be in the range of $1.2 million to $1.5 million.

## 11.2 Concept B

SCWW owns and operates a 10" force main that runs from the plant in Santa Paula to a point of connection to the Oxnard wastewater system in the vicinity of Wooley and Mercantile in Oxnard, California. Santa Clara's current process to treat the waste is to screen and de-water the material, and then transport the residual to Oxnard for further treatment. The existing pipe has a capacity of 1.6 MGD operated at 120 PSI, and has the capacity to handle this increased load from TRJ. The existing pipe is located in or adjacent to Shell Road which runs directly behind (south of) the SCWW plant and behind TRJ property in an easement that has the capacity for one additional pipe to be installed.

Allowing SCWW to treat TRJ waste will require:
1. Construction of a lift station at Todd Road, including two submersible sewage pumps with duplicate utility services served by the on-site generator and an appropriately sized holding tank with a capacity of 8,000 to 10,000 gallons.
2. Construction of an 8" pipeline approximately one mile from Todd Road to SCWW, installed in the unused half of the existing easement.

The construction cost for these improvements would be approximately $2.6M. In addition to the construction cost a processing fee would be paid to SCWW in the range of $0.01 per gallon.

Table 11.1 indicates the cost for each expansion option for both the On-Site WWTP (Option A) and the transfer (piping) of the waste to SCWW.

P000126

Ventura County Todd Road Jail Needs Assessment and Engineering Analysis

Table 11.1

| WWTP Options Summary | | | | |
|---|---|---|---|---|
| | On-Site | | Pipe to SCWW | |
| TRJ Expansion Options | Capital Cost | Operating Cost | Capital Cost | Operating Cost |
| Option 1 | $1.75m | $250k | $3.00m | $550k |
| Option 2 | $2.00m | $275k | $3.00m | $650k |
| Option 3 | $2.25m | $300k | $3.00m | $750k |
| Option 4 | $2.50m | $350k | $3.00m | $1.25m |

**11.3 Conclusions**

Based on the conceptual information developed for this report, the Concept A for on-site
handling of the waste appears to be the most cost effective solution and would allow for the use
of reclaimed water for irrigation, and potential reuse in the facility.

P000127

Ventura County Todd Road Jail Needs Assessment and Engineering Analysis

P000128

Ventura County Todd Road Jail Needs Assessment and Engineering Analysis

## 12.0 EXPANSION COST ANALYSIS

The following Table 12.1 summarizes by Options, the number of rated beds, design and construction cost and cost per bed, and the annual staff and operating cost and cost per bed.

Table 12.1

| TRJ Expansion Options | New Rated Beds | Design & Construction* | Design & Construction Cost/Bed | Additional Annual (Staff & Operating Cost)* | Annual (Cost/Bed) |
|---|---|---|---|---|---|
| 1. Reach Capacity 2012 | 528 | $75.1 M | $142 K | $21.7 M | $41.5 K |
| 2.  Reach Capacity 2017 | 656 | $89.5 M | $136 K | $21.9 M | $34.0 K |
| 3. Reach Capacity 2022 | 877 | $97.0 M | $111 K | $27.2 M | $31.1 K |
| 4. Full Build-Out | 2304 | $139.7 M | $61 K | $50.9 M | $22.1 K |

\* Does not include WWTP costs

### 12.1 Conclusions

Considering the current over-crowding conditions within the local detention system, the local trends affecting the jail population, and the need for medical and mental health beds, any of the options would reduce the overcrowded conditions and provide needed medical and mental beds.  However, careful consideration must be given as to when the needed beds are to be constructed and once constructed, how soon the facility would fall into an over-crowded condition again.

**Option 1**
- Add 528 rated beds.
- Meets CUP conditions.
- Assumes Permit Adjustment granted (+10% beds).
- Total build-out = 371,723 SF. Meets General Plan conditions.
- Staffing for expansion requires 131 additional FTE's at $15.2M annually.
- Expansion of the WWTP.
- Complies with SEIR.

**Option 2**
- Add 656 rated beds.
- Request TRJ CUP modification. Hold public hearings.
- Total build-out = 413,920 SF. Meets General Plan conditions.
- Staffing requires 131 additional FTE's at $15.4M annually.
- Expansion of the WWTP.
- Complies with SEIR.

**Option 3**
- Add 877 rated beds.
- Request modification to CUP.

P000129

- Total build-out = 452,923 SF. Request variance to General Plan (exceeds 5% lot coverage).
- Requires public hearings.
- Staffing requires 161 additional FTE's at $19.2M annually.
- Expansion of the WWTP.
- Complies with SEIR.

**Full Build-Out (Option 4)**

- Add 2,304 rated beds.
- Request modification to CUP.
- Total build-out. Request variance to General Plan (exceeds 5% lot coverage).
- Requires modification of the SEIR.
- Requires public hearings.
- Staffing requires 300 additional FTE's at $35.7M annually.
- Expansion of the WWTP.

**12.2 Financing**

**Ventura County Funding**

Should the jail expansion move forward, funding for the construction may be provided by the County from the "General Fund". A proposed .5% sales tax initiative is being considered.  It is calculated that it would take two years to create enough revenue to fund the jail project.  An additional funding source is Proposition 172, a fund dedicated for public safety, creating revenue through taxes.  It is shared with the DA, Probation, Public Defender, Sheriff's Department and other County agencies, but it cannot fund the entire jail.

Design/Build/Finance, Design/Build/Finance/Operate, and Public/Private Partnerships options are not considered viable options for Ventura County, due to the fact that the County's interest rate is lower than that offered by third party finance providers.  The motivating factor to choose the alternative delivery model would be driven by savings to the County, not a faster schedule.

Also, there is currently no surplus County land available for sale to fund the expansion.

**The Governor's Proposal**

Governor Schwarzenegger proposed a ten-year $222.6 billion Strategic Growth Plan as a part of his 2006-07 proposed State Budget. This plan would provide general obligation bond funding in the amount of $68 billion for critically needed infrastructure projects in five categories: Public Safety; Transportation; Education; Water/Flood Control; Courts and other improvements. The public safety component would provide $12 billion over ten years to add approximately 83,000 jail beds throughout California for local and state prisoners. The mix of funding is proposed to be $4 billion in state bond authority, $4 billion in local matching funds, and $4 billion in state general fund payments to counties for housing state inmates in county jails.

Operational revenue offset from the State is also possible, but it is unknown if the State would provide to the County the current daily reimbursement rate of $68.22 for State inmates residing in County jails. The estimated annual revenue based on the current reimbursement would be:

P000130

Ventura County Todd Road Jail Needs Assessment and Engineering Analysis

1. 1,969 State inmates with 3 years or less generates $42,028,690 annually.

2. 985 State inmates with 18 months or less generates $24,526,795 annually.

P000131

Ventura County Todd Road Jail Needs Assessment and Engineering Analysis

P000132

Ventura County Todd Road Jail Needs Assessment and Engineering Analysis

---

# 13.0 ENGINEERING ANALYSIS OF THE EXISTING TRJ FACILITY

**Introduction**

This report includes an Engineering Analysis (EA) of the existing Phase 1A facilities to consider possible items for retrofit of Phase 1A and/or inclusion into the design of any expansion. A comprehensive list of items for consideration was created and prioritized in categories of "A", "B" and "C". The analysis for each of these items considered Existing Conditions, Current Issues, Discussion, and Recommendations. A Probable Construction Cost Forecast is contained in the following section.

## 13.1 Priority A Items – Detail Analysis

### Vacuum Waste System

**Existing Conditions**

TRJ is served by a vacuum waste system, which provides an alternative to the conventional gravity method of sanitary waste removal from the facility's buildings.  The vacuum waste system serves 384 water closets in the housing pods, the water closets in the Intake, Muster, and Administration Buildings, and miscellaneous fixtures in the facility.  Showers and lavatories drain into a separate gravity waste piping system.

The purpose of providing a vacuum waste system is to reduce water consumption of the water closets and to reduce waste-treatment costs, as compared to a conventional gravity waste system.

The vacuum system consists of vacuum pumps, receivers, grinder pumps, discharge pumps, and distribution piping to the plumbing fixtures served.  By creating a negative pressure, or vacuum, within the piping system, waste from the fixtures is conveyed to the receiver, where it is then pumped to the facility's waste treatment plant.  Within each housing unit, vacuum waste piping is located above the second floor, with 1-1/2" branch lines dropping to each water closet on the first and second floors.

The original system piping included a 3" main vacuum waste system from the suction header of the vacuum pumps to the Housing Core, serving four Pods, with a second 3" main for use by a future Housing Cluster.  Since that time, the system has been re-piped to employ this second 3" main for service to Units HA and HD, while the original main pipe serves Units HB and HE.

**Current Issues**

The existing vacuum waste system has presented maintenance challenges to the staff of TRJ, resulting in an inordinate number of service calls to repair toilet systems.   Among other observations were the following:

1. The maintenance issues with this system are concentrated on the water closets on the first floor of the housing units.  The 1-1/2" waste pipe from each first floor water closet is piped to the second floor ceiling before connecting into a 2" horizontal pipe.

2. Recent samples of pipe sections of these risers have shown that the cross-sectional area of the pipes is severely restricted by accumulated waste.  A visual observation of one sample section showed only a ¾" clear inside cross-section in a 1-1/2" pipe.

P000133

Ventura County Todd Road Jail Needs Assessment and Engineering Analysis

___

3. Loss of sufficient vacuum in the system occurs when inmates in a section of a housing unit synchronize (intentionally or otherwise) the flushing of the water closets in their cells.

4. Certain pipe fittings, couplings, and installation practices contributed to obstructions inside the waste piping, creating locations where waste accumulated and restricted the flow through the piping.

5. The wastewater-treatment system serving TRJ does not have the capacity to accommodate the added water required if the fixtures served by the present vacuum waste system were converted to a gravity waste system. When additional buildings are added to the existing site, the existing wastewater plant will require enlargement, or a connection to a local jurisdiction's waste system will be necessary.

**Discussion**

The following actions have been taken by the facility to-date to resolve the on-going operational issues of the vacuum system:

**Action A**

Sections of overhead distribution piping above the second floor of the housing units have been replaced in order to remove fittings that have caused obstructions. This re-piping added additional horizontal mains above the Housing Units second floor ceiling, with fewer water closets served by each main.

The piping replacement removed and replaced fittings that were improperly selected and/or installed, causing accumulation of waste and loss of vacuum inside these pipes. During this re-piping, 1-1/2" risers to the floor cells were replaced. However, in many cases, the top 4' to 7' of the 1-1/2" riser piping before connection to the overhead 2" branch pipe, have been increased to 2". This pipe increase in the riser creates a condition whereby sufficient vacuum and velocity is lost to completely transport waste from the riser to the horizontal branch piping.

It was observed that a partial trap was installed in the main waste piping, located in the Cluster Control, directly upstream of the reformer pipe assembly. This piping can be observed from the access panel in Building HC. This piping arrangement creates a condition whereby waste sets in the bottom half of the pipe, restricting its cross-sectional area and affecting vacuum downstream.

**Action B**

In Section 4 of Housing Unit HA, an Acorn Master-Trol control system has been installed, which delays the flush of a water closet until sufficient vacuum exists in the waste piping system. This controller prevents system failure caused by multiple simultaneous flushes. In this sector, the number of reported maintenance calls has decreased from eight weekly to one or two weekly. The staff had not distinguished between a service call resulting from the Master-Trol system stopping a water closet from flushing, or from an actual service problem. Over the next few months, site personnel will record this information on service calls to this sector.

P000134

Ventura County Todd Road Jail Needs Assessment and Engineering Analysis

---

**Recommendations**

The operational problems in the vacuum waste system are a result of insufficient vacuum at the first floor water closets of the Housing Units. This lack of vacuum causes waste to remain within the piping and adhere to the pipe walls. This material, in turn, aggravates the insufficient vacuum condition by increasing pressure drop within the piping.

There are several measures, performed separately or in groups, that can address the operational problems of the existing vacuum system. These measures include:

1. The facility is currently implementing a system by which the horizontal mains in the Housing Units attics are being injected with a solution of citric acid and glycolic acid over a period of three weeks. This solution breaks down the waste adhering to inner walls of the pipes, increasing the pipes' cross-sectional area and reducing the pressure drop caused by these restrictions.

2. Measure 1 should be immediately followed by the continued installation of the Acorn Master-Trol control system throughout the facility in order to prevent periods of low vacuum in the system, and to prevent the rebuild-up of waste on the insides of these pipes. The Master-Trol system has contributed to a significant decrease in service calls when employed in one sector of Housing Unit HA. This Master-Trol can be expanded to control up to 384 fixtures.

   Another advantage of the Master-Trol system is that personnel can disable the flush valves in a sector of the housing units immediately before a search for contraband, thus preventing the inmates from flushing this contraband into the waste system.

3. Review the installation of the newer 1-1/2" diameter risers from the first floor water closets. On several risers, the pipe has been increased to 2" for the last several feet of the riser. This increase adversely affects the flow of waste from the water closet to the horizontal pipe run, causing an incomplete evacuation of the riser.

4. The vacuum piping system is intended to reduce the water consumption of a facility, by using ½ gallon of water per flush, versus the 1.6 gallons per flush of a water-saving flush valve. The further reduction of water flow to the water closets on the Housing Units first floor may be preventing the proper removal of waste from the 1-1/2" waste risers serving these fixtures.

   To verify that increased water flow will provide proper removal of waste products, select a section of the system that is currently not controlled by the Master-Trol system. Clean the waste risers from fixtures on the first floor, and adjust the water closet water flow to ½ gallon per flush. Observe this section of the system for build-up of waste in the risers and/or service calls.

5. There is a section of vacuum waste pipe behind the access door in the Cluster Control where an incomplete trap is formed. This creates a condition where the pipe is partially filled with waste, which isn't flowing properly through the system. More importantly, the partial blockage in the pipe adversely affects the vacuum in the system. This section should be re-piped to remove the partial trap.

6. Install pressure gauges at two points in the vacuum system. Simultaneously monitor the vacuum of these two locations. If the vacuum measured at the main pipe in the Housing

P000135

Unit is significantly lower than that of the vacuum pump suction header during periods of high demand, then review the piping between these two points. Particularly, review the installation of 'reformers', which are piping sections designed to allow waste to flow to a higher elevation.   More recent designs in reformers provide less drop in vacuum than those originally detailed for TRJ.  If a significant loss in vacuum is observed between these two points within the system, consider replacement of the existing reformer with one of the newer design.

7. Provide a second vacuum pumping system, and pipe the fixtures in the Housing Units furthest from the existing vacuum system to this new system.  This would relieve the over-demand on the existing system.  The new system can be installed in an area between buildings HA and HD.  This measure should be implemented only if the previous measures fail to completely address the problem of insufficient system vacuum.

Regardless of the measures taken to improve the existing system, it is recommended that the next phase of TRJ be served by a gravity-flow waste system in order to prevent an increase in maintenance issues.

**Convert TRJ to Gravity System**

An analysis was also performed to determine if the existing facility could be converted to a gravity system. Each Housing Unit is served by two (2) 4" waste lines, each providing drainage from approximately half of the lavatories, floor drains, and showers on the first and second floors of that Unit.  These waste lines are routed under the dayrooms, in front of the cells, and join into one (1) 5" waste pipe.  That line then travels under the Cluster Control.

Based upon the invert elevations provided on the as-built plumbing drawings prepared by A.O. Reed, the plumbing contractor, the main waste lines under the Housing Units are installed at a slope of 1/8" per foot.  At this slope, neither the 4" waste pipes nor the 5" main waste pipe are large enough to serve the increased load of the first floor water closets as a gravity system.  The 4" waste lines have a capacity of 173 fixture units (F.U.), whereas the load to each of these pipes would be up to 202 F.U.  Similarly, the 5" line has a capacity of 342 F.U., versus 407 F.U. required.

If the first floor water closets were to be served by the existing gravity system, the following construction would be required:

1. Replacement of 384 water closets with water closets designed to be connected to a gravity-waste piping system.

2. Replacement of the existing 2" waste pipe serving each pair of cells on the first floor with a 4" waste pipe.  This would involve saw-cutting the 5" thick concrete floor slab in the day rooms from each pair of water closets, and removal of the thicker concrete surrounding the existing pipes at the utility rooms.

3. Replacement of approximately 180' of existing 4" waste pipe with 5" waste pipe under the dayroom floors in each housing pod.  Also, saw-cutting the 5" thick floor slab and replacing pipe under existing structural footings.

4. Replacement of existing 160' of existing 5" waste pipe from each Housing Unit to the Cluster Control with 6" waste pipe, including saw-cutting floor slabs and replacement of

P000136

Ventura County Todd Road Jail Needs Assessment and Engineering Analysis

pipe under existing structural footings.   Replacement work would terminate at the existing 8" waste pipe located under the Cluster Control.

5.   Replacement of the vent piping system in each housing pod with larger piping to accommodate the added load.

6.   Addition of cold water lines, as the existing lines do not have sufficient capacity to accommodate the added water demands of 1.6 gallon-per-flush water closets, versus the existing .5 gallon-per-flush vacuum-fixtures. The implementation of this plumbing redesign would cause unacceptable disruption to the facility's operation.

Converting the existing TRJ facilities to a gravity system is not recommended due to the large number of structural and plumbing restrictions.

P000137

Ventura County Todd Road Jail Needs Assessment and Engineering Analysis

___

**Observation of Supervisory Staff**

**Existing Conditions**
The existing construction of the Cluster Control Room, dayroom, and mezzanine walkway within a housing cluster allow the supervisory staff and inmates to observe one another, inmates to communicate with other inmates in a different dayroom, and inmates to view the monitors in the bulkhead of the control room.

**Current Issues**
All of these conditions create serious security concerns in the Housing Cluster for both the supervisory staff and inmates.  Inmates can see supervisory staff in the Cluster Control rooms, inmates on the mezzanine level of one unit can see through the control room and communicate with other inmates within a different unit, and the inmates can view the security monitors mounted in the bulkhead of the control room.  Also, backlighting created from the daylight passing through from the recreation yards into the dayroom creates a lighting level in the control rooms making it easy for the inmates to see the staff.

**Discussion**
Minimizing the inmates' view in and through the control room is needed without compromising the staff's view of the inmates.  Three solutions were discussed in an effort to resolve this issue:

1. Provide adjustable louvers at the control room security glazing

2. Washing the control room windows with artificial light directed upon the security glazing from the dayroom side.

3. Tinting the security glazing at the control room and recreation yard glazing to reduce the backlight

**Recommendations**
1. Adjustable louvers at the control room windows - The installation of fairly deep, adjustable louvers to the upper half of the control room windows may help minimize visibility between the upper levels of the dayrooms.  The louvers are not proposed for the lower half of the window as they would prevent the staff from viewing activities on the first floor near the control room.  These louvers would prevent an inmate on the lower floor from looking up to view the monitors.  The louvers being adjustable could be opened or closed to entirely block the view based on staff's needs.  A  mock-up is required to determine the effectiveness of this proposed solution.

2. Washing the control room windows - This solution would introduce artificial lighting which would wash down on the control room glass from a fairly oblique angle.  The light source would be shielded such that it did not direct light into the control room.  Additionally, lighting could be installed around the window to effectively increase the light levels in the dayroom, to maintain a contrast between that space and the control room which should continue to be kept fairly dark.  This lighting would need to be turned off at night, which may allow for an inmate in his cell to see through the control room into another dayroom.  This solution should effectively keep an inmate from seeing into the control room.  However, the lighting levels in the dayroom beyond may still may allow for some view through the control room to the opposite dayroom.  A full size mock up of this solution should be tested before a final decision is made to install in every housing unit.

P000138

Ventura County Todd Road Jail Needs Assessment and Engineering Analysis

3. Tinting of the security glazing - The security glazing between the control room and the dayroom could be either tinted or replaced with security glazing that has a reflective surface on the membrane facing the dayroom.  This would minimize view through the security glazing as long as the lighting levels in the control room were less than the dayroom.  Some control of the light from the recreation yard may be necessary in order to maintain the lighting differential between the control room and the dayroom.  A mirrored finish on the dayroom side will create a reflective surface in the room.  The desirability of this will need to be confirmed with staff.  A full size mock up of this solution should be tested before a final decision is made in every housing unit.

Refer to cost data at the end of this Section.

P000139

Ventura County Todd Road Jail Needs Assessment and Engineering Analysis

---

**HVAC Controls**

**Existing Conditions**

The facility's Heating, Ventilation, and Air Conditioning systems (HVAC) are monitored and controlled by an Energy Monitoring and Control System (EMCS), manufactured by Robertshaw Controls Company. The HVAC control system consists of four (4) central control panels, Robertshaw Model DMS 350A, which are located in the following locations: Central Utility Plant, Central Services, Administration and Housing buildings.

These control panels provide communications between the various buildings' HVAC systems and a central location in the office of the central plant, through a workstation consisting of a personal computer, monitor, and printer. This workstation provides the point of human interface to the EMCS to allow changes in scheduling, temperature settings, and other control requirements.

The existing EMCS operates on the principle of 'distributed control', meaning that the monitoring and control of each air handling unit, fan coil unit, and terminal box is provided by a separate controller, separate from the central control panels discussed above. The purpose of this systems' architecture is to allow independent control of each system and to prevent a failure of the central controller from affecting the operation of the HVAC system. Each air handling unit, fan coil unit, and fan-powered terminal box is provided with a Robertshaw #MSC controller for this purpose. Each of these controllers provides start / stop operation, control of dampers and chilled and heating water valves, start/stop of associated exhaust fans and other mechanical equipment, and monitoring of alarm conditions such as clogged filters.

The field controllers communicate with the central control panels, allowing the facility personnel to monitor operating conditions, receive alarms, and reset schedules, temperature set points, and other control functions of the mechanical systems. Common points, such as outside air temperature, are measured in one location and shared between the distributed controllers. Due to the distributed nature of the control system, however, a failure of the central control panel will not disrupt the independent operation of field controllers, allowing the individual HVAC systems to continue running at their previously programmed schedules.

The chilled water plant, domestic water heating system, vacuum waste system, and central services steam plant are also monitored and controlled by Robertshaw #MSC controllers, providing start/stop control of chillers, cooling towers, pumps, boilers and associated equipment.

**Current Issues**

At the time of construction of TRJ, Robertshaw Controls Company was owned by Siebe Environmental Controls. Since that time, several controls manufacturers, including Siebe and Barber Colman, have merged into TAC Invensys. This organization provides control systems for the HVAC market today.

Also, since the time that TRJ was originally constructed, HVAC controls systems have advanced several generations. As components of the existing control system break or fail, replacement components from its generation have become more difficult or impossible to obtain. It was learned in interviews with personnel responsible for the maintenance of this site's HVAC system controls, for example, that replacements for the Barber-Colman control valves are no longer available. As these system components begin to fail, they are being replaced with Johnson Controls Inc. control valves. Through the efforts of TRJ staff to salvage parts when

P000140

removed from service and/or during replacement, a small inventory of spare components has been established for use when servicing this site's control system.

Due to the distributed nature of TRJ's HVAC control system, a temperature zone controlled by a replacement Johnson Controls product will receive satisfactory environmental control, but this zone will not communicate with the original Robertshaw control system.  Therefore, changes to the programming of the terminal controllers have to be made locally.   In addition, facility personnel cannot receive alarms, trend properties such as zone temperature, or otherwise monitor operations of these Johnson Controls devices.

Several improvements have been made to HVAC control systems since the original installation of the Robertshaw system at TRJ, including:

1. More user-friendly interface for operators, including better graphics than what was available in earlier generations
2. The ability to access the HVAC control system from remote locations, by dial-up or internet connection
3. The increasing availability of BACNet protocol, which allows control devices of different manufacturers to communicate with each other
4. The ability to receive alarms and notices automatically, via e-mail, pager, or phone

As the existing EMCS serving TRJ continues to age and components require replacement, this system will continue to experience the following operational problems:

1. Subsystems, such as terminal unit controllers, that can't be monitored and controlled with the existing EMCS.
2. Increasing difficulty, or the impossibility, of finding replacement parts for the original Robertshaw system.
3. Obsolete user interface in the central plant office.
4. Inability to monitor and control system from remote location.

There are two options to upgrade the existing control systems to provide full operational capability:

**Option A** - Replace the existing EMCS with a Johnson Controls Metasys System
Due to the County standard of Johnson Controls Metasys control system for its facilities, the existing EMCS can be replaced by a Johnson Controls system.  The advantages of this option are the system matches the systems installed in other County facilities, so GSA personnel are trained in the operation and maintenance of this system.  Also, the system will communicate with older generation Johnson Controls components installed in TRJ.

This option will provide the following features:

• Remote, internet-based access for monitoring and control.
• Remote alarms, to locations both within the facility and outside.
• Updated, user-friendly user interface.
• Compatibility with the existing Johnson Controls devices.
• BACNet communications protocol, to communicate with future controls products of other manufacturers.
• Replacement of control valves with readily-available, off-the-shelf products.

P000141

- Ability to record and trend space temperatures in the housing pods and other locations.

The replacement of the existing controls system with Johnson Controls Metasys can be accomplished in stages. The initial stage would include adding a front-end workstation and controls to the site, and connecting to existing controllers. Communications within the site can be provided with new fiber-optics cables.

As funds become available, as existing Robertshaw controllers fail, and/or as the need to monitor and control the portions of the HVAC system still controlled by Robertshaw controllers increases/arises, the new Johnson Controls system may be expanded into these areas. Existing Belimo control valves serving the air handling units can be reconnected to the new system, while damper actuators and non-compatible control valves will need replacement.

**Option B** - Replace this system with newer generation Invensys controls.
Since the existing control system serving TRJ still consists of the original Robertshaw Controls Company components, this system could be replaced by a newer generation EMCS from Robertshaw's successor, TAC Invensys. This replacement would initially consist of replacement of the four (4) - DMS 350A controllers and the front-end workstation. This would be followed by the MSC controllers throughout the facility, as these units became unserviceable. In the interim, the new system would communicate with the remaining, older generation Robertshaw controllers.

- The upgrade of the existing EMCS with an Invensys system would provide greater ability to monitor and control the existing systems, both from the workstation in the central plant and from remote locations. It would communicate through BACNet protocol, giving the system limited ability to monitor and control the replacement Johnson Controls components on the site, depending upon the generation of these components. The Invensys system would not match the County of Ventura's standard of using Johnson Controls for HVAC control systems, which would mean that the County's GSA personnel would have to learn to operate and maintain two manufacturers' systems, one for TRJ and one for its other facilities.

**Recommendation**
Provide Option A, Replace the existing EMCS with a Johnson Controls Metasys System.

Refer to cost data at the end of this Section.

P000142

**Circuit Breaker Maintenance**

**Existing Conditions**
Power for TRJ is provided by a 16.3 kV incoming service.  This power is distributed to four locations: Administration Building, Central Services Building, Housing Cluster, and Central Utility Plant.  At each location the incoming service feeds a transformer, which steps down the power to 480/277 volt, which is then fed to a distribution panel.  This is the normal power to the buildings, serving the door controls, emergency and outdoor lighting, HVAC, and receptacle loads.

Three 600 kW emergency generators are housed in the Central Plant which provides power to the facility.  This system generates power at 480 volts.  Each of the four buildings listed above has emergency power distribution, consisting of a 16.3 kV/480 volt step-down transformer and an emergency distribution panel.  These emergency power systems are fed in the following manner:  Utility power is stepped down in the Central Plant.  An Automatic Transfer Switch then feeds the emergency power from either this incoming utility power or the generator output.  Output from this transfer switch is stepped up to 16.3 kV, through a second transformer, and distributed to the other three buildings.

Feed from the Central Plant to the other buildings' emergency power distribution passes through the 4000 amp circuit breaker PNBKR.  If this breaker is in the open position, due to maintenance or a trip, neither normal nor emergency power is available to the emergency circuits.  The Central Plant's emergency panels are fed through a different path, so this breaker's operation does not affect those circuits.  However, it would disrupt service to the chiller plant and other circuits within the Central Plant that are on normal power.  This breaker has failed once during the operating of the facility thus far, interrupting service while the breaker was repaired.

**Current Issues**
Power to the facility's emergency electrical distribution panels passes through a single 4000 A circuit breaker.

**Discussion**
A failure of this breaker interrupts both generator and utility power to these panels.   A maintenance bypass breaker should be provided around the existing breaker, to allow power to emergency circuits while original breaker is being serviced.

**Recommendation**
Install a 4000 A maintenance bypass breaker, to allow continued electric service to the facility's emergency power circuits should the existing circuit breaker fails.

Refer to cost data at the end of this Section.

P000143

Ventura County Todd Road Jail Needs Assessment and Engineering Analysis

---

**Fire Alarms**

**Existing Conditions**
TRJ is protected by an Edwards Systems Technology (EST) Model IRC life safety system. This system includes Model 2551 photo-electric smoke detectors, located within each exhaust duct branch serving a pair of back-to-back cells. The housing units' smoke detectors are zoned in groups of four, with each zone monitoring eight (8) adjacent cells. These detectors report back to a master annunciator panel, which includes a printer and a monitoring board with visual indication of zone alarm.

**Current Issues**
Operational issues with the existing system have existed since the opening of TRJ, despite annual inspection and recalibration of smoke detectors. The current fire alarm system does not have a graphical command center and there are key-operated pull station devices throughout the facility.

**Discussion**
Facility staff indicated that 8-12 alarm signals have been reported on a daily bases. Each alarm requires that personnel visually check the source of the alarm. The smoke detectors serving the cells potentially are triggered by fumes from cleaning solvents which sends a false alarm. The facility has only had two actual fires in its history, and both of these occurred in the Laundry Room.

**Recommendations**
1. Provide quarterly testing of all circuits and annual preventive maintenance of all components. Contract services or in-house operations for the routine inspection, testing and maintenance of fire protection equipment and correct deficiencies.

2. Upgrade to a system utilizing computer display technology that will provide an easily readable alarm output in graphical form, EST #CGP or equal.

3. Replacement of existing fire alarm system during the Expansion Options. The existing IRC3 fire alarm system cannot be upgraded to an addressable system without removing and replacing all field wirings. The new EST3 addressable fire alarm system will allow future expansion and will more accurately identify the location of alarm.

Refer to cost data at the end of this Section.

P000144

Ventura County Todd Road Jail Needs Assessment and Engineering Analysis

---

**13.2 Priority B Items – Detail Analysis**

**Door Systems and Controllers**

**Existing Conditions**
The existing door controllers are electro-mechanical.  The control system for these doors is a combination of Graphic Control Panels with switches that operate the doors into the open and closed position and LED's to annunciate the position of the door.

**Current Issues**
The age and the number of times the door is opened and closed have caused the electro-mechanical device to fail and or require maintenance.  If the door fails, it must be opened or closed manually, requiring maintenance staff to perform this operation.

**Discussion**
Some of the door controls which have failed have been converted to pneumatic controls as maintenance funds permitted.  There are 38 doors which remain to be upgraded.

**Recommendations**
1.  The facility should continue the effort to retrofit with pneumatic controllers as allowed by funding and as the existing electro-mechanical systems near their end of serviceable life.  While the electro-mechanical devices have generally functioned well, installing pneumatic devices should result in fewer service and operational issues.

2.  The existing control system operates satisfactorily but the system could be replaced with a new control system when the facility expands.  This would include a touchscreen replacement at Central Control, Cluster control and at each housing unit control room.

Refer to cost data at the end of this Section.

P000145

Ventura County Todd Road Jail Needs Assessment and Engineering Analysis

---

## Security Cameras

**Existing Conditions**

There are in excess of 100 cameras currently installed and operational within the facility.  The system is a combination of analog and digital cameras and controllers.

**Current Issues**

Problems have been encountered with introduction of analog to digital conversion.  Deficiencies in the coverage of the security camera system have been observed and the system does not allow for recording.

**Discussion**

There is a desire to monitor and record activity in volatile areas such the Dayrooms, Special Segregation and Mental Observation cells.  Incident recording would be utilized for forensic evidence.

**Recommendations**

1. The video surveillance system should be expanded to provide full coverage of volatile areas of the facility to include Dayrooms, Special Segregation and Mental Observation cells. The camera added to each dayroom to enhance observation should be installed near the entry doors. Due to the number of cameras in the facility it is unreasonable to expect full time monitoring of all cameras.   Recommend selective 24/7 recording of cameras.

2. This recording should be accomplished with Digital Video Recorders which would allow archival to digital media (DVD's) with a "live-record" capability of seven days.  In order to minimize storage space requirements, 15 Frame Per Second (FPS) recording for dayroom cameras and 15 – 20 FPS for Special Segregation, and Mental Health and Observation cells.

3. Digital video recording also offers added features such as high resolution, email of selected images or moving video, search by day, time, motion within a specific area, remote monitoring of video via a local area network and or internet device and many other criteria.

Refer to cost data at the end of this Section.

P000146

Ventura County Todd Road Jail Needs Assessment and Engineering Analysis

---

**Roof Leaks**

**Existing Conditions**
The roofing material used for all roofs at TRJ is built-up roofing.

**Current Issues**
TRJ is experiencing a significant roof leak, directly over Central Control.  During heavy rains, the leak is significant such that a plastic bag is repeatedly filled.  All other areas of the roof are performing well.

**Discussion**
In general, the condition of the roof on the building is good.  Approximately six soft spots were noticed that had been previously identified with paint.  This is most likely the result of water leaking through the roofing membrane and saturating the rigid insulation below.  In these areas, the roofing should be cut back as required to an area where the substrate is solid.  The insulation should be replaced and the roofing patched per the manufacturer's requirements.

There are areas where the base flashing is beginning to deteriorate and should be addressed in the not-too-distant future.  Some of the vertical joints in the base flashing have been modified with an additional layer of roofing, though many have not and are showing signs of separation.  All vertical joints should be addressed.

It appears that the expansion joints around the building have been resealed with a silicone tape in the recent past.  No leaking is evident at these locations.

The expansion joint above Central Control appears to be in good shape, with one exception.  At the middle of the run, there is a joint in the aluminum expansion joint that is not sealed well.  This could very well be the source of the roof leak that is evident in Central Control.  The expansion joint to the south of Central Control has been previously modified with some sort of flexible fabric type expansion material.  Potentially, the same sort of fix could be installed at this location.

There are other locations on the roof where edge conditions of roofing/flashing could potentially be a source of leaks.  These areas, along with other similar conditions, should be reviewed, cleaned, and re-caulked as required.

Additionally, there were a few locations on the roof of the Administration Building where fallen leaves from the adjacent trees have accumulated.  These areas should be cleaned of debris regularly to allow for the roof to adequately drain and dry.

**Recommendations**
The expansion joint located above Central Control should be repaired or upgraded similarly to the existing expansion joint located directly to the south.  The existing soft spots in the roofing should be cut out and repaired as required.  All vertical joints in the base flashing that have not been modified should be sealed.  All edge conditions where dissimilar materials meet should be reviewed and re-caulked as deemed necessary.  All debris should be removed from the roof.

Refer to cost data at the end of this Section.

P000147

## Duress Alarm

**Existing Conditions**
TRJ has an existing perimeter fence alarm system and duress system.

**Current Issues**
The perimeter fence alarm is inoperative.  The duress alarm system issues many "ghost" alarms every day.  The annunciator panel is antiquated and the LEDs do not report correctly when the system is in alarm.

**Discussion**
The existing Duress and Perimeter Alarm Systems are Perimeter Products Inc. systems which have undergone upgrades. These systems report to a touch-screen interface that is separate from the control panels.  However, even with the upgrades that have occurred, the Perimeter System is not operational at this time. A single zone alarm triggers multiple zones into alarm. This creates a severe security risk at the perimeter of the institution.  An additional upgrade to a Fiber Optic Cabling based system is planned for the near future.  Basic repairs to the perimeter system have been authorized and should be underway at this time.

**Recommendations**
Replace the current Control Panels and Perimeter touch screen with a single integrated platform utilizing Programmable Logic Controllers with a two-station touch screen operator interface. The two touch screens would allow correctional officers to control and monitor all security/life safety functions within the facility from a single point of control.   The stations can be programmed to allow two officers to control separate functional areas during the day shift operation or high activity periods, and allow a single operator to control the entire facility during night shifts or periods of less activity.  In addition, all systems will be monitored from the same location as opposed to multiple locations of alarm acknowledgment.  This type of interface also offers additional advantages for management and reporting of activity within the facility. Additional maintenance reporting can be added to the system to log daily activity, create work orders, and provide alerts for periodic maintenance of hardware.   This replacement should be considered during the expansion phase of the facility.

Refer to cost data at the end of this Section.

P000148

---

**Steam System**

**Existing Conditions**

The facility includes a 35 PSIG medium pressure steam system, which supplies specific equipment in the food services area, including:

- Steam Kettles
- Dishwasher Booster Heater
- Coffee Maker

Other thermal loads in the facility, including heating, domestic hot water, and high temperature hot water for laundry and kitchen requirements, are provided by separate systems; the steam system does not serve them.

The medium pressure steam system consists of eight (8) Fulton model FB-A-10 gas-fired steam generators, feeding one common medium pressure steam header. Each boiler has an output capacity of 326 pounds per hour. Steam is distributed from this header to kitchen equipment, and condensate is returned to a deaerator. This condensate and any make-up water is reheated and re-introduced into the medium pressure steam system. At this time, the steam demand requires that three (3) boilers operate, with the other five boilers in reserve.

**Current Issues**

The steam boilers are difficult to maintain and operate, and require specialized staff. Replacement with electric or gas-driven equipment, in order to delete the existing steam system, involves high construction costs for equipment replacement, additional electrical circuits, and added gas connections. Also, performance of kitchen equipment would not be as acceptable, due to delay times in heating-up of the equipment and/or lower energy efficiency as compared to the current system.

**Discussion**

The existing system is designed to provide medium pressure steam without the requirement for a full-time licensed boiler operator on site. If larger boiler(s) were installed, California Title 8 would require that a qualified person be on-site to monitor and maintain this system. That person would have to respond within 5 minutes to an alarm condition in the boiler room, which would be difficult, given the travel time through the facility. The steam system requires a large amount of scheduled and unscheduled maintenance, yet it serves a small portion of the overall facility needs.

Two Options for this system are:

Option A - Decommissioning and replacing the steam system
Option B - Retaining the existing steam system

Option A - Decommissioning the steam system would require providing and alternate source of heat for the equipment served as follows:

Steam Kettle Replacement – The existing steam kettles can be replaced by electric steam kettles:

P000149

a. Electric Kettles – An equivalent system of four (4) electric kettles would require the following:

- Approximately 8" additional inches of length under the existing hoods.
- 28.5 Amps of electrical power, @ 460V-3-60.
- The replacement of the kettles.

b. Gas Kettles - An equivalent system of four (4) gas kettles would require the following:

- Approximately 16" additional inches of length under the existing hoods.
- Natural gas connection.
- The replacement of the kettles.

Dishwasher Replacement – The existing dishwasher can be replaced by a unit with electric water booster heater, requiring the following:

- A new electric circuit of 140 Amps, @ 460 V-3-60.
- The replacement of the dishwasher, delivered and installed.

Coffee Brewer Replacement – The existing coffee brewer consists of a twin 10 gallon brewer (20 gallon total brewing capacity) and a 60 gallon holding/dispensing tank. Only the brewer would have to be replaced, with an electric unit, requiring the following:

- A new electric circuit of 72 amp, 460 V-3-60.
- The replacement of the electric brewer

Option B - Retaining the Steam System for the above equipment, which offers the following advantages:

- The initial cost of steam equipment is usually less than that of electric or gas-fired equipment.
- There is a tremendous savings in energy cost when using steam.
- Typically, there is less maintenance to steam-heated kitchen equipment.

One of the 4 kettles was observed to be leaking, but a complete overhaul and repair of existing equipment could extend their life another 8-10 years.  Typically, there is very little repair necessary on steam equipment.

**Recommendations**
1. It is more cost-effective to retain the existing steam system than to replace it with electric and/or gas-fired kitchen equipment.  As the steam boilers reach the end of their economic lives, replacement of these units should be considered, to reduce ongoing maintenance costs.

2. If the steam system is to be replaced, however, it can be done in phases, as the kitchen equipment it serves reaches the end of their economic lives.  For example, the dishwasher needs to be replaced soon, whereas the kettles and brewers have several

P000150

Ventura County Todd Road Jail Needs Assessment and Engineering Analysis

more years of useful life.  The dishwasher can be replaced with an electric model, and the other appliances can be replaced later.

Refer to cost data at the end of this Section.

P000151

Ventura County Todd Road Jail Needs Assessment and Engineering Analysis

___

**Blue Cards**

**Existing Conditions**
TRJ was provided with card access system during the design and construction phase that was the County "standard".

**Current Issues**
The existing card access system is outdated.  The system has not operated correctly since the Y2K upgrade was performed and is not an effective system to maintain a secure environment at TRJ.

**Discussion**
The County has converted many of their other facilities to a newer system. TRJ is one of the last County owned facilities still using this technology.  By installation of a new system, TRJ will be compatible with the other County Detention facilities.

**Recommendation**
The access control system should be upgraded to match the County's current standard.

Refer to cost data at the end of this Section.

P000152

## Swamp Coolers

### Existing Conditions

The facility's Central Services Building is served by two (2) rooftop air handling units, AH-CS1 and AH-CS2. These units are designed to condition and deliver large quantities of outside air to the Kitchen, Laundry, and ancillary rooms. Each air handling unit precools outside air using indirect evaporative coolers, followed by direct evaporative coolers. The outside air is then mixed with return air from the spaces (AH-CS1 only), filtered, heated with a gas-fired furnace when necessary, and ducted to the occupied spaces.

AH-CS2 supplies 24,160 cubic feet per minute (CFM) conditioned air to the kitchen and dishwashing spaces. All of this air is then exhausted through the three kitchen hoods and other exhaust systems in this space, making AH-CS2 essentially a 100% outside air make-up unit.

Individual office spaces within the Central Services Building have been retrofitted with portable air conditioning units to relieve uncomfortable conditions.

### Current Issues

The air handling systems serving the Central Services Building are designed to provide comfortable conditions in a facility that requires a large amount of exhaust air, at an economic cost. These units deliver 65 degree supply air by using evaporative cooling, taking advantage of low relative humidity in the area. The existing systems were sized to provide this conditioning at 1% ASHRAE design wet bulb conditions for the region, meaning that 99% of the time, the weather conditions at the site will be less severe than design. The evaporative cooling system is commonly applied to kitchens because it is extremely expensive to mechanically cool air, then pass it once through a space and exhaust it through kitchen hoods.

TRJ has experienced periods where the conditioned spaces have been uncomfortably warm. Personnel reported instances of 85 degree F supply air. These instances occurred when the weather was unseasonably hot and, more critically, more humid than normal. During humid conditions, the indirect and direct evaporative cooling systems do not operate efficiently, resulting in warm air supply to the spaces.

Due to the nature of a direct evaporative cooling system, air delivered to a space is saturated with moisture. This prevents the sensation of coolness on the occupants' skin, because perspiration cannot effectively evaporate from the body. Normally, this is not a concern, because the spaces receive a high volume of cool air. However, when humid outside conditions result in warm, saturated air being supplied, the sensation of warmth is aggravated by the lack of evaporation from occupants' skin.

The Vocational Rooms house printing shops. High moisture content in the supply air to these rooms has an adverse effect on paper stock stored in these spaces and the printing operations. These spaces have been refitted to be served by DX air conditioning systems, and are no longer served by the evaporative cooling systems.

### Discussion

There are two Options to address the issue of high temperatures in the Central Services Building during periods of high temperature and relative humidity:

- Option A - Add mechanical cooling to the existing air handling units.

P000153

Ventura County Todd Road Jail Needs Assessment and Engineering Analysis

- Option B - Maintain the existing air handling systems.  Add permanent air conditioning systems in the offices.

Option A - For periods of high temperature combined with high relative humidity, mechanical cooling, in the form of a chilled water coil or direct expansion (DX) refrigerant coil, can be added to the existing air handling systems.  This method would cool the supply air when the existing evaporative cooling is insufficient.

As no chilled water is available in this building, cooling would be provided by a DX coil coupled with an air-cooled condensing unit.  This coil would most likely be located in the supply duct, downstream of the air handling unit.

This approach incurs a substantial electrical energy cost during the most expensive billing periods of the year.  Assuming, for example, that 24,000 CFM of kitchen supply air is cooled from 85 degrees, 60% relative humidity, to 65 degree supply air, 75 additional tons of cooling would be required.  An air-cooled DX system with an efficiency of 1.1 kW/ton would increase peak demand 83 kW, costing an additional $1100 demand charge per month, along with an hourly energy charge.

Option B - Providing permanent DX cooling in the Laundry Control Office and the Kitchen Offices would provide a comfortable environment in these spaces, which typically don't have the large supply air flow of the open spaces.   This option can consist of small, wall-mounted units piped to rooftop condensing units.

**Recommendations**
1. It is not recommended to provide supplemental mechanical cooling for the Kitchen and/or Laundry facility, to accommodate rare annual occurrence of high outside temperatures coupled with high humidity.  This measure would require a substantial investment in capital, as well as an electrical energy penalty.  For this reason, mechanical cooling is not typically provided for these applications.  During a large majority of the annual operating hours of this facility, the existing evaporative cooling system will deliver comfortable working conditions at an economical operating cost.

2. Split-system, air-cooled heat pumps for the kitchen and laundry offices would provide environmental control of these spaces at a reasonable cost.

Refer to cost data at the end of this Section.

P000154

**Absorption Chiller**

**Existing Conditions**

TRJ is presently served by a 360 ton centrifugal compressor chiller and a 325 ton gas-fired absorption chiller.  During Southern California Edison (SCE) peak summer electrical hours, the gas absorption chiller is operated, to provide cooling to the campus without incurring additional electrical demand charges and energy charges.

**Current Issue**

The Option 1 expansion of TRJ will add approximately 300 tons peak cooling load to the central chilled water plant.  This plant was piped for future addition of a chiller to address these loads.  This addition to the existing central plant can either be a new 300 ton electrically-driven centrifugal chiller or a gas-fired absorption chiller.

**Discussion**

The addition of an electrically-driven chiller will require expansion of the existing chiller room to accommodate the new equipment.  Likewise, and absorption chiller would require building expansion.  However, the absorption chiller would need to be housed in a separate room, as is the existing absorption chiller.  Natural gas piping to the central plant has been sized for the installation of this future chiller.

During the four summer months of SCE's TOU-8 rate schedule, a 300 ton electric chiller would incur approximately $73,000 in mid-peak and peak demand and energy charges.  This assumes a diversity in the cooling load during the day.  The gas cost of an absorption chiller for the same period would be approximately $25,000.

The addition of only a gas absorption chiller could be considered. The existing electrically-driven chiller could be used to serve lower winter cooling loads for both the existing buildings and the expansion.  During many hours of the year, mild outdoor temperature lower the site's cooling load while also allowing partial free cooling, through the air handling units' air-side economizers.  During other off-summer periods, where outdoor temperatures are high, both an electric and an absorption chiller can be operated to maintain cooling.

**Recommendation**

The estimated cost premium of adding a gas absorption chiller, over the cost of an electric chiller, is $180,000.  Including the added cost of larger cooling tower, larger condenser water pump and piping, and a separate room, this cost premium is approximately $250,000.  Energy savings would provide a simple payback of 5 years for the gas absorption system.

Refer to cost data at the end of this Section.

P000155

**On-Site Power Generation**

**Existing Conditions**
TRJ facility is presently served by three (3) – 600 kW Caterpillar generators, located in the Central Plant.  These generators are provided for emergency power only, and are driven by fuel oil.  The original design provides for space in the adjacent room for future generator installation, along with electrical and piping connections and space for a second underground fuel oil storage tank.

**Current Issue**
Based upon a review of electrical use at TRJ for the last two summers, the peak demand ranges from 720 to 840 kW.  The facility operates its gas absorption chiller during peak demand periods, so these kW ratings do not include a substantial portion of the site's HVAC load.

Due to current Ventura County Air Pollution Control District (APCD) rules, the existing generators cannot be operated for electric peak shaving strategies.  Replacement of one or more of these generators would be required to implement a strategy of reducing peak electric demand from the utility source, Southern California Edison (SCE).

If generators were to be used to offset peak electrical demand and energy charges, and meet Ventura County Air Pollution Control District requirements, the generators would have to be natural gas-fired.  This would require the replacement of one existing generator, or the installation of a new generator.  Because the replacement generator would not operate on fuel oil, a disruption of electrical and natural gas service to the site would cause loss of electrical service.  The natural gas-driven generator is approximately twice the physical size of the existing generator, and require a natural gas line from upstream of the existing meter.

**Discussion**
The existing generators cannot be used for continuous operation for two reasons:

1. APCD Rule 74.9 restricts the operating time of the existing fuel oil-driven generator to 200 hours per year.  A run-time meter must be applied to each generator to assure that this time restriction is not exceeded.  The number of peak electrical hours for SCE's TOU-8 electricity rate, applicable to TRJ, is 780 hours (12-6 PM weekdays during summer months).  Additional electricity cost reductions are available by self-generation during 'mid-peak' hours on the same days.

2. The existing generators are selected for emergency operation, and would have to be derated to 85% capacity, or approximately 500 kW for use in a continuous operation.

For these reasons, the installation of a new generator(s) would be required to reduce the level of electrical power purchased from SCE.  These generators must be natural gas-fired, to allow the facility to comply with APCD requirements.

TRJ's existing permit to operate (Permit #1299) restricts the site's Nitrogen Oxide (NOx) emissions from all sources (generators, absorption chiller, boilers, gas-fired heaters, etc.) to 5 tons per year.   If this level is exceeded, the facility must purchase offsets at a market price range of $25,000 – $50,000 per ton NOx. As a jail, TRJ may be eligible for offsets from the community bank to overcome this restriction.  With currently operating equipment, the permit allows 3.39 tons per year NOx.  A new Caterpillar 3516 generator will emit 3 pounds per hour

P000156

NOx into the atmosphere, while operating @ 500 kW.  This equates to approximately 1.2 tons per year, @ 780 operating hours.

The replacement of two existing generators with equivalent natural gas generators would entail:

- Replacement of generators.
- Additional space requirements.  The Caterpillar model 3516 generator required is approximately twice the physical size of the existing generator.
- Installation of a natural gas line from upstream of the existing meter to the new generators.
- A review of TRJ's existing APCD permit, which restricts natural gas consumption to 50 million cubic feet annually.
- Operating personnel man-hours to run generators 6 or more hours daily, on weekdays, during 6 summer months.
- Additional maintenance costs annually, to account for wear to equipment in continuous operation.

**Recommendation**
TRJ reduces its peak electrical demand and consumption charges by operating its gas absorption chiller, in lieu of its electric chiller.  Further reduction of these SCE charges by operating natural gas-fired generators would require both significant first cost and operating cost.  Additionally, these generators would not operate with fuel oil, rendering them inoperable if an event disrupts natural gas and electric service to the facility.  Due to these two factors, replacement of existing generators for peak electrical demand reduction is not recommended.

Refer to cost data at the end of this Section.

P000157

**Housing Section Heating**

**Existing Conditions**
The four existing housing sections of TRJ facility are each served by a Mammoth rooftop air handling unit, consisting of a supply fan, filter section, cooling coil, and gas-fired heater. The heaters are indirect-fired, stainless steel heat exchangers, sized for 1250 MBH capacity.

**Current Issue**
The indirect heaters within the existing air handling units serving the housing sections are constructed with stainless steel heat exchangers and drain pans, extending their economic lives past the 18 years expected for this type of unit. Parts for this equipment is hard to find.

**Discussion**
In recent years, concerns have been raised at the facility regarding the age of the gas heaters within the air handling units, and specific breakdowns, including:

- Failure of tubes in the heaters, leading to potential leakage of products of combustion into the supply air stream, and
- Failure of the gas train components. In some cases, heating was not available to housing for several winter days while replacement parts were being obtained for these heaters.

Gas heaters have a useful economic life of 18 years. However, this value is widely variable, and the use of stainless steel heat exchangers and drain pans extends the life of the materials installed.

**Recommendations**
1. Order and maintain a stock of replacement parts for the gas-fired heaters and their gas trains, to allow timely repair and minimal system downtime.

2. Inspect the heaters' heat exchangers twice a year, once before and once following the heating season, for leaks and other signs of failure.

Refer to cost data at the end of this Section.

P000158

**13.3 Priority C Items – Detail Analysis**

**Water Intrusion and Sealing of Block Walls**

**Existing Conditions**
The exterior concrete block walls have been sandblasted and sealed with a clear sealer during construction and during 2006.

**Current Issue**
Water intrusion has been experienced at various locations throughout the facility.

**Discussion**
Water intrusion has been experienced at various locations throughout the facility. This includes the exterior block walls, windows at the Administration Building, and wicking onto the floor in the Muster Building. Since the outset of the project the exterior concrete block walls have been sandblasted and sealed with a clear sealer that should mitigate any water intrusion problems through the walls that the staff has previously identified. The concrete block wall above the expansion joint over Central Control has not been sealed. Additionally, several of the exterior concrete block walls, primarily above the recreation yards, have not been sealed as a part of the recently completed project. Moisture may still be able to enter the walls at these locations. Should any leaks occur in these areas, these walls should be sealed similarly to the rest of the facility.

Administration Windows - There does not appear to be any source of water intrusion at the exterior of the head of the windows adjacent to the Servery (staff dining). The water could potentially be leaking in at the sill of the spandrel window above and running through the wall cavity and emerging at the head of the window below.

Muster Building - The exterior grade at the north east corner of the Muster Building is either at or slightly above the level of the finish floor of the training room adjacent to this location. During wet weather, water accumulates on the floor in the northeast corner of this room. It appears that some sort of remedial repair has been performed that is not successfully keeping the moisture out of the room.

A water intrusion program (design documents) was started in 2003 and completed for some TRJ facilities. The scope of work for the Muster building has yet to be implemented and should be performed.

**Recommendations**
1. Administration Windows – Further investigation is required. It is recommended that a lift or ladder be used to investigate the sill condition at the windows above the ones in the Administration Building that are experiencing leaks. If evidence of water intrusion is found, the sills should be sealed or repaired. If there is no evidence of intrusion, the ceiling in the adjacent hallway should be temporarily removed such that the interior cavity of the wall can be observed to see if the path of the water can be determined.

2. Muster Building - It is recommended that the wall/foundation at the north east corner be exposed and waterproofed per the details originally designed for the remediation in this area.

Refer to cost data at the end of this Section.

P000159

Ventura County Todd Road Jail Needs Assessment and Engineering Analysis

---

**Noisy Pneumatic Tube-Transfer System in Cluster Observation Center**

**Existing Conditions**
TRJ uses a pneumatic tube system to distribute various items within the facility.  There are pneumatic tube stations located in Central Control, Cluster Control, at each housing unit control room and other locations in the facility.

**Current Issue**
The pneumatic tube system that drops straight down from the Cluster Control to the floor below is very noisy.

**Discussion**
This portion of the pneumatic tube system is not connected with any other portions of the system.  Currently it is not utilized that often, as the staff have determined that it is almost as efficient to just walk outside the control room and drop the paperwork to the ground floor or walk up from the lower floor to make a delivery to the control room.  The time that it takes to load the canister and send it either up or down is at least equal to or greater than the time it takes to manually deliver the paperwork.  The only time the system might be necessary is if security protocol required that the door to the control room remain closed and locked at all times throughout a shift.  Our observations of the operation indicate that this door while remaining closed is utilized for the passage of people and goods frequently during a shift.

The system is noisy to the staff in the control room, as the blower is located at the terminus of the system in the control room.  The design of the pneumatic system in other locations of the facility typically locates the blower units above the ceiling, thereby minimizing noise intrusion.

There are two alternative approaches for this issue.  One is to decommission and remove the system from each of the control rooms.  The parts obtained could be salvaged for use in repairing/maintaining the remainder of the system which runs throughout the facility.  The other option is to construct a sound absorptive enclosure that would cover the unit in the control room and minimize the noise.

**Recommendation**
We recommend that the system be left as-is.  The level of noise emitted by the equipment does not warrant any capital improvements at this time.

Refer to cost data at the end of this Section.

P000160

Ventura County Todd Road Jail Needs Assessment and Engineering Analysis

___

**Separate Controls for Cluster Showers**

**Existing Conditions**
The showers on the first and second level of the housing units are operated simultaneously with one control switch.

**Current Issue**
Showers on the upper and lower levels of the housing sections are controlled with a single switch in the control room.

**Discussion**
TRJ staff does not have the option of letting one shower work independently from the other. Operationally, it would be preferred that each shower is control individually.

**Recommendations**
1. The existing plumbing system could be modified to allow for an additional solenoid-operated valve to be installed, controlling one shower independently from the other. The wall finish adjacent to the shower or the shower itself would need to be opened to allow for this plumbing modification to take place. Additional control wiring would need to be run between the control valve and the control room. It is assumed that the existing conduit has capacity for the additional wiring. If not, this issue could be quite difficult to resolve.

2. Additionally, it is recommended that as a part of the re-plumbing that must be done to separate the controls, the shower enclosures be replaced with stainless steel units, due to mold and tiles falling off the walls.

Refer to cost data at the end of this Section.

P000161

Ventura County Todd Road Jail Needs Assessment and Engineering Analysis

---

**Housing Section Entry**

**Existing Conditions**
The existing Housing Section Entry/Wand system was installed to track deputies as they make their daily "rounds" in various locations of the facility.

**Current Issues**
The current system of wands to track employee "rounds" is not effective; the software system is not user-friendly and does not provide the Sheriff with the ability to track staff or incidents effectively. Additionally, the hardware is reaching the end of its serviceable life and replacement parts are becoming scarce.

**Recommendations**
1. Upgrade the current Housing Section Entry/Wand system with new hardware and software that will provide the end user with "Adhoc" type reporting capabilities. Hardware shall be evaluated for possible replacement as well. The latest Guard Tour system from TimeKeeping Systems has been installed at PTDF and County staff are satisfied with the performance. It is recommended that the Hardware and Software be upgraded to the Guard1 Plus system from Timekeeping Systems.

2. This upgrade should be performed at the time that the facility is expanded.

Refer to cost data at the end of this Section.

P000162

Ventura County Todd Road Jail Needs Assessment and Engineering Analysis

# ENGINEERING ANALYSIS – SUMMARY

**It is assumed that the sub contracts will be competitively bid and administered by the Todd Road Jail facilities department.  Costs do not include for the appointment of a construction management firm to run the various sub contracts.**

**All costs are current and do not include escalation**

| Section | Total |
| --- | --- |
| **Vacuum Toilet System** | |
| **Alternate 1 – New Acorn Master-Trol Closet Controls (400 EA)** | **$380,000** |
| **+ Enzyme System** | **$20,000** |
| **Alternate 2 - New Vacuum Pump System** | **$663,000** |
| **Observation of Supervisory Staff** | |
| **Adjustable Louvers (50% Coverage Only)** | **$20,790** |
| **Light Washing (Light Fixtures, 3 Per Window)** | **$64,800** |
| **Tinting (Keep Original Unit Replace Glass)** | **$7,560** |
| **Intake Area Conversion** | |
| **Interior remodel** | **$166,250** |
| **Energy Management Control System** | |
| **Robertshaw Control Panels** | **$70,000** |
| **Johnson Controls System** | **$500,000** |
| **Circuit Breaker Maintenance** | **$200,000** |
| **Roof Leaks** | |

P000163

Ventura County Todd Road Jail Needs Assessment and Engineering Analysis

| | |
|---|---|
| **Repair Soft Spots** | **$18,000** |
| **Repair Expansion Joint** | **$5,400** |
| **Repairs to existing flashings** | **$12,000** |
| **Steam Systems** | |
| **Electric** | **$216,060** |
| **Electric/Gas** | **$252,660** |
| **Steam** | **$80,000** |
| **Swamp Coolers (1)** | **$7,500** |
| **Cooling** | |
| **350 T Gas Absorption Chiller (1)** | **$575,000** |
| **350 T Electric Centrifugal Chiller (1)** | **$395,000** |
| **Generators** | |
| **Replacement 600 Kw Generator (1) and particulate trap** | **$850,000** |
| **Roof Top Units Heat Exchanger (1)** | **$24,800** |
| **Water Intrusion and Sealing of Block Wall** | |
| **Administration (Seal/Repair Sills Only)** | **$3,500** |
| **Muster** | **$8,372** |
| **Separate Controls for Cluster Showers** | |
| **Shower Controls** | **$138,000** |
| **Stainless Steel Shower Stall Wall Covering** | **$144,000** |

P000164

Ventura County Todd Road Jail Needs Assessment and Engineering Analysis

## APPENDICES

A. Projections Database
B. Inmate Classification System
C. December 12, 2005 TRJ Inspection Report by CSA
D. Expansion Options 1, 2, 3 and 4 Construction Cost Forecast
E. July 20, 2006, Ventura County Sheriff Department Letter to CSA (Notification Letter)
F. August 14, 2006, CSA Letter to Ventura County Sheriff Department (Plan Review # 111.6000.04)
G. CUP and EIR Compliance Review
H. Engineering Analysis – Summary Breakdown

P000165

Ventura County Todd Road Jail Needs Assessment and Engineering Analysis

P000166

Ventura County Todd Road Jail Needs Assessment and Engineering Analysis

# Appendix A
# Projections Database

P000167

Ventura County Todd Road Jail Needs Assessment and Engineering Analysis

VENTURA COUNTY POPULATION

| Year | Total | # Change | % Change |
|------|-------|----------|----------|
| 1996 | 710,215 | | |
| 1997 | 721,107 | 10,892 | 1.5% |
| 1998 | 730,779 | 9,672 | 1.3% |
| 1999 | 743,357 | 12,578 | 1.7% |
| 2000 | 756,673 | 13,316 | 1.8% |
| 2001 | 768,429 | 11,756 | 1.6% |
| 2002 | 780,562 | 12,133 | 1.6% |
| 2003 | 790,237 | 9,675 | 1.2% |
| 2004 | 796,165 | 5,928 | 0.8% |
| 2005 | 796,106 | (59) | 0.0% |
| 1996-05 Total | | 85,891 | 12.1% |
| Annual Growth Rate | | 9,543 | 1.3% |

Source: U.S. Bureau of the Census.

| Year | Total | # Change | % Change |
|------|-------|----------|----------|
| 2010 | 860,664 | 64,558 | 8.1% |
| 2015 | 892,537 | 31,873 | 3.7% |
| 2020 | 924,410 | 31,873 | 3.6% |
| 2025 | 953,602 | 29,192 | 3.2% |
| 2005-25 Total | | 157,496 | 19.8% |
| Annual Growth Rate | | 7,875 | 1.0% |

Source: California Department of Finance.

ANNUAL INTERPOLATIONS - by CGL

| Year | Total | # Change | |
|------|-------|----------|------|
| 2006 | 809,017.60 | | 12,912 |
| 2007 | 821,929.20 | | |
| 2008 | 834,840.80 | | |
| 2009 | 847,752.40 | | |
| 2010 | 860,664 | 860,664 | |
| 2011 | 867,038.60 | | 6,375 |
| 2012 | 873,413.20 | | |
| 2013 | 879,787.80 | | |
| 2014 | 886,162.40 | | |
| 2015 | 892,537 | 31,873 | |
| 2016 | 898,911.60 | | 6,375 |
| 2017 | 905,286.20 | | |
| 2018 | 911,660.80 | | |
| 2019 | 918,035.40 | | |
| 2020 | 924,410 | 31,873 | |
| 2021 | 930,248.40 | | 5,838 |
| 2022 | 936,086.80 | | |
| 2023 | 941,925.20 | | |
| 2024 | 947,763.60 | | |
| 2025 | 953,602 | 29,192 | |

REPORT TABLE 1

| Year | Total Projected Population |
|------|----------------------------|
| 2007 | 821,929 |
| 2008 | 834,841 |
| 2009 | 847,752 |
| 2010 | 860,664 |
| 2011 | 867,039 |
| 2012 | 873,413 |
| 2013 | 879,788 |
| 2014 | 886,162 |
| 2015 | 892,537 |
| 2016 | 898,912 |
| 2017 | 905,286 |
| 2018 | 911,661 |
| 2019 | 918,035 |
| 2020 | 924,410 |
| 2021 | 930,248 |
| 2022 | 936,087 |

Source:
California Department of Finance (2010: 2020: 2030).  In-between years interpolated by Carter Goble Lee, May 2006.

Page 108 of 174

P000168

Ventura County Todd Road Jail Needs Assessment and Engineering Analysis

| ADP | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| January | 1,380 | 1,326 | 1,363 | 1,399 | 1,283 | 1,380 | 1,326 | 1,587 | 1,580 | 1,600 | **1,585** | |
| February | 1,434 | 1,308 | 1,346 | 1,436 | 1,307 | 1,413 | 1,371 | 1,562 | 1,582 | 1,549 | **1,684** | |
| March | 1,383 | 1,358 | 1,403 | 1,424 | 1,330 | 1,421 | 1,379 | 1,553 | 1,599 | 1,526 | **1,738** | |
| April | 1,353 | 1,318 | 1,413 | 1,397 | 1,386 | 1,333 | 1,373 | 1,527 | 1,638 | 1,565 | **1,720** | |
| May | 1,364 | 1,317 | 1,442 | 1,366 | 1,411 | 1,307 | 1,359 | 1,563 | 1,624 | 1,597 | **1,678** | |
| June | 1,330 | 1,237 | 1,434 | 1,393 | 1,414 | 1,313 | 1,359 | 1,648 | 1,545 | 1,554 | **1,712** | |
| July | 1,302 | 1,271 | 1,420 | 1,438 | 1,258 | 1,408 | 1,543 | 1,543 | 1,582 | 1,523 | **1,696** | |
| August | 1,299 | 1,335 | 1,497 | 1,383 | 1,462 | 1,276 | 1,462 | 1,547 | 1,604 | 1,521 | **1,724** | |
| September | 1,320 | 1,368 | 1,482 | 1,371 | 1,488 | 1,276 | 1,454 | 1,593 | 1,642 | 1,524 | | |
| October | 1,299 | 1,369 | 1,445 | 1,358 | 1,457 | 1,315 | 1,487 | 1,617 | 1,632 | 1,529 | | |
| November | 1,286 | 1,334 | 1,397 | 1,353 | 1,426 | 1,303 | 1,520 | 1,600 | 1,669 | 1,576 | | |
| December | 1,308 | 1,210 | 1,305 | 1,250 | 1,371 | 1,231 | 1,471 | 1,527 | 1,524 | 1,551 | | annual chg |
| Annual Avg. | 1,338 | 1,313 | 1,412 | 1,381 | 1,383 | 1,319 | 1,414 | 1,572 | 1,602 | 1,551 | **1,692** | 2.6% |
| High 25% | 1,399 | 1,365 | 1,475 | 1,433 | 1,469 | 1,405 | 1,493 | 1,622 | 1,649 | 1,591 | **1,727** | |
| Peaking | 4.5% | 4.0% | 4.4% | 3.8% | 6.2% | 6.5% | 5.6% | 3.1% | 3.0% | 2.6% | 2.1% | |

Source:

Accelerated Release Data

| ARD | 2004 | 2005 | 2006 |
|---|---|---|---|
| January | 23 | 256 | 85 |
| February | 76 | 67 | 307 |
| March | 182 | 60 | 370 |
| April | 315 | 183 | 376 |
| May | 325 | 218 | 401 |
| June | 73 | 41 | 306 |
| July | 221 | 0 | 338 |
| August | 231 | 25 | 333 |
| September | 320 | 31 | 380 |
| October | 288 | 0 | 332 |
| November | 339 | 119 | |
| December | 114 | 125 | |

# days: 5

| ARD - ADP | 2004 | 2005 | 2006 |
|---|---|---|---|
| January | 4 | 41 | 14 |
| February | 14 | 12 | 55 |
| March | 29 | 10 | 60 |
| April | 53 | 31 | 63 |
| May | 52 | 35 | 65 |
| June | 12 | 7 | 51 |
| July | 36 | 0 | 55 |
| August | 37 | 4 | 54 |
| September | 53 | 5 | 63 |
| October | 46 | 0 | 54 |
| November | 57 | 20 | |
| December | 18 | 20 | |

OLD ADP without the accelerated release impact

| 2004 | 2005 | 2006 |
|---|---|---|
| 1,576 | 1,559 | **1,571** |
| 1,568 | 1,537 | **1,629** |
| 1,570 | 1,516 | **1,678** |
| 1,585 | 1,534 | **1,657** |
| 1,572 | 1,562 | **1,613** |
| 1,533 | 1,547 | **1,661** |
| 1,546 | 1,523 | **1,641** |
| 1,567 | 1,517 | **1,670** |
| 1,589 | 1,519 | |
| 1,586 | 1,529 | |
| 1,612 | 1,556 | |
| 1,506 | 1,531 | |

Accelerated Release Data by GENDER

| ARD | 2004_F | 2004_M | 2005_F | 2005_M | 2006_F | 2006_M |
|---|---|---|---|---|---|---|
| January | 23 | 0 | 49 | 207 | 26 | 59 |
| February | 53 | 0 | 66 | 1 | 43 | 264 |
| March | 77 | 105 | 60 | 0 | 74 | 296 |
| April | 76 | 238 | 51 | 132 | 51 | 325 |
| May | 62 | 263 | 46 | 172 | 86 | 315 |
| June | 46 | 27 | 0 | 41 | 66 | 240 |
| July | 61 | 159 | 0 | 0 | 51 | 287 |
| August | 77 | 154 | 0 | 25 | 53 | 280 |
| September | 94 | 226 | 0 | 31 | 68 | 312 |
| October | 54 | 234 | 0 | 0 | 48 | 284 |
| November | 65 | 273 | 0 | 119 | | |
| December | 68 | 46 | 8 | 117 | | |
| Average | 63 | 144 | 23 | 70 | 57 | 266 |

| ARD - ADP | 2004 | | 2005 | | 2006 | |
|---|---|---|---|---|---|---|
| | Female | Male | Female | Male | Female | Male |
| January | 4 | 0 | 8 | 33 | 4 | 10 |
| February | 9 | 0 | 12 | 0 | 8 | 47 |
| March | 12 | 17 | 10 | 0 | 12 | 48 |
| April | 13 | 40 | 9 | 22 | 9 | 54 |
| May | 10 | 42 | 7 | 28 | 14 | 51 |
| June | 8 | 5 | 0 | 7 | 11 | 40 |
| July | 10 | 26 | 0 | 0 | 8 | 46 |
| August | 12 | 25 | 0 | 4 | 9 | 45 |
| September | 16 | 38 | 0 | 5 | 11 | 52 |
| October | 9 | 38 | 0 | 0 | 8 | 46 |
| November | 11 | 46 | 0 | 20 | | |

P000169

Ventura County Todd Road Jail Needs Assessment and Engineering Analysis

**HIGHEST RECORDED MONTHS PATTERN**

| ADP | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| January | **1,380** | 1,326 | 1,363 | 1,399 | 1,283 | **1,380** | 1,326 | 1,587 | 1,580 | **1,600** | 1,585 |
| February | **1,434** | 1,308 | 1,346 | **1,436** | 1,307 | **1,413** | 1,371 | 1,562 | 1,582 | 1,549 | 1,684 |
| March | **1,383** | **1,358** | 1,403 | **1,424** | 1,330 | **1,421** | 1,379 | 1,553 | 1,599 | 1,526 | **1,733** |
| April | 1,353 | 1,318 | 1,413 | 1,397 | 1,386 | 1,333 | 1,373 | 1,527 | **1,638** | 1,565 | **1,720** |
| May | 1,364 | 1,317 | 1,442 | 1,366 | 1,411 | 1,307 | 1,359 | 1,563 | 1,624 | **1,597** | 1,678 |
| June | 1,330 | 1,237 | 1,434 | 1,393 | 1,414 | 1,313 | 1,359 | **1,648** | 1,545 | 1,554 | 1,712 |
| July | 1,302 | 1,271 | 1,420 | **1,438** | 1,258 | 1,258 | 1,408 | 1,543 | 1,582 | 1,523 | 1,696 |
| August | 1,299 | 1,335 | **1,497** | 1,383 | **1,462** | 1,276 | **1,462** | 1,547 | 1,604 | 1,521 | **1,724** |
| September | 1,320 | **1,368** | **1,482** | 1,371 | **1,488** | 1,276 | 1,454 | 1,593 | **1,642** | 1,524 | |
| October | 1,299 | **1,369** | **1,445** | 1,358 | **1,457** | 1,315 | **1,487** | **1,617** | 1,632 | 1,529 | |
| November | 1,286 | 1,334 | 1,397 | 1,353 | 1,426 | 1,303 | **1,520** | **1,600** | **1,669** | **1,576** | |
| December | 1,308 | 1,210 | 1,305 | 1,250 | 1,371 | 1,231 | **1,471** | 1,527 | 1,524 | 1,551 | |

| Bookings | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| January | 3,774 | 2,460 | 2,371 | 2,535 | 2,634 | 2,359 | 1,029 | 2,523 | 2,762 | 2,522 | **2,559** |
| February | 3,437 | 2,202 | 2,266 | 2,210 | 2,294 | 2,141 | 2,230 | 2,146 | 2,465 | 2,073 | **2,191** |
| March | 3,561 | 2,562 | 2,570 | 2,447 | 2,533 | 2,365 | 2,566 | 2,502 | 2,866 | 2,472 | **2,576** |
| April | 3,579 | 2,496 | 2,353 | 2,264 | 2,455 | 2,162 | 2,293 | 2,480 | 2,604 | 2,686 | **2,393** |
| May | 3,653 | 2,496 | 2,582 | 2,393 | 2,460 | 2,293 | 2,480 | 2,604 | 2,686 | 2,484 | **2,509** |
| June | 3,413 | 2,171 | 2,567 | 2,389 | 2,458 | 2,201 | 2,480 | 2,437 | 2,364 | 2,327 | **2,611** |
| July | 3,428 | 2,496 | 2,501 | 2,592 | 2,160 | 2,160 | 2,436 | 2,610 | 2,598 | 2,312 | **2,522** |
| August | 3,662 | 2,511 | 2,501 | 2,611 | 2,484 | 2,345 | 2,503 | 2,635 | 2,630 | 2,433 | **2,586** |
| September | 3,436 | 2,501 | 2,511 | 2,399 | 2,493 | 2,230 | 2,322 | 2,613 | 2,501 | 2,270 | **2,493** |
| October | 2,362 | 2,293 | 2,350 | 2,510 | 2,333 | 2,248 | 2,506 | 2,447 | 2,444 | 2,430 | |
| November | 2,294 | 2,293 | 2,270 | 2,348 | 2,185 | 2,493 | 2,262 | 2,466 | 2,344 | 2,384 | |
| December | 2,191 | 2,246 | 2,156 | 2,136 | 2,116 | 2,178 | 2,169 | 2,497 | 2,332 | 2,407 | |
| Annual Total | 38,790 | 28,727 | 28,998 | 28,834 | 28,605 | 26,775 | 27,256 | 29,921 | 30,609 | 28,487 | 22,440 |

| ALOS | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| January | 11 | 17 | 17 | 15 | 15 | 18 | 39 | 19 | 17 | 19 | 18.83 |
| February | 13 | 18 | 18 | 20 | 17 | 20 | 19 | 22 | 20 | 23 | 23.36 |
| March | 12 | 16 | 17 | 18 | 16 | 18 | 16 | 19 | 17 | 19 | 20.51 |
| April | 11 | 16 | 18 | 19 | 17 | 19 | 18 | 19 | 19 | 20 | 21.85 |
| May | 11 | 16 | 17 | 17 | 17 | 17 | 17 | 18 | 18 | 20 | 20.33 |
| June | 12 | 17 | 17 | 18 | 17 | 18 | 17 | 21 | 20 | 20 | 19.93 |
| July | 12 | 15 | 17 | 17 | 18 | 18 | 18 | 18 | 19 | 20 | 20.44 |
| August | 11 | 16 | 18 | 16 | 18 | 17 | 18 | 18 | 19 | 19 | 20.26 |
| September | 12 | 17 | 18 | 17 | 18 | 17 | 19 | 19 | 20 | 20 | |
| October | 17 | 18 | 19 | 16 | 19 | 18 | 18 | 20 | 20 | 19 | |
| November | 17 | 18 | 19 | 18 | 20 | 19 | 20 | 20 | 22 | 20 | |
| December | 18 | 16 | 18 | 18 | 20 | 17 | 21 | 19 | 20 | 20 | |
| Annual LOS | 13 | 17 | 18 | 18 | 18 | 18 | 20 | 19 | 19 | 20 | 21 |

| ADP | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006[1] | 2001-06 avg |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Total ADP | 1,338 | 1,313 | 1,412 | 1,381 | 1,383 | 1,319 | 1,414 | 1,572 | 1,568 | 1,536 | 1,635 | |
| % Felons | 59% | 59% | 59% | 59% | 60% | 63% | 65% | 67% | 71% | 77% | 79% | 71% |
| Unsentenced | 60% | 63% | 61% | 65% | 66% | 69% | 68% | 76% | 63% | 56% | 61% | 65% |
| Sentenced | 40% | 37% | 39% | 35% | 34% | 31% | 32% | 24% | 37% | 44% | 39% | 35% |
| % Misdemeanor | 42% | 41% | 41% | 41% | 40% | 37% | 35% | 33% | 29% | 23% | 21% | 29% |
| Unsentenced | 29% | 32% | 31% | 38% | 39% | 41% | 50% | 55% | 28% | 21% | 20% | 36% |
| Sentenced | 71% | 68% | 69% | 62% | 61% | 59% | 50% | 45% | 72% | 79% | 80% | 64% |
| Unsentenced | 47% | 50% | 49% | 54% | 55% | 59% | 62% | 69% | 53% | 48% | 51% | 57% |
| Sentenced | 53% | 50% | 51% | 46% | 45% | 41% | 38% | 31% | 47% | 52% | 47% | 43% |

Source:  Jail Profile Survey, Corrections Standards Authority.
Note: [1] 2006 percentages based on data from January through June.
[2] 2004-2006 data does not include the factoring of Early Releases.

| ADP | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006[1] | 2001-06 avg |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Total ADP | 1,338 | 1,313 | 1,412 | 1,381 | 1,383 | 1,319 | 1,414 | 1,572 | 1,568 | 1,536 | 1,635 | |
| % Maximum | 44% | 43% | 45% | 43% | 42% | 41% | 41% | 42% | 41% | 42% | 42% | 41% |
| % Medium | 41% | 41% | 36% | 31% | 37% | 34% | 35% | 38% | 39% | 38% | 38% | 37% |
| % Minimum | 16% | 17% | 19% | 26% | 21% | 25% | 25% | 20% | 20% | 20% | 20% | 22% |

Source:  Jail Profile Survey, Corrections Standards Authority.
Note: [1] 2006 percentages based on data from January through June.
[2] 2004-2006 data does not include the factoring of Early Releases.

| ADP by Gender | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006[1] | 2001-06 avg |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Total ADP | 1,338 | 1,313 | 1,412 | 1,381 | 1,383 | 1,319 | 1,414 | 1,572 | 1,568 | 1,536 | 1,635 | |

P000170

Ventura County Todd Road Jail Needs Assessment and Engineering Analysis

| | 2006 | Maxium | Medium | Minimum | (Avg number of felony inmates) Unsentenced | (Avg number of felony inmates) Sentenced | (Avg number of felony inmates) Total | (Avg number of misdemeanor inmates) Unsentenced | (Avg number of misdemeanor inmates) Sentenced | (Avg number of misdemeanor inmates) Total |
|---|---|---|---|---|---|---|---|---|---|---|
| January | | 660 | 597 | 314 | 749 | 465 | 1214 | 73 | 284 | 357 |
| February | | 684 | 619 | 326 | 778 | 483 | 1261 | 69 | 299 | 368 |
| March | | 705 | 637 | 336 | 800 | 501 | 1301 | 68 | 309 | 377 |
| April | | 696 | 630 | 331 | 763 | 560 | 1323 | 63 | 271 | 334 |
| May | | 677 | 613 | 323 | 831 | 472 | 1303 | 70 | 240 | 310 |
| June | | 698 | 631 | 332 | 835 | 527 | 1362 | 70 | 229 | 299 |
| July | | | | | | | | | | |
| August | | | | | | | | | | |
| | 2005 | | | | | | | | | |
| January | | 639 | 608 | 312 | 658 | 480 | 1138 | 98 | 323 | 421 |
| February | | 631 | 599 | 307 | 641 | 497 | 1138 | 90 | 309 | 399 |
| March | | 622 | 591 | 303 | 605 | 518 | 1123 | 66 | 327 | 393 |
| April | | 629 | 598 | 307 | 650 | 510 | 1160 | 75 | 299 | 374 |
| May | | 641 | 609 | 312 | 658 | 505 | 1163 | 75 | 324 | 399 |
| June | | 634 | 604 | 309 | 656 | 532 | 1188 | 65 | 294 | 359 |
| July | | 640 | 578 | 305 | 671 | 530 | 1201 | 65 | 257 | 322 |
| August | | 637 | 576 | 304 | 644 | 559 | 1203 | 66 | 248 | 314 |
| September | | 638 | 577 | 304 | 687 | 510 | 1197 | 75 | 247 | 322 |
| October | | 642 | 581 | 306 | 668 | 533 | 1201 | 64 | 264 | 328 |
| November | | 654 | 591 | 311 | 696 | 513 | 1209 | 85 | 262 | 347 |
| December | | 643 | 582 | 306 | 705 | 498 | 1203 | 80 | 248 | 328 |
| | 2004 | | | | | | | | | |
| January | | 646 | 615 | 315 | 829 | 249 | 1078 | 263 | 235 | 498 |
| February | | 643 | 612 | 313 | 743 | 340 | 1083 | 193 | 292 | 485 |
| March | | 644 | 612 | 314 | 629 | 452 | 1081 | 112 | 377 | 489 |
| April | | 650 | 618 | 317 | 667 | 422 | 1089 | 131 | 365 | 496 |
| May | | 645 | 613 | 314 | 680 | 419 | 1099 | 115 | 358 | 473 |
| June | | 629 | 598 | 306 | 680 | 422 | 1102 | 89 | 342 | 431 |
| July | | 634 | 603 | 309 | 701 | 411 | 1112 | 101 | 333 | 434 |
| August | | 642 | 611 | 314 | 698 | 428 | 1126 | 98 | 343 | 441 |
| September | | 651 | 620 | 318 | 749 | 416 | 1165 | 123 | 301 | 424 |
| October | | 650 | 619 | 317 | 714 | 458 | 1172 | 104 | 310 | 414 |
| November | | 661 | 629 | 322 | 701 | 499 | 1200 | 91 | 321 | 412 |
| December | | 618 | 587 | 301 | 636 | 486 | 1122 | 76 | 308 | 384 |
| | 2003 | | | | | | | | | |
| January | | 651 | 619 | 317 | 810 | 274 | 1084 | 257 | 246 | 503 |
| February | | 640 | 609 | 313 | 822 | 239 | 1061 | 266 | 235 | 501 |
| March | | 637 | 605 | 311 | 784 | 244 | 1028 | 278 | 247 | 525 |
| April | | 694 | 519 | 314 | 812 | 222 | 1034 | 271 | 222 | 493 |
| May | | 682 | 549 | 332 | 812 | 249 | 1061 | 292 | 210 | 502 |
| June | | 719 | 578 | 351 | 837 | 280 | 1117 | 292 | 239 | 531 |
| July | | 633 | 601 | 309 | 746 | 274 | 1020 | 271 | 252 | 523 |
| August | | 634 | 604 | 309 | 762 | 260 | 1022 | 282 | 243 | 525 |
| September | | 653 | 621 | 319 | 798 | 262 | 1060 | 296 | 237 | 533 |
| October | | 663 | 631 | 323 | 842 | 242 | 1084 | 307 | 226 | 533 |
| November | | 656 | 624 | 320 | 837 | 247 | 1084 | 292 | 224 | 516 |
| December | | 626 | 596 | 305 | 809 | 263 | 1072 | 248 | 207 | 455 |
| | 2002 | | | | | | | | | |
| January | | 530 | 438 | 358 | 619 | 221 | 840 | 248 | 238 | 486 |
| February | | 549 | 452 | 370 | 638 | 226 | 864 | 253 | 254 | 507 |
| March | | 552 | 455 | 372 | 643 | 236 | 879 | 234 | 266 | 500 |
| April | | 563 | 481 | 329 | 656 | 249 | 905 | 225 | 243 | 468 |
| May | | 557 | 476 | 326 | 666 | 235 | 901 | 227 | 231 | 458 |
| June | | 557 | 476 | 326 | 666 | 235 | 901 | 227 | 231 | 458 |
| July | | 577 | 493 | 338 | 496 | 412 | 908 | 247 | 253 | 500 |
| August | | 599 | 512 | 351 | 511 | 403 | 914 | 277 | 271 | 548 |
| September | | 596 | 509 | 349 | 559 | 393 | 952 | 252 | 250 | 502 |
| October | | 610 | 520 | 357 | 627 | 346 | 973 | 256 | 258 | 514 |
| November | | 623 | 532 | 365 | 695 | 308 | 1003 | 253 | 264 | 517 |
| December | | 603 | 515 | 353 | 746 | 276 | 1022 | 234 | 215 | 449 |

Page 111 of 174

Ventura County Todd Road Jail Needs Assessment and Engineering Analysis

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| **2001** | | | | | | | | | |
| January | 566 | 483 | 331 | 539 | 265 | 804 | 205 | 371 | 576 |
| February | 565 | 466 | 382 | 551 | 279 | 830 | 225 | 358 | 583 |
| March | 568 | 483 | 370 | 552 | 277 | 829 | 217 | 375 | 592 |
| April | 547 | 440 | 346 | 550 | 271 | 821 | 180 | 332 | 512 |
| May | 536 | 444 | 327 | 560 | 271 | 831 | 181 | 295 | 476 |
| June | 525 | 446 | 342 | 578 | 280 | 858 | 198 | 257 | 455 |
| July | 553 | 453 | 252 | 570 | 248 | 818 | 203 | 237 | 440 |
| August | 523 | 447 | 306 | 592 | 254 | 846 | 195 | 235 | 430 |
| September | 523 | 447 | 306 | 602 | 244 | 846 | 195 | 235 | 430 |
| October | 539 | 460 | 316 | 621 | 253 | 874 | 198 | 243 | 441 |
| November | 534 | 456 | 313 | 598 | 261 | 859 | 203 | 241 | 444 |
| December | 505 | 431 | 295 | 582 | 235 | 817 | 202 | 212 | 414 |
| **2000** | | | | | | | | | |
| January | 538 | 392 | 353 | 683 | 85 | 768 | 369 | 146 | 515 |
| February | 509 | 535 | 263 | 485 | 298 | 783 | 183 | 341 | 524 |
| March | 545 | 478 | 307 | 522 | 286 | 808 | 183 | 339 | 522 |
| April | 568 | 554 | 264 | 530 | 293 | 823 | 200 | 363 | 563 |
| May | 635 | 564 | 212 | 510 | 309 | 819 | 203 | 389 | 592 |
| June | 636 | 608 | 170 | 522 | 323 | 845 | 180 | 389 | 569 |
| July | 553 | 453 | 252 | 571 | 247 | 818 | 202 | 238 | 440 |
| August | 614 | 511 | 337 | 524 | 312 | 836 | 238 | 388 | 626 |
| September | 639 | 536 | 313 | 546 | 317 | 863 | 233 | 392 | 625 |
| October | 627 | 525 | 306 | 553 | 302 | 855 | 221 | 381 | 602 |
| November | 585 | 470 | 371 | 560 | 288 | 848 | 208 | 370 | 578 |
| December | 562 | 479 | 330 | 532 | 276 | 808 | 208 | 355 | 563 |
| **1999** | | | | | | | | | |
| January | 671 | 489 | 239 | 511 | 280 | 791 | 230 | 378 | 608 |
| February | 660 | 502 | 274 | 532 | 276 | 808 | 265 | 363 | 628 |
| March | 667 | 498 | 259 | 519 | 282 | 801 | 263 | 360 | 623 |
| April | 558 | 349 | 490 | 563 | 263 | 826 | 241 | 330 | 571 |
| May | 587 | 314 | 465 | 580 | 250 | 830 | 226 | 310 | 536 |
| June | 612 | 279 | 502 | 549 | 300 | 849 | 207 | 337 | 544 |
| July | 611 | 467 | 360 | 552 | 314 | 866 | 229 | 343 | 572 |
| August | 553 | 525 | 305 | 551 | 288 | 839 | 207 | 337 | 544 |
| September | 562 | 479 | 330 | 526 | 290 | 816 | 198 | 357 | 555 |
| October | 563 | 484 | 311 | 527 | 290 | 817 | 183 | 358 | 541 |
| November | 581 | 405 | 367 | 503 | 297 | 800 | 186 | 367 | 553 |
| December | 500 | 387 | 363 | 469 | 297 | 766 | 164 | 320 | 484 |
| **1998** | | | | | | | | | |
| January | 572 | 545 | 246 | 541 | 279 | 820 | 181 | 362 | 543 |
| February | 620 | 524 | 202 | 490 | 301 | 791 | 162 | 393 | 555 |
| March | 576 | 533 | 294 | 514 | 328 | 842 | 167 | 394 | 561 |
| April | 650 | 495 | 268 | 504 | 334 | 838 | 169 | 406 | 575 |
| May | 692 | 475 | 275 | 496 | 353 | 849 | 186 | 407 | 593 |
| June | 602 | 530 | 302 | 500 | 341 | 841 | 189 | 404 | 593 |
| July | 681 | 454 | 285 | 496 | 336 | 832 | 180 | 408 | 588 |
| August | 673 | 598 | 226 | 545 | 336 | 881 | 184 | 432 | 616 |
| September | 682 | 533 | 267 | 533 | 334 | 867 | 183 | 432 | 615 |
| October | 650 | 506 | 289 | 525 | 346 | 871 | 165 | 409 | 574 |
| November | 657 | 433 | 307 | 493 | 322 | 815 | 199 | 383 | 582 |
| December | 613 | 392 | 300 | 498 | 298 | 796 | 183 | 326 | 509 |
| **1997** | | | | | | | | | |
| January | 575 | 510 | 241 | 460 | 290 | 750 | 164 | 412 | 576 |
| February | 556 | 533 | 219 | 462 | 292 | 754 | 183 | 371 | 554 |
| March | 593 | 545 | 220 | 486 | 309 | 795 | 173 | 390 | 563 |
| April | 567 | 526 | 225 | 481 | 296 | 777 | 163 | 378 | 541 |
| May | 566 | 526 | 225 | 466 | 295 | 761 | 155 | 401 | 556 |
| June | 532 | 495 | 210 | 447 | 274 | 721 | 163 | 353 | 516 |
| July | 508 | 546 | 217 | 467 | 267 | 734 | 196 | 341 | 537 |
| August | 534 | 574 | 227 | 495 | 281 | 776 | 191 | 368 | 559 |
| September | 547 | 588 | 233 | 512 | 286 | 798 | 181 | 389 | 570 |
| October | 583 | 575 | 211 | 505 | 293 | 798 | 175 | 396 | 571 |
| November | 614 | 533 | 187 | 515 | 291 | 806 | 170 | 358 | 528 |
| December | 528 | 496 | 186 | 495 | 253 | 748 | 156 | 306 | 462 |
| **1996** | | | | | | | | | |
| January | 655 | 579 | 171 | 443 | 325 | 768 | 157 | 480 | 637 |
| February | 675 | 603 | 183 | 550 | 328 | 878 | 147 | 436 | 583 |
| March | 665 | 589 | 156 | 449 | 327 | 776 | 177 | 457 | 634 |
| April | 610 | 515 | 228 | 473 | 324 | 797 | 157 | 399 | 556 |
| May | 645 | 460 | 259 | 482 | 317 | 799 | 170 | 395 | 565 |
| June | 670 | 484 | 176 | 470 | 309 | 779 | 138 | 413 | 551 |
| July | 541 | 488 | 273 | 462 | 297 | 759 | 177 | 366 | 543 |
| August | 527 | 491 | 281 | 463 | 306 | 769 | 153 | 377 | 530 |
| September | 538 | 507 | 275 | 475 | 314 | 789 | 171 | 360 | 531 |

P000172

Ventura County Todd Road Jail Needs Assessment and Engineering Analysis

| | ADP | Annual ADP | Bookings | ALOS |
|---|---|---|---|---|
| 1/1/1996 | 1,380 | 1,338 | 3,774 | 11.1 |
| 2/1/1996 | 1,434 | 1,338 | 3,437 | 12.7 |
| 3/1/1996 | 1,383 | 1,338 | 3,561 | 11.8 |
| 4/1/1996 | 1,353 | 1,338 | 3,579 | 11.5 |
| 5/1/1996 | 1,364 | 1,338 | 3,653 | 11.4 |
| 6/1/1996 | 1,330 | 1,338 | 3,413 | 11.8 |
| 7/1/1996 | 1,302 | 1,338 | 3,428 | 11.5 |
| 8/1/1996 | 1,299 | 1,338 | 3,662 | 10.8 |
| 9/1/1996 | 1,320 | 1,338 | 3,436 | 11.7 |
| 10/1/1996 | 1,299 | 1,338 | 2,362 | 16.7 |
| 11/1/1996 | 1,286 | 1,338 | 2,294 | 17.0 |
| 12/1/1996 | 1,308 | 1,338 | 2,191 | 18.1 |
| 1/1/1997 | 1,326 | 1,313 | 2,460 | 16.4 |
| 2/1/1997 | 1,308 | 1,313 | 2,202 | 18.1 |
| 3/1/1997 | 1,358 | 1,313 | 2,562 | 16.1 |
| 4/1/1997 | 1,318 | 1,313 | 2,496 | 16.1 |
| 5/1/1997 | 1,317 | 1,313 | 2,496 | 16.0 |
| 6/1/1997 | 1,237 | 1,313 | 2,171 | 17.3 |
| 7/1/1997 | 1,271 | 1,313 | 2,496 | 15.5 |
| 8/1/1997 | 1,335 | 1,313 | 2,511 | 16.2 |
| 9/1/1997 | 1,368 | 1,313 | 2,501 | 16.6 |
| 10/1/1997 | 1,369 | 1,313 | 2,293 | 18.1 |
| 11/1/1997 | 1,334 | 1,313 | 2,293 | 17.7 |
| 12/1/1997 | 1,210 | 1,313 | 2,246 | 16.4 |
| 1/1/1998 | 1,363 | 1,412 | 2,371 | 17.5 |
| 2/1/1998 | 1,346 | 1,412 | 2,266 | 18.1 |
| 3/1/1998 | 1,403 | 1,412 | 2,570 | 16.6 |
| 4/1/1998 | 1,413 | 1,412 | 2,353 | 18.3 |
| 5/1/1998 | 1,442 | 1,412 | 2,582 | 17.0 |
| 6/1/1998 | 1,434 | 1,412 | 2,567 | 17.0 |
| 7/1/1998 | 1,420 | 1,412 | 2,501 | 17.3 |
| 8/1/1998 | 1,497 | 1,412 | 2,501 | 18.2 |
| 9/1/1998 | 1,482 | 1,412 | 2,511 | 17.9 |
| 10/1/1998 | 1,445 | 1,412 | 2,350 | 18.7 |
| 11/1/1998 | 1,397 | 1,412 | 2,270 | 18.7 |
| 12/1/1998 | 1,305 | 1,412 | 2,156 | 18.4 |
| 1/1/1999 | 1,399 | 1,381 | 2,535 | 16.8 |
| 2/1/1999 | 1,436 | 1,381 | 2,210 | 19.8 |
| 3/1/1999 | 1,424 | 1,381 | 2,447 | 17.7 |
| 4/1/1999 | 1,397 | 1,381 | 2,264 | 18.8 |
| 5/1/1999 | 1,366 | 1,381 | 2,393 | 17.4 |
| 6/1/1999 | 1,393 | 1,381 | 2,389 | 17.7 |
| 7/1/1999 | 1,438 | 1,381 | 2,592 | 16.9 |
| 8/1/1999 | 1,383 | 1,381 | 2,611 | 16.1 |
| 9/1/1999 | 1,371 | 1,381 | 2,399 | 17.4 |
| 10/1/1999 | 1,358 | 1,381 | 2,510 | 16.4 |
| 11/1/1999 | 1,353 | 1,381 | 2,348 | 17.5 |
| 12/1/1999 | 1,250 | 1,381 | 2,136 | 17.8 |
| 1/1/2000 | 1,283 | 1,383 | 2,634 | 14.8 |
| 2/1/2000 | 1,307 | 1,383 | 2,294 | 17.3 |
| 3/1/2000 | 1,330 | 1,383 | 2,533 | 16.0 |

P000173

Ventura County Todd Road Jail Needs Assessment and Engineering Analysis

| | | | |
|---|---|---|---|
| 4/1/2000 | 1,386 | 1,383 | 2,455 | 17.2 |
| 5/1/2000 | 1,411 | 1,383 | 2,460 | 17.4 |
| 6/1/2000 | 1,414 | 1,383 | 2,458 | 17.5 |
| 7/1/2000 | 1,258 | 1,383 | 2,160 | 17.7 |
| 8/1/2000 | 1,462 | 1,383 | 2,484 | 17.9 |
| 9/1/2000 | 1,488 | 1,383 | 2,493 | 18.1 |
| 10/1/2000 | 1,457 | 1,383 | 2,333 | 19.0 |
| 11/1/2000 | 1,426 | 1,383 | 2,185 | 19.8 |
| 12/1/2000 | 1,371 | 1,383 | 2,116 | 19.7 |
| 1/1/2001 | 1,380 | 1,319 | 2,359 | 17.8 |
| 2/1/2001 | 1,413 | 1,319 | 2,141 | 20.1 |
| 3/1/2001 | 1,421 | 1,319 | 2,365 | 18.3 |
| 4/1/2001 | 1,333 | 1,319 | 2,162 | 18.7 |
| 5/1/2001 | 1,307 | 1,319 | 2,293 | 17.3 |
| 6/1/2001 | 1,313 | 1,319 | 2,201 | 18.1 |
| 7/1/2001 | 1,258 | 1,319 | 2,160 | 17.7 |
| 8/1/2001 | 1,276 | 1,319 | 2,345 | 16.5 |
| 9/1/2001 | 1,276 | 1,319 | 2,230 | 17.4 |
| 10/1/2001 | 1,315 | 1,319 | 2,248 | 17.8 |
| 11/1/2001 | 1,303 | 1,319 | 2,093 | 18.9 |
| 12/1/2001 | 1,231 | 1,319 | 2,178 | 17.2 |
| 1/1/2002 | 1,326 | 1,414 | | |
| 2/1/2002 | 1,371 | 1,414 | 2,230 | 18.7 |
| 3/1/2002 | 1,379 | 1,414 | 2,566 | 16.3 |
| 4/1/2002 | 1,373 | 1,414 | 2,273 | 18.4 |
| 5/1/2002 | 1,359 | 1,414 | 2,480 | 16.7 |
| 6/1/2002 | 1,359 | 1,414 | 2,480 | 16.7 |
| 7/1/2002 | 1,408 | 1,414 | 2,436 | 17.6 |
| 8/1/2002 | 1,462 | 1,414 | 2,503 | 17.8 |
| 9/1/2002 | 1,454 | 1,414 | 2,322 | 19.0 |
| 10/1/2002 | 1,487 | 1,414 | 2,506 | 18.0 |
| 11/1/2002 | 1,520 | 1,414 | 2,262 | 20.4 |
| 12/1/2002 | 1,471 | 1,414 | 2,169 | 20.6 |
| 1/1/2003 | 1,587 | 1,572 | 2,523 | 19.1 |
| 2/1/2003 | 1,562 | 1,572 | 2,146 | 22.1 |
| 3/1/2003 | 1,553 | 1,572 | 2,502 | 18.9 |
| 4/1/2003 | 1,527 | 1,572 | 2,441 | 19.0 |
| 5/1/2003 | 1,563 | 1,572 | 2,604 | 18.2 |
| 6/1/2003 | 1,648 | 1,572 | 2,437 | 20.6 |
| 7/1/2003 | 1,543 | 1,572 | 2,610 | 18.0 |
| 8/1/2003 | 1,547 | 1,572 | 2,635 | 17.8 |
| 9/1/2003 | 1,593 | 1,572 | 2,613 | 18.5 |
| 10/1/2003 | 1,617 | 1,572 | 2,447 | 20.1 |
| 11/1/2003 | 1,600 | 1,572 | 2,466 | 19.7 |
| 12/1/2003 | 1,527 | 1,572 | 2,497 | 18.6 |
| 1/1/2004 | 1,580 | 1,602 | 2,762 | 17.4 |
| 2/1/2004 | 1,582 | 1,602 | 2,465 | 19.5 |
| 3/1/2004 | 1,599 | 1,602 | 2,866 | 17.0 |
| 4/1/2004 | 1,638 | 1,602 | 2,617 | 19.0 |
| 5/1/2004 | 1,624 | 1,602 | 2,686 | 18.4 |
| 6/1/2004 | 1,545 | 1,602 | 2,364 | 19.9 |
| 7/1/2004 | 1,582 | 1,602 | 2,598 | 18.5 |

P000174

Ventura County Todd Road Jail Needs Assessment and Engineering Analysis

| 8/1/2004 | 1,604 | 1,602 | 2,630 | 18.5 |
| 9/1/2004 | 1,642 | 1,602 | 2,501 | 20.0 |
| 10/1/2004 | 1,632 | 1,602 | 2,444 | 20.3 |
| 11/1/2004 | 1,669 | 1,602 | 2,344 | 21.6 |
| 12/1/2004 | 1,524 | 1,602 | 2,332 | 19.9 |
| 1/1/2005 | 1,600 | 1,551 | 2,522 | 19.3 |
| 2/1/2005 | 1,549 | 1,551 | 2,073 | 22.7 |
| 3/1/2005 | 1,526 | 1,551 | 2,472 | 18.8 |
| 4/1/2005 | 1,565 | 1,551 | 2,373 | 20.0 |
| 5/1/2005 | 1,597 | 1,551 | 2,484 | 19.5 |
| 6/1/2005 | 1,554 | 1,551 | 2,327 | 20.3 |
| 7/1/2005 | 1,523 | 1,551 | 2,312 | 20.0 |
| 8/1/2005 | 1,521 | 1,551 | 2,433 | 19.0 |
| 9/1/2005 | 1,524 | 1,551 | 2,270 | 20.4 |
| 10/1/2005 | 1,529 | 1,551 | 2,430 | 19.1 |
| 11/1/2005 | 1,576 | 1,551 | 2,384 | 20.1 |
| 12/1/2005 | 1,551 | 1,551 | 2,407 | 19.6 |
| 1/1/2006 | **1,585** | **1,692** | **2,559** | 18.8 |
| 2/1/2006 | **1,684** | **1,692** | **2,191** | 23.4 |
| 3/1/2006 | **1,738** | **1,692** | **2,576** | 20.5 |
| 4/1/2006 | **1,720** | **1,692** | **2,393** | 21.8 |
| 5/1/2006 | **1,678** | **1,692** | **2,509** | 20.3 |
| 6/1/2006 | **1,712** | **1,692** | **2,611** | 19.9 |
| 7/1/2006 | **1,696** | **1,692** | **2,522** | 20.4 |
| 8/1/2006 | **1,724** | **1,692** | **2,586** | 20.3 |

P000175

Ventura County Todd Road Jail Needs Assessment and Engineering Analysis

Historical ADP by Gender

| Jurisdiction | Year | Month | (ADP totals) Unsentenced males | (ADP totals) Unsentenced females | (ADP totals) Sentenced males | (ADP totals) Sentenced females | Total Males | Total Females | TOTAL | Avg Annual Males | Avg Annual Females |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Ventura Sheriff's Dept. | 2006 | 1 | 719 | 104 | 607 | 141 | 1326 | 245 | 1571 | 1394 | 241 |
| Ventura Sheriff's Dept. | 2006 | 2 | 746 | 101 | 637 | 145 | 1383 | 246 | 1629 | | |
| Ventura Sheriff's Dept. | 2006 | 3 | 763 | 104 | 670 | 141 | 1433 | 245 | 1678 | | |
| Ventura Sheriff's Dept. | 2006 | 4 | 730 | 97 | 678 | 152 | 1408 | 249 | 1657 | | |
| Ventura Sheriff's Dept. | 2006 | 5 | 790 | 110 | 598 | 115 | 1388 | 225 | 1613 | | |
| Ventura Sheriff's Dept. | 2006 | 6 | 792 | 115 | 634 | 120 | 1426 | 235 | 1661 | | |
| Ventura Sheriff's Dept. | 2005 | 1 | 662 | 94 | 682 | 121 | 1344 | 215 | 1559 | 1307 | 229 |
| Ventura Sheriff's Dept. | 2005 | 2 | 631 | 100 | 680 | 126 | 1311 | 226 | 1537 | | |
| Ventura Sheriff's Dept. | 2005 | 3 | 589 | 82 | 699 | 146 | 1288 | 228 | 1516 | | |
| Ventura Sheriff's Dept. | 2005 | 4 | 645 | 80 | 652 | 157 | 1297 | 237 | 1534 | | |
| Ventura Sheriff's Dept. | 2005 | 5 | 654 | 79 | 672 | 157 | 1326 | 236 | 1562 | | |
| Ventura Sheriff's Dept. | 2005 | 6 | 634 | 87 | 684 | 142 | 1318 | 229 | 1547 | | |
| Ventura Sheriff's Dept. | 2005 | 7 | 641 | 94 | 654 | 134 | 1295 | 228 | 1523 | | |
| Ventura Sheriff's Dept. | 2005 | 8 | 625 | 86 | 675 | 131 | 1300 | 217 | 1517 | | |
| Ventura Sheriff's Dept. | 2005 | 9 | 661 | 101 | 633 | 124 | 1294 | 225 | 1519 | | |
| Ventura Sheriff's Dept. | 2005 | 10 | 629 | 102 | 667 | 131 | 1296 | 233 | 1529 | | |
| Ventura Sheriff's Dept. | 2005 | 11 | 675 | 104 | 644 | 133 | 1319 | 237 | 1556 | | |
| Ventura Sheriff's Dept. | 2005 | 12 | 684 | 101 | 614 | 132 | 1298 | 233 | 1531 | | |
| Ventura Sheriff's Dept. | 2004 | 1 | 915 | 177 | 438 | 46 | 1353 | 223 | 1576 | 1353 | 214 |
| Ventura Sheriff's Dept. | 2004 | 2 | 798 | 138 | 557 | 75 | 1355 | 213 | 1568 | | |
| Ventura Sheriff's Dept. | 2004 | 3 | 656 | 85 | 703 | 126 | 1359 | 211 | 1570 | | |
| Ventura Sheriff's Dept. | 2004 | 4 | 705 | 93 | 668 | 119 | 1373 | 212 | 1585 | | |
| Ventura Sheriff's Dept. | 2004 | 5 | 701 | 94 | 667 | 110 | 1368 | 204 | 1572 | | |
| Ventura Sheriff's Dept. | 2004 | 6 | 678 | 91 | 656 | 108 | 1334 | 199 | 1533 | | |
| Ventura Sheriff's Dept. | 2004 | 7 | 709 | 93 | 631 | 113 | 1340 | 206 | 1546 | | |
| Ventura Sheriff's Dept. | 2004 | 8 | 712 | 84 | 639 | 132 | 1351 | 216 | 1567 | | |
| Ventura Sheriff's Dept. | 2004 | 9 | 771 | 101 | 598 | 119 | 1369 | 220 | 1589 | | |
| Ventura Sheriff's Dept. | 2004 | 10 | 718 | 100 | 646 | 122 | 1364 | 222 | 1586 | | |
| Ventura Sheriff's Dept. | 2004 | 11 | 704 | 88 | 679 | 141 | 1383 | 229 | 1612 | | |
| Ventura Sheriff's Dept. | 2004 | 12 | 622 | 90 | 668 | 126 | 1290 | 216 | 1506 | | |
| Ventura Sheriff's Dept. | 2003 | 1 | 937 | 130 | 439 | 81 | 1376 | 211 | 1587 | 1356 | 217 |
| Ventura Sheriff's Dept. | 2003 | 2 | 957 | 131 | 405 | 69 | 1362 | 200 | 1562 | | |
| Ventura Sheriff's Dept. | 2003 | 3 | 931 | 131 | 423 | 68 | 1354 | 199 | 1553 | | |
| Ventura Sheriff's Dept. | 2003 | 4 | 950 | 133 | 381 | 63 | 1331 | 196 | 1527 | | |
| Ventura Sheriff's Dept. | 2003 | 5 | 947 | 157 | 408 | 51 | 1355 | 208 | 1563 | | |
| Ventura Sheriff's Dept. | 2003 | 6 | 928 | 201 | 440 | 79 | 1368 | 280 | 1648 | | |
| Ventura Sheriff's Dept. | 2003 | 7 | 850 | 167 | 478 | 48 | 1328 | 215 | 1543 | | |
| Ventura Sheriff's Dept. | 2003 | 8 | 873 | 171 | 459 | 44 | 1332 | 215 | 1547 | | |
| Ventura Sheriff's Dept. | 2003 | 9 | 918 | 176 | 466 | 33 | 1384 | 209 | 1593 | | |
| Ventura Sheriff's Dept. | 2003 | 10 | 962 | 187 | 435 | 33 | 1397 | 220 | 1617 | | |
| Ventura Sheriff's Dept. | 2003 | 11 | 936 | 193 | 441 | 30 | 1377 | 223 | 1600 | | |
| Ventura Sheriff's Dept. | 2003 | 12 | 867 | 190 | 438 | 32 | 1305 | 222 | 1527 | | |
| Ventura Sheriff's Dept. | 2002 | 1 | 761 | 106 | 395 | 64 | 1156 | 170 | 1326 | 1226 | 188 |
| Ventura Sheriff's Dept. | 2002 | 2 | 775 | 116 | 428 | 52 | 1203 | 168 | 1371 | | |
| Ventura Sheriff's Dept. | 2002 | 3 | 763 | 114 | 446 | 56 | 1209 | 170 | 1379 | | |
| Ventura Sheriff's Dept. | 2002 | 4 | 774 | 107 | 424 | 68 | 1198 | 175 | 1373 | | |
| Ventura Sheriff's Dept. | 2002 | 5 | 782 | 111 | 397 | 69 | 1179 | 180 | 1359 | | |
| Ventura Sheriff's Dept. | 2002 | 6 | 782 | 111 | 397 | 69 | 1179 | 180 | 1359 | | |
| Ventura Sheriff's Dept. | 2002 | 7 | 641 | 102 | 580 | 85 | 1221 | 187 | 1408 | | |
| Ventura Sheriff's Dept. | 2002 | 8 | 673 | 116 | 580 | 93 | 1253 | 209 | 1462 | | |
| Ventura Sheriff's Dept. | 2002 | 9 | 696 | 117 | 562 | 79 | 1258 | 196 | 1454 | | |
| Ventura Sheriff's Dept. | 2002 | 10 | 751 | 132 | 530 | 74 | 1281 | 206 | 1487 | | |
| Ventura Sheriff's Dept. | 2002 | 11 | 814 | 134 | 482 | 90 | 1296 | 224 | 1520 | | |
| Ventura Sheriff's Dept. | 2002 | 12 | 858 | 122 | 418 | 73 | 1276 | 195 | 1471 | | |
| Ventura Sheriff's Dept. | 2001 | 1 | 649 | 95 | 535 | 101 | 1184 | 196 | 1380 | 1147 | 172 |
| Ventura Sheriff's Dept. | 2001 | 2 | 674 | 102 | 550 | 87 | 1224 | 189 | 1413 | | |
| Ventura Sheriff's Dept. | 2001 | 3 | 667 | 102 | 556 | 96 | 1223 | 198 | 1421 | | |
| Ventura Sheriff's Dept. | 2001 | 4 | 639 | 91 | 515 | 88 | 1154 | 179 | 1333 | | |
| Ventura Sheriff's Dept. | 2001 | 5 | 651 | 90 | 485 | 81 | 1136 | 171 | 1307 | | |
| Ventura Sheriff's Dept. | 2001 | 6 | 686 | 90 | 463 | 74 | 1149 | 164 | 1313 | | |
| Ventura Sheriff's Dept. | 2001 | 7 | 685 | 88 | 421 | 64 | 1106 | 152 | 1258 | | |
| Ventura Sheriff's Dept. | 2001 | 8 | 695 | 92 | 417 | 72 | 1112 | 164 | 1276 | | |
| Ventura Sheriff's Dept. | 2001 | 9 | 700 | 97 | 412 | 67 | 1112 | 164 | 1276 | | |
| Ventura Sheriff's Dept. | 2001 | 10 | 724 | 95 | 427 | 69 | 1151 | 164 | 1315 | | |
| Ventura Sheriff's Dept. | 2001 | 11 | 705 | 96 | 428 | 74 | 1133 | 170 | 1303 | | |
| Ventura Sheriff's Dept. | 2001 | 12 | 690 | 94 | 384 | 63 | 1074 | 157 | 1231 | | |

P000176

Ventura County Todd Road Jail Needs Assessment and Engineering Analysis

| | Year | Month | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Ventura Sheriff's Dept. | 2000 | 1 | 574 | 478 | 135 | 96 | **709** | 574 | 1283 | 1164 | 219 |
| Ventura Sheriff's Dept. | 2000 | 2 | 583 | 85 | 551 | 88 | **1134** | 173 | 1307 | | |
| Ventura Sheriff's Dept. | 2000 | 3 | 625 | 80 | 540 | 85 | **1165** | 165 | 1330 | | |
| Ventura Sheriff's Dept. | 2000 | 4 | 652 | 78 | 570 | 86 | **1222** | 164 | 1386 | | |
| Ventura Sheriff's Dept. | 2000 | 5 | 615 | 98 | 600 | 98 | **1215** | 196 | 1411 | | |
| Ventura Sheriff's Dept. | 2000 | 6 | 604 | 98 | 608 | 104 | **1212** | 202 | 1414 | | |
| Ventura Sheriff's Dept. | 2000 | 7 | 685 | 88 | 421 | 64 | **1106** | 152 | 1258 | | |
| Ventura Sheriff's Dept. | 2000 | 8 | 661 | 101 | 604 | 96 | **1265** | 197 | 1462 | | |
| Ventura Sheriff's Dept. | 2000 | 9 | 672 | 107 | 617 | 92 | **1289** | 199 | 1488 | | |
| Ventura Sheriff's Dept. | 2000 | 10 | 666 | 108 | 589 | 95 | **1255** | 203 | 1458 | | |
| Ventura Sheriff's Dept. | 2000 | 11 | 660 | 108 | 561 | 97 | **1221** | 205 | 1426 | | |
| Ventura Sheriff's Dept. | 2000 | 12 | 643 | 97 | 535 | 96 | **1178** | 193 | 1371 | | |
| Ventura Sheriff's Dept. | 1999 | 1 | 675 | 73 | 566 | 85 | **1241** | 158 | 1399 | 1178 | 203 |
| Ventura Sheriff's Dept. | 1999 | 2 | 688 | 79 | 587 | 82 | **1275** | 161 | 1436 | | |
| Ventura Sheriff's Dept. | 1999 | 3 | 680 | 76 | 579 | 89 | **1259** | 165 | 1424 | | |
| Ventura Sheriff's Dept. | 1999 | 4 | 727 | 292 | 280 | 98 | **1007** | 390 | 1397 | | |
| Ventura Sheriff's Dept. | 1999 | 5 | 722 | 84 | 463 | 97 | **1185** | 181 | 1366 | | |
| Ventura Sheriff's Dept. | 1999 | 6 | 668 | 89 | 541 | 95 | **1209** | 184 | 1393 | | |
| Ventura Sheriff's Dept. | 1999 | 7 | 681 | 99 | 556 | 102 | **1237** | 201 | 1438 | | |
| Ventura Sheriff's Dept. | 1999 | 8 | 653 | 103 | 527 | 100 | **1180** | 203 | 1383 | | |
| Ventura Sheriff's Dept. | 1999 | 9 | 632 | 93 | 535 | 111 | **1167** | 204 | 1371 | | |
| Ventura Sheriff's Dept. | 1999 | 10 | 625 | 85 | 533 | 115 | **1158** | 200 | 1358 | | |
| Ventura Sheriff's Dept. | 1999 | 11 | 606 | 83 | 546 | 118 | **1152** | 201 | 1353 | | |
| Ventura Sheriff's Dept. | 1999 | 12 | 563 | 70 | 505 | 112 | **1068** | 182 | 1250 | | |
| Ventura Sheriff's Dept. | 1998 | 1 | 632 | 92 | 546 | 93 | **1178** | 185 | 1363 | 1235 | 177 |
| Ventura Sheriff's Dept. | 1998 | 2 | 593 | 73 | 579 | 101 | **1172** | 174 | 1346 | | |
| Ventura Sheriff's Dept. | 1998 | 3 | 612 | 69 | 623 | 99 | **1235** | 168 | 1403 | | |
| Ventura Sheriff's Dept. | 1998 | 4 | 597 | 77 | 635 | 104 | **1232** | 181 | 1413 | | |
| Ventura Sheriff's Dept. | 1998 | 5 | 598 | 85 | 655 | 104 | **1253** | 189 | 1442 | | |
| Ventura Sheriff's Dept. | 1998 | 6 | 615 | 74 | 643 | 102 | **1258** | 176 | 1434 | | |
| Ventura Sheriff's Dept. | 1998 | 7 | 607 | 68 | 630 | 115 | **1237** | 183 | 1420 | | |
| Ventura Sheriff's Dept. | 1998 | 8 | 652 | 76 | 663 | 106 | **1315** | 182 | 1497 | | |
| Ventura Sheriff's Dept. | 1998 | 9 | 638 | 78 | 652 | 114 | **1290** | 192 | 1482 | | |
| Ventura Sheriff's Dept. | 1998 | 10 | 619 | 73 | 653 | 100 | **1272** | 173 | 1445 | | |
| Ventura Sheriff's Dept. | 1998 | 11 | 622 | 71 | 607 | 97 | **1229** | 168 | 1397 | | |
| Ventura Sheriff's Dept. | 1998 | 12 | 613 | 69 | 538 | 85 | **1151** | 154 | 1305 | | |
| Ventura Sheriff's Dept. | 1997 | 1 | 572 | 54 | 610 | 90 | **1182** | 144 | 1326 | 1154 | 159 |
| Ventura Sheriff's Dept. | 1997 | 2 | 582 | 64 | 578 | 84 | **1160** | 148 | 1308 | | |
| Ventura Sheriff's Dept. | 1997 | 3 | 597 | 64 | 602 | 95 | **1199** | 159 | 1358 | | |
| Ventura Sheriff's Dept. | 1997 | 4 | 582 | 64 | 568 | 104 | **1150** | 168 | 1318 | | |
| Ventura Sheriff's Dept. | 1997 | 5 | 576 | 65 | 570 | 106 | **1146** | 171 | 1317 | | |
| Ventura Sheriff's Dept. | 1997 | 6 | 544 | 65 | 536 | 92 | **1080** | 157 | 1237 | | |
| Ventura Sheriff's Dept. | 1997 | 7 | 590 | 73 | 519 | 89 | **1109** | 162 | 1271 | | |
| Ventura Sheriff's Dept. | 1997 | 8 | 601 | 85 | 554 | 95 | **1155** | 180 | 1335 | | |
| Ventura Sheriff's Dept. | 1997 | 9 | 610 | 82 | 583 | 93 | **1193** | 175 | 1368 | | |
| Ventura Sheriff's Dept. | 1997 | 10 | 599 | 80 | 593 | 97 | **1192** | 177 | 1369 | | |
| Ventura Sheriff's Dept. | 1997 | 11 | 595 | 84 | 563 | 92 | **1158** | 176 | 1334 | | |
| Ventura Sheriff's Dept. | 1997 | 12 | 602 | 40 | 523 | 45 | **1125** | 85 | 1210 | | |
| Ventura Sheriff's Dept. | 1996 | 1 | 541 | 57 | 713 | 94 | **1254** | 151 | 1405 | 1190 | 155 |
| Ventura Sheriff's Dept. | 1996 | 2 | 585 | 63 | 720 | 93 | **1305** | 156 | 1461 | | |
| Ventura Sheriff's Dept. | 1996 | 3 | 554 | 63 | 712 | 81 | **1266** | 144 | 1410 | | |
| Ventura Sheriff's Dept. | 1996 | 4 | 567 | 63 | 649 | 74 | **1216** | 137 | 1353 | | |
| Ventura Sheriff's Dept. | 1996 | 5 | 576 | 76 | 644 | 68 | **1220** | 144 | 1364 | | |
| Ventura Sheriff's Dept. | 1996 | 6 | 545 | 68 | 637 | 80 | **1182** | 148 | 1330 | | |
| Ventura Sheriff's Dept. | 1996 | 7 | 556 | 84 | 585 | 77 | **1141** | 161 | 1302 | | |
| Ventura Sheriff's Dept. | 1996 | 8 | 540 | 74 | 593 | 92 | **1133** | 166 | 1299 | | |
| Ventura Sheriff's Dept. | 1996 | 9 | 565 | 80 | 596 | 79 | **1161** | 159 | 1320 | | |
| Ventura Sheriff's Dept. | 1996 | 10 | 557 | 78 | 584 | 80 | **1141** | 158 | 1299 | | |
| Ventura Sheriff's Dept. | 1996 | 11 | 547 | 72 | 575 | 92 | **1122** | 164 | 1286 | | |
| Ventura Sheriff's Dept. | 1996 | 12 | 551 | 93 | 586 | 78 | **1137** | 171 | 1308 | | |

P000177

Ventura County Todd Road Jail Needs Assessment and Engineering Analysis

| Jurisdiction | Facility | Year | Month | Population cap | Unsentenced males | Unsentenced females | Sentenced males | Sentenced females | Total facility ADP |
|---|---|---|---|---|---|---|---|---|---|
| Ventura Sheriff's Dept. | Ventura County Branch-Medium | 1997 | 1 | U | 217 | 0 | 293 | 0 | 510 |
| Ventura Sheriff's Dept. | Ventura County Branch-Women | 1997 | 1 | U | 0 | 49 | 0 | 88 | 137 |
| Ventura Sheriff's Dept. | Ventura County Main Jail | 1997 | 1 | U | 352 | 5 | 186 | 2 | 545 |
| Ventura Sheriff's Dept. | Ventura County Ojai - Women | 1997 | 1 | U | 3 | 0 | 131 | 0 | 134 |
| Ventura Sheriff's Dept. | Ventura County Branch-Medium | 1997 | 2 | U | 212 | 0 | 294 | 0 | 506 |
| Ventura Sheriff's Dept. | Ventura County Branch-Women | 1997 | 2 | U | 0 | 58 | 0 | 82 | 140 |
| Ventura Sheriff's Dept. | Ventura County Main Jail | 1997 | 2 | 0 | 369 | 6 | 169 | 2 | 546 |
| Ventura Sheriff's Dept. | Ventura County Ojai - Women | 1997 | 2 | U | 1 | 0 | 115 | 0 | 116 |
| Ventura Sheriff's Dept. | Ventura County Branch-Medium | 1997 | 3 | U | 217 | 0 | 295 | 0 | 512 |
| Ventura Sheriff's Dept. | Ventura County Branch-Women | 1997 | 3 | U | 0 | 58 | 0 | 94 | 152 |
| Ventura Sheriff's Dept. | Ventura County Main Jail | 1997 | 3 | U | 379 | 6 | 187 | 1 | 573 |
| Ventura Sheriff's Dept. | Ventura County Ojai - Women | 1997 | 3 | U | 1 | 0 | 120 | 0 | 121 |
| Ventura Sheriff's Dept. | Ventura County Branch-Medium | 1997 | 4 | U | 219 | 0 | 290 | 0 | 509 |
| Ventura Sheriff's Dept. | Ventura County Branch-Women | 1997 | 4 | U | 0 | 59 | 0 | 103 | 162 |
| Ventura Sheriff's Dept. | Ventura County Main Jail | 1997 | 4 | U | 361 | 5 | 162 | 1 | 529 |
| Ventura Sheriff's Dept. | Ventura County Ojai - Women | 1997 | 4 | U | 2 | 0 | 116 | 0 | 118 |
| Ventura Sheriff's Dept. | Ventura County Branch-Medium | 1997 | 5 | U | 214 | 0 | 297 | 0 | 511 |
| Ventura Sheriff's Dept. | Ventura County Branch-Women | 1997 | 5 | U | 0 | 60 | 0 | 103 | 163 |
| Ventura Sheriff's Dept. | Ventura County Main Jail | 1997 | 5 | U | 361 | 5 | 162 | 3 | 531 |

P000178

Ventura County Todd Road Jail Needs Assessment and Engineering Analysis

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Ventura Sheriff's Dept. | Ventura County Ojai - Women | 1997 | 5 | U | 1 | 0 | 111 | 0 | 112 |
| Ventura Sheriff's Dept. | Ventura County Branch-Medium | 1997 | 6 | 0 | 216 | 0 | 286 | 0 | 502 |
| Ventura Sheriff's Dept. | County Branch-Women | 1997 | 6 | 0 | 0 | 61 | 0 | 91 | 152 |
| Ventura Sheriff's Dept. | Ventura County Main Jail | 1997 | 6 | 0 | 327 | 4 | 146 | 1 | 478 |
| Ventura Sheriff's Dept. | Ventura County Ojai - Women | 1997 | 6 | 0 | 1 | 0 | 104 | 0 | 105 |
| Ventura Sheriff's Dept. | County Branch-Medium | 1997 | 7 | U | 226 | 0 | 276 | 0 | 502 |
| Ventura Sheriff's Dept. | County Branch-Women | 1997 | 7 | U | 0 | 68 | 0 | 88 | 156 |
| Ventura Sheriff's Dept. | Ventura County Main Jail | 1997 | 7 | U | 363 | 5 | 131 | 1 | 500 |
| Ventura Sheriff's Dept. | Ventura County Ojai - Women | 1997 | 7 | U | 1 | 0 | 112 | 0 | 113 |
| Ventura Sheriff's Dept. | County Branch-Medium | 1997 | 8 | U | 219 | 0 | 287 | 0 | 506 |
| Ventura Sheriff's Dept. | County Branch-Women | 1997 | 8 | U | 0 | 79 | 0 | 91 | 170 |
| Ventura Sheriff's Dept. | Ventura County Main Jail | 1997 | 8 | U | 379 | 6 | 158 | 4 | 547 |
| Ventura Sheriff's Dept. | Ventura County Ojai - Women | 1997 | 8 | U | 3 | 0 | 109 | 0 | 112 |
| Ventura Sheriff's Dept. | County Branch-Medium | 1997 | 9 | U | 205 | 0 | 304 | 0 | 509 |
| Ventura Sheriff's Dept. | County Branch-Women | 1997 | 9 | U | 0 | 75 | 0 | 92 | 167 |
| Ventura Sheriff's Dept. | Ventura County Main Jail | 1997 | 9 | U | 403 | 7 | 169 | 1 | 580 |
| Ventura Sheriff's Dept. | Ventura County Ojai - Women | 1997 | 9 | U | 2 | 0 | 110 | 0 | 112 |
| Ventura Sheriff's Dept. | County Branch-Medium | 1997 | 10 | 0 | 215 | 0 | 304 | 0 | 519 |
| Ventura Sheriff's Dept. | County Branch-Women | 1997 | 10 | 0 | 0 | 67 | 0 | 91 | 158 |
| Ventura Sheriff's Dept. | Ventura County Main Jail | 1997 | 10 | 0 | 382 | 13 | 179 | 6 | 580 |
| Ventura Sheriff's Dept. | Ventura County Ojai - Women | 1997 | 10 | 0 | 2 | 0 | 110 | 0 | 112 |

P000179

Ventura County Todd Road Jail Needs Assessment and Engineering Analysis

| Jurisdiction | Facility | Year | Month | Population cap | Unsentenced males | Unsentenced females | Sentenced males | Sentenced females | Total facility ADP |
|---|---|---|---|---|---|---|---|---|---|
| Ventura Sheriff's Dept. | Ventura County Branch-Medium | 1997 | 11 | U | 222 | 0 | 293 | 0 | 515 |
| Ventura Sheriff's Dept. | Ventura County Branch-Women | 1997 | 11 | U | 0 | 73 | 0 | 88 | 161 |
| Ventura Sheriff's Dept. | Ventura County Main Jail | 1997 | 11 | U | 371 | 11 | 157 | 4 | 543 |
| Ventura Sheriff's Dept. | Ventura County Ojai - Women | 1997 | 11 | U | 2 | 0 | 113 | 0 | 115 |
| Ventura Sheriff's Dept. | Ventura County Branch-Medium | 1997 | 12 | 0 | 233 | 0 | 265 | 0 | 498 |
| Ventura Sheriff's Dept. | Ventura County Branch-Women | 1997 | 12 | 0 | 0 | 30 | 0 | 43 | 73 |
| Ventura Sheriff's Dept. | Ventura County Main Jail | 1997 | 12 | 0 | 367 | 10 | 153 | 2 | 532 |
| Ventura Sheriff's Dept. | Ventura County Ojai - Women | 1997 | 12 | 0 | 2 | 0 | 105 | 0 | 107 |

| Jurisdiction | Facility | Year | Month | Population cap | Unsentenced males | Unsentenced females | Sentenced males | Sentenced females | Total facility ADP |
|---|---|---|---|---|---|---|---|---|---|
| Ventura Sheriff's Dept. | Ventura County Branch-Medium | 1998 | 1 | U | 255 | 0 | 245 | 0 | 500 |
| Ventura Sheriff's Dept. | Ventura County Branch-Women | 1998 | 1 | U | 0 | 81 | 0 | 86 | 167 |
| Ventura Sheriff's Dept. | Ventura County Main Jail | 1998 | 1 | U | 376 | 11 | 182 | 7 | 576 |
| Ventura Sheriff's Dept. | Ventura County Ojai - Women | 1998 | 1 | U | 1 | 0 | 119 | 0 | 120 |
| Ventura Sheriff's Dept. | Ventura County Branch-Medium | 1998 | 2 | U | 226 | 0 | 281 | 0 | 507 |
| Ventura Sheriff's Dept. | Ventura County Branch-Women | 1998 | 2 | U | 0 | 63 | 0 | 92 | 155 |
| Ventura Sheriff's Dept. | Ventura County Main Jail | 1998 | 2 | U | 366 | 10 | 170 | 9 | 555 |
| Ventura Sheriff's Dept. | Ventura County Ojai - Women | 1998 | 2 | U | 1 | 0 | 128 | 0 | 129 |
| Ventura Sheriff's Dept. | Ventura County Branch-Medium | 1998 | 3 | 0 | 202 | 0 | 312 | 0 | 514 |
| Ventura Sheriff's Dept. | Ventura County Branch-Women | 1998 | 3 | 0 | 0 | 61 | 0 | 91 | 152 |

Page 120 of 174

P000180

Ventura County Todd Road Jail Needs Assessment and Engineering Analysis

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Ventura Sheriff's Dept. | Ventura County Main Jail | 1998 | 3 | 0 | 409 | 8 | 181 | 8 | 606 |
| Ventura Sheriff's Dept. | Ventura County Ojai - Women | 1998 | 3 | 0 | 1 | 0 | 130 | 0 | 131 |
| Ventura Sheriff's Dept. | Ventura County Branch-Medium | 1998 | 4 | U | 192 | 0 | 323 | 0 | 515 |
| Ventura Sheriff's Dept. | Ventura County Branch-Women | 1998 | 4 | U | 0 | 62 | 0 | 99 | 161 |
| Ventura Sheriff's Dept. | Ventura County Main Jail | 1998 | 4 | U | 405 | 15 | 181 | 5 | 606 |
| Ventura Sheriff's Dept. | Ventura County Ojai - Women | 1998 | 4 | U | 0 | 0 | 131 | 0 | 131 |
| Ventura Sheriff's Dept. | Ventura County Branch-Medium | 1998 | 5 | U | 190 | 0 | 326 | 0 | 516 |
| Ventura Sheriff's Dept. | Ventura County Branch-Women | 1998 | 5 | U | 0 | 68 | 0 | 100 | 168 |
| Ventura Sheriff's Dept. | Ventura County Main Jail | 1998 | 5 | U | 408 | 17 | 197 | 4 | 626 |
| Ventura Sheriff's Dept. | Ventura County Ojai - Women | 1998 | 5 | U | 0 | 0 | 132 | 0 | 132 |
| Ventura Sheriff's Dept. | Ventura County Branch-Medium | 1998 | 6 | U | 187 | 0 | 327 | 0 | 514 |
| Ventura Sheriff's Dept. | Ventura County Branch-Women | 1998 | 6 | U | 0 | 60 | 0 | 98 | 158 |
| Ventura Sheriff's Dept. | Ventura County Main Jail | 1998 | 6 | U | 428 | 14 | 179 | 4 | 625 |
| Ventura Sheriff's Dept. | Ventura County Ojai - Women | 1998 | 6 | U | 0 | 0 | 137 | 0 | 137 |
| Ventura Sheriff's Dept. | Ventura County Branch-Medium | 1998 | 7 | U | 178 | 0 | 338 | 0 | 516 |
| Ventura Sheriff's Dept. | Ventura County Branch-Women | 1998 | 7 | U | 0 | 61 | 0 | 105 | 166 |
| Ventura Sheriff's Dept. | Ventura County Main Jail | 1998 | 7 | U | 426 | 7 | 174 | 10 | 617 |
| Ventura Sheriff's Dept. | Ventura County Ojai - Women | 1998 | 7 | U | 3 | 0 | 118 | 0 | 121 |
| Ventura Sheriff's Dept. | Ventura County Branch-Medium | 1998 | 8 | 0 | 198 | 0 | 324 | 0 | 522 |
| Ventura Sheriff's Dept. | Ventura County Branch-Women | 1998 | 8 | 0 | 0 | 70 | 0 | 95 | 165 |
| Ventura Sheriff's Dept. | Ventura County Main Jail | 1998 | 8 | 0 | 453 | 6 | 189 | 11 | 659 |

P000181

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Ventura Sheriff's Dept. | Ventura County Ojai - Women | 1998 | 8 | 0 | 1 | 0 | 150 | 0 | 151 |
| Ventura Sheriff's Dept. | Ventura County Branch-Medium | 1998 | 9 | 0 | 185 | 0 | 331 | 0 | 516 |
| Ventura Sheriff's Dept. | Ventura County Branch-Women | 1998 | 9 | 0 | 0 | 71 | 0 | 102 | 173 |
| Ventura Sheriff's Dept. | Ventura County Main Jail | 1998 | 9 | 0 | 453 | 7 | 178 | 12 | 650 |
| Ventura Sheriff's Dept. | Ventura County Ojai - Women | 1998 | 9 | 0 | 0 | 0 | 143 | 0 | 143 |
| Ventura Sheriff's Dept. | Ventura County Branch-Medium | 1998 | 10 | 0 | 204 | 0 | 319 | 0 | 523 |
| Ventura Sheriff's Dept. | Ventura County Branch-Women | 1998 | 10 | 0 | 0 | 62 | 0 | 96 | 158 |
| Ventura Sheriff's Dept. | Ventura County Main Jail | 1998 | 10 | 0 | 415 | 11 | 203 | 4 | 633 |
| Ventura Sheriff's Dept. | Ventura County Ojai - Women | 1998 | 10 | 0 | 0 | 0 | 131 | 0 | 131 |
| Ventura Sheriff's Dept. | Ventura County Branch-Medium | 1998 | 11 | 0 | 211 | 0 | 293 | 0 | 504 |
| Ventura Sheriff's Dept. | Ventura County Branch-Women | 1998 | 11 | 0 | 0 | 61 | 0 | 91 | 152 |
| Ventura Sheriff's Dept. | Ventura County Main Jail | 1998 | 11 | 0 | 411 | 10 | 198 | 6 | 625 |
| Ventura Sheriff's Dept. | Ventura County Ojai - Women | 1998 | 11 | 0 | 0 | 0 | 116 | 0 | 116 |
| Ventura Sheriff's Dept. | Ventura County Branch-Medium | 1998 | 12 | 0 | 228 | 0 | 272 | 0 | 500 |
| Ventura Sheriff's Dept. | Ventura County Branch-Women | 1998 | 12 | 0 | 0 | 61 | 0 | 82 | 143 |
| Ventura Sheriff's Dept. | Ventura County Main Jail | 1998 | 12 | 0 | 385 | 8 | 167 | 3 | 563 |
| Ventura Sheriff's Dept. | Ventura County Ojai - Women | 1998 | 12 | 0 | 0 | 0 | 99 | 0 | 99 |

P000182

Ventura County Todd Road Jail Needs Assessment and Engineering Analysis

| Jurisdiction | Facility | Year | Month | Population cap | Unsentenced males | Unsentenced females | Sentenced males | Sentenced females | Total facility ADP |
|---|---|---|---|---|---|---|---|---|---|
| Ventura Sheriff's Dept. | Ventura County Branch-Medium | 1999 | 1 | 0 | 236 | 0 | 263 | 0 | 499 |
| Ventura Sheriff's Dept. | Ventura County Branch-Women | 1999 | 1 | 0 | 0 | 62 | 0 | 82 | 144 |
| Ventura Sheriff's Dept. | Ventura County Main Jail | 1999 | 1 | 0 | 439 | 11 | 192 | 3 | 645 |
| Ventura Sheriff's Dept. | Ventura County Ojai - Women | 1999 | 1 | 0 | 0 | 0 | 111 | 0 | 111 |
| Ventura Sheriff's Dept. | Ventura County Branch-Medium | 1999 | 2 | 0 | 229 | 0 | 280 | 0 | 509 |
| Ventura Sheriff's Dept. | Ventura County Branch-Women | 1999 | 2 | 0 | 0 | 68 | 0 | 75 | 143 |
| Ventura Sheriff's Dept. | Ventura County Main Jail | 1999 | 2 | 0 | 459 | 11 | 192 | 7 | 669 |
| Ventura Sheriff's Dept. | Ventura County Ojai - Women | 1999 | 2 | 0 | 0 | 0 | 115 | 0 | 115 |
| Ventura Sheriff's Dept. | Ventura County Branch-Medium | 1999 | 3 | 0 | 227 | 0 | 286 | 0 | 513 |
| Ventura Sheriff's Dept. | Ventura County Branch-Women | 1999 | 3 | 0 | 0 | 65 | 0 | 81 | 146 |
| Ventura Sheriff's Dept. | Ventura County Main Jail | 1999 | 3 | 0 | 453 | 11 | 177 | 8 | 649 |
| Ventura Sheriff's Dept. | Ventura County Ojai - Women | 1999 | 3 | 0 | 0 | 0 | 116 | 0 | 116 |
| Ventura Sheriff's Dept. | Ventura County Branch-Medium | 1999 | 4 | U | 292 | 215 | 0 | 0 | 507 |
| Ventura Sheriff's Dept. | Ventura County Branch-Women | 1999 | 4 | U | 0 | 65 | 0 | 91 | 156 |
| Ventura Sheriff's Dept. | Ventura County Main Jail | 1999 | 4 | U | 435 | 12 | 173 | 7 | 627 |
| Ventura Sheriff's Dept. | Ventura County Ojai - Women | 1999 | 4 | U | 0 | 0 | 107 | 0 | 107 |
| Ventura Sheriff's Dept. | Ventura County Branch-Medium | 1999 | 5 | U | 319 | 0 | 186 | 0 | 505 |
| Ventura Sheriff's Dept. | Ventura County Branch-Women | 1999 | 5 | U | 0 | 70 | 0 | 92 | 162 |
| Ventura Sheriff's Dept. | Ventura County Main Jail | 1999 | 5 | U | 403 | 14 | 171 | 5 | 593 |
| Ventura Sheriff's Dept. | Ventura County Ojai - Women | 1999 | 5 | U | 0 | 0 | 106 | 0 | 106 |

P000183

Ventura County Todd Road Jail Needs Assessment and Engineering Analysis

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Ventura Sheriff's Dept. | Ventura County Branch-Medium | 1999 | 6 | U | 237 | 0 | 279 | 0 | 516 |
| Ventura Sheriff's Dept. | Ventura County Branch-Women | 1999 | 6 | U | 0 | 75 | 0 | 87 | 162 |
| Ventura Sheriff's Dept. | Ventura County Main Jail | 1999 | 6 | U | 430 | 14 | 171 | 8 | 623 |
| Ventura Sheriff's Dept. | Ventura County Ojai - Women | 1999 | 6 | U | 1 | 0 | 91 | 0 | 92 |
| Ventura Sheriff's Dept. | Ventura County Branch-Medium | 1999 | 7 | U | 229 | 0 | 286 | 0 | 515 |
| Ventura Sheriff's Dept. | Ventura County Branch-Women | 1999 | 7 | U | 0 | 82 | 0 | 93 | 175 |
| Ventura Sheriff's Dept. | Ventura County Main Jail | 1999 | 7 | U | 452 | 17 | 179 | 9 | 657 |
| Ventura Sheriff's Dept. | Ventura County Ojai - Women | 1999 | 7 | U | 0 | 0 | 91 | 0 | 91 |
| Ventura Sheriff's Dept. | Ventura County Branch-Medium | 1999 | 8 | U | 230 | 0 | 297 | 0 | 527 |
| Ventura Sheriff's Dept. | Ventura County Branch-Women | 1999 | 8 | U | 0 | 89 | 0 | 89 | 178 |
| Ventura Sheriff's Dept. | Ventura County Main Jail | 1999 | 8 | U | 423 | 14 | 179 | 11 | 627 |
| Ventura Sheriff's Dept. | Ventura County Ojai - Women | 1999 | 8 | U | 0 | 0 | 51 | 0 | 51 |
| Ventura Sheriff's Dept. | Ventura County Branch-Medium | 1999 | 9 | U | 219 | 0 | 367 | 0 | 586 |
| Ventura Sheriff's Dept. | Ventura County Branch-Women | 1999 | 9 | U | 0 | 84 | 0 | 106 | 190 |
| Ventura Sheriff's Dept. | Ventura County Main Jail | 1999 | 9 | U | 413 | 9 | 168 | 5 | 595 |
| Ventura Sheriff's Dept. | Ventura County Ojai - Women | 1999 | 9 | U | 0 | 0 | 0 | 0 | 0 |
| Ventura Sheriff's Dept. | Ventura County Branch-Medium | 1999 | 10 | U | 202 | 0 | 375 | 0 | 577 |
| Ventura Sheriff's Dept. | Ventura County Branch-Women | 1999 | 10 | U | 0 | 77 | 0 | 109 | 186 |
| Ventura Sheriff's Dept. | Ventura County Main Jail | 1999 | 10 | U | 423 | 8 | 158 | 6 | 595 |
| Ventura Sheriff's Dept. | Ventura County Ojai - Women | 1999 | 10 | U | 0 | 0 | 0 | 0 | 0 |

P000184

Ventura County Todd Road Jail Needs Assessment and Engineering Analysis

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Ventura Sheriff's Dept. | Ventura County Branch-Medium | 1999 | 11 | 0 | 197 | 0 | 377 | 0 | 574 |
| Ventura Sheriff's Dept. | Ventura County Branch-Women | 1999 | 11 | 0 | 0 | 76 | 0 | 113 | 189 |
| Ventura Sheriff's Dept. | Ventura County Main Jail | 1999 | 11 | 0 | 409 | 7 | 169 | 5 | 590 |
| Ventura Sheriff's Dept. | Ventura County Ojai - Women | 1999 | 11 | 0 | 0 | 0 | 0 | 0 | 0 |
| Ventura Sheriff's Dept. | Ventura County Branch-Medium | 1999 | 12 | U | 137 | 0 | 381 | 0 | 518 |
| Ventura Sheriff's Dept. | Ventura County Branch-Women | 1999 | 12 | U | 0 | 64 | 0 | 107 | 171 |
| Ventura Sheriff's Dept. | Ventura County Main Jail | 1999 | 12 | U | 426 | 6 | 124 | 5 | 561 |
| Ventura Sheriff's Dept. | Ventura County Ojai - Women | 1999 | 12 | U | 0 | 0 | 0 | 0 | 0 |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| Ventura Sheriff's Dept. | Ventura County Main Jail | 2000 | 1 | U | 453 | 8 | 135 | 3 | 599 |
| Ventura Sheriff's Dept. | Ventura County Ojai - Women | 2000 | 1 | U | 0 | 0 | 0 | 0 | 0 |
| Ventura Sheriff's Dept. | Ventura County Branch-Medium | 2000 | 2 | 0 | 89 | 0 | 430 | 0 | 519 |
| Ventura Sheriff's Dept. | Ventura County Branch-Women | 2000 | 2 | 0 | 0 | 76 | 0 | 86 | 162 |
| Ventura Sheriff's Dept. | Ventura County Main Jail | 2000 | 2 | 0 | 494 | 9 | 121 | 2 | 626 |
| Ventura Sheriff's Dept. | Ventura County Ojai - Women | 2000 | 2 | 0 | 0 | 0 | 0 | 0 | 0 |
| Ventura Sheriff's Dept. | Ventura County Branch-Medium | 2000 | 3 | U | 132 | 0 | 414 | 0 | 546 |
| Ventura Sheriff's Dept. | Ventura County Branch-Women | 2000 | 3 | U | 0 | 73 | 0 | 83 | 156 |
| Ventura Sheriff's Dept. | Ventura County Main Jail | 2000 | 3 | U | 493 | 7 | 126 | 2 | 628 |
| Ventura Sheriff's Dept. | Ventura County Ojai - Women | 2000 | 3 | U | 0 | 0 | 0 | 0 | 0 |
| Ventura Sheriff's Dept. | Ventura County Branch-Medium | 2000 | 4 | U | 153 | 0 | 435 | 0 | 588 |

P000185

Ventura County Todd Road Jail Needs Assessment and Engineering Analysis

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Ventura Sheriff's Dept. | Ventura County Branch- Women | 2000 | 4 | U | 0 | 52 | 0 | 74 | 126 |
| Ventura Sheriff's Dept. | Ventura County Main Jail | 2000 | 4 | U | 499 | 26 | 135 | 12 | 672 |
| Ventura Sheriff's Dept. | Ventura County Ojai - Women | 2000 | 4 | U | 0 | 0 | 0 | 0 | 0 |
| Ventura Sheriff's Dept. | Ventura County Branch- Medium | 2000 | 5 | U | 152 | 0 | 475 | 0 | 627 |
| Ventura Sheriff's Dept. | Ventura County Branch- Women | 2000 | 5 | U | 0 | 23 | 0 | 59 | 82 |
| Ventura Sheriff's Dept. | Ventura County Main Jail | 2000 | 5 | U | 463 | 75 | 125 | 39 | 702 |
| Ventura Sheriff's Dept. | Ventura County Ojai - Women | 2000 | 5 | U | 0 | 0 | 0 | 0 | 0 |
| Ventura Sheriff's Dept. | Ventura County Branch- Medium | 2000 | 6 | U | 149 | 0 | 483 | 0 | 632 |
| Ventura Sheriff's Dept. | Ventura County Branch- Women | 2000 | 6 | U | 0 | 30 | 0 | 68 | 98 |
| Ventura Sheriff's Dept. | Ventura County Main Jail | 2000 | 6 | U | 455 | 68 | 125 | 36 | 684 |
| Ventura Sheriff's Dept. | Ventura County Ojai - Women | 2000 | 6 | U | 0 | 0 | 0 | 0 | 0 |
| Ventura Sheriff's Dept. | Ventura County Branch- Medium | 2000 | 7 | D | 155 | 0 | 332 | 0 | 487 |
| Ventura Sheriff's Dept. | Ventura County Branch- Women | 2000 | 7 | D | 0 | 81 | 0 | 62 | 143 |
| Ventura Sheriff's Dept. | Ventura County Main Jail | 2000 | 7 | D | 530 | 7 | 89 | 2 | 628 |
| Ventura Sheriff's Dept. | Ventura County Ojai - Women | 2000 | 7 | U | 0 | 0 | 0 | 0 | 0 |
| Ventura Sheriff's Dept. | Ventura County Branch- Medium | 2000 | 8 | U | 159 | 0 | 480 | 0 | 639 |
| Ventura Sheriff's Dept. | Ventura County Branch- Women | 2000 | 8 | U | 0 | 91 | 0 | 95 | 186 |
| Ventura Sheriff's Dept. | Ventura County Main Jail | 2000 | 8 | U | 502 | 10 | 124 | 1 | 637 |
| Ventura Sheriff's Dept. | Ventura County Ojai - Women | 2000 | 8 | U | 0 | 0 | 0 | 0 | 0 |
| Ventura Sheriff's Dept. | Ventura County Branch- Medium | 2000 | 9 | U | 180 | 0 | 486 | 0 | 666 |

Page 126 of 174

P000186

Ventura County Todd Road Jail Needs Assessment and Engineering Analysis

| Jurisdiction | Facility | Year | Month | Population cap | Unsentenced males | Unsentenced females | Sentenced males | Sentenced females | Total facility ADP |
|---|---|---|---|---|---|---|---|---|---|
| Ventura Sheriff's Dept. | Ventura County Branch-Women | 2000 | 9 | U | 0 | 98 | 0 | 90 | 188 |
| Ventura Sheriff's Dept. | Ventura County Main Jail | 2000 | 9 | U | 492 | 9 | 131 | 2 | 634 |
| Ventura Sheriff's Dept. | Ventura County Ojai - Women | 2000 | 9 | U | 0 | 0 | 0 | 0 | 0 |
| Ventura Sheriff's Dept. | Ventura County Branch-Medium | 2000 | 11 | U | 191 | 0 | 430 | 0 | 621 |
| Ventura Sheriff's Dept. | Ventura County Branch-Women | 2000 | 11 | U | 0 | 99 | 0 | 95 | 194 |
| Ventura Sheriff's Dept. | Ventura County Main Jail | 2000 | 11 | U | 469 | 9 | 131 | 2 | 611 |
| Ventura Sheriff's Dept. | Ventura County Ojai - Women | 2000 | 11 | U | 0 | 0 | 0 | 0 | 0 |
| Ventura Sheriff's Dept. | Ventura County Branch-Medium | 2000 | 12 | U | 181 | 0 | 416 | 0 | 597 |
| Ventura Sheriff's Dept. | Ventura County Branch-Women | 2000 | 12 | U | 0 | 90 | 0 | 94 | 184 |
| Ventura Sheriff's Dept. | Ventura County Main Jail | 2000 | 12 | U | 462 | 7 | 119 | 2 | 590 |
| Ventura Sheriff's Dept. | Ventura County Ojai - Women | 2000 | 12 | U | 0 | 0 | 0 | 0 | 0 |

| Jurisdiction | Facility | Year | Month | Population cap | Unsentenced males | Unsentenced females | Sentenced males | Sentenced females | Total facility ADP |
|---|---|---|---|---|---|---|---|---|---|
| Ventura Sheriff's Dept. | Ventura County Branch-Women | 2001 | 1 | D | 0 | 87 | 0 | 99 | 186 |
| Ventura Sheriff's Dept. | Ventura County Main Jail | 2001 | 1 | D | 458 | 8 | 131 | 2 | 599 |
| Ventura Sheriff's Dept. | Ventura County Ojai - Women | 2001 | 1 | D | 0 | 0 | 0 | 0 | 0 |
| Ventura Sheriff's Dept. | Ventura County Todd Road | 2001 | 1 | D | 191 | 0 | 404 | 0 | 595 |
| Ventura Sheriff's Dept. | Ventura County Branch-Women | 2001 | 2 | D | 0 | 94 | 0 | 84 | 178 |
| Ventura Sheriff's Dept. | Ventura County Main Jail | 2001 | 2 | D | 496 | 8 | 116 | 3 | 623 |
| Ventura Sheriff's Dept. | Ventura County Ojai - Women | 2001 | 2 | D | 0 | 0 | 0 | 0 | 0 |
| Ventura Sheriff's Dept. | Ventura County Todd Road | 2001 | 2 | D | 178 | 0 | 434 | 0 | 612 |

P000187

Ventura County Todd Road Jail Needs Assessment and Engineering Analysis

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Ventura Sheriff's Dept. | Ventura County Branch-Women | 2001 | 3 | D | 0 | 94 | 0 | 93 | 187 |
| Ventura Sheriff's Dept. | Ventura County Main Jail | 2001 | 3 | D | 506 | 8 | 116 | 3 | 633 |
| Ventura Sheriff's Dept. | Ventura County Ojai - Women | 2001 | 3 | D | 0 | 0 | 0 | 0 | 0 |
| Ventura Sheriff's Dept. | Ventura County Todd Road | 2001 | 3 | D | 161 | 0 | 440 | 0 | 601 |
| Ventura Sheriff's Dept. | Ventura County Branch-Women | 2001 | 4 | D | 0 | 81 | 0 | 86 | 167 |
| Ventura Sheriff's Dept. | Ventura County Main Jail | 2001 | 4 | D | 464 | 10 | 105 | 2 | 581 |
| Ventura Sheriff's Dept. | Ventura County Ojai - Women | 2001 | 4 | D | 0 | 0 | 0 | 0 | 0 |
| Ventura Sheriff's Dept. | Ventura County Todd Road | 2001 | 4 | D | 175 | 0 | 410 | 0 | 585 |
| Ventura Sheriff's Dept. | Ventura County Branch-Women | 2001 | 5 | D | 0 | 83 | 0 | 79 | 162 |
| Ventura Sheriff's Dept. | Ventura County Main Jail | 2001 | 5 | D | 476 | 7 | 100 | 2 | 585 |
| Ventura Sheriff's Dept. | Ventura County Ojai - Women | 2001 | 5 | D | 0 | 0 | 0 | 0 | 0 |
| Ventura Sheriff's Dept. | Ventura County Todd Road | 2001 | 5 | D | 175 | 0 | 385 | 0 | 560 |
| Ventura Sheriff's Dept. | Ventura County Branch-Women | 2001 | 6 | D | 0 | 84 | 0 | 71 | 155 |
| Ventura Sheriff's Dept. | Ventura County Main Jail | 2001 | 6 | D | 521 | 6 | 98 | 3 | 628 |
| Ventura Sheriff's Dept. | Ventura County Ojai - Women | 2001 | 6 | D | 0 | 0 | 0 | 0 | 0 |
| Ventura Sheriff's Dept. | Ventura County Todd Road | 2001 | 6 | D | 165 | 0 | 365 | 0 | 530 |
| Ventura Sheriff's Dept. | Ventura County Branch-Women | 2001 | 7 | D | 0 | 81 | 0 | 62 | 143 |
| Ventura Sheriff's Dept. | Ventura County Main Jail | 2001 | 7 | D | 530 | 7 | 89 | 2 | 628 |
| Ventura Sheriff's Dept. | Ventura County Ojai - Women | 2001 | 7 | U | 0 | 0 | 0 | 0 | 0 |
| Ventura Sheriff's Dept. | Ventura County Todd Road | 2001 | 7 | D | 155 | 0 | 332 | 0 | 487 |
| Ventura Sheriff's Dept. | Ventura County Branch-Women | 2001 | 8 | D | 0 | 83 | 0 | 70 | 153 |
| Ventura Sheriff's Dept. | Ventura County Main Jail | 2001 | 8 | D | 507 | 9 | 94 | 2 | 612 |

P000188

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Ventura Sheriff's Dept. | Ventura County Ojai - Women | 2001 | 8 | U | 0 | 0 | 0 | 0 | 0 |
| Ventura Sheriff's Dept. | Ventura County Todd Road | 2001 | 8 | D | 188 | 0 | 323 | 0 | 511 |
| Ventura Sheriff's Dept. | Ventura County Branch-Women | 2001 | 9 | D | 0 | 89 | 0 | 65 | 154 |
| Ventura Sheriff's Dept. | Ventura County Main Jail | 2001 | 9 | D | 496 | 8 | 99 | 2 | 605 |
| Ventura Sheriff's Dept. | Ventura County Ojai - Women | 2001 | 9 | D | 0 | 0 | 0 | 0 | 0 |
| Ventura Sheriff's Dept. | Ventura County Todd Road | 2001 | 9 | D | 204 | 0 | 313 | 0 | 517 |
| Ventura Sheriff's Dept. | Ventura County Branch-Women | 2001 | 10 | D | 0 | 89 | 0 | 67 | 156 |
| Ventura Sheriff's Dept. | Ventura County Main Jail | 2001 | 10 | D | 506 | 6 | 101 | 2 | 615 |
| Ventura Sheriff's Dept. | Ventura County Ojai - Women | 2001 | 10 | U | 0 | 0 | 0 | 0 | 0 |
| Ventura Sheriff's Dept. | Ventura County Todd Road | 2001 | 10 | D | 218 | 0 | 326 | 0 | 544 |
| Ventura Sheriff's Dept. | Ventura County Branch-Women | 2001 | 11 | D | 0 | 86 | 0 | 72 | 158 |
| Ventura Sheriff's Dept. | Ventura County Main Jail | 2001 | 11 | D | 505 | 10 | 102 | 2 | 619 |
| Ventura Sheriff's Dept. | Ventura County Ojai - Women | 2001 | 11 | U | 0 | 0 | 0 | 0 | 0 |
| Ventura Sheriff's Dept. | Ventura County Todd Road | 2001 | 11 | D | 200 | 0 | 326 | 0 | 526 |
| Ventura Sheriff's Dept. | Ventura County Branch-Women | 2001 | 12 | D | 0 | 85 | 0 | 61 | 146 |
| Ventura Sheriff's Dept. | Ventura County Main Jail | 2001 | 12 | D | 463 | 9 | 100 | 2 | 574 |
| Ventura Sheriff's Dept. | Ventura County Ojai - Women | 2001 | 12 | D | 0 | 0 | 0 | 0 | 0 |
| Ventura Sheriff's Dept. | Ventura County Todd Road | 2001 | 12 | D | 227 | 0 | 284 | 0 | 511 |

P000189

Ventura County Todd Road Jail Needs Assessment and Engineering Analysis

| Jurisdiction | Year | Month | (ADP totals) Unsentenced males | (ADP totals) Unsentenced females | (ADP totals) Sentenced males | (ADP totals) Sentenced females | (ADP totals) Jurisdiction | (Avg number of felony inmates) Unsentenced | (Avg number of felony inmates) Sentenced | (Avg number of felony inmates) Total | (Avg number of misdemeanor inmates) Unsentenced | (Avg number of misdemeanor inmates) Sentenced |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Ventura Sheriff's Dept. | 2002 | 1 | 761 | 106 | 395 | 64 | 1326 | 619 | 221 | 840 | 248 | 238 |
| Ventura Sheriff's Dept. | 2002 | 2 | 775 | 116 | 428 | 52 | 1371 | 638 | 226 | 864 | 253 | 254 |
| Ventura Sheriff's Dept. | 2002 | 3 | 763 | 114 | 446 | 56 | 1379 | 643 | 236 | 879 | 234 | 266 |
| Ventura Sheriff's Dept. | 2002 | 4 | 774 | 107 | 424 | 68 | 1373 | 656 | 249 | 905 | 225 | 243 |
| Ventura Sheriff's Dept. | 2002 | 5 | 782 | 111 | 397 | 69 | 1359 | 666 | 235 | 901 | 227 | 231 |
| Ventura Sheriff's Dept. | 2002 | 6 | 782 | 111 | 397 | 69 | 1359 | 666 | 235 | 901 | 227 | 231 |
| Ventura Sheriff's Dept. | 2002 | 7 | 641 | 102 | 580 | 85 | 1408 | 496 | 412 | 908 | 247 | 253 |
| Ventura Sheriff's Dept. | 2002 | 8 | 673 | 116 | 580 | 93 | 1462 | 511 | 403 | 914 | 277 | 271 |
| Ventura Sheriff's Dept. | 2002 | 9 | 696 | 117 | 562 | 79 | 1454 | 559 | 393 | 952 | 252 | 250 |
| Ventura Sheriff's Dept. | 2002 | 10 | 751 | 132 | 530 | 74 | 1487 | 627 | 346 | 973 | 256 | 258 |
| Ventura Sheriff's Dept. | 2002 | 11 | 814 | 134 | 482 | 90 | 1520 | 695 | 308 | 1003 | 253 | 264 |
| Ventura Sheriff's Dept. | 2002 | 12 | 858 | 122 | 418 | 73 | 1471 | 746 | 276 | 1022 | 234 | 215 |
| | | | 756 | 116 | 470 | 73 | 1,414 | 627 | 295 | 922 | 244 | 248 |

| Jurisdiction | (Avg number of misdemeanor inmates) Total | Highest one-day population for this month occurred on: | The highest count was: | ADP of maximum security inmates | ADP of medium security inmates | ADP of minimum security inmates | Mental health cases opened last day of the month | New mental health cases opened during this month | day of the month, receiving psych medication | Inmates assigned to mental health beds last day of month | Inmates that were seen at inmate sick call this month | Physician/practitioner occurrences during this month |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Ventura Sheriff's Dept. | 486 | 1/22/2002 | 1408 | 530 | 438 | 358 | U | 94 | U | D | 969 | 488 |
| Ventura Sheriff's Dept. | 507 | 2/11/2002 | 1443 | 549 | 452 | 370 | U | 125 | U | D | 897 | 513 |
| Ventura Sheriff's Dept. | 500 | 3/25/2002 | 1431 | 552 | 455 | 372 | U | 173 | U | D | 868 | 588 |
| Ventura Sheriff's Dept. | 468 | 4/2/2002 | 1443 | 563 | 481 | 329 | U | U | 250 | 22 | 1040 | 545 |
| Ventura Sheriff's Dept. | 458 | 5/28/2002 | 1435 | 557 | 476 | 326 | U | U | 279 | 26 | 890 | 547 |
| Ventura Sheriff's Dept. | 458 | 6/1/2002 | 1435 | 557 | 476 | 326 | U | U | 279 | 26 | 890 | 547 |
| Ventura Sheriff's Dept. | 500 | 7/1/2002 | 1440 | 577 | 493 | 338 | U | U | U | U | U | U |
| Ventura Sheriff's Dept. | 548 | 8/19/2002 | 1495 | 599 | 512 | 351 | U | U | U | U | U | U |
| Ventura Sheriff's Dept. | 502 | 9/3/2002 | 1480 | 596 | 509 | 349 | U | U | U | U | U | U |
| Ventura Sheriff's Dept. | 514 | 10/28/2002 | 1511 | 610 | 520 | 357 | 195 | 173 | 146 | 0 | 1034 | 508 |
| Ventura Sheriff's Dept. | 517 | 11/18/2002 | 1540 | 623 | 532 | 365 | 195 | 173 | 146 | 0 | 1009 | 538 |
| Ventura Sheriff's Dept. | 449 | 12/30/2002 | 1563 | 603 | 515 | 353 | 195 | 173 | 146 | 0 | 1025 | 462 |
| | 492 | | 1,469 | 576 | 488 | 350 | | | | | | |

Page 130 of 174

P000190

Ventura County Todd Road Jail Needs Assessment and Engineering Analysis

| Jurisdiction | Off-site medical appointments during this month | Dental encounters during this month | Inmates assigned to medical beds last day of the month | Avg # of inmates not assigned to housing | Avg # of your inmates in contract beds in other jurisdictions | federal inmates housed in your system on contract | Avg # of state inmates housed in your system on contract | Avg # of inmates from other Co. in your system on contract | Avg # of inmates sent. and awaiting transport to state prison | inmates in hospital(s) outside of your jail facilities | Total # of persons booked this month | pretrial released due to lack of housing capacity | Total # of sent. released due to lack of housing capacity | juveniles in custody this month (per 707 W&I code) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Ventura Sheriff's Dept. | 129 | 147 | U | U | D | D | D | D | 72 | 0.13 | 1029 | 0 | 0 | D |
| Ventura Sheriff's Dept. | 117 | 137 | 0.18 | 0 | D | D | D | D | 54 | 9 | 2230 | 0 | 0 | D |
| Ventura Sheriff's Dept. | 117 | 112 | 0.71 | 0 | D | D | D | D | 29 | 7 | 2566 | 0 | 0 | D |
| Ventura Sheriff's Dept. | 34 | 150 | 25 | 0 | D | D | D | D | 66 | U | 2273 | 0 | 0 | D |
| Ventura Sheriff's Dept. | 27 | 144 | 25 | 0 | D | D | D | D | 40 | 0 | 2480 | 0 | 0 | D |
| Ventura Sheriff's Dept. | 27 | 144 | 25 | 0 | D | D | D | D | 40 | U | 2480 | 0 | 0 | D |
| Ventura Sheriff's Dept. | U | U | U | 0 | D | D | D | D | 45 | 0 | 2436 | 0 | 0 | D |
| Ventura Sheriff's Dept. | U | U | U | 0 | D | D | D | D | 15 | U | 2503 | 0 | 0 | D |
| Ventura Sheriff's Dept. | U | U | U | 0 | D | D | D | D | 28 | U | 2322 | 0 | 0 | D |
| Ventura Sheriff's Dept. | 23 | 158 | U | U | D | D | D | D | 54 | U | 2506 | 0 | 0 | D |
| Ventura Sheriff's Dept. | 23 | 132 | U | 0 | D | D | D | D | 53 | U | 2262 | 0 | 0 | D |
| Ventura Sheriff's Dept. | 25 | 122 | U | 0 | D | D | D | D | 25 | U | 2169 | 0 | 0 | D |

| Jurisdiction | Year | Month | (ADP totals) Unsentenced males | (ADP totals) Unsentenced females | (ADP totals) Sentenced males | (ADP totals) Sentenced females | (ADP totals) Jurisdiction | (Avg number of felony inmates) Unsentenced | (Avg number of felony inmates) Sentenced | (Avg number of felony inmates) Total | (Avg number of misdemeanor inmates) Unsentenced | (Avg number of misdemeanor inmates) Sentenced |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Ventura Sheriff's Dept. | 2003 | 1 | 937 | 130 | 439 | 81 | 1587 | 810 | 274 | 1084 | 257 | 246 |
| Ventura Sheriff's Dept. | 2003 | 2 | 957 | 131 | 405 | 69 | 1562 | 822 | 239 | 1061 | 266 | 235 |
| Ventura Sheriff's Dept. | 2003 | 3 | 931 | 131 | 423 | 68 | 1553 | 784 | 244 | 1028 | 278 | 247 |
| Ventura Sheriff's Dept. | 2003 | 4 | 950 | 133 | 381 | 63 | 1527 | 812 | 222 | 1034 | 271 | 222 |
| Ventura Sheriff's Dept. | 2003 | 5 | 947 | 157 | 408 | 51 | 1563 | 812 | 249 | 1061 | 292 | 210 |
| Ventura Sheriff's Dept. | 2003 | 6 | 928 | 201 | 440 | 79 | 1648 | 837 | 280 | 1117 | 292 | 239 |
| Ventura Sheriff's Dept. | 2003 | 7 | 850 | 167 | 478 | 48 | 1543 | 746 | 274 | 1020 | 271 | 252 |
| Ventura Sheriff's Dept. | 2003 | 8 | 873 | 171 | 459 | 44 | 1547 | 762 | 260 | 1022 | 282 | 243 |
| Ventura Sheriff's Dept. | 2003 | 9 | 918 | 176 | 466 | 33 | 1593 | 798 | 262 | 1060 | 296 | 237 |
| Ventura Sheriff's Dept. | 2003 | 10 | 962 | 187 | 435 | 33 | 1617 | 842 | 242 | 1084 | 307 | 226 |
| Ventura Sheriff's Dept. | 2003 | 11 | 936 | 193 | 441 | 30 | 1600 | 837 | 247 | 1084 | 292 | 224 |
| Ventura Sheriff's Dept. | 2003 | 12 | 867 | 190 | 438 | 32 | 1527 | 809 | 263 | 1072 | 248 | 207 |
|  |  |  | 921 | 164 | 434 | 53 | 1,572 | 806 | 255 | 1,061 | 279 | 232 |

P000191

Ventura County Todd Road Jail Needs Assessment and Engineering Analysis

| Jurisdiction | (Avg number of misdemeanor inmates) Total | Highest one-day population for this month occurred on: | The highest count was: | ADP of maximum security inmates | ADP of medium security inmates | ADP of minimum security inmates | Mental health cases opened last day of the month | New mental health cases opened during this month | day of the month, receiving psych medication | Inmates assigned to mental health beds last day of the month | Inmates that were seen at inmate sick call this month | Physician/practitioner occurrences during this month |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Ventura Sheriff's Dept. | 503 | 1/27/2003 | 1609 | 651 | 619 | 317 | 303 | U | 235 | 0 | 1134 | 366 |
| Ventura Sheriff's Dept. | 501 | 2/3/2003 | 1562 | 640 | 609 | 313 | 379 | U | 303 | 0 | 906 | 379 |
| Ventura Sheriff's Dept. | 525 | 3/3/2003 | 1555 | 637 | 605 | 311 | 277 | U | 347 | 0 | 1125 | 477 |
| Ventura Sheriff's Dept. | 493 | 4/16/2003 | 1532 | 694 | 519 | 314 | U | U | U | U | 992 | 487 |
| Ventura Sheriff's Dept. | 502 | 5/27/2003 | 1585 | 682 | 549 | 332 | U | U | U | U | 1130 | 501 |
| Ventura Sheriff's Dept. | 531 | 6/16/2003 | 1670 | 719 | 578 | 351 | U | U | U | U | U | U |
| Ventura Sheriff's Dept. | 523 | 7/28/2003 | 1631 | 633 | 601 | 309 | 342 | U | 276 | 0 | 1168 | 371 |
| Ventura Sheriff's Dept. | 525 | 8/18/2003 | 1631 | 634 | 604 | 309 | 322 | U | 258 | 0 | 811 | 414 |
| Ventura Sheriff's Dept. | 533 | 9/15/2003 | 1681 | 653 | 621 | 319 | U | U | U | 0 | 1036 | 451 |
| Ventura Sheriff's Dept. | 533 | 10/20/2003 | 1730 | 663 | 631 | 323 | 309 | 233 | 247 | 0 | 1183 | 388 |
| Ventura Sheriff's Dept. | 516 | 11/10/2003 | 1679 | 656 | 624 | 320 | 448 | 233 | 358 | 0 | 931 | 336 |
| Ventura Sheriff's Dept. | 455 | 12/1/2003 | 1653 | 626 | 596 | 305 | 354 | 233 | 283 | 0 | 1080 | 418 |
| | 512 | | 1,627 | 657 | 596 | 319 | | | | | | |

| Jurisdiction | Off-site medical appointments during this month | Dental encounters during this month | Inmates assigned to medical beds last day of the month | Avg # of inmates not assigned to housing | Avg # of your inmates in contract beds in other jurisdictions | federal inmates housed in your system on contract | Avg # of state inmates housed in your system on contract | Avg # of inmates from other Co. in your system on contract | Avg # of inmates sent, and awaiting transport to state prison | inmates in hospital(s) outside of your jail facilities | Total # of persons booked this month | pretrial released due to lack of housing capacity | Total # of sent. released due to lack of housing capacity | juveniles in custody this month (per 707 W&I code) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Ventura Sheriff's Dept. | 27 | 126 | U | U | D | D | D | D | 47 | 0 | 2523 | 0 | 0 | D |
| Ventura Sheriff's Dept. | 28 | 141 | U | U | D | D | D | D | 44 | 2 | 2146 | 0 | 0 | D |
| Ventura Sheriff's Dept. | 28 | 145 | U | U | D | D | D | D | 49 | 3 | 2502 | 0 | 0 | D |
| Ventura Sheriff's Dept. | 30 | 168 | U | 0 | D | D | D | D | 29 | U | 2441 | 0 | 0 | D |
| Ventura Sheriff's Dept. | 49 | 131 | U | 0 | D | D | D | D | 53 | U | 2604 | 0 | 0 | D |
| Ventura Sheriff's Dept. | U | U | U | 0 | D | D | D | D | 55 | U | 2437 | 0 | 0 | D |
| Ventura Sheriff's Dept. | 5 | 150 | U | 0 | D | D | D | D | 66 | 3 | 2610 | 0 | 0 | D |
| Ventura Sheriff's Dept. | 26 | 136 | U | 0 | D | D | D | D | 40 | 10 | 2635 | 0 | 0 | D |
| Ventura Sheriff's Dept. | 40 | 144 | U | 0 | D | D | D | D | 28 | 4 | 2613 | 0 | 0 | D |
| Ventura Sheriff's Dept. | 49 | 139 | U | 0 | D | D | D | D | 45 | U | 2447 | 0 | 0 | D |
| Ventura Sheriff's Dept. | 29 | 94 | U | 0 | D | D | D | D | 33 | U | 2466 | 0 | 0 | D |
| Ventura Sheriff's Dept. | 24 | 86 | U | 0 | D | D | D | D | 48 | U | 2497 | 0 | 0 | D |

Page 132 of 174

P000192

Ventura County Todd Road Jail Needs Assessment and Engineering Analysis

| Jurisdiction | Year | Month | (ADP totals) Unsentenced males | (ADP totals) Unsentenced females | (ADP totals) Sentenced males | (ADP totals) Sentenced females | (ADP totals) Jurisdiction | (Avg number of felony inmates) Unsentenced | (Avg number of felony inmates) Sentenced | (Avg number of felony inmates) Total | (Avg number of misdemeanor inmates) Unsentenced | (Avg number of misdemeanor inmates) Sentenced |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Ventura Sheriff's Dept. | 2004 | 1 | 915 | 177 | 438 | 46 | 1576 | 829 | 249 | 1078 | 263 | 235 |
| Ventura Sheriff's Dept. | 2004 | 2 | 798 | 138 | 557 | 75 | 1568 | 743 | 340 | 1083 | 193 | 292 |
| Ventura Sheriff's Dept. | 2004 | 3 | 656 | 85 | 703 | 126 | 1570 | 629 | 452 | 1081 | 112 | 377 |
| Ventura Sheriff's Dept. | 2004 | 4 | 705 | 93 | 668 | 119 | 1585 | 667 | 422 | 1089 | 131 | 365 |
| Ventura Sheriff's Dept. | 2004 | 5 | 701 | 94 | 667 | 110 | 1572 | 680 | 419 | 1099 | 115 | 358 |
| Ventura Sheriff's Dept. | 2004 | 6 | 678 | 91 | 656 | 108 | 1533 | 680 | 422 | 1102 | 89 | 342 |
| Ventura Sheriff's Dept. | 2004 | 7 | 709 | 93 | 631 | 113 | 1546 | 701 | 411 | 1112 | 101 | 333 |
| Ventura Sheriff's Dept. | 2004 | 8 | 712 | 84 | 639 | 132 | 1567 | 698 | 428 | 1126 | 98 | 343 |
| Ventura Sheriff's Dept. | 2004 | 9 | 771 | 101 | 598 | 119 | 1589 | 749 | 416 | 1165 | 123 | 301 |
| Ventura Sheriff's Dept. | 2004 | 10 | 718 | 100 | 646 | 122 | 1586 | 714 | 458 | 1172 | 104 | 310 |
| Ventura Sheriff's Dept. | 2004 | 11 | 704 | 88 | 679 | 141 | 1612 | 701 | 499 | 1200 | 91 | 321 |
| Ventura Sheriff's Dept. | 2004 | 12 | 622 | 90 | 668 | 126 | 1506 | 636 | 486 | 1122 | 76 | 308 |
| | | | 724 | 103 | 629 | 111 | 1,568 | 702 | 417 | 1,119 | 125 | 324 |

| Jurisdiction | (Avg number of misdemeanor inmates) Total | Highest one-day population for this month occurred on: | The highest count was: | ADP of maximum security inmates | ADP of medium security inmates | ADP of minimum security inmates | Mental health cases opened last day of the month | New mental health cases opened during this month | day of the month, receiving psych medication | Inmates assigned to mental health beds last day of month | Inmates that were seen at inmate sick call this month | Physician/pra ctitioner occurrences during this month |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Ventura Sheriff's Dept. | 498 | 1/26/2004 | 1675 | 646 | 615 | 315 | U | U | 274 | 0 | 944 | 369 |
| Ventura Sheriff's Dept. | 485 | 2/8/2004 | 1662 | 643 | 612 | 313 | U | U | 252 | 0 | 981 | 335 |
| Ventura Sheriff's Dept. | 489 | 3/15/2004 | 1622 | 644 | 612 | 314 | U | U | 260 | 0 | 1248 | 364 |
| Ventura Sheriff's Dept. | 496 | 4/4/2004 | 1620 | 650 | 618 | 317 | 296 | 331 | 296 | 0 | 1007 | 500 |
| Ventura Sheriff's Dept. | 473 | 5/2/2004 | 1621 | 645 | 613 | 314 | 254 | 346 | 254 | 0 | 903 | 325 |
| Ventura Sheriff's Dept. | 431 | 6/27/2004 | 1597 | 629 | 598 | 306 | 282 | 323 | 282 | 0 | 1007 | 327 |
| Ventura Sheriff's Dept. | 434 | 7/18/2004 | 1598 | 634 | 603 | 309 | 329 | 259 | 244 | 0 | 1051 | 254 |
| Ventura Sheriff's Dept. | 441 | 8/22/2004 | 1599 | 642 | 611 | 314 | 321 | 238 | 113 | 0 | 1108 | 370 |
| Ventura Sheriff's Dept. | 424 | 9/19/2004 | 1630 | 651 | 620 | 318 | 378 | 280 | 253 | 0 | 1096 | 390 |
| Ventura Sheriff's Dept. | 414 | 10/9/2004 | 1614 | 650 | 619 | 317 | 360 | 229 | 290 | 0 | 911 | 286 |
| Ventura Sheriff's Dept. | 412 | 11/10/2004 | 1664 | 661 | 629 | 322 | 323 | 239 | 259 | 0 | 870 | 300 |
| Ventura Sheriff's Dept. | 384 | 12/4/2004 | 1579 | 618 | 587 | 301 | 336 | 220 | 269 | 0 | 1107 | 281 |
| | 448 | | 1,623 | 643 | 611 | 313 | | | | | | |

P000193

Ventura County Todd Road Jail Needs Assessment and Engineering Analysis

| Jurisdiction | Off-site medical appointments during this month | Dental encounters during this month | Inmates assigned to medical beds last day of the month | Avg # of inmates not assigned to housing | Avg # of your inmates in contract beds in other jurisdictions | federal inmates housed in your system on contract | Avg # of state inmates housed in your system on contract | Avg # of inmates from other Co. in your system on contract | Avg # of inmates sent. and awaiting transport to state prison | inmates in hospital(s) outside of your jail facilities | Total # of persons booked this month | pretrial released due to lack of housing capacity | Total # of sent. released due to lack of housing capacity | juveniles in custody this month (per 707 W&I code) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Ventura Sheriff's Dept. | 23 | 105 | U | 0 | D | D | D | D | D | 43 | U | 2762 | 0 | 0 | D |
| Ventura Sheriff's Dept. | 26 | 105 | U | 0 | D | D | D | D | D | 57 | U | 2465 | 0 | 0 | D |
| Ventura Sheriff's Dept. | 41 | 124 | U | 0 | D | D | D | D | D | 61 | U | 2866 | 0 | 0 | D |
| Ventura Sheriff's Dept. | 32 | 118 | U | 0 | D | D | D | D | D | 61 | U | 2617 | 0 | 330 | D |
| Ventura Sheriff's Dept. | 32 | 110 | U | 0 | D | D | D | D | D | 58 | U | 2686 | 0 | 325 | D |
| Ventura Sheriff's Dept. | 43 | 119 | U | 0 | D | D | D | D | D | 47 | U | 2364 | 0 | 74 | D |
| Ventura Sheriff's Dept. | 41 | 117 | U | 0 | D | D | D | D | D | 50 | 18 | 2598 | 0 | 175 | D |
| Ventura Sheriff's Dept. | 44 | 126 | U | 0 | D | D | D | D | D | 68 | 33 | 2630 | 0 | 190 | D |
| Ventura Sheriff's Dept. | 61 | 97 | U | 0 | D | D | D | D | D | 70 | 14 | 2501 | 0 | 270 | D |
| Ventura Sheriff's Dept. | 40 | 74 | U | 0 | D | D | D | D | D | 37 | U | 2444 | 0 | 317 | D |
| Ventura Sheriff's Dept. | 29 | 107 | U | 0 | D | D | D | D | D | 66 | U | 2344 | 0 | 388 | D |
| Ventura Sheriff's Dept. | 34 | 141 | U | 0 | D | D | D | D | D | 81 | U | 2332 | 0 | 121 | D |

| Jurisdiction | Year | Month | (ADP totals) Unsentenced males | (ADP totals) Unsentenced females | (ADP totals) Sentenced males | (ADP totals) Sentenced females | (ADP totals) Jurisdiction | (Avg number of felony inmates) Unsentenced | (Avg number of felony inmates) Sentenced | (Avg number of felony inmates) Total | (Avg number of misdemeanor inmates) Unsentenced | (Avg number of misdemeanor inmates) Sentenced |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Ventura Sheriff's Dept. | 2005 | 1 | 662 | 94 | 682 | 121 | 1559 | 658 | 480 | 1138 | 98 | 323 |
| Ventura Sheriff's Dept. | 2005 | 2 | 631 | 100 | 680 | 126 | 1537 | 641 | 497 | 1138 | 90 | 309 |
| Ventura Sheriff's Dept. | 2005 | 3 | 589 | 82 | 699 | 146 | 1516 | 605 | 518 | 1123 | 66 | 327 |
| Ventura Sheriff's Dept. | 2005 | 4 | 645 | 80 | 652 | 157 | 1534 | 650 | 510 | 1160 | 75 | 299 |
| Ventura Sheriff's Dept. | 2005 | 5 | 654 | 79 | 672 | 157 | 1562 | 658 | 505 | 1163 | 75 | 324 |
| Ventura Sheriff's Dept. | 2005 | 6 | 634 | 87 | 684 | 142 | 1547 | 656 | 532 | 1188 | 65 | 294 |
| Ventura Sheriff's Dept. | 2005 | 7 | 641 | 94 | 654 | 134 | 1523 | 671 | 530 | 1201 | 65 | 257 |
| Ventura Sheriff's Dept. | 2005 | 8 | 625 | 86 | 675 | 131 | 1517 | 644 | 559 | 1203 | 66 | 248 |
| Ventura Sheriff's Dept. | 2005 | 9 | 661 | 101 | 633 | 124 | 1519 | 687 | 510 | 1197 | 75 | 247 |
| Ventura Sheriff's Dept. | 2005 | 10 | 629 | 102 | 667 | 131 | 1529 | 668 | 533 | 1201 | 64 | 264 |
| Ventura Sheriff's Dept. | 2005 | 11 | 675 | 104 | 644 | 133 | 1556 | 696 | 513 | 1209 | 85 | 262 |
| Ventura Sheriff's Dept. | 2005 | 12 | 684 | 101 | 614 | 132 | 1531 | 705 | 498 | 1203 | 80 | 248 |
| | | | 644 | 93 | 663 | 136 | 1,536 | 662 | 515 | 1,177 | 75 | 284 |

P000194

Ventura County Todd Road Jail Needs Assessment and Engineering Analysis

| Jurisdiction | (Avg number of misdemeanor inmates) Total | Highest one-day population for this month occurred on: | The highest count was: | ADP of maximum security inmates | ADP of medium security inmates | ADP of minimum security inmates | Mental health cases opened last day of the month | New mental health cases opened during this month | day of the month, receiving psych medication | Inmates assigned to mental health beds last day of the month | Inmates that were seen at inmate sick call this month | Physician/practitioner occurrences during this month |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Ventura Sheriff's Dept. | 421 | 1/29/2005 | 1624 | 639 | 608 | 312 | 318 | 211 | 245 | 0 | 975 | 435 |
| Ventura Sheriff's Dept. | 399 | 2/1/2005 | 1594 | 631 | 599 | 307 | 250 | 209 | 236 | 0 | 971 | 369 |
| Ventura Sheriff's Dept. | 393 | 3/7/2005 | 1562 | 622 | 591 | 303 | 297 | 291 | 228 | 0 | 937 | 462 |
| Ventura Sheriff's Dept. | 374 | 4/23/2005 | 1576 | 629 | 598 | 307 | 262 | 253 | 233 | 0 | 1039 | 479 |
| Ventura Sheriff's Dept. | 399 | 5/7/2005 | 1597 | 641 | 609 | 312 | 330 | 217 | 259 | 0 | 1150 | 466 |
| Ventura Sheriff's Dept. | 359 | 6/6/2005 | 1583 | 634 | 604 | 309 | 266 | 227 | 217 | 0 | 1099 | 360 |
| Ventura Sheriff's Dept. | 322 | 7/11/2005 | 1583 | 640 | 578 | 305 | 211 | 229 | 150 | 0 | 522 | 359 |
| Ventura Sheriff's Dept. | 314 | 8/29/2005 | 1570 | 637 | 576 | 304 | 190 | 286 | 140 | 0 | 517 | 322 |
| Ventura Sheriff's Dept. | 322 | 9/6/2005 | 1561 | 638 | 577 | 304 | 214 | 258 | 142 | 0 | 472 | 323 |
| Ventura Sheriff's Dept. | 328 | 10/11/2005 | 1570 | 642 | 581 | 306 | 186 | 215 | 132 | 0 | 1001 | 433 |
| Ventura Sheriff's Dept. | 347 | 11/14/2005 | 1588 | 654 | 591 | 311 | 176 | 198 | 123 | 0 | 1013 | 379 |
| Ventura Sheriff's Dept. | 328 | 12/12/2005 | 1586 | 643 | 582 | 306 | 187 | 234 | 131 | 0 | 982 | 295 |
| | 359 | | 1,583 | 638 | 591 | 307 | 241 | | | | | |

| Jurisdiction | Off-site medical appointments during this month | Dental encounters during this month | Inmates assigned to medical beds last day of the month | Avg # of inmates not assigned to housing | Avg # of your inmates in contract beds in other jurisdictions | federal inmates housed in your system on contract | Avg # of state inmates housed in your system on contract | Avg # of inmates from other Co. in your system on contract | Avg # of inmates sent. and awaiting transport to state prison | inmates in hospital(s) outside of your jail facilities | Total # of persons booked this month | pretrial released due to lack of housing capacity | Total # of sent. released due to lack of housing capacity | juveniles in custody this month (per 707 W&I code) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Ventura Sheriff's Dept. | 27 | 133 | U | 0 | D | D | D | D | 30 | U | 2522 | 0 | 261 | D |
| Ventura Sheriff's Dept. | 34 | 128 | U | 0 | D | D | D | D | 77 | U | 2073 | 0 | 121 | D |
| Ventura Sheriff's Dept. | 39 | 154 | U | 0 | D | D | D | D | 44 | U | 2472 | 0 | 71 | D |
| Ventura Sheriff's Dept. | 45 | 153 | U | 0 | D | D | D | D | 44 | 15 | 2373 | 0 | 117 | D |
| Ventura Sheriff's Dept. | 43 | 120 | U | 0 | D | D | D | D | 73 | 17 | 2484 | 0 | 256 | D |
| Ventura Sheriff's Dept. | 34 | 125 | U | 0 | D | D | D | D | 66 | 17 | 2327 | 0 | 77 | D |
| Ventura Sheriff's Dept. | 25 | 54 | U | 0 | D | D | D | D | 41 | U | 2312 | 0 | 0 | D |
| Ventura Sheriff's Dept. | 28 | 42 | U | 0 | D | D | D | D | 81 | U | 2433 | 0 | 25 | D |
| Ventura Sheriff's Dept. | 37 | 51 | U | 0 | D | D | D | D | 50 | U | 2270 | 0 | 31 | D |
| Ventura Sheriff's Dept. | 31 | 88 | U | 0 | D | D | D | D | 62 | 12 | 2430 | 0 | 0 | D |
| Ventura Sheriff's Dept. | 34 | 128 | U | 0 | D | D | D | D | 60 | 8 | 2384 | 0 | 159 | D |
| Ventura Sheriff's Dept. | 35 | 87 | U | 0 | D | D | D | D | 55 | 17 | 2407 | 0 | 91 | D |

Page 135 of 174

P000195

Ventura County Todd Road Jail Needs Assessment and Engineering Analysis

| Historical | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Co. Population | 710,215 | 721,107 | 730,779 | 743,357 | 756,673 | 768,429 | 780,562 | 790,237 | 796,165 | 796,106 | |
| ADP | 1,338 | 1,313 | 1,412 | 1,381 | 1,383 | 1,319 | 1,414 | 1,572 | 1,602 | 1,551 | 1,692 |
| ADM | 38,790 | 28,727 | 28,998 | 28,834 | 28,605 | 26,775 | 27,256 | 29,921 | 30,609 | 28,487 | |
| ALOS | 12.6 | 16.7 | 17.8 | 17.5 | 17.6 | 18.0 | 18.9 | 19.2 | 19.1 | 19.9 | |
| IR (per 1,000) | 1.88 | 1.82 | 1.93 | 1.86 | 1.83 | 1.72 | 1.81 | 1.99 | 2.01 | 1.95 | |
| ADP High | 1,434 | 1,369 | 1,497 | 1,438 | 1,488 | 1,421 | 1,520 | 1,648 | 1,669 | 1,600 | |
| Average of 3 High months | 1,399 | 1,365 | 1,475 | 1,433 | 1,469 | 1,405 | 1,493 | 1,622 | 1,649 | 1,591 | |
| Peaking (using ADP High) | 7.2% | 4.3% | 6.0% | 4.2% | 7.6% | 7.7% | 7.5% | 4.8% | 4.2% | 3.2% | |
| Peaking (using Avg 3 High Months) | 4.5% | 4.0% | 4.4% | 3.8% | 6.2% | 6.5% | 5.6% | 3.1% | 3.0% | 2.6% | |

| Statistics | 1996 - 2005 | | | | |
|---|---|---|---|---|---|
| Columns: 9 | # Change | | % Change | | Average |
| | Number | Per Year | Percent | Per Year | |
| ADP | 213 | 23.7 | 15.9% | 1.8% | 1,428 |
| ADM | -10,303 | -1145 | -26.6% | -3.0% | 29,700 |
| ALOS - data for 1997-2005 | 3.2 | 0.40 | 19.2% | 2.4% | 17.7 |
| Incarceration Rate (per 1,000) | 0.1 | 0.01 | 3.4% | 0.4% | 1.9 |
| Peaking | | | | | 4.4% |

| DO NOT DELETE YEARS - JAIL | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 15 | 20 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Projected | | | | | | | | | | | |
| Projected ADM | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2020 | 2025 |
| Model 1 - Multiple Regression (ADM/Population) | 26,587 | 25,944 | 25,302 | 24,659 | 24,342 | 24,025 | 23,707 | 23,390 | 23,073 | 21,487 | 20,034 |
| R-square = 0.2202 | | | | | | | | | | | |
| Model 2 - ARIMA | 30,159 | 30,515 | 30,753 | 30,912 | 31,016 | 31,084 | 31,126 | 31,152 | 31,166 | 31,159 | 31,116 |
| R-square = 0.6610 | | | | | | | | | | | |
| Recommended Model 2 | 30,159 | 30,515 | 30,753 | 30,912 | 31,016 | 31,084 | 31,126 | 31,152 | 31,166 | 31,159 | 31,116 |

| Projected ADP | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Model 1 - ARIMA | 1,884 | 1,920 | 1,955 | 1,991 | 2,027 | 2,063 | 2,098 | 2,134 | 2,170 | 2,206 | 2,242 |
| R-square = 0.91 | | | | | | | | | | | |

Source: Carter Goble Lee: October 2006.

| Bedspace Projections | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Projected ADP | 1,884 | 1,920 | 1,955 | 1,991 | 2,027 | 2,063 | 2,098 | 2,134 | 2,170 | 2,206 | 2,242 | 2.0% |
| Peaking = 4.4% | 83 | 84 | 86 | 88 | 89 | 91 | 92 | 94 | 95 | 97 | 99 | |
| Classification = 5% | 94 | 96 | 98 | 100 | 101 | 103 | 105 | 107 | 109 | 110 | 112 | |
| Total Projected Beds | 2,061 | 2,100 | 2,139 | 2,178 | 2,217 | 2,257 | 2,296 | 2,335 | 2,374 | 2,413 | 2,452 | |

Source: Carter Goble Lee. October 2006.

| Bed Classification | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | BREAKDO | 5-yr avg |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Projected Bed Need | 2,061 | 2,100 | 2,139 | 2,178 | 2,217 | 2,257 | 2,296 | 2,335 | 2,374 | 2,413 | 2,452 | | |
| Males = 86% | 1,773 | 1,806 | 1,840 | 1,873 | 1,907 | 1,941 | 1,974 | 2,008 | 2,042 | 2,075 | 2,109 | Male | 86.0% |
| Maximum (41%) | 727 | 740 | 754 | 768 | 782 | 796 | 809 | 823 | 837 | 851 | 865 | Female | 14.0% |
| Medium (37%) | 656 | 668 | 681 | 693 | 706 | 718 | 730 | 743 | 755 | 768 | 780 | Pretrial | 57.0% |
| Minimum (22%) | 390 | 397 | 405 | 412 | 420 | 427 | 434 | 442 | 449 | 457 | 464 | Sentenced | 43.0% |
| Females = 14% | 289 | 294 | 299 | 305 | 310 | 316 | 321 | 327 | 332 | 338 | 343 | | |
| Maximum (41%) | 118 | 121 | 123 | 125 | 127 | 130 | 132 | 134 | 136 | 139 | 141 | | 5-yr avg |
| Medium (37%) | 107 | 109 | 111 | 113 | 115 | 117 | 119 | 121 | 123 | 125 | 127 | Maximum | 41.0% |
| Minimum (22%) | 63 | 65 | 66 | 67 | 68 | 70 | 71 | 72 | 73 | 74 | 76 | Medium | 37.0% |
| | | | | | | | | | | | | Minimum/C | 22.0% |
| | | | | | | | | | | | | | 100% |

Source: Carter Goble Lee: October 2006.

P000196

Ventura County Todd Road Jail Needs Assessment and Engineering Analysis

| Projected ADP | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2020 | 2025 | Annual Rate of Growth |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **ADP Based Models** | | | | | | | | | | | | |
| Model 1 - ARIMA | 1,708 | 1,734 | 1,779 | 1,813 | 1,847 | 1,884 | 1,920 | 1,955 | 1,991 | 2,170 | 2,349 | 2.6% |
| R-square = 0.91 | | | | | | | | | | | | |
| Model 2 - Exponential Smoothing (Winters) | 1,735 | 1,751 | 1,767 | 1,782 | 1,798 | 1,813 | 1,829 | 1,844 | 1,860 | 1,938 | 2,015 | 1.5% |
| R-square = 0.88 | | | | | | | | | | | | |
| Model 3 - Historical Percent Increase | 1,606 | 1,634 | 1,661 | 1,688 | 1,716 | 1,743 | 1,771 | 1,798 | 1,826 | 1,963 | 2,100 | 1.8% |
| Base ADP 2005: 1551  Growth: 1.8% per yr | | | | | | | | | | | | |
| **POPULATION Based Models** | | | | | | | | | | | | |
| Model 4 - Ratio to Population Growth | 1,614 | 1,645 | 1,677 | 1,709 | 1,728 | 1,747 | 1,766 | 1,786 | 1,805 | 1,904 | 1,999 | 1.4% |
| Projected IR | 1.96 | 1.97 | 1.98 | 1.99 | 1.99 | 2.00 | 2.01 | 2.02 | 2.02 | 2.06 | 2.10 | |
| Model 5 - Multiple Regression (ADP/Population | 1,594 | 1,629 | 1,663 | 1,697 | 1,714 | 1,731 | 1,748 | 1,765 | 1,781 | 1,866 | 1,943 | 1.3% |
| R-square = 0.6168 | | | | | | | | | | | | |
| **BOOKINGS Based Models** | | | | | | | | | | | | |
| Model 6 - Projected ADM and ALOS | 1,708 | 1,762 | 1,809 | 1,853 | 1,893 | 1,931 | 1,968 | 2,003 | 2,038 | 2,209 | 2,376 | 2.7% |
| Projected Annual Bookings | 30,159 | 30,515 | 30,753 | 30,912 | 31,016 | 31,084 | 31,126 | 31,152 | 31,166 | 31,159 | 31,116 | 0.5% |
| Projected ALOS | 20.7 | 21.1 | 21.5 | 21.9 | 22.3 | 22.7 | 23.1 | 23.5 | 23.9 | 25.9 | 27.9 | |
| **ADP PROJECTED RANGE** | | | | | | | | | | | | |
| **Model 2 - Low** | 1,735 | 1,751 | 1,767 | 1,782 | 1,798 | 1,813 | 1,829 | 1,844 | 1,860 | 1,938 | 2,015 | 1.5% |
| **Model 1 - Middle** | 1,708 | 1,734 | 1,779 | 1,813 | 1,847 | 1,884 | 1,920 | 1,955 | 1,991 | 2,170 | 2,349 | 2.6% |
| **Model 7 - High** | 1,708 | 1,762 | 1,809 | 1,853 | 1,893 | 1,931 | 1,968 | 2,003 | 2,038 | 2,209 | 2,376 | 2.7% |

Source: Carter Goble Lee:  October 2006.

Page 137 of 174

P000197

Ventura County Todd Road Jail Needs Assessment and Engineering Analysis

P000198

Ventura County Todd Road Jail Needs Assessment and Engineering Analysis

**Appendix B**
**Inmate Classification System**

P000199

Ventura County Todd Road Jail Needs Assessment and Engineering Analysis

## CLASSIFICATION CRITERIA

**ADSEG** — Inmates segregated for their own safety or the safety of others. Additional Precaution ("AP") inmates. Inmates with civil charges only (339 W&I, 1209 CCP). High profile cases or inmates that are blatant homosexuals, transsexuals or inmates considered Developmentally Disabled. [ADSEG, ASDO, ASP, ASPC, ASPCST, ASPCVA, ASPCVC, ASST, ASVA, ASVC, ASVCVA, ASVCST, ASVAST, ASPVA, ASPST, ASPVC]   *Restrictions: Housed and moved alone. Can be housed or moved with compatible Adseg predetermined by SPU. No more then 2 moved at one time. Staff to inmate ratio 1:2*

**PSYCH** — Inmates displaying a continual pattern of bizarre behavior or mental disorder. [PL1, PL2, PL3, PL3N, PST, PVA, PVC, PVCST, PVAST]   *Restrictions: Housed and moved alone or with compatible Psych. No more then 2 moved at one time. Staff to inmate ratio 1:2*

**P.C.** — Inmates segregated for their own safety. Inmates who are informants. Inmates who have subservient characteristics, possibly homosexual but not blatant. Those inmates charged with 286(a) PC, 288A(C), PC, 288(B), PC, 286(c) PC, 288.5 PC, PC647.6 PC. [PC, PCST, PCVA, PCVC]   *Restrictions: Housed and moved with compatible PC's. No more then 8 (PC's) or 4 (PCVC/VA's) moved at one time. Staff to inmate ratio 1:8 for PC's and 1:4 for PCVC/VA's*

**V.C.** — Those inmates charged with Penal Code Sections: 187, 664/187, 151.2, 203, 207, 209, 209.5, 265, 217.1, 243(b), 242(c), 243.1, 245(b), 245(c), 245(d), 404(b), 69, 210.5, 148(c), 148(d), 4500, 4501, 4502, 4503, 4574. [VC, VCVA, VCST]   *Time Limit: 10 Years.*   *Restrictions: Housed and moved with compatible VC,VA's. No more than 4 moved at one time. Staff to inmate ratio 1:4*

**V.A.** — Inmates who have assaulted staff or show a pattern of violence toward others. [VA, VAST]   *Time Limit: 5 Years.*   *Restrictions: Same as VC*

**S.T.** — General Population inmates charged with Penal Code Sections: 4011.7, 4530, 4532, 4534, 4450, 4573, 4600, 4600(a), 4600(b), 6054. W&I Code Sections: 1001.5, 1768.7, 871, 871.5. [ST]   *Time Limit: 10 Years.*   *Restrictions: Housed and moved with other GP inmates per facility Housing Plan. No more then 8 moved at one time. Staff to inmate ratio 1:5*

**LEVEL 3** — General Population inmates charged with Penal Code Sections: 211, 215, 220, Any 245 charges, 261, 241, 422, 244.5(b). [L3]   *Time Limit: 5 Years.*   *Restrictions: Housed and moved with other GP's per facility Housing Plan. No more than 20 moved at one time. Staff to inmate ratio 1:10*

**LEVEL 2** — Unsentenced Level 1 inmates or Level 1 inmates with a HOLD. [L2, L2KN]   *Restrictions: Housed and moved with other GP's per facility Housing Plan. No more then 20 moved at one time. Staff to inmate ratio 1:10. Not allowed outside access.*

**LEVEL 1** — Sentenced inmates. [L1, L1KN] Note: Inmates with HOLDS can never be classified Level 1 only Level 2.   *Restrictions: Housed in GP, No more then 20 moved at one time. Ratio 1:10*

**TODD NO** — These inmates charged with Penal Code Sections: 187, 664/187, and any third-strike inmates. Inmates with serious medical conditions. [TN]

**TS** — Those inmates charged by the DA with a third-strike allegation. [TS]

**SUICIDAL** — When an inmate is suicidal, place in SU at the end of the classification. This is to be removed when the inmate is cleared by medical staff. If there is no room for the SU, remove the least important class to make room.

**HOLDS** — 3056PC, 3PND, OCW, BPH. Enter for job assignment.

RM2738 1/15/02

P000200

## Appendix C
## December 12, 2005 CSA TRJ Inspection Report

STATE OF CALIFORNIA — DEPARTMENT OF CORRECTIONS AND REHABILITATION          ARNOLD SCHWARZENEGGER, GOVERNOR

**CORRECTIONS STANDARDS AUTHORITY**
**600 Bercut Drive**
**Sacramento, CA 95814**
916-445-5073 www.csa.ca.gov



December 12, 2005

Sheriff Bob Brooks
Ventura County Sheriff's Department
800 S. Victoria Avenue
Ventura CA 93009

<u>Corrections Standards Authority[1] Inspection</u>
<u>Temporary Holding and Type II Facilities – Penal Code 6031</u>

Dear Sheriff Brooks:

During December 5-7, 2005 the Corrections Standards Authority (CSA) conducted the 2004-2006 biennial inspections of the Temporary Holding and Type II detention facilities that are operated by the Ventura County Sheriff's Department. A Pre-Inspection Briefing with facility managers and administrators was provided on October 6, 2005 and the inspection was followed by an administrative exit conference on December 7, 2005.

<u>Scope of Inspection</u>

The following facilities were inspected: Main Jail/Pretrial Detention Facility, Todd Road and the East Valley Jail.[2] The inspection assessed compliance with Titles 15 and 24, Minimum Standards for Local Detention Facilities, California Code of Regulations (CCR) and consisted of a "walk-through" of each physical plant, review of policies and procedures governing operations, documentation review and interviews with staff and inmates.

We want to express our appreciation to Chief Kathryn Kemp, Commanders Brent Morris and Steve DeCesari, and Captains Kelly Fadler and Harold Humphries, for their assistance in coordinating our inspections and for their support and availability. The Commanders participated in the inspection of their respective facilities. Together with the facility Captains and staff, they ensured that advance requests were completed and they clarified questions and responded to concerns. We want to especially thank Sergeant Renee Ferguson for her coordination of the overall process and Medical Program Manager Nicoleta Weeks for her availability and participation. We appreciate their professionalism and courtesy.

<u>Inspection Report</u>

Complete inspection reports are enclosed for each facility and consist of: this transmittal letter; a summary face sheet_identifying the facility and listing any areas of _non-compliance; a "procedures" checklist that outlines applicable Title 15 sections and provides more detailed comments related to the regulations; a "physical plant evaluation" outlining Title 24,

---

[1] Effective 7/1/05 the Board of Corrections was renamed to the Corrections Standards Authority.
[2] The East Valley Jail was closed 6/30/04 and reopened as a Temporary Holding Facility on 10/30/05. The report for the Court Holding Facilities has been forwarded under separate cover.

5960 Ventura Brooks TH-II 05 LTR.doc;12/12/05

P000201

Sheriff Brooks                              - 2 -                          December 12, 2005

requirements for design;[3] and a "living area space evaluation" that summarizes the physical plant configuration for each facility. In coordination with Chief Kemp's office, please provide administrators and managers with the above documents for their facility. We recommend continuing your practice of maintaining a permanent historical file of all inspections.

**Health and Fire Inspections**

In addition to a biennial inspection by the CSA, local inspections are required by the county health officer and the fire marshal (Health and Safety Code Sections 101045 and 13146.1).[4] Our report should be considered in conjunction with health department and fire authority reports to obtain an overall view of the jail conditions.

As noted in Attachment A, with the exception of the Medical/Mental Health portion of the health inspection, all reports are current.[5] That inspection was conducted in November 2005 and we are advised that the report is expected by the end of this year. The nutritional portion of the health inspection noted that the inmate menus exceed 30 percent fat (Title 15, Section 1241 Menus) and managers will consult with the dietitian to assess options.

**Corrections Standards Authority Inspection**

Staffing and Operations: Budget constraints are having a significant impact on operations. With closure of the Ojai Women's Facility on June 23, 2003, females were moved to the PTDF. Classification staff is commended for their commitment and ability to manage housing assignments with the limited options; however, non-rated dayroom beds continue to be used to accommodate the population. The East Valley Facility was reduced to a limited operation in August 2003 and closed completely on June 30, 2004. It reopened October 30, 2005 for male admissions between the hours of 1800 and 0600, but utilizes staff allocations from PTDF.

Regulations require that the facilities be staffed to ensure implementation and operation of programs and activities required by regulations (Title 15, Section 1027, Number of Personnel). While this inspection is not a comprehensive staffing analysis, we observed several indicators that led to our conclusion that staffing is insufficient and we found the PTDF and Todd Road out of compliance with this regulation.

- Housing unit lockdowns are scheduled into facility operations due to insufficient staff. From 1800-2200 four quads on Level Four at the PTDF and one housing unit at Todd Road are locked down due to unavailability of staff. These lockdowns continue into sleeping hours of 1000-0600, resulting in inmates being locked down from 1800-0600. Additionally, PTDF housing units are locked down during staff breaks/meals and when no one is available if staff calls in or goes home sick.

- Positions have been eliminated due to insufficient funds. In 2004 at PTDF, two booking positions were eliminated (one in male and one in female booking; 6 staff); one cleaning

---

[3] Facilities are assessed against physical plant standards that were in place at the time of construction or significant remodel to the lockup area, unless more current regulations are less restrictive.
[4] Statute changed on 1/1/05 to require the fire inspections every two years rather than annually.
[5] For purposes of our inspection, these local reports are "current" if they occurred in 2004 or 2005.

5960 Ventura Brooks TH-II 05 LTR.doc;12/12/05

P000202

Sheriff Brooks                          - 3 -                          December 12, 2005

crew has been eliminated when the supervising staff position was cut; and, one position was cut from classification.  Additionally, SST positions have gone to 12-hour shifts to reduce the number of staff.  The Department has good managers who make every effort to operate the facilities in a secure and efficient manner; however, the erosion of positions is having a cumulative, negative effect.

• Mandatory overtime is a regular practice at PTDF and occasionally needed at Todd Road.  Two shifts at PTDF have one position that is routinely covered by overtime.  Increased overtime results in accumulated "compensation time" that must be covered when staff takes the time off.

• Access to outdoor exercise has been cancelled or rescheduled at both facilities due to insufficient staff to supervise that activity.  We were advised that inmates receive at least the required three hours of access per week, but managers can be faced with hard choices to make this happen.  For example, on the day following our inspection at PTDF, mangers locked down a housing unit rather than cancel access to outdoor exercise for the second consecutive day due to insufficient staffing.  While we did not find the facilities out of compliance with exercise requirements, cancellation/rescheduling is a program disruption that reflects staffing shortages.

• In an effort to improve staffing, provisional staff is hired to work under supervision of core-trained staff prior to being core trained themselves.  Facility managers are still faced with the responsibility to cover their shifts when they go to training.  Staff is not consistently available to back-fill these positions to allow for training.

• Annual training requirements of the Standards and Training for Corrections (STC) program were not met during 2004-2005, in part, due to difficulties in covering shifts.  This deficiency also relates to State and local budget cuts, resulting in less training availability as well as limited ability to cover positions with overtime.

Physical Plants:  The Department does a good job maintaining their physical plants, but at PTDF, it is no longer "extemporary," as it has been in the past.  Both facilities were generally clean during our inspection and it is evident that staff is conscientious about maintenance.  Overall aging and deterioration at PTDF was more evident this year than in previous inspections.  While acknowledging that wear is anticipated after 25 years of operation, we note that plumbing problems are a regular occurrence and we observed non-working light fixtures, missing ceiling tiles, and an intake area that was dirtier and showing more general wear than we have seen previously.  The loss of a cleaning crew may be having a day-to-day impact, but the overall maintenance requirements will be more substantial than what can be remedied by restoring one crew.  Returning women to the main jail has also had an impact on the physical plant, by crowding other units and increasing the number of prisoners in dayroom bunks.

Documentation:  We reviewed documentation related to several regulations, with particular attention to safety checks, sobering cells and safety cells.  The Department no longer uses the restraint chair, and, other than for transport, restraints are rarely used; the Legal Unit reviews those instances.  We found the overall documentation to be good, but recommended that managers review procedures for documenting circumstances leading to placement and retention in safety

5960 Ventura Brooks TH-II 05 LTR.doc;12/12/05

P000203

Ventura County Todd Road Jail Needs Assessment and Engineering Analysis

---

Sheriff Brooks                          - 4 -                          December 12, 2005

cells to ensure that it clearly establishes the basis for placing and maintaining inmates in those cells.

Compliance at each facility is outlined below. Please refer to the inspection checklists for additional discussion.

### Main Jail/Pre-Trial Detention Facility

The on-site inspection occurred December 6, 2005. This facility was constructed under 1976 regulations, which require single cells. With the Chief's approval, in 2004 we re-rated the facility under later regulations, which allow double bunks and more closely approximate the actual operation of double-bunking cells. This resulted in increasing the rated capacity from 412 to 793 prisoners. Additionally, the facility has 32 disciplinary, 32 medical, and four special use beds, which are not rated (Title 15, Section 1006). At the time of the inspection, 750 inmates were in custody. In addition to the Minimum Diet concern raised by the local health inspection, we found the facility out of compliance with the following regulations:

Title 15, Section 1025, Continuing Professional Training: Staff with custodial responsibilities did not receive 24 hours of annual training during FY 2004-2005. The Department is making an effort to meet this requirement during 2005-2006.

Title 15, Section 1027, Number of Personnel: This was discussed earlier in this letter. Budget cutbacks have resulted in staffing shortages that are having a significant impact on operations.

Title 24, Section 470A.2.9 Dayrooms: This regulation requires 35 square feet of dayroom space per prisoner. "Temporary" bunks have been added to dayrooms on the third floor quads to maintain classification in the housing units. Consequently the dayroom space is reduced and the facility is out of compliance.

### Todd Road Facility

The on-site inspection occurred December 7, 2005. This facility has a rated capacity of 782, with 810 prisoners in custody on the day of the inspection. The facility was exceptionally clean and appears to be in good condition. In addition to the Minimum Diet concern raised by the local health inspection, we found the facility out of compliance with the following regulations:

Title 15, Section 1025, Continuing Professional Training: Staff with custodial responsibilities did not receive 24 hours of annual training during FY 2004-2005. The Department is making an effort to meet this requirement during 2005-2006.

Title 15, Section 1027, Number of Personnel: This was discussed earlier in this letter. Budget cutbacks have resulted in staffing shortages that are having a significant impact on operations.

Title 24, Section 470A.2.9 Dayrooms: This regulation requires 35 square feet of dayroom space per prisoner. "Temporary" bunks have been added to the general population dayrooms to accommodate the population. As was the case with the Pre-Trial Facility, dayroom space is consequently reduced and the facility is out of compliance.

5960 Ventura Brooks TH-II 05 LTR.doc;12/12/05

P000204

Sheriff Brooks                    - 5 -                    December 12, 2005

### East Valley Temporary Holding Facility

The on-site inspection of the physical plant occurred on October 6, 2005. We reviewed operational procedures on December 6, 2005, in conjunction with the PTDF inspection, because East Valley comes under that command. As noted earlier, East Valley operation has fluctuated depending upon budget constraints. It was closed from June 30, 2004 until October 30, 2005, when it opened for limited operation between the hours of 1800 – 0600 for male admissions. We identified no areas of non-compliance and note that polices and procedures are being reviewed to reflect the current operation.

### Follow-Up

Upon completion, the health department will provide us with a copy of their report. Please provide a response to the areas of non-compliance by March 1, 2006. Please include management's decisions related to documenting safety cell placement and retention decisions.

I appreciate the professionalism and assistance of your staff during the inspection and during past years. I will be retiring the end of this year; after that time, pending assignment of a permanent replacement, please forward follow-up correspondence and questions to Acting Deputy Director Jerry Read (jerry.read@cdcr.ca.gov; 916-445-9435).

Sincerely,

Audrey J. Bakke, Field Representative
Facilities Standards and Operations Division
(916-323-8621; e-mail: audrey.bakke@cdcr.ca.gov)


Enclosures


cc:    Chief Kathryn Kemp, Detention Division
       Chair, Ventura County Board of Supervisors*
       Ventura County Administrator*
       Presiding Judge, Superior Court, County of Ventura*
       Grand Jury Foreman, Superior Court, County of Ventura*

       * Copies of this inspection report are available upon request.


5960 Ventura Brooks TH-II 05 LTR.doc;12/12/05

P000205

Ventura County Todd Road Jail Needs Assessment and Engineering Analysis

## Attachment A

### Health and Fire/Life Safety Inspections
### on File at the Corrections Standards Authority as of
### December 7, 2005

#### Ventura County Sheriff's Department – Detention Services Division

| Facility Name & Inspection | Inspection Date |
|---|---|
| **5960      Ventura County Main Jail** | |
| Fire and Life Safety | 10/18/2005 |
| Health-Environmental | 2/22/2005 |
| Health-Medical/MMH | 4/17/2002* |
| Health-Nutrition | 10/28/2005 |
| **5980      East Valley** | |
| Fire and Life Safety | 4/19/2004 |
| Health-Environmental | 10/19/2005 |
| Health-Medical/MMH | N/A |
| Health-Nutrition | N/A |
| **6045      Todd Road Jail** | |
| Fire and Life Safety | 10/11/2005 |
| Health-Environmental | 3/29/2005 |
| Health-Medical/MMH | 4/18/2002* |
| Health-Nutrition | 12/22/2005 |

* Medical/Mental Health inspections were completed in November 2005 and their report is anticipated prior to the end of December.

5960 Ventura Brooks TH-II 05 LTR.doc;12/12/05

P000206

**Corrections Standards Authority**
**Adult Detention Facility**
**Inspection Cycle Information**

| | | | |
|---|---|---|---|
| CSA Code: | 6045 | Inspection Cycle: | 04/06 |
| County: | Ventura | Inspection Date: | 12/7/2005 |
| City: | Countywide | Field Representative: | Read, Jerry |

### A. Description

| | | | |
|---|---|---|---|
| Department: | Ventura Sheriff's Department | Department #: | 324 |
| Administrator: | Bob Brooks, Sheriff | Phone #: | (805) 654-2382 |
| Address: | 800 S. Victoria Ave. | FAX #: | |
| | Ventura, CA 93009 | Email: | |
| Admin Desig.: | Ken Kipp, Chief of Detention | Phone #: | (805) 654-2305 |
| Address: | 800 South Victora Boulevard | FAX #: | (805) 654-3500 |
| | Ventura, CA 93009 | Email: | ken.kipp@mail.co.ventura.ca.us |
| Facility: | **Todd Road Jail** | Type: | II |
| Facility Address: | 600 So. Todd Road | Phone #'s: | (805) 933-8502 |
| City, State Zip: | Santa Paula, CA 93060 | | |
| Mailing Address: | | Fax #'s: | (805) 933-8533 |
| Manager: | John Glueckert | Phone # | (805) 933-8507 |
| Title: | Captain | Email: | john.glueckert@mail.co.ventura.ca.us |

### B. Physical Plant

| | | | |
|---|---|---|---|
| Year Facility Completed: | 1994 | Applicable Standards: | 1988 |
| Year Last Remodeled: | | | |
| Date of Anticipated Opening: | | | |

### C. Lawsuit Information

Court-ordered Population Cap (if applicable):

### D. Population Information

| Rated Capacity | | Non-Rated Special Use Beds | | Avg. Daily Population | |
|---|---|---|---|---|---|
| Total RC: | 782 | Medical/Mental Health: | | # Males: | |
| Total # of Beds: | 782 | Disciplinary: | | # Females: | |
| | | Other Beds: | | | |
| Total Capacity: | 782 | Total NRC: | 0 | Total ADP: | 0 |

### E. Local Inspections And Dates

| Inspection Type | Date | Inspection Type | Date |
|---|---|---|---|
| Fire and Life Safety | 9/15/2003 | Health-Environmental | 3/29/2005 |
| Health-Medical/MMH | 4/18/2002 | Health-Nutrition | 12/17/2002 |

### F. Staffing

| | Positions | Vacancies |
|---|---|---|
| Management/Supervisor | 12 | 0 |
| Line Custody / Custody Staff | 118 | 0 |
| Support Staff | 4 | 0 |

| | |
|---|---|
| Thursday, November 17, 2005 | Page 1 of 2 |

P000207

Ventura County Todd Road Jail Needs Assessment and Engineering Analysis

| CSA Code: | 6045 | | | | Inspection Cycle: | 04/06 |
| County: | Ventura | | | | Inspection Date: | 12/7/2005 |
| Facility: | Todd Road Jail | | | | | |

| | | | G. Standards Compliance | | |
|---|---|---|---|---|---|
| Reg. # | Code | Article | Article Title | | Description |
| 1241 | 15 | 11 | Food | | Minimum Diet |
| 2.9 | 24 | Part 2 | Physical Plant 470A | | Dayrooms |

P000208

**PHYSICAL PLANT EVALUATION**
**CORRECTIONS STANDARDS AUTHORITY- BIENNIAL INSPECTION**
**ADULT TYPE I, II, III AND IV FACILITIES**

**APPLICABLE REGULATIONS:  3/80; 8/86; 5/88; 1/91**
**Title 24, California Code of Regulations (CCR)**

CSA Code: 6045

| FACILITY NAME:  Ventura County Todd Road Facility | | | | | FACILITY TYPE:  II | |
|---|---|---|---|---|---|---|
| APPLICABLE REGULATIONS (Check All That Apply): | 3/80: | 8/86: | 5/88:  X | 1/91: | OTHER: | |
| FIELD REPRESENTATIVE:  Audrey J. Bakke | | | | | DATE:  12/6/05 | |

| ARTICLE/SECTION | YES | NO | N/A | COMMENTS |
|---|---|---|---|---|
| **Temporary Holding Cells (2.2)** | X | | | |
| Contain 10 square feet of floor per inmate | | | | |
| Limited to no more than 16 inmates | X | | | |
| No smaller than 40 square feet | X | | | |
| Contain sufficient seating to accommodate all inmates | X | | | |
| Toilet accessible | X | | | |
| Water fountain accessible | X | | | |
| Wash basin accessible | X | | | |
| Provides clear visual supervision | X | | | |
| Telephone accessible | X | | | |
| **Weapons Locker (3.12)** | X | | | |
| External to the security area and equipped with individual compartments, locks and keys | | | | |
| **Temporary Staging Cell or Room (2.3)** | | | X | No cells of this type in this facility; text of the regulation deleted from this checklist. |
| 1-91:  Added provision for temporary staging cells-rooms | | | | |
| **Detoxification Cells (2.4)** | | | X | No cells of this type in this facility; text of the regulation deleted from this checklist. |
| **Shower-Delousing Room (3.4)** | X | | | |
| Available in reception/booking | | | | |
| **Secure Vault or Storage Space (2.1)** | | | X | |
| Available for inmate valuables | | | | |
| **Telephone (2.1)** | | | X | |
| Available for inmate use per Penal Code § 851.5 | | | | |
| **Safety Cells (2.5)** | X | | | |
| Contain 48 square feet with one floor dimension at least 6 feet and ceiling height of at least 8 feet | | | | |
| Limited to no more than one inmate | X | | | |
| Contain flush ring toilet with controls located outside the cell | X | | | |
| Padded floor, door and walls | X | | | |
| Equipped with variable intensity, security light, inaccessible to occupant | X | | | |

P000209

Ventura County Todd Road Jail Needs Assessment and Engineering Analysis

| ARTICLE/SECTION | YES | NO | N/A | COMMENTS |
|---|---|---|---|---|
| Vertical view panel not more than 4 inches wide and at least 24 inches long, in or adjacent to the door | X | | | |
| Provide a food pass with lockable shutter no more than 4 inches high and located at least 30 inches above the floor | X | | | |
| **Single Occupancy Cells (2.6)** <br><br> Maximum capacity of one inmate | X | | | |
| Contain a minimum of 60 square feet of floor area in Type I facilities and 70 square feet in Type II and III facilities | X | | | |
| Have a minimum ceiling height of 8 feet | X | | | |
| Contain toilet, washbasin and drinking fountain | X | | | |
| Contain a bunk, desk and seat (Desk and seat not required in Type I in later, less restrictive 1986 standards) | X | | | |
| **Multiple Occupancy Cells (8227)** <br> 8-86:  Deleted provision for multiple occupancy cells | | | X | 1988 Standards – no cells of this type in the facility |
| **Multiple Occupancy Rooms (8229)** <br> 8-86:  Deleted provision for multiple occupancy rooms | | | X | 1988 Standards – no cells of this type in the facilty |
| **Double Occupancy Cells (2.7)** <br> 5-88:  Added provision for double occupancy cells <br><br> Maximum capacity of two inmates | X | | | |
| Contain a minimum of 60 square feet of floor space in Type I facilities and 70 square feet in Type II and III facilities | X | | | |
| Have a minimum ceiling height of 8 feet and one floor dimension at least 6 feet | X | | | |
| Contain toilet, washbasin and drinking fountain | X | | | |
| Contain 2 bunks, 1 desk and seat (Desk and seat not required in Type I facilities) | X | | | |
| **Dormitories (2.8)** <br> 8-86:  Provision for dormitories added | | | X | No cells of this type in this facility; text of the regulation deleted from this checklist. |
| **Dayrooms (2.9)** <br><br> 8-86:  Added requirement for 3 foot wide corridors in front of cells-rooms | X | | | 32 seats at 4 tables. |
| 35 square feet of floor area per inmate | X | | | |
| Contain tables and seating to accommodate the maximum number of inmates served | X | | | |
| Access to toilets, washbasins and drinking fountains | X | | | |
| Available to all inmates in Type II and III facilities (excluding special use cells) and to workers in Type I facilities | X | | | |
| **Shower (3.4)** <br><br> Available on a ratio of 1:16 | X | | | |

P000210

Ventura County Todd Road Jail Needs Assessment and Engineering Analysis

| ARTICLE/SECTION | YES | NO | N/A | COMMENTS |
|---|---|---|---|---|
| **Lighting (3.6)**<br><br>Sufficient to permit easy reading.  Night lighting is sufficient to allow good supervision.<br>8-86:  Specifies at least 20 foot-candles at desk level and in grooming areas, with night lighting not to exceed 5 foot-candles | X | | | |
| **Beds-Bunks (3.5)**<br><br>30 inches wide and 76 inches long | X | | | |
| **Comfortable Living Environment [102(c)6]**<br><br>A comfortable living environment is maintained through an adequate heating and cooling system. | X | | | |
| **Exercise Area -Type II, III and WA IV (2.10)**<br><br>At least one exercise area must contain a minimum of 900 square feet | X | | | |
| 8-86:  Outdoor exercise area provided | X | | | |
| 8-86:  Clear height of 15 feet with required surface area meeting a formula of:  80% of maximum rated inmate population and number of one-hour exercise periods per day = required surface area | X | | | |
| **Program Space - Type II and III (2.11)**<br><br>Sufficient area and furnishings to meet the needs of the facility programs | X | | | |
| **Dining Facilities (2.17)**<br><br>15 square feet per inmate being fed | | | X | |
| Toilets, washbasins and showers are not in the same room or not in view of inmate dining | | | X | |
| **Visiting (2.18)**<br><br>Sufficient visiting area | X | | | |
| Contact visits whenever possible for minimum security inmates | X | | | |
| **Attorney Interviews (2.26)**<br><br>Provide for confidential attorney consultation | X | | | |
| **Safety Equipment Storage (2.19)**<br><br>Adequate space is provided for storage of equipment such as fire extinguishers, SCBA, emergency lights, etc. | X | | | |
| **Janitor Closet (2.20)**<br><br>Located in security areas lockable, containing a mop sink and storage space | X | | | |

P000211

| ARTICLE/SECTION | YES | NO | N/A | COMMENTS |
|---|---|---|---|---|
| **Storage Rooms (2.21)**<br><br>Sufficient space to accommodate inmate property, bedding and supplies | X | | | |
| **Audio or Video Monitoring System -NA Type IV (2.22)**<br><br>Audio monitoring system capable of alerting staff in a central control | X | | | |
| Video monitoring in corridors, main entries and/or exits and programs or activity areas | X | | | |
| **Fire Detection and Alarm System [102(c)6]**<br><br>Automatic fire alarm system capable of alerting staff in a central control point | X | | | |
| **Emergency Power (2.24)**<br><br>Available to provide minimal lighting, maintain communications, alarm, fire, life and security systems | X | | | |
| **Provide Space for:**<br><br>Barber/beauty shop(2.15)<br>8-86:  Limit requirement to Type II and III facilities (Deleted 2/99)) | X | | | |
| **Canteen (2.16)**<br>8-86:  Added for II, III & IV facilities | X | | | |
| **Confidential Interview Rooms (2.25)**<br>8-86:  Added for Type II facilities | X | | | |

P000212

CORRECTIONS STANDARDS AUTHORITY- BIENNIAL INSPECTION
ADULT DETENTION FACILITY
LIVING AREA SPACE EVALUATION

CSA Code: 6045

| FACILITY: Ventura County Todd Road Facility | | | | | | TYPE: II | | RC: 782 | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| FIELD REPRESENTATIVE: Audrey J. Bakke | | | | | | | | DATE: 12/7/05 | | | |

| | | ROOMS | | EACH CELL | | Total | EACH ROOM | | FIXTURES* | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Location | Cell Type | Applicable Standards | # Cells | # Beds | RC | RC | DIMENSIONS (L x W x H) | T | U | W | F | S |
| **INTAKE** | | | | | | | | | | | | |
| 1 | Holding | 1988 | 1 | 16 | (16) | | 215 square feet | 1 | | 1 | 1 | |
| Notes: Irregular. 55.7' bench. | | | | | | | | | | | | |
| 2 | Holding | 1988 | 1 | 16 | (16) | | 215 square feet | 1 | | 1 | 1 | |
| Notes: Irregular. 55.7' bench. | | | | | | | | | | | | |
| 3 | Holding | 1988 | 1 | | 3 | (3) | 5.7 x 11.8 | 1 | | 1 | 1 | |
| Notes: 5.3' bench. | | | | | | | | | | | | |
| 4 | Holding | 1988 | 1 | | 3 | (3) | 5.7 x 11.8 | 1 | | 1 | 1 | |
| Notes: 5.3' bench. | | | | | | | | | | | | |
| 5 | Holding | 1988 | 1 | | 16 | (16) | 215 square feet | 1 | | 1 | 1 | |
| Notes: Irregular. 55'7 bench. | | | | | | | | | | | | |
| 6 | Holding | 1988 | 1 | | 16 | (16) | 215 square feet | 1 | | , 1 | 1 | |
| Notes: Irregular. 55.7' bench | | | | | | | | | | | | |
| 7 | Holding | 1988 | 1 | | 5 | (5) | 5.7 x 11.8 | 1 | | 1 | 1 | |
| Notes: 8.5' bench. | | | | | | | | | | | | |
| 8 | Holding | 1988 | 1 | | 5 | (5) | 5.7 x 11.8 | 1 | | 1 | 1 | |
| Notes: 8.5' bench. | | | | | | | | | | | | |
| | Safety | 1988 | 1 | | 1 | (1) | 70 square feet | | | | | |
| **MEDICAL** | | | | | | | | | | | | |
| Spec. Use | Holding | 1988 | 2 | | | (2) | 7.5 x 10.8 | 1 | | 1 | 1 | |
| **A UNIT** | | | | | | | | | | | | |
| Notes: One shower per level per section; 14 showers in Unit A. One outdoor recreation yard for Unit A. | | | | | | | | | | | | |
| Section 1 | Double | 1988 | 16 | 2 | 32 | 32 | 12.8 x 6.1 | 1 | | 1 | 1 | |
| Section 2 | Double | 1988 | 16 | 2 | 32 | 32 | 12.8 x 6.1 | 1 | | 1 | 1 | |
| Section 3 | Double | 1988 | 16 | 2 | 32 | 32 | 12.8 x 6.1 | 1 | | 1 | 1 | |
| Section 4 | Double | 1988 | 16 | 2 | 32 | 32 | 12.8 x 6.1 | 1 | | 1 | 1 | |

*T = Toilets; U = Urinals; W = Wash Basins; F = Fountains; S = Showers in unit;  If "Total BRC" appears in brackets ( ), it is not part of the facility's rated capacity.   "+" indicates that capacity includes prorated air space from adjacent areas.

P:\\Adult..\Cycle\Living..\6045 Ventura Todd II LAS.doc;11/17/05          - 1 -                                          A360 LAS Adult.dot (9/98)

P000213

Ventura County Todd Road Jail Needs Assessment and Engineering Analysis

| Location | ROOMS | | | EACH CELL | | Total RC | EACH ROOM | | FIXTURES* | | | | |
| | Cell Type | Applicable Standards | # Cells | # Beds | RC | | DIMENSIONS (L x W x H) | T | U | W | F | S |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Section 5 | Double | 1988 | 16 | 2 | 32 | 32 | 12.8 x 6.1 | 1 | | 1 | 1 | |
| Section 6 | Double | 1988 | 16 | 2 | 32 | 32 | 12.8 x 6.1 | 1 | | 1 | 1 | |
| Section 7 | Single | 1988 | 14 | 1 | 14 | 14 | 12.8 x 6.1 | 1 | | 1 | 1 | |

Notes: Section 7 is Administrative Segregation

**B UNIT**

Notes: One shower per level per Section; 12 showers in Unit B. Every section has 10 dayroom beds.

| Location | Cell Type | Applicable Standards | # Cells | # Beds | RC | Total RC | DIMENSIONS (L x W x H) | T | U | W | F | S |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Section 1 | Double | 1988 | 16 | 2 | 32 | 32 | 12.8 x 6.1 | 1 | | 1 | 1 | |
| Section 2 | Double | 1988 | 16 | 2 | 32 | 32 | 12.8 x 6.1 | 1 | | 1 | 1 | |
| Section 3 | Double | 1988 | 16 | 2 | 32 | 32 | 12.8 x 6.1 | 1 | | 1 | 1 | |
| Section 4 | Double | 1988 | 16 | 2 | 32 | 32 | 12.8 x 6.1 | 1 | | 1 | 1 | |
| Section 5 | Double | 1988 | 16 | 2 | 32 | 32 | 12.8 x 6.1 | 1 | | 1 | 1 | |

Notes: Section 5 used for disciplinary isolation during 2002 inspection; not deducted from BRC; re-evaluate in future inspections if it continues to be used solely for discipline.

| Location | Cell Type | Applicable Standards | # Cells | # Beds | RC | Total RC | DIMENSIONS (L x W x H) | T | U | W | F | S |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Section 6 | Double | 1988 | 16 | 2 | 32 | 32 | 12.8 x 6.1 | 1 | | 1 | 1 | |

**C UNIT**

Notes: One shower per level per section; 12 showers in Unit C.

| Location | Cell Type | Applicable Standards | # Cells | # Beds | RC | Total RC | DIMENSIONS (L x W x H) | T | U | W | F | S |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Section 1 | Double | 1988 | 16 | 2 | 32 | 32 | 12.8 x 6.1 | 1 | | 1 | 1 | |
| Section 2 | Double | 1988 | 16 | 2 | 32 | 32 | 12.8 x 6.1 | 1 | | 1 | 1 | |
| Section 3 | Double | 1988 | 16 | 2 | 32 | 32 | 12.8 x 6.1 | 1 | | 1 | 1 | |
| Section 4 | Double | 1988 | 16 | 2 | 32 | 32 | 12.8 x 6.1 | 1 | | 1 | 1 | |
| Section 5 | Double | 1988 | 16 | 2 | 32 | 32 | 12.8 x 6.1 | 1 | | 1 | 1 | |
| Section 6 | Double | 1988 | 16 | 2 | 32 | 32 | 12.8 x 6.1 | 1 | | 1 | 1 | |

**D UNIT**

Notes: One shower per level per section; 12 showers in Unit D. Every section has 10 dayroom beds.

| Location | Cell Type | Applicable Standards | # Cells | # Beds | RC | Total RC | DIMENSIONS (L x W x H) | T | U | W | F | S |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Section 1 | Double | 1988 | 16 | 2 | 32 | 32 | 12.8 x 6.1 | 1 | | 1 | 1 | |
| Section 2 | Double | 1988 | 16 | 2 | 32 | 32 | 12.8 x 6.1 | 1 | | 1 | 1 | |
| Section 3 | Double | 1988 | 16 | 2 | 32 | 32 | 12.8 x 6.1 | 1 | | 1 | 1 | |
| Section 4 | Double | 1988 | 16 | 2 | 32 | 32 | 12.8 x 6.1 | 1 | | 1 | 1 | |
| Section 5 | Holding | 1988 | 16 | 2 | 32 | 32 | 12.8 x 6.1 | 1 | | 1 | 1 | |
| Section 6 | Holding | 1988 | 16 | 2 | 32 | 32 | 12.8 x 6.1 | 1 | | 1 | 1 | |

*T = Toilets; U = Urinals; W = Wash Basins; F = Fountains; S = Showers in unit;  If "Total BRC" appears in brackets ( ), it is not part of the facility's rated capacity.   "+" indicates that capacity includes prorated air space from adjacent areas.

P:\Adult..\Cycle\Living..\6045 Ventura Todd II LAS.doc;11/17/05          - 2 -                                  A360 LAS Adult.dot (9/98)

Page 154 of 174

P000214

Ventura County Todd Road Jail Needs Assessment and Engineering Analysis

# Appendix D
# Expansion Options 1, 2, 3 and 4
# Probable Construction Cost

## BASIS OF FORECAST

**1    Basis of Estimate**

This statement is based on "Site Diagram Proposal" by HDR Architecture, received on 12-06-2006 along with verbal direction from the architect and engineer.

A          Architectural drawings: Expansion Option 1, Option 2, Option 3 and Option 4

**2    Conditions of Construction**

The pricing is based on the following general conditions of construction

Construction contract procurement method is competitive bidding

Contractors performance bond is deemed to be included by the general contractor

Builders all risk insurance is deemed to be included by the general contractor

Although construction comprises several different buildings it is not anticipated that the work will require phasing beyond a typical multi building project

The general contractor will have supervised access to the site during normal business hours

**3    Items Not Included Within Estimate**

The following cost items are excluded from this estimate.

A          Professional fees, inspections and testing.
B          Cost escalation
C          Plan check fees and building permit fees.
D          Group 2 furniture and equipment
E          Major site and building structures demolition

P000215

F       Costs of hazardous material surveys, abatements, and disposals

G       Costs of offsite construction

H       Premium for PSA Labor Agreements.

I       Construction contingency costs.

J       Blasting or excavation of rock.

## 4   Notes

We recommend that the client review this statement, and that any interpretations contrary to those intended by the design documents be fully addressed. The statement is based upon a detailed measurement of quantities when possible, and reasonable allowances for items not clearly defined in the documents.

**The statement reflects probable construction costs obtainable in a competitive and stable bidding market.** This estimate is based upon a minimum of four (4) competitive bids from qualified general contractors, with bids from a minimum of three (3) subcontractors per trade. This statement is a determination of fair market value for the construction of the project and is not intended to be a prediction of low bid. Experience indicates that a fewer number of bidders may result in a higher bid amount, and more bidders may result in a lower bid result.

| | | |
|---|---|---|
| I bidder | add | 15% to 40% |
| 2 to 3 bids | add | 8% to 12% |
| 4 to 5 bids | | -4% to +4% |
| 7 to 8 bids | deduct | 5% to 7% |

All square foot costs include general contractor's conditions/requirements and fee.

P000216

Ventura County Todd Road Jail Needs Assessment and Engineering Analysis

---

## EXPANSION OPTION 1 - SUMMARY

| Section | Area | Units | Cost / SF | Total |
|---|---|---|---|---|
| **Program Spaces - Option 1** | | | | |
| **A.   Housing** | | | | |
| Cluster building configuration with module/pod housing layout (500 beds) | 100,000 | SF | $290.00 | **$29,000,000** |
| **B.   Mental Health (Part of Housing Cluster)** | | | | |
| | 10,000 | SF | $330.00 | **$3,300,000** |
| **C.   Medical Clinic/Infirmary (Part of Housing Cluster)** | | | | |
| | 10,000 | SF | $360.00 | **$3,600,000** |
| **D.   Ambulance (Part of Housing Cluster)** | | | | |
| | 1,800 | SF | $300.00 | **$540,000** |
| **E.   Admin Medical (Part of Housing Cluster)** | | | | |
| | 10,000 | SF | $250.00 | **$2,500,000** |
| **F.   Storage (Part of Housing Cluster)** | | | | |
| | 10,000 | SF | $180.00 | **$1,800,000** |
| **G.   Pantry** | | | | |
| | 5,000 | SF | $675.00 | **$3,375,000** |
| **H.   Programs** | | | | |
| | 4,000 | SF | $325.00 | **$1,300,000** |
| **I.   Expand Commissary** | | | | |
| | 4,000 | SF | $280.00 | **$1,120,000** |
| **J.   Expand Warehouse** | | | | |
| | 4,000 | SF | $225.00 | **$900,000** |
| **K.   Expand Central Plant** | | | | |
| | 2,000 | SF | $1,400.00 | **$2,800,000** |
| **L.   Expand Intake** | | | | |
| Tenant improvement | 2,000 | SF | $120.00 | **$240,000** |
| **M.   Video Visitation** | | | | |
| Highly secured bullet proof glass, surveillance cameras and card access entry - TI | 4,000 | SF | $290.00 | **$1,160,000** |
| **N.   Expand Lockers** | | | | |
| Tenant improvement | 2,000 | SF | $225.00 | **$450,000** |
| **Task 2 Item N** | | | | |
| Upgrade fire alarm system in existing facility | | | | **$800,000** |
| **TOTAL ESTIMATED BUILDING CONSTRUCTION COST** | 168,800 | SF | **$313.30** | **$52,885,000** |
| **Expand staff parking -185 stalls** | 185 | Stalls | $4,000.00 | **$740,000** |
| **Site Work** | 250,000 | SF | $20.00 | **$5,000,000** |
| **TOTAL ESTIMATED BUILDING & SITEWORK CONSTRUCTION COST AS OF DECEMBER 2006** | | | | **$58,625,000** |
| | | | **Cost Per Bed** | $117,250 |

P000217

Ventura County Todd Road Jail Needs Assessment and Engineering Analysis

---

## EXPANSION OPTION 2 - SUMMARY

| Section | Area | Units | Cost / SF | Total |
|---|---|---|---|---|
| **Program Spaces - Option 2** | | | | |
| **A. Housing** | | | | |
| Cluster building configuration with module/pod housing layout (700 beds) | 135,000 | SF | $290.00 | **$39,150,000** |
| **B. Mental Health** | | | | |
| | 10,000 | SF | $380.00 | **$3,800,000** |
| **C. Medical Clinic/Infirmary** | | | | |
| | 10,000 | SF | $410.00 | **$4,100,000** |
| **D. Ambulance** | | | | |
| | 1,800 | SF | $300.00 | **$540,000** |
| **E. Admin Medical** | | | | |
| | 10,000 | SF | $280.00 | **$2,800,000** |
| **F. Storage** | | | | |
| | 10,000 | SF | $180.00 | **$1,800,000** |
| **G. Pantry** | | | | |
| | 5,000 | SF | $675.00 | **$3,375,000** |
| **H. Programs** | | | | |
| | 4,000 | SF | $325.00 | **$1,300,000** |
| **I. Expand Commissary** | | | | |
| | 4,000 | SF | $280.00 | **$1,120,000** |
| **J. Expand Warehouse** | | | | |
| | 4,000 | SF | $225.00 | **$900,000** |
| **K. Expand Central Plant** | | | | |
| | 2,000 | SF | $1,700.00 | **$3,400,000** |
| **L. Expand Intake** | | | | |
| Tenant improvement | 2,000 | SF | $120.00 | **$240,000** |
| **M. Video Visitation** | | | | |
| | 4,000 | SF | $290.00 | **$1,160,000** |
| **N. Expand Lockers** | | | | |
| Tenant improvement | 2,000 | SF | $225.00 | **$450,000** |
| **O. Pre-Engineered Vehicle Building** | | | | |
| | 7,200 | SF | $165.00 | **$1,188,000** |
| **Task 2 Item N** | | | | |
| Upgrade fire alarm system in existing facility | | | | **$800,000** |
| **TOTAL ESTIMATED BUILDING CONSTRUCTION COST** | 211,000 | SF | **$313.38** | **$66,123,000** |
| **Expand staff parking -185 stalls** | 185 | Stalls | $4,000.00 | **$740,000** |
| **Site Work** | 250,000 | SF | $20.00 | **$5,000,000** |
| **TOTAL ESTIMATED BUILDING & SITEWORK CONSTRUCTION COST AS OF DECEMBER 2006** | | | | **$71,863,000** |
| | | | Cost Per Bed | $102,661 |

P000218

Ventura County Todd Road Jail Needs Assessment and Engineering Analysis

---

## EXPANSION OPTION 3 - SUMMARY

| Section | Area | Units | Cost / SF | Total |
|---|---|---|---|---|
| **Program Spaces - Option 3** | | | | |
| **A.  Housing** | | | | |
| Cluster building configuration with module/pod housing layout (900 beds) | 174,000 | SF | $290.00 | **$50,460,000** |
| **B.  Mental Health** | | | | |
| | 10,000 | SF | $380.00 | **$3,800,000** |
| **C.  Medical Clinic/Infirmary** | | | | |
| | 10,000 | SF | $410.00 | **$4,100,000** |
| **D.  Ambulance** | | | | |
| | 1,800 | SF | $300.00 | **$540,000** |
| **E.  Admin Medical** | | | | |
| | 10,000 | SF | $280.00 | **$2,800,000** |
| **F.  Storage** | | | | |
| | 10,000 | SF | $180.00 | **$1,800,000** |
| **G.  Pantry** | | | | |
| | 5,000 | SF | $675.00 | **$3,375,000** |
| **H.  Programs** | | | | |
| | 4,000 | SF | $325.00 | **$1,300,000** |
| **I.  Expand Commissary** | | | | |
| | 4,000 | SF | $280.00 | **$1,120,000** |
| **J.  Expand Warehouse** | | | | |
| | 4,000 | SF | $225.00 | **$900,000** |
| **K.  Expand Central Plant** | | | | |
| | 2,000 | SF | $1,700.00 | **$3,400,000** |
| **L.  Expand Intake** | | | | |
| Tenant improvement | 2,000 | SF | $120.00 | **$240,000** |
| **M.  Video Visitation** | | | | |
| | 4,000 | SF | $290.00 | **$1,160,000** |
| **N.  Expand Lockers** | | | | |
| Tenant improvement | 2,000 | SF | $225.00 | **$450,000** |
| **O.  Pre-Engineered Vehicle Building** | | | | |
| | 7,200 | SF | $165.00 | **$1,188,000** |
| **Task 2 Item N** | | | | |
| Upgrade fire alarm system in existing facility | | | | **$800,000** |
| **TOTAL ESTIMATED BUILDING CONSTRUCTION COST** | 250,000 | SF | **$309.73** | **$77,433,000** |
| **Expand staff parking - 185 stalls** | 185 | Stalls | $4,000.00 | **$740,000** |
| **Site Work** | 250,000 | SF | $20.00 | **$5,000,000** |
| **TOTAL ESTIMATED BUILDING & SITEWORK CONSTRUCTION COST AS OF DECEMBER 2006** | | | | **$83,173,000** |
| | | | **Cost Per Bed** | **$92,414** |

P000219

## EXPANSION OPTION 4 - SUMMARY

| Section | Area | Units | Cost / SF | Total |
|---|---|---|---|---|
| **Program Spaces - Option 4** | | | | |
| **A. Housing** | | | | |
| Cluster building configuration with module/pod housing layout (1700 beds) | 330,000 | SF | $290.00 | **$95,700,000** |
| **B. Mental Health** | | | | |
| | 10,000 | SF | $380.00 | **$3,800,000** |
| **C. Medical Clinic/Infirmary** | | | | |
| | 10,000 | SF | $410.00 | **$4,100,000** |
| **D. Ambulance** | | | | |
| | 1,800 | SF | $300.00 | **$540,000** |
| **E. Admin Medical** | | | | |
| | 10,000 | SF | $280.00 | **$2,800,000** |
| **F. Storage** | | | | |
| | 10,000 | SF | $180.00 | **$1,800,000** |
| **G. Pantry** | | | | |
| | 5,000 | SF | $675.00 | **$3,375,000** |
| **H. Programs** | | | | |
| | 4,000 | SF | $325.00 | **$1,300,000** |
| **I. Expand Commissary** | | | | |
| | 4,000 | SF | $280.00 | **$1,120,000** |
| **J. Expand Warehouse** | | | | |
| | 4,000 | SF | $225.00 | **$900,000** |
| **K. Expand Central Plant** | | | | |
| | 2,000 | SF | $1,700.00 | **$3,400,000** |
| **L. Expand Intake** | | | | |
| Tenant improvement | 2,000 | SF | $120.00 | **$240,000** |
| **M. Video Visitation** | | | | |
| | 4,000 | SF | $290.00 | **$1,160,000** |
| **N. Expand Lockers** | | | | |
| Tenant improvement | 2,000 | SF | $225.00 | **$450,000** |
| **O. Pre-Engineered Vehicle Building** | | | | |
| | 7,200 | SF | $165.00 | **$1,188,000** |
| **Task 2 Item N** | | | | |
| Upgrade fire alarm system in existing facility | | | | **$800,000** |
| **TOTAL ESTIMATED BUILDING CONSTRUCTION COST** | 406,000 | SF | **$302.15** | **$122,673,000** |
| **Expand staff parking -185 stalls** | 185 | Stalls | $4,000.00 | **$740,000** |
| **Site Work** | 250,000 | SF | $20.00 | **$5,000,000** |
| **TOTAL ESTIMATED BUILDING & SITEWORK CONSTRUCTION COST AS OF February 2007** | | | | **$128,413,000** |
| | | | **Cost Per Bed** | $75,537 |

P000220

## Appendix E
## Ventura County Sheriff Department
## Letter to CSA (Notification Letter)



# VENTURA COUNTY
# SHERIFF'S DEPARTMENT

- **BOB BROOKS**
  SHERIFF
- **CRAIG HUSBAND**
  UNDERSHERIFF

800 SOUTH VICTORIA AVENUE, VENTURA, CA 93009   PHONE (805) 654-2380   FAX (805) 645-1391

July 20, 2006

Corrections Standards Authority
Facilities Standards and Operations Division
600 Bercut Drive
Sacramento, CA 95814

Attention: Michael Bush

**RE:   Ventura County Sheriff's Department Phase 1B Todd Road Expansion Project**

**Subject:   Notification of Intent to Proceed with The Expansion of The Todd Road Jail.**

Dear Mr. Bush

Please accept this letter as notification that the Ventura County Sheriff's Department is currently in the process of moving forward with plans to expand the Todd Road Jail Facility. The Todd Road Jail is located at 600 S Todd Road, Santa Paula, CA, County of Ventura.   During this process our Needs Assessment, design plans for the expansion, and plans for structural changes and renovation to our existing facility will be submitted for review.

This project will include the addition of Phase 1B to the existing facility.

P000221

Page#2

The actual number of beds and cell configurations will be determined during the needs assessment phase. It is estimated that we will add about 600 beds to our current facility. We also intend to include a special housing unit including beds for medical and psychiatric observation. The proposed expansion should fall within compliance of our current Conditional Use Permit and Environmental Impact Report.

This project will evaluate our current system technologies and integrate the new and old systems into one. Expansion of our warehouse, expansion of the intake area, video visitation, and food delivery are all areas identified for engineering analysis.

The personnel currently assigned to this project are as follows:

Public Works

PHD PE Karl Novak Public Works Engineering Services (805) 654-3706

Ventura County Sheriff's Department

Chief Deputy Kathyrn E. Kemp (805) 654-2305
Commander Brent Morris (805) 933-8505
Sergeant Richard Barber (805 933-8514

General Services Agency

Maintenance Supervisor Allyn Cahoon  (805) 933-8541

We look forward to working with your agency on this project. Please see attached proposed time line, which takes our project to start of construction. Should you have any question please feel free to contact any of our project members.

Respectfully,

Kathyrn E. Kemp
Chief Deputy

P000222

P000223

Ventura County Todd Road Jail Needs Assessment and Engineering Analysis

P000224

# Appendix F
## August 14, 2006, CSA Letter to
## Ventura County Sheriff Department (Plan Review # 111.6000.04)

STATE OF CALIFORNIA — DEPARTMENT OF CORRECTIONS AND REHABILITATION          ARNOLD SCHWARZENEGGER, GOVERNOR

**CORRECTIONS STANDARDS AUTHORITY**
600 Bercut Drive
Sacramento, CA 95814
445-5073
i.cdcr.ca.gov/DivisionsBoards/CSA



August 14, 2006

Kathyrn E. Kemp, Chief Deputy
Ventura County Sheriff's Department
800 South Victoria Avenue
Ventura, CA 93009

<u>Ventura County</u>
<u>Todd Road Facility – 600-beds Expansion</u>
<u>Corrections Standards Authority's Plan Review Number 111.6000.04</u>

Dear Chief Kemp:

Thank you for your Letter of Intent dated July 20, 2006 regarding the project listed above. This satisfies the requirement that a letter of intent be filed with the Corrections Standards Authority (CSA) as outlined in the California Code of Regulations (CCR), Part 1, Title 24, Section 13-102 (c) 1.

The CSA's objective is to facilitate both design and operation of local adult detention facilities so they function in a constitutional and efficient manner. This is accomplished through the process of: 1) technical assistance, 2) plan review, and 3) inspection. The letter of intent initiates a working relationship between local authorities and the CSA to ensure that planned construction conforms to minimum standards for adult facilities. Knowledgeable and experienced staff members are available to assist you in successfully planning and building a safe and secure juvenile facility.

In accordance with Penal Code 6029, CSA staff reviews plans and specifications for city, city and county, county and private detention facilities. Reviews occur at the following stages of detention facility projects:

        1)    Schematic Design (30%)
        2)    Design Development (50%)
        3)    Construction Document (100%)

The CSA's staff reviews one set of drawings and specifications to verify compliance with Title 24 regulations. Please have your local fire authority review a second set for compliance with fire and life safety regulations.

P000225

Chief Kemp                     Page 2 of 2                     August 14, 2006

When CSA's staff completes its review at each phase of design, a *Title 24 Compliance Review* and a cover letter will be returned to the designated contact Person and any other entities authorized to receive this document. Each review enables the project design team to be aware of both resolved and unresolved standards issues as the project progresses.

If you have questions on the plan review process, or any of its elements, or if CSA's staff can be of technical assistance at any time during your project, please give us a call.

Sincerely,

Michael J. Bush, Field Representative
Facilities Standards and Operations Division
(916) 324-9861    michael. bush@cdcr.ca.gov

cc:    Bob Takeshta, Deputy Director (A)
       Ron Bertrand, Field Representative

Letter of Intent Reply.doc; 8/14/2006

# Appendix G
# CUP and EIR Compliance Review

### TODD ROAD JAIL

### CUP and EIR Compliance Review

### Summary of Findings
### 7/20/06

RMA completed a compliance review of the conditions specified in the CUP and EIR. In addition, Pat Richards (RMA), Jim Thonis (County Counsel), and Karl Novak (PWA) met to discuss several issues and related to Phase 1A and moving ahead with Phase 1B.

Conclusions of the review and meeting are as follows:

1) All TRJ CUP (including EIR) conditions were certified to be in compliance after construction.
2) The CUP specifies a maximum building coverage of 423,630 SF for Phase 1A and 1B. This figure cannot be exceeded without a variance from the General Plan. A Permit Adjustment cannot be obtained to increase this amount.
3) The CUP allows for a rated capacity of 1,191 inmates under Phases 1A and 1B. However, up to 1,641 inmates may be held "as necessary under overcrowded conditions". Phase 1B may be designed to more easily accommodate overcrowded conditions than the 1A facility. For example, cells could be oversized so that extra bunks could be added when necessary.
4) The rated inmate capacity may be increased by up to 10% if the existing (and proposed Phase 1B) facilities can adequately handle the increased inmate population without significant impacts. An RMA review and Permit Adjustment would be necessary.
5) Increasing the rated inmate capacity by greater than 10% would require a Permit Minor Modification and public hearing.

P000227

Ventura County Todd Road Jail Needs Assessment and Engineering Analysis

P000228

Ventura County Todd Road Jail Needs Assessment and Engineering Analysis

---

## Appendix H
## Engineering Analysis – Summary Breakdown

## ENGINEERING ANALYSIS – SUMMARY BREAKDOWN

| Element | Quantity | Unit | Unit Cost | Total |
|---|---|---|---|---|
| ***Vacuum Toilet System - Alternate 1*** | | | | |
| New Acorn Master-Trol Closet Controls | | | | |
| Material only including controls, back boxes, transformer, valves etc. | 400 | EA | $450.00 | $180,000 |
| Sub contractors markups, tax and installation | 400 | EA | $500.00 | $200,000 |
| Material pricing supplied by Laura Marshall - Acorn Vac Inc (800-591-9920) | | | | |
| | | | | ***$380,000*** |
| ***Vacuum Toilet System - Alternate 2*** | | | | |
| New vacuum pump system | | | | |
| Materials only including (3) 15hp pumps, (4) 100g collection tanks, (2) discharge pumps and two inline sewage grinders | 1 | LS | $363,000.00 | $363,000 |
| Sub contractors markups, tax and installation | 1 | LS | $300,000.00 | $300,000 |
| Material pricing supplied by Laura Marshall - Acorn Vac Inc (800-591-9920) | | | | |
| | | | | ***$663,000*** |
| ***Observation of Supervisory Staff - Adjustable Louvers*** | | | | |
| Deep adjustable louvers, supply and install, louvers typically 48" x 42" | 378 | SF | $55.00 | $20,790 |
| | | | | ***$20,790*** |
| ***Observation of Supervisory Staff - Light Washing*** | | | | |

P000229

Ventura County Todd Road Jail Needs Assessment and Engineering Analysis

| | | | | |
|---|---|---|---|---|
| Light fixtures angles accordingly, assume 3 fixtures per window | 72 | EA | $900.00 | $64,800 |
| | | | | *$64,800* |

### *Observation of Supervisory Staff - Tinting*

| | | | | |
|---|---|---|---|---|
| Line existing windows with tinting film | 756 | SF | $10.00 | $7,560 |
| | | | | *$7,560* |

### *Intake Area Conversion*

| | | | | |
|---|---|---|---|---|
| Remodel existing area for new holding | 950 | SF | $175.00 | $166,250 |
| | | | | *$166,250* |

### *Energy Management Control System - Alternate 1*

Robertshaw Controls Panel

| | | | | |
|---|---|---|---|---|
| Includes removal of DMS, install new UNC, reuse all sub controllers and sensors, upload all control point information, produce new control program and assume all sub controllers and sensors are existing | 4 | EA | $17,500.00 | $70,000 |

Pricing supplied by Jim Coughlin - Servi-Tech Controls Inc. (559-264-6679)

| | | | | |
|---|---|---|---|---|
| | | | | *$70,000* |

### *Energy Management Control System - Alternate 2*

Johnson Controls - Metasys System

Includes the renewal of all control panels and individual equipment controls complete to the four main systems

| | | | | |
|---|---|---|---|---|
| Central Plant | 1 | LS | $150,000.00 | $140,000 |
| Central Services | 1 | LS | $150,000.00 | $140,000 |

P000230

Ventura County Todd Road Jail Needs Assessment and Engineering Analysis

| | | | | |
|---|---|---|---|---|
| Administration | 1 | LS | $120,000.00 | $115,000 |
| Housing | 1 | LS | $110,000.00 | $105,000 |

Pricing supplied by Salvador Jimenez - Johnson Controls (562-594-3227)

| | | | | |
|---|---|---|---|---|
| | | | | **_$500,000_** |

### Circuit Breaker Maintenance

| | | | | |
|---|---|---|---|---|
| Furnish and install a maintenance bypass breaker to an existing 4000A breaker, including demo, shut down, installation and testing | 1 | LS | $200,000.00 | $200,000 |
| | | | | **_$200,000_** |

### Roof Leaks - Soft Spots

| | | | | |
|---|---|---|---|---|
| Cut back existing roof system to substrate, replace insulation and patch roof covering | 6 | EA | $3,000.00 | $18,000 |
| | | | | **_$18,000_** |

### Roof Leaks - Expansion Joint

| | | | | |
|---|---|---|---|---|
| Remove existing joint material and install new flexible fabric repair | 90 | LF | $60.00 | $5,400 |
| | | | | **_$5,400_** |

### Roof Leaks - Flashings

| | | | | |
|---|---|---|---|---|
| Remove existing flashing sealer material and re-seal/caulk | 600 | LF | $20.00 | $12,000 |
| | | | | **_$12,000_** |

### Steam Systems - Electric

| | | | | |
|---|---|---|---|---|
| Replace existing dishwasher with new Hobart | 1 | EA | $100,000.00 | $100,000 |

P000231

| | | | | |
|---|---|---|---|---|
| Provide infrastructure for new dishwasher | 1 | EA | $20,000.00 | $20,000 |
| Replace existing Kettle with new | 4 | EA | $18,150.00 | $72,600 |
| Provide infrastructure for new kettles | 4 | EA | $2,000.00 | $8,000 |
| Replace existing coffee brewer with new | 1 | EA | $9,460.00 | $9,460 |
| Provide infrastructure for new coffee brewer | 1 | EA | $6,000.00 | $6,000 |
| Equipment costs provided by Laschober+ Sovich - November 1, 2006 | | | | |

**$216,060**

### Steam Systems - Gas/Electric

| | | | | |
|---|---|---|---|---|
| Replace existing dishwasher with new Hobart (E) | 1 | EA | $100,000.00 | $100,000 |
| Provide infrastructure for new dishwasher | 1 | EA | $20,000.00 | $20,000 |
| Replace existing Kettle with new (G) | 4 | EA | $25,300.00 | $101,200 |
| Provide infrastructure for new kettles | 4 | EA | $4,000.00 | $16,000 |
| Replace existing coffee brewer with new (E) | 1 | EA | $9,460.00 | $9,460 |
| Provide infrastructure for new coffee brewer | 1 | EA | $6,000.00 | $6,000 |
| Equipment costs provided by Laschober+ Sovich - November 1, 2006 | | | | |

**$252,660**

### Steam Systems - Steam

| | | | | |
|---|---|---|---|---|
| Replace existing steam generators with one 9.5hp 15# 335 MBTUH Fulton Steam Boiler including connections and switches | 1 | EA | $80,000.00 | $80,000 |
| Equipment costs provided by Laschober+ Sovich - November 1, 2006 | | | | |

**$80,000**

P000232

Ventura County Todd Road Jail Needs Assessment and Engineering Analysis

---

### *Swamp Cooler*

| | | | | |
|---|---|---|---|---|
| Provide 1 Ton split system air cooled heat pump including electric power - ceiling mounted | 1 | EA | $7,500.00 | $7,500 |
| | | | | *$7,500* |

### *Cooling - Gas*

| | | | | |
|---|---|---|---|---|
| 350T gas absorption chiller and cooling tower | 1 | EA | $575,000.00 | $575,000 |
| | | | | *$575,000* |

### *Cooling - Electric*

| | | | | |
|---|---|---|---|---|
| 350T electric centrifugal chiller | 1 | EA | $395,000.00 | $395,000 |
| | | | | *$395,000* |

### *Generators*

| | | | | |
|---|---|---|---|---|
| Replacement 600 Kw diesel generator, indoor, complying with current air quality codes. Includes demo of existing and switchover, day tank, muffler, filters and exhaust stack | 1 | EA | $700,000.00 | $700,000 |
| Particulate trap | 1 | EA | $150,000.00 | $150,000 |
| Pricing confirmed with Alan Abramovitch - Quinn Power (805-431-3180) | | | | |
| | | | | *$850,000* |

### *Rooftop Units*

| | | | | |
|---|---|---|---|---|
| Material only, heat exchanger - 125MBH capacity including gaskets | 1 | EA | $12,800.00 | $12,800 |
| Sub contractors markups, tax and installation | 1 | EA | $12,000.00 | $12,000 |
| | | | | *$24,800* |

P000233

Ventura County Todd Road Jail Needs Assessment and Engineering Analysis

### *Water Intrusion - Administration*

| | | | | |
|---|---|---|---|---|
| Seal/repair sills | 100 | LF | $35.00 | $3,500 |
| | | | | *$3,500* |

### *Water Intrusion - Muster*

| | | | | |
|---|---|---|---|---|
| Break up and remove existing concrete paving | 480 | SF | $2.00 | $960 |
| Excavate down approximately 12" to expose wall | 12 | CY | $55.00 | $652 |
| Apply waterproofing | 160 | SF | $10.00 | $1,600 |
| Backfill and compact | 12 | CY | $30.00 | $360 |
| Replace paving | 480 | SF | $10.00 | $4,800 |
| | | | | *$8,372* |

### *Cluster Showers - Controls*

| | | | | |
|---|---|---|---|---|
| New solenoid valves | 24 | EA | $5,750.00 | $138,000 |
| | | | | *$138,000* |

### *Cluster Showers - Shower Stall Wall Covering*

| | | | | |
|---|---|---|---|---|
| Stainless steel stall wall and floor covering | 24 | EA | $6,000.00 | $144,000 |
| | | | | *$144,000* |

P000234



# VENTURA COUNTY
# SHERIFF'S OFFICE

- **GEOFF DEAN**
  Sheriff
- **GARY PENTIS**
  Assistant Sheriff
- **STEVE DE CESARI**
  Assistant Sheriff

**800 SOUTH VICTORIA AVENUE, VENTURA, CA 93009   PHONE (805) 654-2380   FAX (805) 645-1391**

January 13, 2015

Board of Supervisors
County of Ventura
800 So. Victoria Avenue
Ventura, CA 93009

**Subject:**      Authorization for the Sheriff's Office to Apply for Jail Construction Funding Under California Senate Bill 863, and Adoption of a Resolution in Support of the Application.

**Recommendation:**

It is recommended that your Board:

1. Authorize the Sheriff's Office to submit an application for jail construction funding grant under Senate Bill 863, which establishes a state program to help finance the construction of adult local criminal justice facilities.

2. Approve the attached Resolution in support of the application.

**Fiscal/Mandates Impact:**

Mandatory:            No
Source of Funding:     SB 863
Funding Match Required:
     Cash:             $4,874,036
     In-Kind:         $1,281,580
     Total:           $6,155,616 (10% total Project)
Impact on other Departments: None

☐ **SPECIAL SERVICES**
5177 Camino Ruiz
Camarillo, CA 93012
(805) 383-8791 Fax (805) 389-6549

☐ **PATROL SERVICES**
2101 East Olsen Road
Thousand Oaks, CA 91360
(805) 494-8260 FAX (805) 494-8295

☐ **DETENTION SERVICES**
800 South Victoria Avenue #3400
Ventura, CA 93009
(805) 654-2305 FAX (805) 654-3500

☐ **SUPPORT SERVICES**
800 South Victoria Avenue #3300
Ventura, CA 93009
(805) 654-3541 FAX (805) 677-8715

P000235

Board of Supervisors
January 13, 2015
Page 2 of 5

| Summary of Revenue and Costs: | FY 2014-15 | FY 2015-16 |
|---|---|---|
| Revenue: | $55,400,541 | $          0 |
| Costs: | | |
|     Direct: | $61,556,157 | $          0 |
|     Indirect – Department | $          0 | $          0 |
| | | |
| Net Costs: | $ 6,155,616 | $          0 |
|     Recovered Indirect Costs: | $          0 | $          0 |

*Note: If the application is accepted and approved, the Sheriff's Office will return to your Board for the necessary budgetary modifications, plans and discussion on how the required 10% match of $6.1 million will be provided.*

**Current Fiscal Year Budget Projection**:

| FY 2014-15 Budget Projection for Sheriff Detention Services, Org 4050 | | | | |
|---|---|---|---|---|
| | Adopted Budget | Adjusted Budget[1] | Projected Budget | Estimated Savings/(Deficit) |
| Appropriations | $100,898,354 | $101,751,086 | $101,751,086 | -0- |
| Revenue | $46,168,677 | $46,271,698 | $46,271,698 | -0- |
| Net Cost | $54,729,677 | $55,479,388 | $55,479,388 | -0- |

[1]As of December 22, 2014

**Discussion:**

On July 16, 2013, the Sheriff's Office made a presentation to your Board detailing the operational challenges faced by the Sheriff's detention facilities for an inmate population with chronic medical and/or mental health needs.  These challenges were especially brought about through the shift in custodial responsibility for certain long-term inmates from the state to the counties under the 2011 Public Safety Realignment Act (Realignment Act).  The presentation described the Sheriff's plan to address these challenges, including building a new, 64-bed medical and mental health facility at the Todd Road Jail (TRJ) and converting the Main Jail's current specialized housing unit into a general population unit to house more inmates.  The presentation included a request to authorize the Sheriff's Office to apply for jail construction funding available through a competitive grant process under Senate Bill 1022 (SB 1022).  SB 1022 provided $500,000,000 for counties through a competitive grant program administered by Board of State and Community Corrections (BSCC).

Board of Supervisors
January 13, 2015
Page 3 of 5

Following that presentation, your Board approved Resolution #13-051, authorizing the Sheriff's Office to submit an application to the Board of State and Community Corrections (BSCC) seeking jail construction funding under SB 1022. The resolution was amended by your Board on October 1, 2013 (Resolution #13-064) to include certain language required by the State for funding preference.

Unfortunately, Ventura County was not selected from among the many counties that applied for funding.

However, as a result of the grant process, the State Legislature and BSCC recognized the great need for Counties around the State to receive additional funding to build and/or refurbish crowded and aging jail facilities. On June 20, 2014, Governor Brown signed SB 863 into law, authorizing another $500,000,000 in jail construction funding to be offered through a competitive grant program administered by the BSCC. We now ask for authorization from your Board to apply for a grant when BSCC opens the application period.

As we stated in the Board Letters regarding the prior grant, the Sheriff's Office faces a number of challenges in the jail. Due to realignment, inmates are being housed in local jails for longer periods of time, resulting in an increase in the level of care previously not experienced, including services such as preventative screening (e.g. mammograms, pap smears, colonoscopies, etc.) in addition to enhanced levels of dental and optometry services. Preventative medical, dental and optometry screenings were not provided in the jail in the past, as inmates' sentences averaged 45 days or less. With inmates now being sentenced to multiple years in the county jail, we now must respond in a different manner.

Another concern we have is the appropriate management of the mentally ill in our jails. Approximately 15% of the existing inmate population has been diagnosed with a mental illness. Of this group, approximately 4% are severely and persistently mentally ill, and are classified as "psychiatric" inmates for their safety and housing security. Of the inmates diagnosed with a mental illness, approximately 70% are treatment compliant.

There are currently 32 beds at the Pre-Trial Detention Facility (PTDF) dedicated to the sheltered housing of inmates with significant medical/mental health concerns. These inmates require a higher level of observation due to their condition or past behaviors, eliminating the option of housing them in general housing locations.

In addition to the 32 special use beds at the PTDF, one general housing quad (PTDF QUAD A) has been identified as a specialized housing area for male inmates who are classified as psychiatric inmates. The severely mentally ill population often requires segregation from other inmates for their protection and oftentimes cannot be housed

Board of Supervisors
January 13, 2015
Page 4 of 5

together in one cell, reducing the efficient use of existing facility design. The proposed 64-bed medical/mental health facility expansion would free up space in PTDF QUAD-A for general population inmates who could be housed two to a cell, thereby effectively adding approximately 100 beds to our overall jail capacity for general population inmates.

### *Anticipated Project Costs*

One change since the original Resolution was adopted in August 2013 is that the cost of construction is anticipated to increase substantially. It is estimated that the same Medical/Mental Health housing project that was envisioned when we applied for the first grant under SB 1022 will now cost $61,556,157, of which it is anticipated that the County will be required to cover 10% in hard and soft costs. The 10% match has not been formally announced, however, BSCC officials have indicated that the SB 863 grant will be similar in scope and nature to the previous SB 1022 grant. Although costs may change, we estimate that the costs to build and occupy the 64-bed option sought will be as follows:

### *64-bed option: $61,556,157*

| | |
|---|---|
| Construction cost | $41,647,092 |
| Soft cost of project* | $18,808,205 |
| Additional Costs** | $1,100,860 |
| | |
| Total project cost | $61,556,157 |

*Soft cost includes estimated architectural and design fees, inspection fees, project management, furnishings, taxes, permit fees, and contingency.*

**Additional costs include, land value and county administration costs.*

### *County 10% match: $6,155,616*

We are committed to provide the 10% match through both cash and in-kind contributions. The in-kind amounts have yet to be fully defined. We are awaiting an independent updated appraisal of the land due to the belief that land values have most likely increased since the last appraisal. The updated appraised value will be added to the final letter to your Board, should the county be awarded the funding.

Cash and other in-kind to be determined: $6,155,616
Identified in-kind total: $1,281,580
Detail of Offset:
     Audit:                            ($15,000)

Board of Supervisors
January 13, 2015
Page 5 of 5

| | |
|---|---|
| Needs Assessment: | ($94,580) |
| Transition Planning: | ($102,000) |
| County Administration: | ($17,000) |
| Estimated Assessed Land: | ($1,053,000) |

## *Estimated Annualized Costs of Jail Expansion*

The original presentation to your Board on July 16, 2013, included an estimate of annualized cost for this proposed jail expansion project to range from $2 to $3 million to cover security staffing and staffing associated with delivery of medical and mental health services and ISF costs.  The actual annualized cost associated with this project will not be fully known until the project has been designed.  With the new medical facility design, we hope some economies of scale and efficiencies in operation will be realized which may minimize the increased staffing costs.  If awarded a grant, we will return to the Board with updated cost after the design phase, and will work with the CEO staff to identify funding for any increase in operational costs.

## *Application Timeline and the Need for Your Board's Approval at This Time*

The BSCC has not yet determined the funding criteria.  However, we anticipate that BSCC may finalize and release its criteria sometime in early 2015, and at that time will announce a deadline by which counties must submit proposals.

Because the Sheriff's Office does not wish to miss the opportunity to participate in this important program, the Sheriff's Office is asking that your Board authorize the Sheriff to submit an application for funding that complies with all requirements under SB 863 and under BSCC guidelines.  We also ask that your Board approve the attached Resolution in support of the application.  If any specific findings by your Board are required by BSCC or would enhance our application, we will return to your Board with a request for a revised Resolution.

The Offices of the County Executive, County Counsel, Auditor-Controller and Public Works have reviewed this letter. Please contact Assistant Sheriff Gary Pentis at (805) 654-2305 if you have any questions or need additional information.

GEOFF DEAN
Sheriff

Attachment: Resolution



# VENTURA COUNTY
# SHERIFF'S OFFICE

- **GEOFF DEAN**
  Sheriff
- **GARY PENTIS**
  Undersheriff
- **STEVE DE CESARI**
  Assistant Sheriff
- **GUY STEWART**
  Assistant Sheriff

800 SOUTH VICTORIA AVENUE, VENTURA, CA 93009   PHONE (805) 654-2380   FAX (805) 645-1391

September 22, 2015

Board of Supervisors
County of Ventura
800 So. Victoria Avenue
Ventura, CA 93009

**Subject:**   **Adoption of a Revised Resolution in Support of the Application for Jail Construction Funding Under California Senate Bill 863; and Waive the Board Policy Prohibiting the Inclusion of Penalty Interest and Attorney's Fees Provision in County Contracts; and Authorize the Auditor-Controller to Process the Necessary Accounting Transactions (Recommendation No. 3 Requires 4/5th vote)**

**Recommendations:**

1.  Adopt the attached Resolution, including specific language required by the State for funding preference, in support of the Sheriff's Office's application to the State for jail construction funds available under Senate Bill 863 (SB 863).

2.  Waive the Board policy prohibiting the inclusion of attorneys' fees provisions with respect to the construction agreement for this project.

3.  Authorize the Auditor-Controller to process the following Fund Balance transactions(requires 4/5th vote):

    INCREASE   General Fund Assigned Fund Balance for Fixed Asset Acquisition – Todd Road Jail Facility   $27,000
    DECREASE   General Fund Contingency   $27,000

**Fiscal/Mandates Impact:**

Mandatory:   No
Source of Funding:   SB 863, General Fund Contingency

☐ **SPECIAL SERVICES**
(805) 383-8791 Fax (805) 389-6549

☐ **PATROL SERVICES**
(805) 494-8260 FAX (805) 494-8295

☐ **DETENTION SERVICES**
(805) 654-2305 FAX (805) 654-3500

☐ **SUPPORT SERVICES**
(805) 654-5134 FAX (805) 677-8715

Visit Us on the Web
www.vcsd.org

P000240

Board of Supervisors
September 22, 2015
Page 2 of 5

Funding Match Required:

| | | | |
|---|---|---|---|
| Total: | $6,127,000 (10% total Project) | | |

Impact on other Departments: None

| Summary of Revenue and Costs: | FY 2015-16 | FY 2016-17 | |
|---|---|---|---|
| Revenue: | $55,137,567 | $ | 0 |

Costs:

| | | | |
|---|---|---|---|
| Direct: | $61,263,964 | $ | 0 |
| Indirect – Department | $ 0 | $ | 0 |
| Net Costs: | $ 6,127,000 | $ | 0 |
| Recovered Indirect Costs: | $ 0 | $ | 0 |

*Note:  If the application is accepted and approved, the Sheriff's Office will return to your Board for the necessary budgetary modifications, plans and discussion on how the required 10% match of $6.127 million will be provided.*

**Current Fiscal Year Budget Projection**:

| FY 2015-16 Budget Projection for Sheriff's Todd Road Jail, Unit 2561 | | | | |
|---|---|---|---|---|
| | Adopted Budget | Adjusted Budget[1] | Projected Budget | Estimated Savings/(Deficit) |
| Appropriations | $29,090,270 | $29,090,270 | $29,090,270 | -0- |
| Revenue | $22,798,785 | $22,798,785 | $22,798,785 | -0- |
| Net Cost | $6,291,485 | $6,291,485 | $6,291,485 | -0- |

[1]As of September 9, 2015

**Discussion:**

On July 22, 2015, the Sheriff's Office made a presentation to your Board seeking authorization to apply for jail construction funding available under SB 863 in order to construct a new medical/mental health housing and programming unit on the grounds of the Todd Road Jail Facility.  SB 863 authorized a $500 million financing program to assist counties in meeting local needs for local jails, including those relating to the housing and care of mentally ill and chronically ill inmates under the counties' care.  The funding is accomplished through lease-revenue bonds issued by the State.  Under the proposed lease-revenue bond financing, the County provides the State with property rights (a leasehold interest, not ownership) of the land, on which the proposed project will be built.  The State sells bonds and funds the construction of the new facility.  The State then leases the completed facility to the California Department of Corrections and Rehabilitation (CDCR), which then sub-leases the facility to the County to operate as proposed in the County's jail system.  Once the State's bonds are paid off, the State no longer holds a property right on the land and the County retains ownership of the land.

P000241

Board of Supervisors
September 22, 2015
Page 3 of 5

Once constructed, the new 64-bed facility will be able to more appropriately house the medical and mental health inmates in our jail system.

Following the presentation, we requested and your Board authorized the Sheriff to submit an application for SB 863 funding and approved a Resolution in support of the Sheriff's application. The Sheriff submitted the SB 863 application to the Board of State and Community Corrections (BSCC) for technical review by the deadline of August 28, 2015. The BSCC completed its technical review of our application on September 4, 2015, and requested a few minor changes to your Board's Resolution. An amended Resolution is due back to the BSCC by October 2, 2015. The changes, include Item (B), identifying the appropriate County official authorized to sign and execute the project financing documents (Paul Derse, Chief Financial Officer); and Item (E), spelling out the exact amount of the 10% required cash match that the County has committed to the project. The earlier Resolution identified the amount as $6.1 million. The amended resolution identifies the amount as $6,127,000.

In addition, since the presentation to your Board on July 21, 2015, the County received an updated land appraisal report on August 3, 2015, (Item H) valuing the land for the proposed project at $1,100,000, which is an increase from the appraised value of $1,053,000 we received in September 2013.

The Resolution contains the following required information for our application to be considered for funding:

A. Names, titles, and positions of the County construction administrator, project financial officer, and project contact person.

B. Language approving the forms of the project documents deemed necessary, as identified by the State Public Works Board (SPWB) to the BSCC, to effectuate the financing authorized by the legislation, as well as identifying the appropriate County Official authorized to sign and execute these documents at the appropriate times.

As part of this, your Board is also being requested to waive the Board policy prohibiting the inclusion of attorneys' fees with respect to the construction agreement (Attachment B, Forms 1-2, Article 11) for this project. The State has advised that the language is non-negotiable.

Once the form documents are finalized with respect to this project, the finalized documents will be submitted to your Board for approval.

C. Authorization of Sheriff Geoff Dean to sign the applicant's Agreement and submit the proposal for funding.

Board of Supervisors
September 22, 2015
Page 4 of 5

D. Assurance that the County will adhere to State requirements and the terms of
the agreements between the County, the BSCC, and the SPWB in the
expenditure of State financing and County match funds.

E. Authorization of an adequate amount of available matching funds to satisfy the
County's contribution.  The identified matching funds in the resolution shall be
compatible with the States' lease revenue bond financing.  (Your Board set aside
$6,100,000 under an Assigned Fund Balance Account in the FY 2015/2016
Budget to be used to satisfy the County's contribution and we are asking your
Board today to approve adding $27,000 to meet the required state funding match
of $6,127,000.)

F. Assurance that the County will fully and safely staff and operate the facility that
is being constructed (consistent with Title 15, California Code of Regulations,
Chapter 1, Subchapter 6, section 1756 (j)(5) within 90 days after project
completion.

BSCC requires that the County estimate the cost to staff and operate the
proposed facility over the lifespan of 30 years, assuming a 3% annual increase
each year based on staffing rates and operational costs for FY 2015/16.  That
30-year cost, is estimated at $134,065,000.

G. At the time of proposal or not later than 90 days following the BSCC's notice
of Intent to Award assurance that the County (1) has project site control through
either fee simple ownership of the site or comparable long-term possession of
the site and right of access to the project sufficient to assure undisturbed use and
possession of the site (Todd Road Jail facility is on County-owned land); and (2)
will not dispose of, modify the use of, or change the terms of the real property
title, or other interest in the site of the facility subject to construction, or lease the
facility for operation to other entities, without permission and instructions from the
BSCC, for so long as the SPWB lease-revenue bonds secured by the financed
project remain outstanding.

H. Attestation as to the current fair market land value for the proposed new or
expanded facility. This value can be the on-site land value for new facility
construction, on-site land value of a closed facility that will be renovated and
reopened, or on-site land value used for expansion of an existing facility. It
cannot be claimed for land value under an existing operational facility. (If claimed
as in-kind match, actual on-site land value documentation from an independent
appraisal will be required as a pre-agreement condition.)

The County received an appraisal from an independent appraiser in August
2015, which valued the land targeted for construction at $1,100,000.

Board of Supervisors
September 22, 2015
Page 5 of 5

We recommend that your Board adopt the revised Resolution, which includes the various points required by the BSCC, in support of the Sheriff's Office's application for jail construction funding under SB 863.  We also recommend that your Board waive the Board policy prohibiting the inclusion of attorneys' fees provisions with respect to the construction agreement for this project.  In addition, we recommend that your Board authorize the Auditor-Controller to process the requested accounting transactions that are necessary to provide the 10% match required for the proposed funding being sought.

The Offices of the County Executive, County Counsel, Auditor-Controller and Public Works have reviewed this letter. Please contact Assistant Sheriff Guy Stewart at (805) 654-2305 if you have any questions or need additional information.

Sincerely,

GEOFF DEAN
Sheriff

Attachments:          Resolution

S/R 126

Ventura
3.2 miles

Santa Paula
2.8 miles

P000245

P000246

Resolution No. _15-103_

**RESOLUTION OF THE VENTURA COUNTY BOARD OF SUPERVISORS AUTHORIZING THE SHERIFF'S OFFICE TO APPLY FOR JAIL CONSTRUCTION FUNDING UNDER CALIFORNIA SENATE BILL 863**

**WHEREAS,** the Board of Supervisors of the County of Ventura desires to participate in the Correctional Facilities: Construction Financing Program ("The Program") administered by the Board of State and Community Corrections (hereafter referred to as "the BSCC") and established by Senate Bill 863 (Part 10b of Division 3 of Title 2 of the Government Code); and

**WHEREAS**, according to the application criteria issued by the BSCC, when applying for financing though The Program, the County of Ventura (and all other counties applying for financing) must include with its proposal a resolution by its Board of Supervisors that includes the following information:

A. Names, titles, and positions of the County construction administrator, project financial officer, and project contact person.

B. Language approving the forms of the project documents deemed necessary, as identified by the State Public Works Board (SPBW) to the BSCC, to effectuate the financing authorized by the legislation, as well as the appropriate County Official authorized to sign and execute these documents at the appropriate times.

C. Authorization of an appropriate County official to sign the applicant's Agreement and submit the proposal for funding.

D. Assurance that the County will adhere to State requirements and the terms of the agreements between the County, the BSCC, and the SPWB in the expenditure of State financing and County match funds.

E. Authorization of an adequate amount of available matching funds to satisfy the County's contribution, which shall be compatible with the States' lease-revenue bond financing.

F. Assurance that the County will fully and safely staff and operate the facility that is being constructed (consistent with Title 15, California Code of Regulations, Chapter 1, Subchapter 6, section 1756 (j)(5) within 90 days after project completion.

G. At the time of proposal or not later than 90 days following the BSCC's notice of Intent to Award, assurance that the County (1) has project site control through either fee simple ownership of the site or comparable long-term possession of the

site and right of access to the project sufficient to assure undisturbed use and possession of the site; and (2) will not dispose of, modify the use of, or change the terms of the real property title, or other interest in the site of the facility subject to construction, or lease the facility for operation to other entities, without permission and instructions from the BSCC, for so long as the SPWB lease-revenue bonds secured by the financed project remain outstanding.

H. Attestation to the current fair market land value as of August 2015 for the proposed new or expanded facility.

**NOW, THEREFORE,** THE BOARD OF SUPERVISORS OF THE COUNTY OF VENTURA DOES HEREBY RESOLVE AS FOLLOWS:

1. Ventura County Public Works Director Jeff Pratt will be the County construction administrator, Chief Financial Officer Paul Derse will be the project financial officer, and Commander Ron Nelson will be the project contact person.

2. The Board of Supervisors approves the forms of the project documents deemed necessary, as identified by the SPBW to the BSCC, to effectuate the financing authorized by the legislation, and authorizes Paul Derse, Chief Financial Officer for the County of Ventura, to sign and execute these project documents at the appropriate times.

3. Ventura County Sheriff Geoff Dean is authorized on behalf of the Board of Supervisors to sign the Agreement and submit a proposal for funding to the BSCC for participation in the Program and that such proposal will comply with all requirements under SB 863 and under BSCC Program guidelines.

4. The Board of Supervisors assures that the County of Ventura will adhere to state requirements and the terms of the agreements between the County, the BSCC, and the SPWB in the expenditure of State financing and County match funds.

5. The Board of Supervisors has authorized and set aside $6,127,000 under an Assigned Fund Balance Account in the FY 2015/2016 Budget to be used to satisfy the County's contribution. The identified matching funds are compatible with the States' lease-revenue bond financing, in that the payment of these funds (i) is within the power, legal right, and authority of the County; (ii) is legal and will not conflict with or constitute on the part of the County a material violation of, a material breach of, a material default under, or result in the creation or imposition of any lien, charge, restriction, or encumbrance upon any property of the County under the provisions of any charter instrument, bylaw, indenture, mortgage, deed

of trust, pledge, note, lease, loan, installment sale agreement, contract, or other material agreement or instrument to which the County is a party or by which the County or its properties or funds are otherwise subject or bound, decree, or demand of any court or governmental agency or body having jurisdiction over the County or any of its activities, properties or funds; and (iii) have been duly authorized by all necessary and appropriate action on the part of the Board of Supervisors.

6. The County of Ventura, through its Sheriff's Office, will fully and safely staff and operate the facility that is being constructed (consistent with Title 15, California Code of Regulations, Chapter 1, Subchapter 6, section 1756 (j)(5) within 90 days after project completion.

7. The County of Ventura has project site control through fee simple ownership of the site and right of access to the project sufficient to assure undisturbed use and possession of the site, and will not dispose of, modify the use of, or change the terms of the real property title, or other interest in the site of the facility subject to construction, or lease the facility for operation to other entities, without permission and instructions from the BSCC, for so long as the Bonds remain outstanding.

8. The County of Ventura received an independent appraisal in August 2015 of the land value for the proposed new/expanded facility of $1,100,000 and attests that $1,100,000 is the fair market land value for the proposed new or expanded facility. An updated appraisal will be submitted to the BSCC within 90 days after receiving a conditional Intent to Award

On motion by Supervisor _____*Foy*_____, seconded by Supervisor_____*Parks*_____, this resolution was passed and adopted this 22nd day of September, 2015.

KATHY LONG, CHAIR
BOARD OF SUPERVISORS

ATTEST:

Michael Powers,
Clerk of the Board of Supervisors
County of Ventura, State of California

By:_____
     Deputy Clerk of the Board

P000249

**EXHIBIT 2**

# Ventura County Grand Jury
# 2015 - 2016



## Final Report

## Annual Detention  Facilities and
## Law Enforcement Issues

## May 24, 2016

*This page intentionally blank*

# Annual Detention Facilities and Law Enforcement Issues

## Summary

Pursuant to California Penal Code Section 919(b), the 2015-2016 Ventura County Grand Jury (Grand Jury) "inquired into the condition and management" of the detention facilities in Ventura County (County). The Grand Jury inspected the Pre-Trial Detention Facility (Main Jail), Todd Road Jail, the East Valley Jail, all nine police/Sheriff's holding facilities, and the two juvenile facilities.

The Grand Jury continued to follow a well-established methodology: touring facilities, asking questions of the various facilities' personnel, and documenting the process. In the course of fulfilling its mandate, the Grand Jury took note of factors that affected the law enforcement agencies over the past year.

The first key factor was the 2011 federal court order to reduce prison overcrowding. The resulting Public Safety Realignment Act (AB 109) significantly reduced the prison population. However, AB 109 did not meet its intended goal. The Ventura County Jail population initially rose due to newly convicted non-violent/non-serious/non-sex offenders being incarcerated in County jails instead of State prisons.

The second key factor was the passage of Proposition 47 (Prop 47) in 2014. This proposition retroactively changed the classification of many property and drug offenses from felonies to citable misdemeanors. Since the passage of Prop 47, the prison population was reduced to meet the Court mandated goals; however, with the passage of time a number of unanticipated consequences have become evident.

Another factor affecting law enforcement is the Ventura County Sheriff's Office (Sherriff's Office) initiative to provide Crisis Intervention Team training to sworn staff and dispatchers. This 40-hour training is a well-recognized tool enabling law enforcement to de-escalate "crisis situations" that may involve a high-degree of emotion, disorientation, and/or mental illness. Seventy-four percent (74%) of sworn patrol officers and 40% of dispatchers have completed this program.

The Grand Jury found that, with few exceptions, the jails and holding facilities in the County are in good order. One notable concern was the state of the facility and funding for the Santa Paula police force. The Grand Jury recommends that the City of Santa Paula create a prioritized list of changes targeted at improving the capabilities of its police force.

The Grand Jury recommends that the Sheriff's Office, working with the Behavioral Health Division, provide the Board of Supervisors with an annual, data-based assessment of mental health issues in the law enforcement environment and propose additional measures to mitigate those issues.

The Grand Jury commends the Sheriff's Office and the Board of Supervisors for their proactive stance and persistence in obtaining funding for the medical/mental health facility addition to Todd Road Jail.

The Grand Jury further commends the Sheriff's office for its work in providing Crisis Intervention Team training for the sworn staff and dispatchers.

## Background

California Penal Code section 919 (b), that established the Grand Jury's duties, mandates one specific task, an annual inspection of all the detention facilities in the County. It leaves it up to the Grand Jury to choose whether to write a report on the results of those inspections. The 2015-2016 Ventura County Grand Jury, like its predecessor grand juries, has chosen to document its detention facilities task and, as in recent reports, provide facts relevant to the forces at work on the law enforcement community within the County.

These forces include:

- The statewide movement of inmates from State prisons to parole, probation, and monitored release, known as Realignment (AB 109), driven by federal court order relating to overcrowding conditions in the State prisons

- The effects of Prop 47, approved by the voters in November 2014, that further sought to reduce prison population by reclassifying certain felonies to misdemeanors

- The growing recognition that drug usage and mental health issues strongly affect law enforcement activity

The Sheriff's Office has initiated measures, such as Crisis Intervention Team (CIT) training, to mitigate situations driven by mental illness and developmental disabilities that might otherwise result in arrests and/or incarceration.

## Methodology

The 2015-2016 Ventura County Grand Jury carried out its annual inspection of the Ventura County detention facilities as mandated by State law. These inspections included both a physical walk-through of the facilities and discussions with the staff. The Grand Jury continued its inquiry through interviews and internet searches to provide further information relevant to the purpose of the report.

The Grand Jury completed the following tasks to fulfill its mandate:

- Before the inspections, discussed the facilities and reviewed past reports

- Scheduled an inspection of each of the 14 facilities in the County where individuals are detained

- Used a standard checklist form for jurors to follow when inspecting the various facilities

- Conducted a post-inspection review session for each facility

*Ventura County 2015 – 2016 Grand Jury*                              *Final Report*

Some of the typical items considered for review when touring the individual facilities were:

- Logs for the Automated External Defibrillators to verify that the devices are inspected, tested, and logged as required

- Policies and Procedures Manuals

- Spot checks of sanitation equipment

- Juvenile detention logs and procedures

- Facility improvements recommended by previous grand juries

## Facts

### State Responses to Prison Overcrowding

**FA-01.** The 2011 implementation of the Public Safety Realignment Initiative (AB 109) has reached its "four-year mark". AB 109 has had several important outcomes:

- The State prison population was reduced but did not meet the Federal Court mandate until the implementation of Prop 47.

- The County jail population initially rose as newly convicted non-violent/non-serious/non-sex offenders were incarcerated in County jails instead of State prison.

- The pressure to further reduce prison and jail populations has forced early release of prisoners through the mechanisms of probation, parole, and supervised release. This has significantly increased the workloads of the responsible agencies.

- Low-level parole violators and/or those convicted of some specific low-level felonies are not sent to prison but are incarcerated for the offense in the county of origin.

(Ref-01, Ref-02, Ref-03, Ref-04, Ref-05)

**FA-02.** Prop 47 was passed by initiative on November 4, 2014. Its motivation was to further reduce the prison population in California. Its principal elements are:

- It retroactively reclassified certain felonies as misdemeanors.

- It classified certain crimes such as commercial burglary, forgery, bad checks, and possession of stolen property valued under $950, including firearms, as misdemeanors dealt with by citation rather than incarceration.

- It changed possession of controlled substances for personal use to a citable misdemeanor instead of a felony. Under certain circumstances, such as perceived threat to themselves, public safety, or the likelihood of flight, the alleged offender could be subject to arrest.

The effects of Prop 47, both anticipated and unanticipated, are still being assessed. Initially, Prop 47 has had the desired effect of reducing the number of prisoners in State prisons. Approximately 4000 prisoners have been released from State prisons as a result of Prop 47.

There is growing realization that some modifications of Prop 47 would be of significant value to public safety. These modifications include changing theft of all firearms to a felony, reverting possession of a date rape drug to a felony, and increasing law enforcement access to search warrants. Currently, search warrants are not issued for misdemeanors.

The anticipated reduction in the State of California Department of Corrections budget has not yet materialized due in part to the increased costs associated with post-release supervision and other unanticipated expenses. It was anticipated by the Legislative Analyst's Office in January 2014 (10 months before the vote) that $100 to $200 million would be saved annually. The 2015-2016 budget includes a savings of $19.3 million. Budget savings for 2016-2017 and beyond are estimated at $57 million per fiscal year.

The initiative specifies that the savings realized from Prop 47 would be spent as follows:

- 65% to mental health and drug abuse programs
- 25% to a safe schools fund
- 10% to the state victims compensation fund

Many criminals are adapting to Prop 47's provisions by carefully limiting their offenses to remain under the $950 limit. Law enforcement agencies are seeing instances of the same offenders being cited numerous times with no additional consequences.

Many of the crimes are driven by individuals seeking money to support drug habits. Because of the misdemeanor classification, the courts no longer have the leverage to make alcohol rehabilitation and drug diversion programs part of the sentencing process.

(Ref-06, Ref-07, Ref-08, Ref-09, Ref-10, Ref-11)

**FA-03.** The Crisis Intervention Team (CIT) is a tool used by law enforcement to de-escalate situations where an individual is in a "crisis situation" typically involving a high degree of emotion, mental illness, or disorientation. The officers are taught to recognize these situations, de-escalate them, and connect the individuals involved with alternative supporting resources. The CIT training is a 40-hour class.

Seventy-four percent (74%) of the sworn patrol staff and 40% of the dispatchers countywide have received this training with the goal of 100% in the near future. (Ref-12)

### Ventura County Jails

**FA-04.** The attached table summarizes the results of the Grand Jury's inspections of the detention facilities in the County. Because there are three types of facilities (holding cells, jails, and juvenile facilities), three sets of evaluation criteria, with significant overlap, were used. These criteria are reflected in the structure of the table. The following legend identifies the rating system used:

E – Excellent

S – Satisfactory

N – Needs improvement

(Att-01)

**FA-05.** The Main Jail, otherwise known as the Pre-Trial Detention Facility, was opened in 1980. On August 30, 2015, it housed 841 inmates. The facility is certified by the Board of State and Community Corrections (BSCC) for a maximum rated housing capacity of 823.

Todd Road was built in 1995. On October 5, 2015, it housed 824 inmates (591 males, 233 females) and has a BSCC maximum rated housing capacity of 796.

The East Valley Jail (EVJ) housed 10 inmates on September 2, 2015. It has a maximum rated housing capacity of 34. Inmates housed at the EVJ are carefully screened by the Classification Unit at the Main Jail prior to transfer to EVJ.

**FA-06.** Male inmates at the Main Jail are being housed in the dayrooms in the auxiliary pods to increase capacity.

**FA-07.** Inmates identified as problematic or suicidal are segregated from the general population. Detainees at the Main Jail who exhibit violent behavior are transported to Ventura County Medical Center (VCMC) for evaluation. Seventy-five percent (75%) of incoming inmates exhibit some degree of intoxication, and those who are severely intoxicated may also be transported to VCMC.

Due to the number of gang members incarcerated, complete separation of members of specific gangs is not possible. Where individuals have a particular rivalry, they are housed separately.

**FA-08.** The medical personnel at the Main Jail include primary care physicians, psychiatrists, nurses, and mental health workers. There are nurses on duty 24/7. The medical professionals perform patient care for chronic conditions including diabetes and mental health problems. Inmates are transported to VCMC for medical issues beyond the capabilities of the Main Jail medical facility.

The Main Jail has 18 cells to house the medically ill and two cells to house inmates with Severe and Persistent Mental Illness (SPMI). The severely mentally ill are segregated from the general populace and are supervised 24/7.

It was reported that 42% of female inmates and 18% of male inmates exhibit some symptoms of mental illness. Of this population, 21% of the female inmates and 11% of the male inmates are classified SPMI. Substance abuse is a factor in a high percentage of these mental health issues.

**FA-09.** Originally, the Main Jail was designated for shorter term incarceration while Todd Road Jail was intended for longer term incarceration. Due to capacity limitations, inmates are transferred between these two jails to minimize overcrowding at both facilities.

**FA-10.** The staff is fully informed about Immigration and Naturalization Service (INS) procedures. The INS has access to the Main Jail system files and runs its own inquiries.

**FA-11.** The length of inmate sentences at Todd Road Jail has been increasing due to AB 109 and the effects of Prop 47. Currently the longest sentence at Todd Road is 12 years; the shortest is 30 days.

**FA-12.** The medical facility at Todd Road Jail is equivalent to an outpatient clinic. There are two primary care physicians, four days a week; one full time and one part time psychiatrist; two registered nurses 24/7 plus nurse practitioners. Medications are prescribed and dispensed at the medical facility. The inmates may refuse medication.

**FA-13.** One major objective of the health professionals at Todd Road Jail is to bridge inmates with medical/mental health issues to a supportive environment by connecting them with transition organizations upon their release. This transitional process includes providing five to seven days of medications upon release.

**FA-14.** Todd Road Jail inmate programs include educational/vocational programs, substance abuse treatment and education programs, a re-entry planning program, and religious services. Additionally, the inmates may attend 12 Step program meetings. The Grand Jury learned that the 12 Step program is available to inmates on a limited basis. Where costs are involved, programs are paid for by a fund established through the purchase of phone cards and commissary items by the inmates. The programs are not paid for out of the County General Fund.

**FA-15.** The Classification Units at Todd Road Jail and Main Jail determine the classification of each inmate. The factors determining their classification are based on the criminal history, tendency to violent behavior, need for protective custody, need for administrative segregation, and need for

medical or other special care. The inmates wear colored wrist bands indicating their classification.

Todd Road Jail has become a "de facto mental health facility". The Sheriff's Office applied for and recently received a State grant to build a 64-bed medical facility including treatment for physical and mental illness. The cost of the facility is estimated at $64 million.

(Ref-13)

**FA-16.** A recent policy change made it possible for new graduates from the Sheriff's Academy to be assigned to the jails for a period of three to four years. Prior to this change, the assignment period was six years. Each new officer is assigned a jail training officer who administers further training relating to the Manual of Procedures and indoctrination in skills needed.

### Other Detention Facilities

**FA-17.** The Grand Jury noted that the City of Oxnard installed benches in one holding cell as had been recommended by previous grand juries.

**FA-18.** The City of Oxnard provides maintenance for the police station including the holding cell area; however, it was not very clean. There was toilet paper on the ceiling, dirt in the corners, and cracks in the tile flooring.

**FA-19.** As of January 12, 2016, Simi Valley Police Department's last fire inspection occurred on June 7, 2012. Consequently, the Simi Valley Station does not have a current fire clearance. Fire inspections are required once every two years (Section 1032 Title 15 CCR).

**FA-20.** As of January 12, 2016, Simi Valley Police Department's Station Environmental Health and Medical/Mental Health inspection is overdue. These evaluations must occur annually.

**FA-21.** The Santa Paula Police Department's salaries are on a lower pay scale than the Sheriff's Office and city police departments within the County. As a consequence, they have a high turnover of officers. As of October 19, 2015, there were 28 sworn officers on staff with four to five on duty each shift. The staffing goal is 30 to 40 sworn officers to increase community presence and to staff special units.

**FA-22.** The Santa Paula Police Department's gang unit has been disbanded due to financial constraints. It was reported that "gangs in the area are out-of-control". The staffing shortage has forced the Santa Paula Police Department to be reactive versus proactive in their approach to policing.

**FA-23.** The Santa Paula Police Department's station roof leaks. Maintenance of this facility is provided by the City of Santa Paula.

**FA-24.** The age of the Santa Paula Police Department's station, built in the 1930s, inhibits its modification to allow upgrading their technological capabilities.

**FA-25.** As of January 12, 2016, the Santa Paula Police station's most recent fire inspection occurred on June 19, 2013. Consequently, the station does not have a current fire clearance. Fire inspections are required once every two years.

**FA-26.** As of January 12, 2016, the Santa Paula Police station inspection by the Ventura County Health Department was overdue. These evaluations must occur annually.

**FA-27.** Due to a funding issue, the inoperable internal camera system at the Moorpark Police Station has not been repaired for the past three to four years.

### Juvenile Facilities

**FA-28.** The Ventura Youth Correctional Facility (VYCF) is the only co-ed facility in the State Juvenile Correction System.

The ward's ages range from 13 to 25. A ward's stay at the facility averages two to two and one half years (2-2½). At the time of the inspection, the oldest ward was 23; the youngest approximately 15 or 16.

The wards at VYCF have committed crimes that are classified by the California Penal Code Section 707(b), as serious violent crimes including murder, kidnapping, grand theft, and sex offenses.

(Ref-14)

**FA-29.** The VYCF facility was built in 1962 with 38 housing units. As of November 30, 2015, it housed 237 wards; 26 females, 211 males, with three awaiting their transfer to prison. Only 12 of the 38 housing units are being utilized. Each housing unit has a Youth Correctional Counselor (YCC) on duty 24/7.

**FA-30.** At VYCF wards may participate in an apprenticeship program to help with the unit renovation. These wards earn program credits and are paid for jobs performed. The pay scale is based on "levels" and is determined by such criteria as overall behavior, school participation, and compliance with the institutional rules.

**FA-31.** Part of the responsibility of the VCYF wards is to maintain neatness and cleanliness in their individual cells and surrounding common living areas. One of the YCC's responsibilities is to oversee their compliance. The rooms were unkempt, floors and walls were dirty, windows were covered, and inappropriate pictures were on the walls.

**FA-32.** All VCYF wards are required to work toward receiving a high school diploma or to pass the GED exam. They may attend a high school in the VYCF that is fully-accredited by the Western Association of Schools and Colleges or take online courses to acquire an associate degree. The educational environment is structured to provide separate classes for males and females.

**FA-33.** The Ventura Youth Correctional Facility website states:   "DJJ [Department of Juvenile Justice] considers a high school diploma or GED equivalent a minimum requirement for parole consideration." If the ward's stay at VYCF does not permit completing a formal high school curriculum, they are then "…guided to a General Education Development (GED) program". A recent bill, Senate Bill 172 (Liu) states that the wards are required to complete the curriculum but do not have to sit for the California High School Exit Examination. (Ref-15, Ref-16)

**FA-34.** The wards at the VYCF are directed to participate in the "Impact of Crime on Victims Program" which addresses the effect their crime had on the victims, their families, and the community. (Ref-17)

**FA-35.** At the time of the inspection, November 30, 2015, there were 40 wards at the VYCF in the mental health program, 60 on psychotropic medications, and 18 designated as high-risk for suicide.

**FA-36.** The Ventura County Probation Agency Juvenile Facility (VCPAJF) is a detention facility for those youths, both male and female, going through the court process or those whose charges have been sustained. These youths are considered delinquent, have committed crimes, or have probation violations.

This facility makes heavy use of incentives to help manage the youth's behavior and personal growth. Each of the 90 youths housed at the VCPAJF maintains his/her own personal cell area and by doing so earns incentive credits. Appropriate behavior allows them to participate in special programs and have additional privileges. These incentives also allow the youth to earn a reduction of time served.

**FA-37.** At VCPAJF, programs are offered in trades such as construction, plumbing, electrical wiring, and silk screen printing.

**FA-38.** Per the Juvenile Justice Subsystem website, "The Juvenile Justice (JJ) Ventura County Behavioral Health (VCBH) team has training, expertise, and experience in juvenile forensic mental health services, a unique clinical specialty in the behavioral health system of care.  JJ VCBH staff work within the Juvenile Facility with youth in detention and partner with Probation in both blending mental health treatment within facility operations, and enhancing the facility's rehabilitation milieu.  JJ VCBH staff have clinical skills specifically honed to work with juvenile offenders." (Ref-18)

**FA-39.** The VCPAJF received a grant to develop an eight-hour version of Crisis Intervention Team training for staff. Subsequently, the original program was expanded to 40 hours for all employees. It is expected that the full cycle for training all the staff will take four years.

**FA-40.** At least 75% of the youths housed at the VCPAJF have some type of mental health issue and are either in therapy and/or on medication.

**FA-41.** The VCPAJF has a padded safety room for those individuals who are in crisis. This room has areas that are not visible from the window in the door.

## Findings

**FI-01.** The Grand Jury rated all holding cells in the County as satisfactory or better for the areas reviewed with the exception of:

- The Oxnard Police holding cell area was dirty.

- The Moorpark police station internal camera system was inoperative.

(FA-01, FA-18, FA-27)

**FI-02.** The financial situation of the City of Santa Paula has imposed serious constraints on the functionality and capabilities of its police force which have affected public safety. (FA-21, FA-22, FA-23, FA-24, FA-25, FA-26)

**FI-03.** Consistent with the prior grand jury report, this Grand Jury found that the wards and the staff at the VYCF need to be held accountable for the cleanliness of the living quarters. (FA-31)

**FI-04.** The VCPAJF padded safety room has areas not visible from the window in the door. This poses a safety risk to youths who may do harm to themselves.  (FA-41)

**FI-05.** The Grand Jury found that the efforts of the County law enforcement community have been complicated by the combined effects of Realignment (AB 109) and Prop 47. The effects range from continued pressure on jail population to changes in some offender's behavior by limiting offenses below the Prop 47 felony threshold. These, in turn, may be driving up crime rates in certain categories.  (FA-02, FA-03, FA-05, FA-07, FA-09, FA-11)

**FI-06.** The Grand Jury found that the law enforcement community has an increased awareness of the magnitude of mental health issues to be addressed. While the addition of the medical/mental health facility at Todd Road will be a valuable asset, the facility cannot, by itself, be the complete solution for the issues posed by the Severe Persistent Mental Illness cases in the jails, let alone the other mental health support challenges. The problem clearly requires continued attention to characterize and identify solutions. (FA-04, FA-08, FA-14, FA-15, FA-35, FA-38, FA-39, FA-40)

**FI-07.** The Grand Jury found that, while 12 Step programs are offered in the Ventura County jail system, given the percentage of inmates identified as having substance abuse issues, the opportunity for participation by inmates in these 12 Step meetings needs to increase. (FA-07, FA-08, FA-13, FA-14, FA-15)

**FI-08.** The Grand Jury found that five facilities were noted to have staffing adequacy issues. (FA-04) (Att-01)

## Recommendations

**R-01.** The Grand Jury recommends that the Ventura County Sheriff, working with County Behavioral Health Division, provide the Board of Supervisors with an annual data based assessment of mental health issues in the law enforcement environment. Based on this assessment, the Grand Jury recommends that these agencies expand existing programs (such as the 12 Step programs) and propose additional programs  to both mitigate those issues and to help transition inmates with mental health issues back to "mainstream society". (FI-06, FI-07)

**R-02.** The Grand Jury recommends that the Ventura County Sheriff provide an annual update to the Board of Supervisors on the observable and measurable effects of Prop 47 with recommendations regarding Prop 47 changes that would improve the balance between public safety and the use of resources. (FI-05)

**R-03.** The Grand Jury recommends that the City of Santa Paula create a prioritized list of improvements targeted at restoring the functionality and capabilities of its police force. On a semi-annual basis, the City Council should report progress in funding the items on the list to the public. (FI-02)

**R-04.** The Grand Jury recommends that the City Council of the City of Moorpark authorize the funds to repair the camera system internal to the Moorpark police station. (FI-01)

**R-05.** The Grand Jury recommends that the Ventura County Probation Agency improve the observation of the entire "safety cell" at the Ventura County Probation Agency Juvenile Facility. (FI-04)


## Responses

<u>Responses Required From:</u>

Ventura County Sheriff (FI-05, FI-06) (R-01, R-02)
City Council of the City of Moorpark (FI-01) (R-04)
City Council of the City of Oxnard (FI-01)
City Council of the City of Santa Paula (FI-02) (R-03)


<u>Responses Requested From:</u>

Ventura County Health Agency (FI-06) (R-01)
Ventura County Probation Agency (FI-04) (R-05)

## Commendations

The Grand Jury commends the Sheriff's Office and the Board of Supervisors for their proactive stance and persistence in obtaining funding for the Medical/Mental health facility addition to Todd Road Jail.

The Grand Jury further commends the Sheriff's Office for its work in providing Crisis Intervention Team training for the sworn staff and dispatchers.

## References

**Ref-01.** California Department of Corrections And Rehabilitation, "2011 Public Safety Realignment", December 19, 2013, http://www.cdcr.ca.gov/realignment/docs/realignment-fact-sheet.pdf (accessed  April 12, 2016).

**Ref-02.** Lagos, Marisa, KQED News, The California Report, "Four Years After Realignment, Prisons Are Less Crowded and Crime Rates Are Lower" September 29, 2015, http://ww2.kqed.org/news/2015/09/29/state-prison-realignment-has-achieved-its-goals (accessed April 12, 2016).

**Ref-03.** Lofstrom, Magnus; Martin, Brandon; Public Policy Institute of California, "Public Safety Realignment: Impacts So Far" September, 2015, http://www.ppic.org/main/publication_quick.asp?i=1164 (accessed April 12, 2016).

**Ref-04.** Willer-Allred, Michelle, Ventura County Star, "Ventura County Wrestles With Justice Realignment Plan", September 11, 2012, http://www.vcstar.com/news/crime/351977881.html?d=mobile (accessed April 12, 2016).

**Ref-05.** Couzens, J. Richard; Bigelow, Tricia A. "Felony Sentencing After Realignment August, 2015, http://www.courts.ca.gov/partners/documents/felony_sentencing.pdf (accessed April 12, 2016).

**Ref-06.** Graves, Scott, California Budget and Policy Center, "Spending Remains High Under the Governor's Proposed Budget, Despite Big Drop in Correctional Populations" September 2015, http://calbudgetcenter.org/wp-content/uploads/Corrections-Spending-Remains-High-Under-the-Governor%E2%80%99s-Proposed-Budget-Despite-Big-Drop-in-Correctional-Populations.pdf (accessed April 12, 2016).

**Ref-07.** Harris, Mike, Ventura County Star, "Prop. 47 Might Be Increasing Property Crime, Police Say" March 21, 2015, "http://www.vcstar.com/news/crime/prop-47-might-be-contributing-to-property-crime-police-say-ep-1002864652-347553541.html (accessed April 12, 2016).

Ref-08.    Koseff, Alexei, The Sacramento Bee, "California Prison Population Drops Under Proposition 47, But Public Safety Impact Still Unclear", August 7 2015, http://www.sacbee.com/news/politics-government/capitol-alert/article30455739.html (accessed April 12, 2016).

Ref-09.    Graves, Scott, California Budget and Policy Center, "Governor's Surprisingly Low Estimate of State Savings Faces Scrutiny In The Legislature this Week", March 7, 2016, http://calbudgetcenter.org/blog/governors-surprisingly-low-estimate-state-savings-prop-47-faces-scrutiny-legislature-week/ (accessed April 12, 2016).

Ref-10.    Debbaudt, Marc, ADDA, "Legislature should fix the Harmful Repercussions Created by Prop 47", January 13, 2016, https://www.laadda.com/legislature-should-fix-the-harmful-repercussions-created-by-prop-47/ (accessed April 12, 2016).

Ref-11.    O'Neil, Chris, VC Reporter, "Effects of Prop 47", http://www.vcreporter.com/cms/story/detail/the_effects_of_prop_47/13 153/ (accessed April 12, 2016).

Ref-12.    Ventura County Health Care Agency Behavioral Health Department Crisis Intervention Team " About the CIT program", http://www.venturacountycit.org/about.html (accessed April 12, 2016).

Ref-13.    Von Quednow, Cindy, Ventura County Star, "Changing Jail Dynamics Pose Challenges    for    Classification    Unit"    September    6,    2014, http://www.vcstar.com/news/local/ventura/changing-jail-dynamics-pose-challenges-for-classification-unit-ep-599311228-351251471.html (accessed May 5, 2016).

Ref-14.    California Legislative Information System, Welfare and Institutions Code, "Sections 675-714", http://www.leginfo.ca.gov/cgi-bin/displaycode?section=wic&group=00001-01000&file=675-714 (accessed April 12, 2016).

Ref-15.    California Department of Corrections and Rehabilitation, "Division of Juvenile Justice", http://www.cdcr.ca.gov/Juvenile_Justice/ (accessed April 12, 2016).

Ref-16.    California Legislative Information, "SB 172: high school exit examination: suspension", October 7, 2015, https://leginfo.legislature.ca.gov/faces/billNavClient.xhtml?bill_id=2015 20160SB172 (accessed April 12, 2016).

Ref-17.    Department of Justice, Office of Justice Programs; et al. Restorative Justice Fact Sheet, "Victim Impact Class", http://www.courts.ca.gov/documents/VictimImpactClass.pdf (accessed April 12, 2016).

**Ref-18.**   Ventura County Health Care Agency, Behavioral health Department, "Juvenile Justice Subsystem", http://www.vchca.org/behavioral-health/mental-health---youth-family-services/juvenile-justice-subsystem (accessed April 12, 2016).

## Attachments

**Att-01.**   Detention Facility Summary Matrix

## Disclaimer

This report is issued by the 2015-2016 Ventura County Grand Jury. Due to a potential conflict of interest, certain members of this Grand Jury were excused from participating in some aspects in the production of this report.

*Ventura County 2015 – 2016 Grand Jury*                       *Final Report*

## Glossary

| TERM | DEFINITION |
|------|------------|
| 12 Step Program | A set of guiding principles outlining a course of action for recovery from addiction, compulsion, or other behavioral problems |
| AED | Automated External Defibrillator |
| BSCC | Board of State and Community Corrections |
| CIT | Crisis Intervention Team |
| DJJ | Division of Juvenile Justice |
| EVJ | East Valley Jail |
| GED | General Educational Development |
| Grand Jury | 2015-2016 Ventura County Grand Jury |
| INS | Immigration and Naturalization Service |
| JJ | Juvenile Justice |
| P&P | Policies and Procedures |
| Prop 47 | Proposition 47 |
| Sherriff's Office | Ventura County Sheriff's Office |
| SPMI | Severe and  Persistent Mental Illness |
| Supervised release | A realignment created form of court-ordered probation requiring a period of time in the community under the supervision of the Ventura County Sheriff's Office |
| VCBH | Ventura County Behavioral Health |
| VCPAJF | Ventura County Probation Agency Juvenile Facility |
| VYCF | Ventura Youth Correctional Facility |
| Wards | Term used by the State to address underage inmates of the corrections system |
| YCC | Youth Correctional Counselor |
| Youths | Term used by the County to address underage inmates of the corrections system |

Attachment 01

Detention Facility Summary Matrix

## Detention Facilities Inspection Summary

| | Holding Facilities | | | | | | | | | Jail Facilities | | | | |
| | | | | | | | | | | Adult Facilities | | | Juvenile Facilities | |
| | Camarillo | Fillmore | Moorpark | Ojai | Oxnard | Port Hueneme | Santa Paula | Simi Valley | Ventura | East Valley/TO | Main Jail | Todd Road | Juvenile Justice | Corrections Facility |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Policy/Procedures** | | | | | | | | | | | | | | |
| Training for natural disasters | E | S | S | S | S | S | S | E | S | S | S | S | S | S |
| Medical incidents | S | S | S | S | S | S | E | S | S | S | S | S | S | S |
| Crisis intervention | | | | | | | | | | S | S | S | S | S |
| Routine operations procedure | S | S | S | S | S | S | E | S | S | S | S | E | S | S |
| Inmate classification procedure | | | | | | | | | | S | E | S | S | S |
| Inmate request procedure | | | | | | | | | | S | S | S | S | S |
| Grievance procedure | | | | | | | | | | S | S | S | S | S |
| **Physical Facility Observations** | | | | | | | | | | | | | | |
| Capacity (See notes below) | 4 | 7 | 10 | 2 | 75 | 4 | 14 | 25 | 6 | 34 | 823 | 796 | 150# | 600 & |
| Average population/crowding? | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | 10 | 841 | 824 | 90 | 237 |
| Certifications current? | S | S | S | S | S | S | S | S | S | S | S | S | S | S |
| Average detainee stay | | | | | | | | | | 12h | 8m | 2-10 | 60d | 9.5m |
| Cell cleanliness/sanitation | S | S | E | E | N | S | E | E | S | S | S | S | S | N |
| Clothing/personal hygiene | | | | | | | | | | S | S | S | S | S |
| Bedding linens | | | | | | | | | | S | S | S | S | S |
| Toilet accessibility | E | S | S | S | S | S | E | S | S | S | S | S | S | S |
| Shower accessiblity | | | | | | | | | | S | S | E | S | S |
| Bodily fluids cleaners/drainage | S | S | S | S | S | S | S | S | S | | | | | |
| Safety/maintenance | E | E | S | E | N | S | E | S | S | S | S | S | S | N |
| Lighting/environment | | | | | | | | | | E | S | S | S | S |
| Phone accessibility | S | E | E | S | S | S | S | S | S | E | S | S | S | S |
| Food/snacks/water | S | E | S | S | S | S | S | E | S | S | | | | |
| Kitchen cleanliness/adequacy | | | | | | | | | | E | E | S | S | S |
| Food/preparation | | | | | | | | | | S | E | S | S | S |
| First aid/AED, log | S | S | S | S | S | S | S | E | S | S | S | S | S | S |
| Medical infrastructure | | | | | | | | | | S | S | S | S | S |
| Accommodation for restraints | E | S | E | S | S | S | S | S | S | | | | | |
| Exercise/recreation facilities | | | | | | | | | | S | S | S | S | S |
| Appropriate English/Spanish signage | S | S | S | S | S | S | S | S | N | E | S | S | S | S |
| **Other** | | | | | | | | | | | | | | |
| Staff Spanish ability | S | S | S | S | S | S | S | S | S | S | S | S | S | S |
| Staffing adequacy | S | S | S | S | N | N | S | N | N | N | S | S | S | S |
| Inmate programs | | | | | | | | | | E | S | E | E | S |
| **Holding Facility Accom. For Juveniles** | | | | | | | | | | | | | | |
| Appropriate use of restraints | S | E | S | S | S | S | S | E | S | S | | | | |
| Segregation from adults | S | S | S | S | S | S | E | E | S | S | | | | |
| Shouting distance to staff | S | S | S | S | S | S | S | S | S | S | | | | |
| Phone call to parents | S | S | S | S | S | S | S | E | S | S | | | | |
| Pretransfer interview | S | S | E | S | S | S | S | E | S | S | | | | |
| Log | S | S | E | S | S | S | S | S | S | S | | | | |
| Average time held (hrs.) | 0.5 | 1 | 2 | 1 | 1 | 2 | 3 | 2 | 1 | 2 | | | | |

\*: 100 capacity set by staffing level. Facility has 235 beds.
#: 150 capacity set by staffing level. Facility has 435 beds.
&: 600 capacity set by staffing level. Facility has 800 beds.
Capacity for Todd Road, Main Jail, and East Valley set by State of California.

**EXHIBIT 3**



**An Alternative Approach:**

# Treating the Incompetent to Stand Trial

MAC TAYLOR • LEGISLATIVE ANALYST • JANUARY 3, 2012



A N   L A O   R E P O R T

AN LAO REPORT

# EXECUTIVE SUMMARY

*Background.* Under state and federal law, all individuals who face criminal charges must be mentally competent to help in their defense. By definition, an individual who is incompetent to stand trial (IST) lacks the mental competency required to participate in legal proceedings. In California, there is a monthly statewide waitlist that averages between 200 and 300 individuals alleged to have committed felonies whom the courts have deemed mentally incompetent to stand trial. These individuals are waiting for a bed to become available in a state hospital so they can undergo evaluation and receive treatment to restore them to competency. Once at a state hospital, the state spends significant resources to provide treatment for this population—approximately $170 million annually.

*Waitlist Received Courts Attention.* Traditionally, these individuals have waited in county jails before being transferred to state hospitals. A recent state court case has highlighted the legal issues in the long wait times experienced by ISTs and resulted in a recommendation by the courts that IST commitments be transferred to a state hospital within 35 days. However, many ISTs currently wait in jails longer than 35 days. The lack of physical space to house IST commitments combined with the difficulty in staffing key personnel in state hospitals has maintained a steady backlog of IST commitments in county jails. If the state were required to eliminate its waitlist in its entirety, it could face costs of $20 million annually.

*Pilot Program Could Reduce Waitlist.* The Department of Mental Health (DMH) received an appropriation from the Legislature in the amount of $4.3 million in 2007-08 to begin pilot programs to examine alternative approaches to addressing the IST waitlist problem. After several years of delays, the department, working with a private vendor, established a pilot program in San Bernardino County to treat ISTs in the county jail instead of at a state hospital. The nine-month results are promising in regard to the ability of the program to reduce the IST waitlist. Specifically, we find the pilot program provides less incentive for potential malingerers, has greater flexibility to hold down costs, and is able to restore ISTs to competency in a shorter amount of time than the state hospitals. Additionally, the number of referrals from courts into IST treatment has decreased, possibly because treatment in a county jail is less appealing to defendants who may use a claim of incompetency as a defense strategy to keep out of prison.

*Pilot Program Brings Public Sector Savings.* We find expansion of the pilot not only has the potential to reduce the waitlist, but also to significantly decrease costs to the public sector. We estimate the San Bernardino County pilot has resulted in approximately $1.4 million in public sector savings after a nine-month period—providing treatment at a cost of about $70,000 less per IST commitment.

*Expand Pilot Program.* If the Legislature wishes to reduce the waitlist, we recommend that it do so first by expanding the pilot into counties with historically long waitlists. Those counties would be the ones that ordinarily send their IST commitments to Patton and Atascadero state hospitals. Our analysis indicates that such an approach would result in significant savings for the state and counties in the costs of providing services to IST commitments. Furthermore, it would reduce state and county exposure to potential future court involvement from delays in the treatment of ISTs held in county jail longer than recommended by the courts.

A N   L A O   R E P O R T

# INTRODUCTION

Under state and federal law, all individuals who face criminal charges must be mentally competent to help in their defense. By definition, an individual who is IST lacks the mental capacity required to participate in legal proceedings. While a person may be IST because of a mental illness or for other reasons (such as a developmental disability), this report focuses on the former. For individuals who are accused of felonies and who are seriously mentally ill, California generally provides mental health treatment in state hospitals to restore them to competency. At the time this report was prepared, more than 1,000 persons, about 20 percent of the state hospital population, were IST commitments. Due to a myriad of issues in state hospitals, the state has had a waiting list for entry into the state hospitals by ISTs for some time. For various reasons discussed in this report, our analysis finds that it is in the best interest of the state to attempt to reduce its waitlist population in order to provide prompt treatment for these commitments, reduce county costs, and avoid potentially significant future state costs.

In this report we (1) provide an overview of the state process for handling IST commitments, (2) assess the cause of the IST waitlist problem, (3) examine an ongoing pilot project in San Bernardino County to expedite the restoration of ISTs to competency, and (4) present our recommendations for steps to address the waitlist problem.

# BACKGROUND

Below, we describe how persons accused of misdemeanors and felonies are deemed to be ISTs. We also describe how felony IST commitments are restored to competency.

***U.S. Supreme Court Requires Competency.*** The 1960 U.S. Supreme Court decision *Dusky v. United States* found that a defendant must have "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding" and "a rational as well as factual understanding of the proceedings against him." In short, being competent means the defendant both understands the charges against him and has sufficient mental ability to help in his or her own defense. The 1972 U.S. Supreme Court decision *Jackson v. Indiana* found the state violated a criminal defendant's federal constitutional right to due process of law by involuntarily committing an individual for an indefinite amount of time because of his incompetency to stand trial. The U.S. Constitution (as well as the State Constitution) states that no person shall be deprived of life, liberty, or property without due process of the law. In the *Jackson* case, the court ruled that "a person charged by a State with a criminal offense who is committed solely on account of his incapacity to proceed to trial cannot be held for more than the reasonable period of time necessary to determine whether there is a substantial probability that he will attain that capacity in the foreseeable future."

***How Is Incompetency Determined?*** Under state law, when a defendant's mental competency to stand trial is in doubt, the courts must follow a specific competency determination process before the defendant can be brought to trial. Figure 1 (see next page) summarizes this process.

Typically, the process is initiated by defense attorneys reporting their concerns about their clients' mental capacity to the judge. The judge then orders the defendant to undergo an initial evaluation by court-appointed mental health experts, during which time court proceedings

A N   L A O   R E P O R T

are suspended. The court assesses the evaluation, which guides it in deciding whether to hold a competency hearing. If a hearing is ordered, one or two additional experts are appointed by the court to assess the defendant's competency and the defendant has the opportunity to challenge their conclusions during this hearing. Generally, a defendant charged with a violent felony and found *incompetent* to stand trial will be ordered to undergo treatment at a state hospital to be restored to competency.

Judges typically order a community mental health program director or designee to determine the most appropriate treatment facility for IST defendants. The program director is then required to submit a report with findings to the court within 15 days. Defendants charged with misdemeanors are usually provided treatment in a local mental health facility, provided treatment in an outpatient setting, or released with the charges dismissed. Defendants charged with nonviolent, non-sexual felonies are sometimes treated in the community. Those defendants charged with violent and/or sexually violent felony crimes are committed to state hospitals to have competency restored. If there is a bed available in a state hospital for felony defendants, they are transferred from the jail to the state hospital. However, if there is not a bed available, then they are usually put on a statewide waitlist and held in a county jail until a bed becomes available.

***Court Recommendation Increases Pressure for Speedy Transfer From Jail to State Hospitals.*** California law requires that state hospitals admit, examine, and report to the court on the likelihood of competency restoration within 90 days of the defendant's commitment in order to avoid violating the defendant's constitutional right to due process. In a case known as *Freddy Mille v. Los Angeles County*, the Second District Court of Appeal ruled in 2010 that a person determined to be IST must be transferred to a state hospital within a "reasonable amount of time" in order to comply with this 90-day statutory requirement. The court specifically held that the provision of medications alone to mentally ill defendants within the confines of a jail—a common practice—did not legally constitute the kind of treatment efforts that are required to restore someone to mental competency. Thus, the court held, the transfer of such defendants in a timely fashion from jail to a state hospital (or perhaps



**Figure 1**

## IST Commitment Process

Defendant's competency has been questioned by attorney(s).

Defendant is given an evaluation and, if needed, treatment.

Defendant returns to court. If substantial evidence is presented on defendant's incompetency, then a competency hearing is scheduled.

Competency hearing held which includes one or two psychiatrists who testify on their evaluation of the defendant.

If the defendant is found incompetent, community mental health program director is ordered by a court to evaluate the best place to restore competency.

Generally, those accused of **misdemeanors** are handled in an outpatient setting or released.

Generally, those accused of **felonies** wait in county jail to be transferred to a state hospital to receive IST treatment.

IST = Incompetent to stand trial.

AN LAO REPORT

to a community treatment center) is legally required. This legal precedent is binding across the state.

As the result of a series of rulings, the courts have recommended that the transfer of IST defendants from jail to a state hospital be completed in no more than 30 to 35 days. (This would still leave 55 to 60 days for the examination and assessment of competency.) Thus, the *Mille* court case increased the pressure on state hospitals to admit IST commitments promptly and report back to the courts within the required 90-day period.

**The State Hospital Role in Restoring Competency.** The state's five state hospitals—Atascadero, Coalinga, Metropolitan, Napa, and Patton—provide treatment to a combined patient population of over 5,000 (see the nearby box for more information on these facilities). All but Coalinga serve ISTs. State hospitals treat patients under several other commitment classifications, including not guilty by reason of insanity and mentally disordered offenders. Additionally, two psychiatric programs located on the grounds of state prisons at Vacaville and Salinas Valley have a combined inmate patient population of less than 700, however, these programs typically have served only a handful of ISTs. All of these programs are administered by the state DMH. The process for determining which commitments go to which hospital is complicated. However, ISTs from certain counties tend to be transferred to certain state hospitals. For example, Patton State Hospital typically accepts admissions from Kern, Los Angeles, Merced, Orange, Riverside, Santa Barbara, San Bernardino, San Diego, Stanislaus, and Ventura counties.

---

### California's State Hospital System

California is home to five state hospitals and two in-prison psychiatric programs which specialize in treating the mentally ill.

**Atascadero** State Hospital is located in the Central Coast and houses and all-male maximum security forensic patient population. As of July 2011, it housed over 1,000 patients.

**Coalinga** State Hospital is California's newest state hospital. Located in the City of Coalinga, it houses over 700 patients, most of whom are Sexually Violent Predators (SVPs). Coalinga has been reserved for this specific SVP population and does not treat individuals who are incompetent to stand trial.

**Metropolitan** State Hospital houses over 600 patients and is located in the city of Norwalk. Metropolitan does not accept individuals who have a history of escape from a detention center, a charge or conviction of a sex crime, or one convicted of murder.

**Napa** State Hospital, located in the city of Napa, is classified as a low- to moderate-security level state hospital. It housed over 1,000 patients as of July 2011.

**Patton** State Hospital treats approximately 1,500 patients and is primarily a forensic hospital. Located in San Bernardino County, Patton has seen its forensic population grow quickly in the past few years.

**Vacaville** and **Salinas Valley** Psychiatric Programs are not hospitals, but psychiatric programs designated to treat inmates with mental health issues. The Vacaville and Salinas Valley Psychiatric Programs are located inside prisons. Both programs treat less than 700 inmate-patients combined.

Felony IST commitments may suffer from one or more mental illnesses, including schizophrenia and bipolar disorder. Treatment is provided through a combination of medications, therapeutic classes (like art), and counseling. Additionally, specialized units within the state hospitals teach classes on basic court procedures, giving IST commitments the capability of identifying the judge, defense attorneys, and prosecutors. This allows defendants to understand the charges against them and assist in their own defense once they have been restored to competency and proceed to trial.

***California Dedicates Significant Resources to Competency Restoration.*** California dedicates significant resources to the competency restoration process. With an average daily population of 1,000 ISTs and a cost of approximately $450 per day per patient, the state spends approximately $170 million annually on this category of patients. (This estimate does not include any facilities-related costs.) In recent years, several factors have driven up these costs for ISTs and for other categories of patients. For example:

- As a result of enforcement actions brought by the U.S. Department of Justice under the authority of the Civil Rights for Institutionalized Persons Act, the state was required to increase staff-to-patient ratios and expand the services offered to patients in its facilities.

- Increased concerns about security, stemming mainly from acts of violence committed by patients against staff and other patients, have also increased state hospital operating and capital outlay costs. These increased security measures include the installation of new personal alarm systems and the deployment of more security staff on the grounds.

***How Long Does It Take to Restore Competency?*** Once at a state hospital, it takes an average of six to seven months to restore a defendant to competency. Under state law, defendants charged with a felony and committed to state hospitals for competency treatment are not permitted to spend longer than three years or the maximum prison term the court could have sentenced the defendant to serve if they were found guilty of the crime, whichever is shorter. Additionally, time spent at state hospitals can be applied to the sentence of the individual if they are found guilty of a crime after their competency has been restored.

# LIMITED STATE HOSPITAL BEDS HAVE RESULTED IN A SIGNIFICANT IST WAITLIST

The state faces a long wait list due to a shortage of staff and/or psychiatric beds at the hospitals. Therefore, county jails have had to hold IST commitments in county jails longer than the court-recommended 35-day time period. According to data collected by DMH, during 2009-10, defendants waited an average of 68 days, almost double the 35 days recommended by the courts, for transfer from a county jail to a state hospital for evaluation. (This average excludes IST patients headed for Metropolitan State Hospital, for which data are not available.) Figure 2 shows the average county jail wait times for IST commitments by facility. Napa is, on average, accepting patients within the time limits recommended by the courts. (One possible reason for the low average wait time

AN LAO REPORT

for Napa is the relatively lower number of ISTs originating from Northern California counties, which feed into Napa.) The data indicate, however, that almost half of the transfers to Napa are still occurring after 35 days have lapsed. Moreover, IST commitments headed both to Atascadero and Patton are significantly exceeding 35 days. In the case of Patton, it is taking an average of 87 days for ISTs to be transferred from their county jail. Some transfers are taking as long as 162 days after the recommended 35-day limit by the courts.

A total of 1,261 persons were placed on an IST waitlist at some point during 2009-10. Of this group, 923 commitments stayed on the waitlist longer than the recommended 35-day period. Since 2007, the IST waitlist has fluctuated between 200 and 300 persons at any given time. At the time this report was prepared, there were 264 persons on the IST waitlist.

**Costs to Counties From Serving ISTs in County Jails.** Since IST commitments wait in county jail before being transferred to a state hospital, counties pay the cost of their care during that time. Statewide, jails report spending $92 per day on average for all their inmates, with costs for IST patients generally expected to be higher because of their medical needs (average daily costs vary from county to county). As shown in Figure 3, we estimate that counties are spending a combined annual total of at least $3.5 million to hold IST commitments in their jails beyond the 35-day period while they wait for a state hospital bed to become available. (The actual cost is probably more than we have estimated because it does not include IST commitments held at Metropolitan and because the $92 county jail daily rate we assume likely understates the costs to counties for an IST population that typically has high medical needs.) Patton, which had the longest wait times for IST transfers from the county jails it serves, accounted for more than 70 percent of the costs. As shown in

| Figure 2 |  |
| :--- | :--- |
| **Average IST Wait Time Varies Significantly** | |
| *2009-10* | |
| **State Hospital[a]** | **Average Number of Days Until Transfer to State Hospital** |
| Atascadero | 53 |
| Napa | 33 |
| Patton | 87 |
| [a] Data unavailable for Metropolitan State Hospital. IST = Incompetent to stand trial. | |

the figure, delays in IST admissions to Atascadero and Napa resulted in lesser, but still significant, costs to counties.

**Why State Hospital Beds for IST Commitments Are Limited.** The ability of the state hospital system to accept new commitments for ISTs (as well as for certain other categories of patients) is constrained by the physical capacity of these facilities and the state's ability to hire sufficient staff. The DMH has struggled with staffing key personnel classifications, with some state hospitals reporting vacancy rates as high as 40 percent in occupations like staff psychiatrists. The state has aggressively tried to recruit and retain key personnel but has faced challenges in filling positions. The state has used overtime by hospital staff and private contractors to help fill some of the

| Figure 3 |  |
| :--- | :--- |
| **IST Waiting Lists Prove Costly to Counties** | |
| *2009-10 (In Thousands)* | |
| **State Hospital[a]** | **Cost to Counties Due to That Hospital's Waitlist** |
| Atascadero | $648 |
| Napa | 345 |
| Patton | 2,554 |
| **Total** | **$3,545** |
| [a] Data unavailable for Metropolitan State Hospital. IST = Incompetent to stand trial. | |

staffing gap. However, the amount of overtime that staff members can work is limited and the use of contractors has proven to be expensive.

In theory, the state has the option of trying to curb other types of patient admissions to create space for IST commitments. However, the risk to public safety posed by other patient population groups, and requirements imposed as a result of other federal court cases, limit the state's flexibility in its use of state hospital beds. For example, admissions of mentally ill prison inmates to the state hospitals required as a result of the longstanding *Coleman v. Schwarzenegger* case are generally a higher priority for admission than ISTs. The DMH has adopted rules establishing the following priority for admissions of penal code commitments: (1) Sexually Violent Predators, (2) Mentally Disordered Offenders, (3) *Coleman* inmate-patients, (4) Not Guilty by Reason of Insanity, and (5) ISTs. Thus, ISTs are usually the last group to be placed in a state hospital,

having priority only over persons who receive civil commitments to state hospitals under the Lanterman-Petris-Short Act.

As a result of these various constraints, state hospitals have been unable to solve the IST waitlist problem.

***Potential Fiscal Implications for the State.*** If the state were required by the courts to comply immediately with *Mille* to eliminate the backlog of ISTs solely by expanding staff capacity and filling the remaining available beds in the state hospital, it would face ongoing annual costs of about $20 million. The *Mille* case highlights the risk of potential problems that could arise for the state and counties as a result of the continued waitlist for IST admissions to state hospitals. The holding of mentally ill defendants in the jails for a longer period than recommended by the courts creates a risk of claims by some defendants that their due process rights are being violated.

## HOW A SAN BERNARDINO PILOT PROJECT HELPED A COUNTY ADDRESS ITS IST WAITLIST

In 2007-08, the Legislature approved a $4.3 million budget request from DMH for additional funding for a pilot program to test a more efficient and less costly process to restore persons determined to be IST to competency. These monies were intended to provide 40 beds at the county level for one year for competency restoration services in lieu of providing this treatment in state hospitals.

After several years of delay, ultimately only 20 beds were established in San Bernardino County using about $300,000 of the budgeted amount. After conducting a competitive bidding process, DMH entered into a contract with Liberty Healthcare Corporation to establish the new program in that one county. Liberty, a private

provider with experience in California and other states in providing treatment to ISTs and other types of offenders with mental health problems, in turn established a contractual relationship with San Bernardino County to implement this pilot at its county jail beginning in January 2011. Under these agreements, Liberty provides intensive psychiatric treatment, acute stabilization services, and court-mandated services for IST patients. San Bernardino County jail officials provide security and management of the IST population held in the jail, as well as food and medication.

The state pays Liberty $278 per day for these services—much less than the $450 cost per day of a state hospital bed. Using part of these monies, Liberty, in turn, passes through $68 per day per

commitment to the county for various food and housing costs and pays for the medication. Under the terms of its contract with the DMH, Liberty provides services to ISTs in the jail for a maximum of 70 days. At that point, those who have not been restored to competency—typically because their mental health issues are more severe—are transferred to the state hospital system, where their treatment continues. Also, a small portion of those who cannot be restored to competency by Liberty are those who speak languages Liberty is not staffed to handle.

### Data on Liberty's Nine-Month Results

In accordance with the terms of its contract with DMH, Liberty submits monthly progress reports to the DMH outlining the number of patients it treats, the number it transfers to Patton State Hospital, the length of time that each of its IST patients have been in treatment, and specific diagnostic patient information. The data collected for the first nine months of the operation of the program are summarized in Figure 4.

Our analysis indicates that the pilot program has had several important outcomes.

- ***Treatment Starts More Quickly.*** Under the San Bernardino County approach, treatment begins much sooner for felony ISTs. Treatment starts in the jail almost immediately after an IST determination by a judge. As discussed earlier, treatment of felon ISTs ordinarily does not begin until after their transfer to a state hospital, which can often take months.

- ***Treatment Completed More Quickly.*** Under the pilot program, restoration of competency is completed relatively quickly for many ISTs, with an average length of treatment for those who have completed the program (so far) of 54 days. This

compares to six to seven months in the state hospital system.

- ***Treatment Has Been Effective.*** So far, none of the 19 patients brought to competency has returned to an incompetent status once returned to the courts, a sign that the treatment has been effective in allowing them to successfully assist in their defense. (The DMH reports that less than 5 percent of the IST population it restores to competency subsequently returns to its state hospitals.)

- ***The Number of IST Referrals in the County Has Decreased.*** After the IST pilot program began, the number of individuals determined by judges to be ISTs and requiring restoration of competency has noticeably decreased in San Bernardino County.

### Fiscal Effects of the Pilot Program

Our analysis indicates that the San Bernardino County pilot program is resulting in some fiscal benefits both for the county and for the state.

***County Impacts.*** As noted earlier, Liberty is passing through $68 per day per IST commitment received under its state contract to San Bernardino County to pay for food, clothing, and housing of

**Figure 4**

**Initial Outcomes Show Almost Half of Patients Restored to Competency**

*January to September 2011*

| | Number of Patients | Average Days in Treatment |
|---|---|---|
| Fully restored | 19 | 54 |
| In program | 13 | N/A |
| Transferred to Patton | 10 | 81 |
| **Total Admissions** | **42** | **63** |

A N   L A O   R E P O R T

the defendants held in its jail. In addition, Liberty is paying the costs of their medications that, for the county, had historically averaged $14 per day per IST commitment. (As discussed above, by relying on generic medications, Liberty is paying lower costs for medications than the county had for ISTs—about $10 per day.) Based on our conversations with county officials, San Bernardino County is now saving the full amount of the costs it would otherwise incur for holding IST defendants in its jail until their eventual transfer to a state hospital. The county is incurring operating costs for food, clothing, and security for IST defendants who remain at the jail to receive competency restoration from Liberty, but all of these costs are offset by the payments of state monies passed through to them by Liberty.

Thus far, San Bernardino County estimates that it has been able to achieve net savings of more than $5,000 for each IST commitment Liberty treats. Based on the first nine months of the program, during which 42 commitments were under Liberty's care, San Bernardino County thus estimates that it has saved about $200,000. The annual savings to the county would be higher.

**State Impact.** The state has likewise benefitted fiscally because 19 San Bernardino County IST commitments were treated and released without being placed in a state hospital. We estimate that the state thus avoided spending about $1.5 million for their care in the state hospital system. Instead, the state spent close to $300,000 for this group, via funding for the Liberty contract, for net state savings of about $1.2 million.

Other factors might modestly change the net fiscal impact to the state, although they are hard to calculate at this time. For example, there is no way to know at this time what cost impacts are associated with the group of ten IST commitments who received treatment from Liberty but were eventually transferred to Patton. If these individuals subsequently had a shorter stay at Patton because of the treatment they received from Liberty before their transfer, the pilot project would result in some additional savings for the state. If their treatment by Liberty did not reduce their subsequent stay at Patton, the pilot program would in effect result in some added state costs for this group. The DMH does not now collect data that would enable us to determine how their treatment at Liberty is affecting their subsequent stays in the state hospital system, but our analysis suggests they are unlikely to greatly change the overall level of savings the pilot program is providing for the state.

**Public Sector Savings.** The combined savings to both the state and the county bring the total public sector savings from the pilot project to approximately $1.4 million for this group—over $70,000 in savings being achieved for each IST patient directed to Liberty.

### Why Is the Pilot Program Achieving These Results?

Several key factors appear to be behind the programmatic and fiscal benefits that have resulted so far from the pilot program.

- **Less Incentive for Potential Malingering.** The shift in IST restoration of competency treatment from state hospitals to a jail setting may be deterring some offenders from malingering while in treatment. State hospitals regularly assess and attempt to extract malingerers who, after their competency has been restored, feign mental illness to extend their stay and avoid trial and sentencing to jail or prison. The shift of IST competency treatment to a jail setting, where there is less freedom of movement and fewer amenities than a state hospital, may be deterring malingerers.

- ***IST Commitments Less Appealing to Defendants.*** The shift in IST restoration of competency treatment from state hospitals to a jail setting appears to be deterring defendants from seeking such commitments. As noted earlier, the number of defendants in San Bernardino County determined by judges to be ISTs has declined. One reason for this may be that defendants are using a claim of incompetency less often as a defense strategy to keep out of prison. This may be because defendants perceive time in jail to be less desirable than in a state hospital.

- ***Private Provider Given Greater Flexibility to Hold Down Costs.*** The privatization of the services for ISTs is keeping costs low by allowing the contractor to use clinical resources in a more flexible and targeted way than is possible in a state hospital setting. For example, Liberty is able to pay its contract psychiatrists based on the specific number of hours of patient care they provide to IST commitments. State hospitals, which are subject to standard, federally required staffing requirements and labor agreements, do not have the same degree of flexibility. Liberty's cost to ensure the safety of its personnel are also lower than for state hospitals because its treatment program operates in a jail setting, which already provides a high level of security. Additionally, Liberty uniformly uses generic medications for IST commitments to hold down its drug costs.

# LAO RECOMMENDATIONS FOR REDUCING THE IST WAITLIST

As noted in this report, the state faces significant legal risks because of state court rulings in the *Mille* case. Also, counties are incurring significant costs for IST commitments being held in county jails for a longer period than recommended by the courts. However, the approach the state has used in the past to reduce the waitlist of ISTs being held in county jails—expanding the staffing and capacity of the state hospital system—would likely be expensive and problematic because of ongoing staffing shortages and other problems.

If the Legislature concludes that additional action is needed to reduce the IST waitlist, we recommend the Legislature do so by expanding the San Bernardino County pilot program. Providing treatment to IST commitments in other county jails with a private contractor, largely along the lines of the San Bernardino County model, would not only result in significantly less public sector costs to provide this treatment (over $70,000 per commitment), but also more timely and potentially more effective services to ISTs.

***Consider Expanding the Liberty Contract.*** If an assessment by DMH based on complete outcome data demonstrates that Liberty is doing a good job of implementing the pilot program, its contract could be extended and expanded to other counties to help reduce the remaining IST waitlist across the state. By extending the existing contract, the state would be able to begin expanding immediately with a provider that is already familiar with California's complex IST commitment and treatment process. Based on our review of state procurement rules, it appears that DMH would be able to extend the current contract for an additional year without having to go through

A N  L A O  R E P O R T

another bid process. In order to significantly reduce the current IST waitlist, we estimate that the state would need to establish approximately 50 to 80 additional beds in county jails, perhaps in up to four 20-bed units around the state besides San Bernardino County, dedicated to IST treatment.

**Expand First in the Feeder Counties for Patton and Atascadero.** An expansion of IST treatment programs in county jails is more likely to succeed if the additional sites are in the right locations. We recommend that any such expansion be focused, at least initially, on the counties feeding IST patients to Patton and Atascadero. Our analysis indicates that counties such as Los Angeles, Kern, and San Diego are prime candidates for expansion. Smaller rural counties are not as good of candidates, in our view, because they tend to have smaller populations of ISTs and smaller waitlists. However, we believe it may be possible, and advantageous, for small or medium-sized counties on a voluntary basis to send their ISTs to another county offering such a program.

# CONCLUSION

As we have discussed in this report, the state is subject to a legal risk if long wait times for transfers to state hospitals by the IST commitment population continue. To the extent the state has the resources, we recommend expanding the pilot program to those counties with a sufficient IST waitlist population. Replicating the success that San Bernardino County has had in restoring defendants to competency more quickly and less expensively could resolve the waitlist issue, ensure due process, and thereby preempt such court action.

A N   L A O   R E P O R T

A N  L A O  R E P O R T

## LAO Publications

This report was prepared by Lishaun Francis, and reviewed by Shawn Martin. The Legislative Analyst's Office (LAO) is a nonpartisan office which provides fiscal and policy information and advice to the Legislature.

To request publications call (916) 445-4656. This report and others, as well as an email subscription service, are available on the LAO's website at www.lao.ca.gov. The LAO is located at 925 L Street, Suite 1000, Sacramento, CA 95814.

**EXHIBIT 4**



Subscribe TODAY!

Submit Your Stuff!

Wednesday, January 18, 2017

What's going

What's going on in your backyard...

      

**Home** | **About Us** | **Advertise** | **Community Calendar** | **Get Publishe**

## San Bernardino County to Expand Jail-Based Restoration of Competency Program Along with Liberty Healthcare

By Paul Andrews
Community Writer
2015-08-31 at 13:05:32

Liberty Healthcare of California, the San Bernardino County Sheriff's Department, and the California Department of State Hospitals are pleased to announce the expansion of the restoration of competency program in San Bernardino County. The program provides intensive jail-based mental health services to felony defendants that the court has found incompetent to stand trial. Restoring competency has historically been done in California's State Hospitals. However, a shortage of beds has hundreds of inmates languishing in jail awaiting a treatment bed. The restoration of competency program, which began as a 20-bed pilot in 2011 between Liberty Healthcare and the San Bernardino County Sheriff's Department, was designed to reduce the waiting list and to provide a full array of treatment services focused on patients who could be restored to competency quickly. Pam Ahlin, Director of the California Department of State Hospitals (CA DSH), which funds the program, states that, "the program is part of our efforts to reduce the waiting lists to zero and provide critical services in a timely fashion. The program is part of a continuum of services from hospital level care, to jail based care, to outpatient care. Each patient is treated in the setting most appropriate to his or her case." CA DSH originally contracted with Liberty healthcare in 2010 to establish the first program of its kind in the county. Liberty Healthcare then enlisted San Bernardino County Sheriff's Department as a host for the program. In 2012, the California Legislative Analyst Office (LAO) studied Liberty's ROC® program and found it not only successful in reducing the number of defendants on state hospital waiting lists, but also effective at restoring competency at a faster rate than state hospitals while saving California taxpayers approximately $70,000 per restored patient. The LAO recommended the expansion of the program. Sheriff John McMahon stated the program "has been a big success for us. It has not only provided needed treatment to mentally ill inmates, it has also resulted in those same inmates spending significantly less time in jail." San Bernardino County Sheriff's Department Deputy Chief Shannon Dicus added that "with the expansion of beds, the program will now be able to help other counties reduce their waiting list." The expanded 76-bed program accepts defendants awaiting treatment from surrounding counties, such as Los Angeles, and is helping to ease waiting lists across the region. Terry Fillman, San Bernardino County Sheriff's Department Health Services Administrator, reports that the treatment is conducted by a full treatment team of psychiatrists, psychologists, nurses, social workers, recreation therapists, and psychiatric technicians. "This is a full service treatment program that has been very effective in restoring competency," he said. Liberty Healthcare Vice President, Ken Carabello, states, "We are very happy to be continuing our partnerships with the San Bernardino County Sheriff's Department and the California Department of State Hospitals. This program shows that effective solutions can be implemented in ways that enhance treatment for patients and removes costly systemic barriers." The expanded jail based competency treatment opened on June 1.

Text Size
aA  aA

| 0 Like | 0 |
|---|---|

Tweet

Share

**0 Comments**          Sort by  Oldest

Add a comment...

Facebook Comments Plugin