BARRETT S. LITT, SBN 45527
blitt@littlaw.com
DAVID S. McLANE, SBN 124952
dmclane@kmbllaw.com
LINDSAY B. BATTLES, SBN 262282
lbattles@kmbllaw.com
KAYE, McLANE, BEDNARSKI & LITT
975 East Green Street
Pasadena, California 91106
Telephone: (626) 844-7600
Facsimile: (626) 844-7670

Brian A. Vogel, No. 167413
Email: brian@bvogel.com
THE LAW OFFICES OF
BRIAN A. VOGEL, PC
770 County Square Drive, Suite 104
Ventura, California 93003
Telephone: (805) 654-0400
Facsimile: (805) 654-0326

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MATTHEW SCOTT, et al., | 2:16-cv-03084-DSF-RAO |
| Plaintiffs, | [Hon. Dale S. Fischer[ |
| vs. | NOTICE OF MOTION AND MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT; [PROPOSED] ORDER; DECLARATIONS; EXHIBITS |
| CALIFORNIA FORENSIC MEDICAL GROUP et al., | |
| Defendants. | Date:       October 5, 2020<br>Time:       1:30 P.M.<br>Place:      Courtroom 7D |

TO DEFENDANTS AND TO THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that, on October 5, 2020 at 1:30 p.m., in Courtroom 7D of the United States District Court for the Central District of California, 350 West 1st Street, Los Angeles, CA, Plaintiffs will, and hereby do, move the Court to preliminarily approve the proposed settlement in this case, and to authorize the mailing and other forms of notice to class members.

This motion is unopposed and is based upon the accompanying Memorandum of Law, the stipulation of all parties to entry of the Proposed Preliminary Approval Order, the Proposed Preliminary Approval Order and exhibits thereto filed concurrently, the files and records in this case, and on such further evidence as may be presented at a hearing on the motion.

DATED: SEPTEMBER 3, 2020          RESPECTFULLY SUBMITTED,

KAYE, MCLANE, BEDNARSKI & LITT, LLP
Law Office Of Brian Vogel

BY: /s/ BARRETT S. LITT
     BARRETT S. LITT
     ATTORNEYS FOR PLAINTIFFS

# TABLE OF CONTENTS

**I.   INTRODUCTION**…………………………………………………………………………**1**

**II.  TERMS OF THE SETTLEMENT** ........................................................**3**

**III. RELEVANT FACTS IN ASSESSING THE REASONABLENESS OF THE SETTLEMENT**………………… .......................................................**5**

**IV. THE STANDARDS FOR ENTRY OF THE PRELIMINARY APPROVAL ORDER HAVE BEEN MET** ................................................**8**

**V.   ATTORNEYS' FEES**………………… ..................................................**16**

    A.  It Is Well-Established That Attorneys' Fees Can Substantially Exceed Damages In Statutory Fee Cases………………………………………   17

    B.  Statutory Fees Are An Appropriate Basis For An Award Of Attorneys' Fees In A Class Action Brought Under Fee-Shifting Statutes, Including Where The Fees Exceed Damages…………………………………   19

**VI. THE SETTLEMENT MEETS ANY HEIGHTENED STANDARD THAT MAY APPLY BECAUSE SETTLEMENT WAS REACHED BEFORE CLASS CERTIFICATION**………………............................................**23**

**VII. PROPOSED SCHEDULE NOTICE, FILING OBJECTIONS AND OPT-OUTS, AND DATE OF FAIRNESS HEARING** ..............................**24**

**VIII. CONCLUSION**……………….. .....................................................**25**

i

1
2

# TABLE OF AUTHORITIES

## Federal Cases

*City of Riverside v. Rivera*,
  477 U.S. 561, 106 S. Ct. 2686, 91 L. Ed. 2d 466 (1986) ..................................... 18

*Cordy v. USS– Posco Indus.*,
  No. 12–553, 2013 WL 4028627 (N.D. Cal. Aug. 1, 2013) .................................. 9

*Cotter v. Lyft, Inc.*,
  176 F. Supp. 3d 930 (N.D. Cal. 2016) .................................................................. 8

*Craft v. Cty. of San Bernardino*,
  624 F. Supp. 2d 1113 (C.D. Cal. 2008) .............................................................. 20

*Donovan v. CSEA Local Union 1000, American Federation of State, County and
  Municipal Employees, AFL-CIO*,
  784 F.2d 98 (2d Cir. 1986) ........................................................................... 16, 21

*Fair Hous. of Marin v. Combs*,
  285 F.3d 899 (9th Cir. 2002) .............................................................................. 19

*Gascho v. Glob. Fitness Holdings, LLC*,
  822 F.3d 269 (6th Cir. 2016) .............................................................................. 21

*Glass v. UBS Fin. Servs., Inc.*,
  2007 WL 221862 (N.D. Cal. Jan.26, 2007) ........................................................ 13

*Hanlon v. Chrysler Corp*,
  150 F.3d 1026 (9th Cir. 1998) ............................................................................. 9

*In In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prod. Liab. Litig.*,
  55 F.3d 768 (3d Cir. 1995) ................................................................................. 20

*In re Bluetooth Headset Prod. Liab. Litig.*,
  654 F.3d 935 (9th Cir. 2011) .............................................................................. 20

*In re High–Tech Emp. Antitrust Litig.*,
  No. 11–CV–02509–LHK, 2014 WL 3917126 (N.D.Cal. Aug. 8, 2014) .......... 8, 9

*In re Home Depot Inc.*,
  931 F.3d 1065 (11th Cir. 2019) ...................................................................21

*In re Nat'l Football League Players' Concussion Injury Litig.*,
  961 F.Supp.2d 708 (E.D. Pa. 2014) ..............................................................9

*In re Tableware Antitrust Litig.*,
  484 F.Supp.2d 1078 (N.D. Cal. 2007) ...........................................................9

*In re Washington Public Power Supply System Securities Litigation*,
  19 F.3d 1291 (9th Cir. 1994) .....................................................................19

*McKibben v. McMahon*,
  2019 WL 1109683 (C.D. Cal. Feb. 28, 2019) ..............................................22

*Moore v. Millenium Acquisitions, LLC*,
  2017 WL 1079753 (E.D. Cal. Mar. 21, 2017) .............................................19

*Morales v. City of San Rafael*,
  96 F.3d 359 (9th Cir. 1996) .......................................................................18

*Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc.*,
  221 F.R.D. 523 (C.D.Cal.2004) ....................................................................8

*Nielson v. Sports Auth.*,
  No. C–11–4724–SBA, 2012 WL 5941614 (N.D. Cal. Nov. 27, 2012) ...........9

*Owner-Operator Indep. Drivers Ass'n, Inc. v. Mayflower Transit, Inc.*,
  659 F. Supp. 2d 1016 (S.D. Ind. 2009) .......................................................21

*Paul, Johnson, Alston & Hunt v. Graulty*,
  886 F.2d 268 (9th Cir. 1989) .....................................................................19

*Prandini v. National Tea Co.*,
  585 F.2d 47, (3d Cir. 1978) ............................................................16, 20, 21

*Quesada v. Thomason*,
  850 F.2d 537 (9th Cir.1988) .......................................................................19

iii

*Rodriguez v. West Publishing Corp.*,
    563 F.3d 948 (9th Cir. 2009) ........................................................................13

*Roes, 1-2 v. SFBSC Mgmt., LLC*,
    No. 17-17079, 2019 WL 6721190 (9th Cir. Dec. 11, 2019) ...............................23

*Sobel v. Hertz Corp.*,
    53 F. Supp. 3d 1319 (D. Nev. 2014)..............................................................20

*Staton v. Boeing Co.*,
    327 F.3d 938 (9th Cir. 2003) .................................................................13, 19

*Torrisi v. Tucson Elec. Power Co.*,
    8 F.3d 1370 (9th Cir.1993) ............................................................................9

*Van Vranken v. Atlantic Richfield Co.*,
    901 F.Supp. 294 (N.D. Cal.1995) ..................................................................13

*Weeks v. Kellogg Co.*,
    No. CV 09-08102 MMM RZX, 2013 WL 6531177 (C.D. Cal. Nov. 23, 2013)..13

*Will v. Michigan Dep't of State Police*,
491 U.S. 58, 109 S. Ct. 2304, 105 L. Ed. 2d 45 (1989) .........................................14

**State Case**
*Laffitte v. Robert Half Internat. Inc.*,
    1 Cal. 5th 480, 376 P.3d 672 (2016)..............................................................20

**Rules**
42 U.S.C. §1988.............................................................................................16, 19
CCP §1542 .........................................................................................................4
California Civil Code § 52.1...............................................................................8, 15
California Civil Code §52.1(i)..........................................................................16, 19
California Government Code §965.5(c) ...................................................................4

**Treatises**
Newberg on Class Actions §13:13 (5th ed.)........................................................11, 13
Newberg on Class Actions §15:93 (5th ed.)........................................................16, 21

## MEMORANDUM OF POINTS & AUTHORITIES

### I.    INTRODUCTION

Plaintiffs are persons charged with crimes who were found incompetent to stand trial ("IST")  by a court in Ventura County.

The settling Defendants are the following persons or entities: Pam Ahlin, former Director of California Department of State Hospitals; Harry Oreol, former Director of Patton State Hospital (collectively State Defendants); MHM Services is DSH's community program director or designee for Ventura County, and is responsible to make written recommendations as to where IST individuals should be placed for treatment; and CFMG, Ventura County's mental health care provider which operates a medical unit inside the Ventura County jail, and is responsible for the treatment of ISTs while in Ventura County custody. Individual defendants associated with CFMG or MHM are to be separately dismissed after final approval of the settlement.

Plaintiffs allege that ISTs were entitled to psychiatric treatment, including restorative treatment (i.e., treatment sufficient to restore them to competency), while incarcerated, and that Plaintiffs, and other similarly situated individuals, went for weeks or months without appropriate mental health treatment while awaiting restorative treatment, and did not receive adequate treatment while awaiting transfer to a designated treatment facility, causing deterioration in their mental health as well as greater lengths of incarceration time than if they had been promptly treated.

Plaintiffs contend that the delays in mental health and restorative mental health treatment by Defendants violated their constitutional and statutory rights to timely restorative mental health treatment by failing to transfer IST individuals in a timely manner to be evaluated, treated and restored to competency to stand trial. Plaintiffs contend, as alleged in paragraphs 52 and 53 of the 4th Amended Complaint, that IST inmates on average were held 131 days in county custody

1

1   without restorative mental health care after being found IST by the superior court.
2   Plaintiffs contend that the failure to transfer inmates to a Jail Based Treatment
3   Center, Community Based Treatment Center, or state hospital, within 28 days of
4   the IST designation, was done with deliberate indifference to their constitutional
5   right to restorative mental health treatment, and violated their rights under the
6   ADA and Rehabilitation Act as the actions of Defendants had a negative disparate
7   impact on Ventura County IST detainees. The failure to provide constitutionally
8   adequate mental health treatment to ISTs rises to the level of deliberate
9   indifference to the ISTs' serious mental health treatment needs under the 14th
10  Amendment and Bane Act. Defendants' actions had a negative disparate impact on
11  ISTs because IST inmates have been denied equal access to the courts, equal
12  statutory pre-trial custody credits, reasonably timely mental health and restorative
13  mental health care, and appropriate conditions of confinement for treatment.
14      Defendants deny all of Plaintiffs' allegations.  Defendants contend that
15  Plaintiffs have not stated valid causes of action against them,  that they exercised
16  their responsibility and authority diligently and in accordance with governing law;
17  that they had been neither deliberately indifferent nor negligent and did not violate
18  Plaintiff ISTs' rights; and in the case of State Defendants, that they are entitled to
19  qualified immunity as to some or all of Plaintiffs' claims. Substantial document
20  discovery was undertaken by both Plaintiffs and Defendants. Discovery was
21  ongoing at the time of the settlement negotiations. In addition to this case, there
22  was a petition for a writ of mandate in state court raising similar issues but
23  statewide, titled *Stiavetti v. Ahlin*, Alameda Co. Sup. Ct. No. RG15779731.
24  Plaintiffs used discovery and expert reports from that case as well as discovery
25  provided in this case.
26      This case has been litigated for several years. In the interest of avoiding
27  expense, delay and inconvenience of further litigation of issues raised in this
28  action, and without any admission of liability by Defendants, the parties reached

agreement on a settlement, subject to the approvals of the State of California and this Court. This settlement was reached after two full days of mediation before the Honorable Irma Gonzalez (Ret.), a former United States District Judge from the Southern District of California, and currently affiliated with Judicial Arbitration and Mediation Services ("JAMS").

## II.    TERMS OF THE SETTLEMENT

The terms of the settlement are set forth in greater detail in the exhibits attached to the Proposed Preliminary Approval Order (specifically in the Settlement Agreement), which exhibits are as follows:

Exhibit A          Settlement Agreement

Exhibit B          Proposed Class Notice

Exhibit C          Claim Form

In summary, the class settlement's basic terms, subject to Court approval, are as follows:

a.      Plaintiffs will file a motion for class certification, which Defendants will not oppose, or the parties, with the Court's permission, will stipulate to such a certification.

b.      Defendants will pay, inclusive of costs in this litigation and class administration fees and costs, $650,000 into a Damages Class Fund, to be paid as follows: State Defendants: $575,000; CFMG: $25,000; MHM: $50,000.

c.      Defendants will pay attorneys' fees, as follows: State Defendants: $550,000; CFMG: $100,000; MHM: $0.

d.      Plaintiffs' claims for injunctive and declaratory relief will be dismissed with prejudice, with the understanding that these issues will be addressed in *Stiavetti v. Ahlin*, either by way of disposition on appeal, or by settlement among the parties therein.

e.      The settlement will include mutual releases, including under

CCP §1542, and dismissal of the case with prejudice.

f.      Interest against State Defendants, if any, will only begin accruing 180 days from the date of final approval of the settlement by the Court pursuant to California Government Code §965.5(c). Interest against MHM and CFMG Defendants, if any, will only begin accruing 30 days from the date of final approval of the settlement by the Court.

g.      Plaintiffs will separately dismiss Taylor Fithian, Paul Adler, MD, Ronald Pollack, and Marcus Lopez with prejudice prior to entry of the Final Order of Approval of Settlement, and as such they will not be parties to the final settlement approved by the Court.  Pam Ahlin, formerly director of California Department of State Hospitals, and Harry Oreol, Director of Patton State Hospital, are affiliated Defendants of the California Department of State Hospitals and Patton State Hospital, and were sued in their individual and official capacities (the latter for injunctive relief).

h.      The formula for distribution of the Remainder of the Class Fund available for distribution to Class Members is based, solely for purposes of this Settlement Agreement, on the number of days that, for purposes of this settlement, are designated as Untreated Days. An "Untreated Day" is defined as days over 28 days of wait time. Twenty-eight days wait time is the time limit to commence restorative mental health treatment to regain competency as ordered in the *Stiavetti* litigation. "Wait time" is defined as the number of days between the date of the commitment order and the date of the Class Member's physical placement in a DHS facility. The 28-day period was chosen by Plaintiffs' Counsel as what they consider to be a reasonable number of days by which an IST person should be delivered for treatment based on the court's use of that standard in *Stiavetti*. Although Defendants dispute *Stiavetti's* conclusion and Plaintiffs' assumption that 28 days is a reasonable number of days by which an IST

should be delivered for treatment, solely for purposes of this settlement Defendants do not object to use that demarcation by Plaintiffs' counsel for the purposes of this Agreement.  The Class Members shall be compensated for each day in excess of the 28 days.

      i.    For purposes of this settlement agreement, each Class Member who makes a timely claim shall receive one point for each Untreated Day. A Class Member's point total is the sum of all their daily points. The total points for each Class Member will then be added together, from which the Class Member's percentage share of the recovery available for distribution can be determined. Because it is anticipated that not all Class Members will make timely claims, and this is a non-reversionary fund, a claiming Class Member's percentage of the Remainder will be determined based on that class member's percentage of the total points for class members who made timely claims. If, for example, there was a total of 2000 points for the aggregated timely claims, and Class Member X had a total of 25 points, and the Remainder was $600,000, Class Member X would receive 1.25% (or .0125) of $600,000 (which is $7500).

## III.    RELEVANT FACTS IN ASSESSING THE REASONABLENESS OF THE SETTLEMENT

Plaintiffs' counsel received extensive document discovery, as well as informal discovery provided for settlement purposes, and reviewed it to determine to what extent, if at all, there existed a pattern of failure to provide timely IST treatment. Several discovery disputes were addressed by the Court. In addition to this case, there was a petition for a writ of mandate in state court raising similar issues but statewide, titled *Stiavetti v. Ahlin*, Alameda Co. Sup. Ct. No. RG15779731. Plaintiffs used discovery and expert reports from that case as well as discovery provided in this case.

Despite substantial litigation over their entitlement to class member data, Plaintiffs ultimately obtained anonymized data from Defendants through informal discovery, provided for settlement purposes only, regarding Class Members' untreated days. They retained statistical experts to analyze untreated days as well as the impact of delays on Class Members' good time credits. Declaration of Barrett S. Litt (hereafter "Litt Dec."), ¶13.

While Plaintiffs alleged that there was a systematic failure to provide timely restorative treatment, or any meaningful mental health treatment, *id.,* ¶14, they also determined that the litigations had substantial risks, including that 1) the uncertainty of class certification due to defense arguments that there were individualized issues and that medical information consent was needed from individual class members to be in the class, 2) other laws governing Defendants' conduct during the IST process may conflict with and undermine Plaintiffs' claims against Defendants, and 3) the individual State Defendants had a viable argument that they were not deliberately indifferent since they had made efforts to decrease the restorative treatment wait times and the failures were due to insufficient funds over which they had not control. While Plaintiffs believed there were strong counter arguments to defeat both of these claims, these risks (echoed by the mediator) were a significant factor in assessing a reasonable settlement. *Id.*, ¶14.

Through formal and informal discovery, Plaintiffs determined that DSH had records that would allow a determination of the number of class members and their wait times, all of which has been denied by Defendants. Their settlement assessment was based on this data and projections based on it regarding the likely final size of the class. Specifically, from data provided by DSH (for settlement purposes only), Plaintiffs determined that there were over 200 class members through early 2019 and that the total class size would not likely exceed 300. Assuming a class size of 300, which is likely on the high end, this meant that the mean recovery if all class members made claims (which experience shows is not

6

the case) would be approximately $2000 per class member, a significant recovery in a jail class action. *Id.*, ¶15.

After two arms-length mediation sessions with the Hon. Irma Gonzalez (Ret), the parties reached a proposed settlement, contingent on this Court's approval. That there was no collusion as evidenced by the extensive discovery, the arms' length mediation process and the fact that the attorneys' fees are highly discounted from what Plaintiffs would seek as their lodestar in a contested fee motion without a cap. *Id.*, ¶16.

The agreed upon attorneys' fees of $650,000, plus certain costs to be drawn from the class fund, were negotiated before Judge Gonzalez only after agreement on the class fund and injunctive relief. Plaintiffs' lodestar using 2019 rates, not 2020 rates that would be used in a contested motion, amounted to over $2 Million or more before the substantial work to come to negotiate the settlement agreement and attachments, and draft relevant class certification and preliminary approval documents. Even if the hours were discounted by 10% for duplication of effort, and the 2019 rates were cut 20%, the lodestar would be approximately $1.5 Million or more when all the work is completed, 2 ½ times above the agreed upon fee. Thus, the fee is a very substantial discount. *Id.*, ¶17.

The proposal for incentive awards was at Class Counsel's initiative, and no discussion or agreement regarding incentive awards occurred with the Named Plaintiffs until the proposed settlement was reached, and the proposed incentive awards to each Named Plaintiff reflects counsel's assessment of the contribution of various individual Class Representatives. While the Class Representatives were not especially active in the litigation, they did (personally and/or through their GALs) step forward at the risk of focusing attention on themselves and, as ISTs, are a vulnerable population. Because the class representatives were not extensively involved, counsel have proposed a modest incentive award of $2500 for each class

representative+ in addition to what they will recover as their share of the Class Damages fund, a figure on the low end of incentive payments. *Id.*, ¶19.

Class Counsel requested bids from three potential administrators. Based on a review of these bids, Class Counsel determined that RG2 provided the best overall service and value.

RG2's bid is attached as Exhibit D. The maximum estimated cost of class administration is $32,000. When added to the proposed $5,000 in incentive awards ($2,500 for each of two named plaintiffs) and the approximately $27,000 for costs, approximately $586,000 or more will be distributed to class member with an average (mean) payout of in the range of $1,950 if all (~300) class members filed claims (which experience shows does not happen, and is even less likely for this IST class). Assuming a fairly high 25% claims rate, the mean recovery is likely several thousand dollars ($7,800), likely higher than minimum statutory damages under California Civil Code §52.1. Plaintiffs' counsel concluded that this settlement compares well with other jail class action settlements. *Id.*, ¶¶ 20-21.

## IV.    THE STANDARDS FOR ENTRY OF THE PRELIMINARY APPROVAL ORDER HAVE BEEN MET

The following from the court in *Cotter v. Lyft, Inc.*, 176 F. Supp. 3d 930, 935 (N.D. Cal. 2016) explains the two-step inquiry for preliminary approval:

> "District courts have interpreted Rule 23(e) to require a two-step process for the approval of class action settlements: 'the Court first determines whether a proposed class action settlement deserves preliminary approval and then, after notice is given to class members, whether final approval is warranted.' " *In re High–Tech Emp. Antitrust Litig.*, No. 11–CV–02509–LHK, 2014 WL 3917126, at *3 (N.D.Cal. Aug. 8, 2014) (quoting *Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc.*, 221 F.R.D. 523, 525 (C.D.Cal.2004)). At the final approval stage, it is well-established that the Court must balance the following non-exhaustive factors to evaluate

the fairness of the proposed settlement: "the strength of the plaintiffs' case; the risk, expense, complexity, and likely duration of further litigation; the risk of maintaining class action status throughout the trial; the amount offered in settlement; the extent of discovery completed and the stage of the proceedings; the experience and views of counsel; the presence of a governmental participant; and the reaction of the class members to the proposed settlement." *Hanlon v. Chrysler Corp,* 150 F.3d at 1026 (9th Cir. 1998) (citing *Torrisi v. Tucson Elec. Power Co.,* 8 F.3d 1370, 1375 (9th Cir.1993)).

It is less clear what factors should guide the Court's evaluation of the proposed settlement at the preliminary approval stage. "Some district courts ... have stated that the relevant inquiry is whether the settlement 'falls within the range of possible approval' or 'within the range of reasonableness.' " *In re High–Tech Emp. Antitrust Litig.,* 2014 WL 3917126, at *3 (quoting *In re Tableware Antitrust Litig.,* 484 F.Supp.2d 1078, 1079 (N.D. Cal. 2007)) (citing *Cordy v. USS– Posco Indus.,* No. 12–553, 2013 WL 4028627, at *3 (N.D. Cal. Aug. 1, 2013)). In determining whether the proposed settlement falls within the range of reasonableness, perhaps the most important factor to consider is "plaintiffs' expected recovery balanced against the value of the settlement offer." *Id.* (quoting *In re Nat'l Football League Players' Concussion Injury Litig.,* 961 F.Supp.2d 708, 714 (E.D. Pa. 2014)); *see also Nielson v. Sports Auth.,* No. C–11–4724–SBA, 2012 WL 5941614, at *6 (N.D. Cal. Nov. 27, 2012). Determining whether the settlement falls in the range of reasonableness also requires evaluating the relative strengths and weaknesses of the plaintiffs' case; it may be reasonable to settle a weak claim for relatively little, while it is not reasonable to settle a strong claim for the same amount. *See In re High–Tech Emp. Antitrust Litig.,* 2014 WL 3917126, at *4.

9

1    The standards for entry of a preliminary approval order have been similarly
2    summarized in *Newberg on Class Actions* as follows:

3         [T]the goal of preliminary approval is for a court to determine
4         whether notice of the proposed settlement should be sent to the class, not to
5         make a final determination of the settlement's fairness. Accordingly, the
6         standard that governs the preliminary approval inquiry is less demanding
7         than the standard that applies at the final approval phase. Some courts go so
8         far as to state that a proposed settlement is 'presumptively reasonable at the
9         preliminary approval stage, and there is an accordingly heavy burden of
10        demonstrating otherwise.' Nevertheless, most courts will not simply
11        "rubber-stamp" a motion for preliminary approval, and review is more than
12        "perfunctory."

13        "Bearing in mind that the primary goal at the preliminary review stage
14        is to ascertain whether notice of the proposed settlement should be sent to
15        the class, courts sometimes define the preliminary approval standard as
16        determining whether there is '"probable cause" to submit the [settlement] to
17        class members and [to] hold a full-scale hearing as to its fairness.' More
18        specifically, courts will grant preliminary approval where the proposed
19        settlement 'is neither illegal nor collusive and is within the range of possible
20        approval.' Courts in most circuits use some variation of this test. The test
21        grew out of a statement in an early version of the *Manual for Complex*
22        *Litigation* calling for approval if 'the proposed settlement appears to be the
23        product of serious, informed, non-collusive negotiations, has no obvious
24        deficiencies, does not improperly grant preferential treatment to class
25        representatives or segments of the class, and falls within the range of
26        possible [judicial] approval.' Many courts continue to utilize that phrasing of
27        the test.

28        …

10

1       "The general test—holding that a settlement will be preliminarily

2   approved if it 'is neither illegal nor collusive and is within the range of

3   possible approval'—contains both procedural and substantive elements. The

4   procedural element focuses on the nature of the settlement negotiations and

5   the possibility of collusion, while the substantive element focuses on the

6   terms of the agreement itself. …".

7   *Newberg on Class Actions* §13:13 (5th ed.) (footnote references omitted).

8       An additional guide, although it only formally applies in the context of a

9   final approval, is Rule 23(e)(2)'s enumeration of final settlement factors – "(A) the

10  class representatives and class counsel have adequately represented the class; (B)

11  the proposal was negotiated at arm's length; (C) the relief provided for the class is

12  adequate, taking into account: (i) the costs, risks, and delay of trial and appeal; (ii)

13  the effectiveness of any proposed method of distributing relief to the class,

14  including the method of processing class-member claims; (iii) the terms of any

15  proposed award of attorney's fees, including timing of payment; and (iv) any

16  agreement required to be identified under Rule 23(e)(3); and (D) the proposal

17  treats class members equitably relative to each other."

18      Applying the factors for preliminary approval, this case qualifies. The

19  following facts are uncontested or stipulated to in the parties' accompanying

20  stipulation for purposes of the settlement and pleadings related to it:

21      1.  The settlement terms were negotiated at arm's-length with the

22          assistance of an experienced mediator and jurist, now retired Judge

23          Irma Gonzalez, after two full days of in-person mediation. Litt Dec.

24          ¶16.

25      2.  This case was litigated extensively and vigorously. Plaintiffs

26          conducted extensive written discovery, and several discovery disputes

27          were addressed by the court. Plaintiffs also gathered substantial

28          evidence, including expert reports, from the *Stiavetti* litigation, which

11

informed their analysis of the issues in the case. Despite substantial litigation over their entitlement to class member data, Plaintiffs ultimately obtained anonymized data from Defendants regarding class members' untreated days to facilitate settlement of the case, which allowed them to determine the average days delay for the putative class members. They retained statistical experts to analyze untreated days as well as the impact of delays on class members' good time credits. Litt Dec., ¶¶13-14.

3. There were arm's-length negotiations and no collusion, as evidenced by the extensive discovery and mediation process. (See Litt Dec. ¶16)

4. The proposed settlement provides a slight benefit to the Class Representatives; $2500 in addition to their class member formula award. While the Class Representatives were not active in the litigation, they did (personally and/or through their GALs) step forward at the risk of focusing attention on themselves and, as ISTs, are a vulnerable population. Litt Dec. ¶19. The proposal for incentive awards was at class counsel's initiative, and no discussion or agreement regarding incentive awards occurred with the Named Plaintiffs until the proposed settlement was reached. The proposed incentive awards to each Named Plaintiff reflects counsel's assessment that they should receive some measure of additional compensation given the risk taken by them and the considerable recovery (in the thousands of dollars) expected for the average claimant. Litt Dec. ¶18-19.

5. Plaintiffs proposal for $2500 for each of the two Class Representatives, Matthew Scott and Omar Mojica, satisfies the considerations in determining the reasonableness of incentive awards. These figures are well within the range of acceptable incentive

payments to Class Representatives for which the Court has discretion in recognition of work done on behalf of the class and in consideration of the risk undertaken in bringing the action. *See, e.g., Rodriguez v. West Publishing Corp.*, 563 F.3d 948, 958–59 (9th Cir. 2009) (incentive awards are "intended to compensate class representatives for work done on behalf of the class, to make up for financial or reputational risk undertaken in bringing the action, and, sometimes, to recognize their willingness to act as a private attorney general"); *Staton v. Boeing Co.*, 327 F.3d 938, 977 (9th Cir. 2003) (recognizing that service awards to named plaintiffs in a class action are permissible and do not render a settlement unfair or unreasonable). "An incentive award of $5,000 per class representative is in line with other awards approved in this circuit." *Weeks v. Kellogg Co.*, No. CV 09-08102 MMM RZX, 2013 WL 6531177, at *37 (C.D. Cal. Nov. 23, 2013). Substantially larger incentive awards have been approved. *See, e.g., Glass v. UBS Fin. Servs., Inc.,* 2007 WL 221862, at *16 (N.D. Cal. Jan.26, 2007) (approving payments of $25,000 to each named plaintiff); *Van Vranken v. Atlantic Richfield Co.,* 901 F.Supp. 294, 299 (N.D. Cal.1995) (awarding $50,000 to a lead plaintiff). Plaintiffs will more fully brief this issue in connection with the final approval order and address it here only to demonstrate that this is appropriate. The Class Notice will advise class members of this proposed incentive award, thereby allowing them the opportunity to object to it.

6. The recovery for Class Members is substantial, especially when viewed from the perspective of the trial risks. Given the class size of approximately 300, and the class damages fund of $650,000 (of which approximately $600,000 will be available for distribution to Class Members after payment of costs), the minimum recovery per Class

7. Member exceeds $2000. Given that not all Class Members will file claims, the likely mean recovery per claiming Class Member (assuming even a 25% claim rate, which is high for jail class actions even without the added issue of particular mental health challenges) may exceed $8000.

8. The attorneys' fees were negotiated at arm's-length in a full day mediation, and only after damages and injunctive relief were agreed to. Thus, the attorneys' fees agreement did not inform the amount of damages. Because there were statutory attorneys' fees available under Plaintiffs' claims, there was not a necessary tie between the value of the damages recovery and the reasonable value of the statutory fees. Because, based on prior experience, the size of the fees in proportion to the class damages fund may appear to raise concerns (see Litt Dec., ¶¶16-17), this issue is separately discussed in Section V *infra.*

9. This is a particularly favorable result in light of the existence of meaningful risk of loss. The State could not be sued directly in federal court, and Monell bases of liability do not apply to the State because it is not a person under §1983. *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71, 109 S. Ct. 2304, 2312, 105 L. Ed. 2d 45 (1989) ("neither a State nor its officials acting in their official capacities are "persons" under §1983"). Thus, as to the principal entity at issue in the case, the Department of State Hospitals, former director and director at time of the commencement of the lawsuit is Pam Ahlin was the Named Defendant) and Patton State Hospital, director Harry Oreol was the Named Defendant, Plaintiffs would have to prove that these two Defendants were personally deliberately indifferent. This would allow these Defendants to assert that they tried and were unsuccessful to obtain increased bed space for ISTs; they thus had a considerably

14

1    stronger defense than would the State have had if it could have been

2    sued on a *Monell* theory because the State had the resources and made

3    the decision to limit its commitment of funds, thereby resulting in

4    fewer state hospital beds.[1] (Litt Dec. ¶¶ 24-31)

5    Examining what the *Cotter* Court looked to as the most important factor to

6    consider ("plaintiffs' expected recovery balanced against the value of

7    the settlement offer"), the proposed settlement is a fair and reasonable settlement.

8    Leaving aside the risk of loss on liability explained above, it was not at all clear

9    that damages would be recoverable on a class wide basis. Four Thousand Dollars

10   in statutory damages per violation were available if damages were awarded under

11   Civil Code §52.1, (the "Bane Act"). However, the applicability of §52.1 or the

12   Bane Act to claims such as these is hotly disputed, has been the subject of

13   considerable legal debate, and its contours are not yet clearly set. In addition,

14   whether each day is a violation, or this is a onetime violation under the statute, is

15   not currently clear under the case law. Absent statutory damages, class-wide

16   general damages were potentially available for general damages, but that issue is

17   also a disputed one. In the absence of statutory or general damages, and without a

18   settlement, class members would have been left to pursue relatively modest

19   damages claims individually, which would have presented a unique set of

20   challenges given the mental health issues affecting so many class members. An

21   additional factor driving settlement from Plaintiffs' perspective is that, even if

22   Plaintiffs were successful at trial, this case could have spread out over several

23   years litigating individual damages claims and defending a potential appeal.

24   Given all of these factors, it was the judgment of Plaintiffs' counsel that the

25   settlement represents a fair compromise reflecting "plaintiffs' expected recovery

26

27

28

---

[1] Although Plaintiffs' counsel believed they had strong arguments, they recognized there was a substantial risk that Plaintiffs might not prevail, or would only prevail after substantial litigation, including potentially appellate litigation

15

1    balanced against the value of the settlement offer." Accordingly, the proposed

2    settlement is certainly "within the range of possible approval." (*Newberg*, *supra*.)

3    ## V.    ATTORNEYS' FEES

4            While counsel will file a detailed motion for an award of attorneys' fees, to

5    which class members will have the right to object, it is important to address the

6    propriety of the fees in the preliminary approval context in light of the fact that the

7    fees (without costs) are the size of the Class Damages Fund. In the table contained

8    in ¶39 of the Litt Declaration, we summarize the work done to date (through

9    September 2, 2020) in this case, and the hourly rates we would be seeking in the

10   event that this was a normal contested fee case. This table demonstrates that

11   Plaintiffs' counsel have substantially discounted their fees in order to reach a

12   resolution in this case. In ¶¶45-88 of his Declaration and the accompanying

13   exhibits, Mr. Litt, who has been recognized by various courts as an expert on

14   attorneys' fees, supports the rates used based on other civil rights and other fees in

15   this community.

16           The request for fees here is not for a fee award out of the Class Fund, but for

17   a statutory fee under 42 U.S.C. §1988 and Cal. Civil Code §52.1(i).[2] Plaintiffs'

18   counsel will be filing a full attorneys' fee motion, and class members will have the

19   opportunity to object. However, in order to satisfy any concerns the Court may

20

21   _____

22   [2] Although it is immaterial in this context, since the requested fees are well below
     lodestar, such statutory fees include fees on fees in contrast to fees drawn from the Class
23   Fund. *See, e.g., Prandini v. National Tea Co.*, 585 F.2d 47, 53, (3d Cir. 1978) (explaining
     that, because the class action fee request there was for a statutory fee award and not for
24   fees drawn from a common fund, the attorneys were due compensation for the work spent
     litigating the attorneys' fees); *Donovan v. CSEA Local Union 1000, American Federation
25   of State, County and Municipal Employees, AFL-CIO*, 784 F.2d 98, 106 (2d Cir. 1986)
     (allowing for fees-on-fees in a class action fee-shifting case but carefully distinguishing it
26   from common fund cases); *5 Newberg on Class Actions* §15:93 (5th ed.) (Applying the
     lodestar method in common fund cases—Time spent advocating for fees ("fees-on-
27   fees")),

28

16

1  have about the relationship between the size of the class fund and the

2  reasonableness of the maximum fees, Plaintiffs provide rate support in the Litt

3  Declaration and attachments establishing the reasonableness of the attorneys' fees.

4  The agreed-upon maximum attorneys' fee award, subject to Court approval,

5  reflects a substantial discount from what Plaintiffs' counsel would have sought and

6  would reasonably expect to be awarded as statutory attorneys' fees. While the fees,

7  $650,000, are slightly higher than the Class Damages Fund (which is $650,000 less

8  approximately $50,000 in costs), that is not surprising in a civil rights class action

9  where the size of the class and the extent of individual damages was relatively

10  small. The agreed-upon attorneys' fee reflects a substantial discount from what

11  Plaintiffs' counsel would have sought and would reasonably expect to be awarded

12  as statutory attorneys' fees. Litt Dec. ¶16-17.

13  Mr. Litt's Declaration also explains that, based on his prior experience in

14  settling numerous class actions, an additional 50-150 hours (exclusive of class

15  administration) or more will be spent between remaining work, the attorneys' fee

16  motion, dealing with certain class issues or class member inquiries, responses to

17  objections if there are any, and the final approval motion and final approval order,

18  all of which is included in the agreed upon $650,000 fee. Litt Dec. ¶40. It is not

19  possible to be more accurate because of unknown circumstances that may arise,

20  and the varying time needed depending on the existence and state of objections. In

21  addition, because the fee information for the other firms is not fully up to date, the

22  final tally of time will include that.

23   A.   IT IS WELL-ESTABLISHED THAT ATTORNEYS' FEES CAN
24        SUBSTANTIALLY EXCEED DAMAGES IN STATUTORY FEE CASES.

25  Plaintiffs' counsel are very aware that the attorneys' fees here will slightly

26  exceed the class damages fund. In a case without an available statutory fee, where

27  the primary relief is monetary (as opposed to injunctive relief), this disparity would

28  generally be inappropriate. That is not so for statutory fees in cases involving fee

17

shifting statutes. In that circumstance, it is common that statutory fees exceed recovered damages particularly, but not exclusively, where nonpecuniary injunctive relief is involved. The reason is that the public policy behind fee shifting statutes, particularly those involving civil rights, is to make litigation of such claims financially viable regardless of the size of the claim because protection and vindication of civil rights has a societal value beyond the monetary value of the claim. In *City of Riverside v. Rivera*, 477 U.S. 561, 106 S. Ct. 2686, 91 L. Ed. 2d 466 (1986), the Supreme Court affirmed a fee award of $245,456 where plaintiffs received only $33,350 in damages, with no injunctive relief, "[b]ecause damages awards do not reflect fully the public benefit advanced by civil rights litigation, Congress did not intend for fees in civil rights cases, unlike most private law cases, to depend on obtaining substantial monetary relief." *Id.*, 477 U.S. at 575. Congress recognized that the normal contingent fee arrangements made in personal injury cases "would often not encourage lawyers to accept civil rights cases, which frequently involve substantial expenditures of time and effort but produce only small monetary recoveries." *Id.* at 577. "Regardless of the form of relief he actually obtains, a successful civil rights plaintiff often secures important social benefits that are not reflected in nominal or relatively small damages awards." *Id.* at 574. Further, Congress intended that fee awards "be governed by the same standards which prevail in other types of equally complex Federal litigation, such as antitrust cases." *Id.* at 576.

Accordingly, courts in the Ninth Circuit have routinely reiterated these precepts and awarded fees in excess of damages when appropriate. *See, e.g., Morales v. City of San Rafael*, 96 F.3d 359, 365 (9th Cir. 1996), *opinion amended on denial of reh'g,* 108 F.3d 981 (9th Cir. 1997) ("we have repeatedly made it clear that the level of success achieved by a civil rights plaintiff should be measured by more than the amount of damages awarded"; damages verdict was itself "significant…[and] established a deterrent to the City, its law enforcement officials

and others who establish and implement official policies"; overturning $20,000 fee award in case where awarded damages were $17,500); *Quesada v. Thomason,* 850 F.2d 537, 539 (9th Cir.1988) ("court should not reduce lodestars based on relief obtained simply because the amount of damages recovered on a claim was less than the amount requested"); *Fair Hous. of Marin v. Combs*, 285 F.3d 899, 907 (9th Cir. 2002) (upholding statutory attorneys' fee award of $508,606.78 where $24,377 in compensatory damages and $74,400 in punitive damages [total damages of $98,777] were awarded); *Moore v. Millenium Acquisitions, LLC*, 2017 WL 1079753, at *11 (E.D. Cal. Mar. 21, 2017) (awarding $58,961.25 in attorneys' fees and $6,966.78 in litigation expenses where plaintiff received $4000 in statutory damages).

**B.  STATUTORY FEES ARE AN APPROPRIATE BASIS FOR AN AWARD OF ATTORNEYS' FEES IN A CLASS ACTION BROUGHT UNDER FEE-SHIFTING STATUTES, INCLUDING WHERE THE FEES EXCEED DAMAGES.**

This analysis applies in the class action context just as it does for individual plaintiffs. In the Ninth Circuit, a court generally has discretion to use either a percentage of the fund or a lodestar approach in compensating class counsel. In a class action where there is no available statutory attorneys' fee available, the lodestar or percentage method comes from a common fund, but either method can be used to determine the fee. *See, e.g., Paul, Johnson, Alston & Hunt v. Graulty*, 886 F.2d 268, 272 (9th Cir. 1989); *In re Washington Public Power Supply System Securities Litigation*, 19 F.3d 1291, 1295 (9th Cir. 1994).

However, where a statutory fee is available, such as here under 42 U.S.C. §1988 and Cal. Civil Code §52.1(i), a statutory fee award is appropriate independent of the size of the class damages fund. *See, e.g., Staton v. Boeing Co.*, 327 F.3d 938, 972 (9th Cir. 2003) ("in a class action involving both a statutory fee-shifting provision and an actual or putative common fund, the parties may negotiate and settle the amount of statutory fees along with the merits of the case,

1   …[and] the amount of such attorney's fees can be approved if they meet the

2   reasonableness standard when measured against statutory fee principles"); *In re*

3   *Bluetooth Headset Prod. Liab. Litig.*, 654 F.3d 935, 941 (9th Cir. 2011) ("The

4   'lodestar method' is appropriate in class actions brought under fee-shifting statutes

5   (such as federal civil rights, securities, antitrust, copyright, and patent acts)");

6   *Laffitte v. Robert Half Internat. Inc.*, 1 Cal. 5th 480, 489, 376 P.3d 672, 676 (2016)

7   ("Class action litigation can result in an attorney fee award pursuant to a statutory

8   fee shifting provision or through the common fund doctrine"); *Sobel v. Hertz*

9   *Corp.*, 53 F. Supp. 3d 1319, 1326 (D. Nev. 2014) ("the differing purposes

10  behind statutory fee shifting and the common fund doctrine confirm that the

11  lodestar method is the appropriate manner for calculating reasonable

12  attorney's fees" in a class action where a statutory fee is available, but the court

13  may add a risk multiplier in a common fund case); *Craft v. Cty. of San Bernardino*,

14  624 F. Supp. 2d 1113, 1126 (C.D. Cal. 2008) (citing $27 Million total settlement in

15  *Williams v. Block* with both "a statutory fee of $5.5 Million negotiated in

16  connection with a related state court taxpayer's suit for injunctive relief" and "an

17  additional 20% of the remaining class fund ($21.5 Million) in attorney's fees").

18       In *In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prod. Liab. Litig.*, 55

19  F.3d 768, 821 (3d Cir. 1995) (cited favorably in *In re Bluetooth Headset Prod.*

20  *Liab. Litig., supra*), the Court explained that "the lodestar method…[is] the

21  appropriate method in statutory fee shifting cases…[including in class actions.]

22  *Because the lodestar award is de-coupled from the class recovery, the lodestar*

23  *assures counsel undertaking socially beneficial litigation (as legislatively*

24  *identified by the statutory fee shifting provision) an adequate fee irrespective of the*

25  *monetary value of the final relief achieved for the class.*" (Emphasis supplied.)

26  In *Prandini v. Nat'l Tea Co.*, 585 F.2d 47 (3d Cir. 1978), the parties, as here,

27  negotiated an amount for the class damages fund, and a separate amount for

28  attorneys' fees in a Title VII case. The attorneys' fees negotiated were a "ceiling"

subject to court approval. In light of the fact that "any of the $50,000 which is not awarded to plaintiffs' attorneys will not be paid to the plaintiffs to augment their settlement fund," calling the fees a "fund" had "little analytical value" since they were separate from the "damages fund." Because, "unlike a common fund award," the attorneys' fees award would not "reduce the plaintiffs' recovery…[, the] fee award made here may be analyzed on the same terms as a statutory fee award, which the defendant would pay, and which would not in any way affect or reduce the plaintiffs' award." *Id.* at 53. *See also Newberg*, §15.93 (citing *Prandini* and noting "fees that are paid to class counsel for the time they spend pursuing attorney's fees for the underlying case" are compensable in class fee claims based on a statutory fee, in contrast to a pure class fund fee award); *Donovan v. CSEA Local Union 1000, American Federation of State, County and Municipal Employees, AFL-CIO*, 784 F.2d 98, 106 (2d Cir. 1986) (allowing for fees-on-fees in a class action fee-shifting case and carefully distinguishing it from common fund cases, where such fees-on-fees are not appropriate).

Thus, courts have awarded lodestar-based fees independent, and in excess, of the amount of class damages based on fee shifting statutes (or contracts). *See. e.g., Owner-Operator* Indep. *Drivers Ass'n, Inc. v. Mayflower Transit, Inc.*, 659 F. Supp. 2d 1016 (S.D. Ind. 2009) (class action under Truth in Lending statutes where class members received $194,220.98 [236 claims filed out of possible 3200 "potential claimants"]; granting statutory attorneys' fees and costs in the amount of $1,145,671.58 under statutory fee provisions); *Gascho v. Glob. Fitness Holdings, LLC*, 822 F.3d 269, 275–76 (6th Cir. 2016) (in a consumer class action where the "district court also correctly noted that several of the plaintiffs' claims involved fee shifting statutes, … and that the purpose of such statutes is to induce a capable attorney to take on litigation that may not otherwise be economically viable," it was not an abuse of discretion for the court to use a lodestar method of calculating fees of $2.39 Million where the maximum fund value was $15,500,430, but the

1    amount paid class members was $1,593,240); *In re Home Depot Inc.*, 931 F.3d

2    1065, 1078–80 (11th Cir. 2019) (awarding a class attorneys' fee of $15.3

3    million using the lodestar calculation including a multiplier of 1.3, finding that the

4    case was a contractual fee-shifting case, and the constructive common-fund

5    doctrine did not apply).

6          In *McKibben v. McMahon*, 2019 WL 1109683, at *11–15 (C.D. Cal. Feb.

7    28, 2019), a jail class action involving disparate treatment of gay, bi-sexual and

8    transgender inmates in programming and privileges, there was a settlement similar

9    to this (in which one of the class counsel in this case, Barrett S. Litt, was also

10   counsel). There was a settlement for injunctive relief and a damages fund of

11   $818,195.51 exclusive of certain litigation costs and incentive awards. Separately,

12   there was an agreed upon attorneys' fee of $1,100,000, inclusive of certain costs.

13   In approving the attorneys' fee component of the settlement, the Court noted that

14   the "lodestar approach is appropriate because this is a class action brought under

15   fee-shifting statutes"[3] and observed that the "Ninth Circuit noted it has repeatedly

16   made it clear that the level of success achieved by a civil rights plaintiff should be

17   measured by more than the amount of damages awarded." (Citation and internal

18   quotation marks omitted). While, in "a case without an available statutory fee, this

19   disparity would be inappropriate[,]…it is common for statutory fees to exceed

20   recovered damages." Thus, the lodestar method was appropriate even though the

21   statutory fees (discounted, as here) exceeded the damages.[4]

---

26   [3]While the court noted that this was true "where the primary relief sought is injunctive
27   relief," the foregoing authorities establish this is true also for damages cases.

28   [4] The rates used in *McKibben* were 2018 rates whereas the rate used in this fee motion are 2020
     rates. Thus, the *McKibben* rates, although slightly lower than those here, are comparable after
     adjustment for annual increases in fee rates and experience of the attorneys involved.

**VI.   THE SETTLEMENT MEETS ANY HEIGHTENED STANDARD THAT MAY APPLY BECAUSE SETTLEMENT WAS REACHED BEFORE CLASS CERTIFICATION.**

Where "the parties negotiate a settlement agreement before the class has been certified, settlement approval "requires a higher standard of fairness" and 'a more probing inquiry than may normally be required under Rule 23(e).' " *Roes, 1-2 v. SFBSC Mgmt., LLC*, No. 17-17079, 2019 WL 6721190, at *10 (9th Cir. Dec. 11, 2019) (citations omitted). This "higher level of scrutiny" is appropriate to ensure there has been no improper collusion, and the court should focus on such issues as 1) whether counsel receive a "disproportionate distribution of the settlement;" (2) whether there is a clear sailing agreement preventing defendants from arguing the fee is unreasonable, and 3) "when the parties create a reverter that returns unclaimed [funds] to the defendant." *Id.*

In this case, these concerns do not exist. First, although the settlement was reached prior to class certification, Plaintiffs have filed an independent class certification motion, which establishes that this case fits well within Rule 23(b)(3) certification for at least liability, and class-wide damages are resolved by virtue of the settlement; in contrast, there is nothing in the *Roes* opinion indicating that such an independent determination of the propriety of class certification was made. Second, to the extent there is any "disproportion" between the class damages and the fees, Plaintiffs have addressed the propriety of any "disproportion" in light of the availability of statutory fees. There was no indication in *Roes* that the fees sought were statutory fees. Defendants here are not prevented from challenging the reasonableness of the fees if they so choose, and it is clear that the maximum fee is substantially discounted from what would be sought in a normal prevailing party fee motion. Further, no class damages funds revert to Defendants. Finally, there is no suggestion of collusion in light of the foregoing factors and the involvement of a retired district judge in all settlement negotiations.

23

## VII.   PROPOSED SCHEDULE NOTICE, FILING OBJECTIONS AND OPT-OUTS, AND DATE OF FAIRNESS HEARING

The parties propose that, assuming a preliminary approval order issues within two weeks of the hearing on the motion, that the Court set the following dates for notice claim filing, final approval and related dates:

(a) Final class identifying information, to the extent not already provided, will be provided to the Class no later than _____, 2020;

(b) ___ [three weeks later], 2020: Text message, emailing and first-class mail notice (for those for whom email addresses and mobile phone numbers are unavailable);

(c) ___ [20 days later], 2020: Notice by regular mail to all class members who were initially notified by electronic means only (those who received notice by email and text) and who have not yet submitted claim forms along with the explanation that they were sent such electronic notice but this notice is being sent as well because they did not file a claim or exclude themselves from the settlement;

(d) _____ [six weeks after above date]: Filing of Plaintiffs' Motion for Award of Attorneys' Fees and Costs;

(e) _____, 2020: Deadline to file Class Members' Objections to any aspect of the Settlement (including Plaintiffs' Motion for Award of Attorneys' Fees and Costs): Must be postmarked or received by that date;

(f) ___ [same], 2020: Deadline to opt-out: Must be postmarked or received by that date;

(g) ___ [same], 2020: Deadline to file class claims: Must be postmarked or received by that date;

24

1        (h) ___ [4 weeks later], 2020: Deadline to file Opposition or Reply to

2           Objections (including to objections to award of attorneys' fees and

3           costs);

4        (i) ___ [same], 2020: Deadline to file proposed final approval order and

5           motion for final approval of settlement;

6        (j) ___ [six weeks later], 2020: Final Approval hearing.

7     In the event that the class notice is not communicated through text message,

8 email and regular mail by _____, the subsequent dates contained herein will be

9 deferred for the number of additional days before such notice occurs without the

10 need for additional Court approval. However, the Court must approve any change

11 of the date of the Final Approval Hearing.

12 **VIII. CONCLUSION**

13     For the foregoing reasons, Plaintiffs ask that the Court preliminarily approve

14 the settlement, and sign the proposed Preliminary Approval Order (with any

15 revisions the Court deems necessary). That Order contains dates that have been

16 worked out among the parties. They assume that the order will be entered by ____,

17 2020. If it is later, the dates may need to be modified to allow sufficient time to

18 follow the schedule.

19  DATED: September 3, 2020     Respectfully submitted,

20

21                      KAYE, McLANE, BEDNARSKI & LITT,   LLP

22                      LAW OFFICE OF BRIAN VOGEL

23                      By: /s/ Barrett S. Litt

24                          Barrett S. Litt

25                          Attorneys for Plaintiffs

26

27

28